IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CHRISTINE FINGER )
)
Plaintiff )
) CIVIL ACTION
v. )
) NO.: 4:22-cv-04205
UNITED AIRLINES, INC. )
)
Defendant )

\---------------------------------

ORAL DEPOSITION OF
CHRISTINE FINGER
SEPTEMBER 7, 2023

\---------------------------------

ORAL DEPOSITION OF CHRISTINE FINGER, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the 7th of September, 2023, from 10:11 a.m. to 4:35 p.m., before Velma C. LaChausse, Shorthand Reporter and Notary Public in and for the State of Texas, reported by machine shorthand, at the law offices of Fisher & Phillips, 910 Louisiana Street, Suite 4000, Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



A P P E A R A N C E S

FOR THE PLAINTIFF:
Mr. H. Julian Frachtman
LAW OFFICES OF H. JULIAN FRACHTMAN
3100 Richmond, Suite 203
Houston, Texas 77098
Phone: (832)499-0611
E-mail: hjfrachtmanlaw@gmail.com

FOR THE DEFENDANT:
Mr. Stephen J. Roppolo
FISHER & PHILLIPS LLP
910 Louisiana Street, Suite 4000
Houston, Texas 77002
Phone: (713)292-0150
E-mail: sroppolo@fisherphillips.com

ALSO PRESENT:
Ms. Ashley Lemon, Frachtman Law Firm



INDEX


| | PAGE |
|---|---|
| Stipulations | 1 |
| Appearances | 2 |
| WITNESS: CHRISTINE FINGER | |
| Examination by Mr. Roppolo | 4 |
| Examination by Mr. Frachtman | 168 |
| Signature and Changes | 201 |
| Reporter's Certificate | 203 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | United Airlines Letter dated 6-28-19 | 11 |
| 2 | Letter by Christine Finger dated 7-15-19 | 16 |
| 3 | Arbitration Transcript 7-29-21 | 21 |
| 4 | Arbitration Opinion and Award | 24 |
| 5 | Transaction Totals | 46 |
| 6 | United Airlines Workers' Compensation Employee Work Status Form | 70 |
| 7 | United Airlines Letter dated 4-19-19 | 77 |
| 8 | United Airlines Letter dated 4-19-19 | 79 |
| 9 | E-mail Correspondence | 119 |
| 10 | United Airlines Inflight Services Flight Attendant LOA Packet | 145 |




PROCEEDINGS
CHRISTINE FINGER,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. ROPPOLO:
Q. Ms. Finger, my name is Steve Roppolo. I represent United Airlines in connection with the lawsuit that you have filed in federal court asserting claims of age discrimination, disability discrimination.
We're here today to take your deposition, to ask you questions. And you understand that you have been sworn under oath. Correct?
**A. Yes, sir.**
Q. All right. You have testified before under oath. Correct?
**A. Yes, sir.**
Q. In a grievance proceeding that the flight attendants union pursued on your behalf. That was something that you testified in -- in the hearing. Correct?
**A. The arbitration hearing?**
Q. Yes.
**A. Yes, sir.**
Q. All right. And in that proceeding, you were also sworn under oath. Correct?

Page 5

**A. Yes, sir.**
Q. All right. So this is going to be similar to that. You know, if you have any questions about any of the inquiries that I make during the course of the deposition, please let me know, and I will rephrase the question. All right?
**A. Okay. Thank you.**
Q. If at any time you would like to take a break and you would like to, you know, stretch your legs or walk down the hall or whatever you would like to do, just let me know and we can do that. Okay?
**A. Thank you.**
Q. The only rule that we will have is that if there is a pending question, we'll ask that you answer the question before we take that break. Okay?
**A. Yes, sir.**
Q. All right. Other than the arbitration hearing in which you testified with respect to the flight attendants union and United Airplanes, have you ever testified before in any proceeding?
**A. In a courtroom or just in a -- this type of situation?**
Q. Either.
**A. Never in a courtroom other than jury duty. And there had been -- a proceeding. Yes, there was a**

Page 6

**lawsuit I had against another person that I was in a deposition.**
Q. All right. And what was that lawsuit about?
**A. It was about jewelry of mine that was missing. It was someone that I dated.**
Q. Okay. And that was a lawsuit that you initiated?
**A. Yes, sir.**
Q. All right. And you sued someone who you believed took your jewelry?
**A. I had given my jewelry -- we had dated, and the gentleman was in possession of my jewelry.**
Q. And he wouldn't give it back?
**A. He would not give it back.**
Q. All right. And so that's why you initiated the lawsuit?
**A. Yes, sir.**
Q. All right. And what was the result of that litigation?
**A. I was paid the amount of the jewelry, and then we pursued -- I -- the finding was that I was due the 40,000 for the jewelry, but then I had a complication with the attorney, so it kind of took off into another lawsuit.**
Q. All right. Was there a separate lawsuit that

Page 7

you just described?
**A. Yes. But I'm under an NDA with that lawsuit.**
Q. All right. And so with respect to the lawsuit, do you know where those lawsuits were filed? What court?
**A. No, sir. I can't recall. Here in Houston, downtown, at the criminal justice building.**
Q. Okay.
**A. Does that make sense?**
Q. Mm-hmm. Did you press any criminal charges against the individual?
**A. No. Civil. And let me -- I need to amend that also.**
Q. Sure.
**A. I filed a lawsuit against a gentleman that was stalking me also, now that I'm thinking of being down there. I did file a lawsuit against him.**
Q. Is that the same person?
**A. No.**
Q. Okay. This is a different person?
**A. Yes, sir.**
Q. All right. So these are two separate lawsuits?
**A. Yes, sir.**
Q. One involving stalking and one involving property?

Page 8

**A. Yes, sir.**
Q. All right. And both of those lawsuits were filed in Harris County?
**A. Yes, sir.**
Q. All right. And you were the plaintiff in each of those lawsuits?
**A. Yes, sir.**
Q. With respect to the stalking lawsuit, what was the result of that? Was there any injunction or judgment against the individual?
**A. Yes, sir. It was a restraining order, and he was fined a certain amount of money, I believe, and then I had no more contact with him. But there was a restraining order assigned to him to stay away.**
Q. And with respect to the stalking circumstance, were there any criminal charges asserted in that situation?
**A. I don't know if it's criminal or civil or -- he was found to be guilty of stalking and trespassing, and I don't know if that's criminal or civil. I don't -- I don't know. It was a long time ago.**
Q. That was going to be my next question -- is that -- when did those lawsuits take place, to your knowledge?
**A. 1998, 2000-something.**

Page 9

Q. And in both of those proceedings --
**A. Excuse me. I take that back. Because I had moved into my new house, so it had to be after 2000. Sorry. 2000 to 2003, something like that, 2004. I'm not sure.**
Q. And in connection with both of those lawsuits, you did take depositions? You gave a deposition?
**A. I gave a deposition in one to the HPD here downtown in the sexual criminal lab department. I didn't ever testify in court because he was found guilty. I was at a court hearing, but I never testified. But I did testify in front of a police officer downtown here, never in the courtroom.**
Q. Well, you sound very clear and concise and very clearheaded. I just want to ask you are you under the influence of any medication that might impact, in any way, your ability to testify today?
**A. No, sir.**
Q. Okay. Are you currently employed?
**A. No, sir.**
Q. Okay. What was the last job that you held?
**A. Flight attendant position with United Airplanes.**
Q. For United?
**A. Yes.**

Page 10

Q. All right. Are you currently married?
**A. No, sir.**
Q. Do you have any source of income, currently?
**A. I do furniture flipping and furniture staging with clients off and on to supplement, interior decorating but, no, not through an employer, no.**
Q. Do you have an independent business that you file taxes with?
**A. I just organized that in -- this is September -- I want to say sometime after my surgeries -- January, February, March -- so I think April or May, I formed a company, Premiere Luxury.**
Q. And this is April --
**A. This year.**
Q. -- of 2023?
**A. Yes, sir. Maybe June.**
Q. And what is the name of the entity?
**A. Premiere Luxury, ROI.**
Q. Prior to your establishing Premiere Luxury, you still did services with respect to furniture for clients?
**A. I would buy furniture and then repair it, flip it, paint it, and clients or friends or neighbors would purchase it after I had. It was kind of a hobby.**
Q. My understanding is that you were separated

Page 11

from United in 2019. Is that correct?
**A. Yes, sir. On June 28th.**
Q. So I'm going to show you what I'm going to mark as Exhibit 1.
(Exhibit No. 1 was marked.)
**A. Thank you.**
Q. (BY MR. ROPPOLO) All right. Exhibit 1 is a letter from United that was sent to you on June 28th via Federal Express. Correct?
**A. Yes, sir.**
Q. And this is a letter indicating to you that you were administratively terminated in accordance with Section 15.E 1 and 2 of the Joint Collective Bargaining Agreement?
**A. Yes, sir.**
Q. All right. The letter is signed by Alita Stansbery. What was Ms. Stansbery's role at the time that you were separated?
**A. I truly do not know. I had not been to the base until I had my return-to-work interview with my supervisor, Dominic Cordova, on May 23rd, prior to attending requal training in Denver where I flew out June 2nd, and I was in the class for the 3rd.**
**As far as I knew, she was just down there doing admin, as she has for years, admin and family**

Page 12

**leave.**
Q. So admin in the context of like a corporate secretary?
**A. Yes, sir.**
Q. So somebody who is kind of pushing papers and kind of organizing, you know, documents for individuals she reports to?
**A. Prior to my leaving, she was handling -- and at one time in 1999 she was handling FMLAs. She was the one doing the paperwork for FMLAs. We had someone at the time that was doing occupational; her name was Terri Kushner, and then it went to Dina Jones.**
**And I truly do not know what Alita's role was other than what she signed, Supervisor Inflight Service, or on my paperwork in my packets, it says Inflight Administrative Secretary.**
Q. So do you know who made the decision to administratively terminate you?
**A. I don't know who made the ultimate decision. I do know that she pursued speaking with Mr. Krabbe as to how they could go forward to terminate me.**
Q. And when you say "she," you mean Ms. Stansbery?
**A. Alita. I'm sorry. Yes.**
Q. Okay. So --
**A. Would you prefer I call her Ms. Stansbery or**

Page 13

**Alita?**

Q. Whichever you prefer.

**A. Okay. Okay.**

Q. We'll call her Alita if that's easier for you.

**A. Okay.**

Q. So you understand that Alita consulted with Mr. -- is it Krabbe?

**A. Yes, sir.**

Q. Okay. And that's spelled K-R-A-B-B-E. Correct?

**A. Yes.**

Q. All right. And Mr. Krabbe is in Chicago. Correct?

**A. Yes, sir.**

Q. Alita worked here in Houston?

**A. At our Houston Inflight Base, yes, sir, at the airport.**

Q. And so how do you know that Alita reached out to Mr. Krabbe as part of this process?

**A. Because in some of the production -- which I'd like to put on record here that, you know, I had medical issues in December and January, as I think you knew, and I had a problem with a gallbladder leak and was in ER surgery and collapsed lung and everything else. And we had a deposition -- my discovery -- excuse me.**

Page 14

**My discovery was due; we asked for a two-week continuance because of my hospital complications.**

**I need to ask for a little bit of leniency and some patience and a little bit of grace today because, as of last week, I did not know that there were 1589 pages that we did not have. Now, where that breakdown came, from your firm to my firm to my previous attorney to whatever it was -- Julie and I discussed pushing this deposition back because now I've got 1600 pages, over Labor Day weekend, that I'm trying to navigate through. I'm not a bot; I can't scan it. I'm reading these pages, so I'd like to have -- I'm a little bit back and forth. There's a lot of information that I'm trying to sort through and retain, so I ask for a little bit of latitude and grace, not that my previous employer had that.**

**And I'm not sure, based upon some of the answers I read here in your discovery, that transparency and really trying to find the truth of the facts here seem to be running parallel with their choice of law firm.**

**So I -- there's a lot to unpack. I'm not going to have any more flight attendant cliches, but in one of those documents, there is an e-mail that we were**

Page 15

**given, that on -- I believe it's -- I called in sick for my trip on May 26th -- excuse me -- June 26th when I was back from Denver and had picked up trips. And on June 27th there is an e-mail that Alita wrote to Mr. Krabbe giving him a synopsis of what had happened. I had requal'd, everything, done my training, but then I had submitted a new claim injury, and she wants to know how to proceed forward, and she says, Can we admin term? Please let me know because I want to complete an investigation, get back with Sedgwick. Because Sedgwick wasn't contacting me.**

**So I feel it's very opportunistic that she was on a pursuit to try and get rid of me. I just -- and -- and there was no response from Mr. Krabbe, so either a phone call was made or e-mails that we don't have or blind cc's that we don't have. But she's the one that circled back to him and also to Sabrina Clark; it was within 45 minutes of each other, How do you want us to proceed? What can we do here?**

Q. So your understanding from a document that we produced in this case, that Alita requested guidance from Mr. Krabbe?

**A. Absolutely.**

Q. And the guidance was about, What do we do with respect to this employee? Should there be an

Page 16

administrative termination or what should we do?

**A. Sabrina Clark was, How do we proceed? Alita was, Can we admin term like this (indicating) and her little dog, Toto? There was, to me, the wording -- I think people tell you a lot about themselves by the words we use.**

**And it was -- it was targeting. It was -- I was already in the system; I was already going along, and then all of a sudden it's like, Before we go any further, can we stop it now? Can we admin terminate? Let me know as soon as possible.**

Q. So if Alita is asking Mr. Krabbe if there can be an administrative termination, that presumes that she doesn't have the authority to go ahead and decide that without the input from Mr. Krabbe. Correct?

**A. I would believe that also. Yes.**

Q. And so you wrote a letter, following the separation, to Mr. Krabbe essentially protesting your administrative termination. Correct?

**A. And pleading for my job. Yes, sir.**

Q. And I'm going to show you that right now as well so we can get that in the record. I'm going to mark this as Exhibit 2.

(Exhibit No. 2 was marked.)

Q. (BY MR. ROPPOLO) And, again, I don't need you

to read every word of the document unless you prefer to, but I'm just going to ask you what this document is and what the purpose of it was.

**A. The purpose of the document was -- on July 15th, 2019, I had met with my AFA local president, Elizabeth Hibbard, and Tammy Holt, director of HR, on July 1st in the crew room after the fallout.**

**I found out June 28th that I was terminated, so I called Elizabeth that weekend. She set up an appointment for 8:00 o'clock on Monday, July 1st to meet.**

**In that meeting Tammy and Elizabeth -- which is in our production -- handwrote, Contact Dean Whittaker, Bob Krabbe, who to contact, and write a plea, Crystal Heckman, my base director, as to what happened and let them know that I'm -- you know, want to get this discipline, this termination reversed.**

**So this was my letter to him on my 60th birthday, which is July 15th.**

Q. And did you receive a response from Mr. Krabbe with respect to this letter?

**A. I wrote him, I believe, initially like three or four in this time frame, and I said -- I had to send them from UPS or FedEx, and I said, Please let me know that you've received these. Because they don't go on my**



**personal e-mail; it goes from USPS. And I kept asking him, Did you receive my letter? Did you receive my letter?**

**Within a week's span I got an auto-generated e-mail stating I'm out of the office. Then he wrote, I will be back in touch with you. And then he did say that he's aware of the situation, he did receive my letter. From his understanding, it was being grieved at the local level with AFA and that was the avenue for it and he knows that's not the answer I wanted to hear but wishing me the best.**

Q. So his response was the appropriate process for contesting the administrative termination would be to file a grievance?

**A. At this point. The first step in it is to have a local meeting at your base and discuss it with your management. Why Crystal Heckman was not in that meeting -- because at a level -- at a level -- Step 1 before it goes to a Level 1, I was told that, you know, the director should be there instead of just Tammy Holt as HR, that that was the -- I don't want to say it was an informal meeting, but it was the first step in -- when you've had a disciplinary action, to meet downstairs with Inflight management.**

Q. And once that meeting took place, there -- was



a formal grievance filed following that?

**A. Yes, sir.**

Q. All right. And that grievance, then, led ultimately to the arbitration hearing that we talked about where you were sworn under oath. Correct?

**A. The grievance was filed, but it was never heard because, in all fairness to Elizabeth, July 1st, the day I had my informal hearing with her -- or just our meeting to discuss this, was her first day as AFA local president. So Denny Wheeling, who was our outgoing president, was in the crew room. And Elizabeth, this was her first day as AFA president, so she came in.**

**The grievance was filed by Jarvet Beto who -- I'm not sure all the evidence and what transpired. He evidently filed it under a disciplinary grievance because I had been terminated, and Crystal Heckman wrote back and said, I cannot hear that. Withdraw it with warning. And he did, and therefore we -- Elizabeth pursued it with the MEC in Chicago.**

**But it was really never even heard at a Level 1 at the base.**

Q. But the grievance ultimately did go to an arbitration hearing?

**A. Yes, sir, it did.**

Q. And in that process you were able to testify



about all the things that you felt were relevant as it related to this administrative separation?

**A. Absolutely not.**

Q. You were -- you did not testify about all the things that you were -- you thought were appropriate?

**A. Absolutely not.**

Q. Well, the union direct examined you. Correct?

**A. The union examined me. This was supposed to be a two page -- two-day arbitration. The union examined me. Ms. Cohen and United cross-examined me, and then we went to Bob Krabbe. And I was supposed to come back on the stand, and the union attorney, Mr. Peter Swanson, who had been inserted into this hearing two and a half years into me battling with AFA, who had no knowledge of our JCBA, who is counsel for the commuters -- and I think it's Air Wisconsin or something -- who told me he's never seen our JCBA, but he's going to try and get up to speed four weeks before I have an arbitration hearing.**

**I was then told that I would be put back on the stand after Mr. Krabbe's testimony because I was outraged, and he said that's all we have.**

**I went into a breakroom with him and the other union officials and got very upset that they wouldn't put me back on the stand because I was not**

Page 21

**heard, my testimony was not there. The only papers that AFA presented were my 209 pages that I had luckily screenshot and prepared before they took me out of the system. And the union provided not one page from my employee records because they said they didn't go back this far.**

Q. But you had the opportunity to testify at that hearing. Correct?

**A. Not completely, no.**

Q. Well, you testified essentially for over 100 pages of testimony in the transcript. Correct?

**A. I don't know. As a fact, I don't know.**

Q. Okay. Well, I'm going to show you the transcript of the arbitration hearing so you have an opportunity to see that.

**A. Okay.**

Q. So I'm going to mark this as Exhibit 3.

(Exhibit No. 3 was marked.)

Q. (BY MR. ROPPOLO) And your testimony begins on Page 29 of the transcript after the United counsel and the AFA counsel provided their opening statements to the arbitration board. Correct?

**A. Yes, sir.**

Q. All right. So you began testifying on 29 under a direct examination by Mr. Swanson?

Page 22

**A. Yes, sir.**

Q. All right. And then on Page 102 you began being cross-examined by the United counsel?

**A. Ms. Cohen.**

Q. Correct.

**A. Yes, sir.**

Q. And then you testified until Page 144. Is that correct? When Ms. Hibbard began testifying?

**A. I'm having a hard time seeing where -- okay. On 142? Okay. I'm sorry.**

Q. Sure.

**A. I'm on the bottom -- yes, sir.**

Q. 144 is where Ms. Hibbard began testifying?

**A. Yes, sir.**

Q. And so she testified after that?

**A. Yes, sir.**

Q. And you were present for her testimony. Correct?

**A. Yes, sir.**

Q. All right. And during your testimony, you testified truthfully about the events that occurred with respect to your injury, your follow-up training in June of 2019 that you described in Denver, and other aspects of calls that you made following your injury in connection with the training. Is that correct?

Page 23

**A. Yes, sir.**

Q. All right. And you testified accurately about that information. Correct?

**A. To the best of my knowledge, yes. It's been a while, and, yes, I would tell the truth.**

Q. All right. And what I understand is the case is that the board that decided the grievance with respect to your situation concluded that United had complied with the JCBA. Is that correct?

**A. That was the ultimate finding, but I wouldn't rely too heavily on the arbitration findings of a fight where I literally was set up before I went in the room and the details were not presented.**

**So I had even asked Mr. Berig, who is the arbitration -- arbitrator -- I sent -- within my 90 days of finally getting the ruling, I wrote to have it reversed or listened to again or appealed because I was totally railroaded by AFA.**

Q. So your understanding was -- was that AFA did not competently argue your case? Is that what you are saying?

**A. 100 percent.**

Q. Okay. And you were a member of the AFA. Correct?

**A. Yes, sir. We have to be.**

Page 24

Q. Right. And so this is Exhibit 4.

(Exhibit No. 4 was marked.)

Q. (BY MR. ROPPOLO) This is the decision issued by the arbitration board, the board of adjustment.

**A. System board of adjustments, yes, sir.**

Q. Correct. And this is the decision that was made following the arbitration hearing. Correct?

**A. Yes, sir.**

Q. All right. And you received a copy of this?

**A. I requested copies of the transcripts that I had to fight AFA to get. I don't believe -- I -- I don't recall getting this.**

Q. Okay. So you -- you --

**A. I requested in an e-mail to Maria Torre and Peter Swanson -- our communication had completely broken down. Because after the arbitration, when I was so upset, he said, No, we work on the post brief; that's where we put all your information in here, is during the post brief.**

**That changed. I have to say that two-day arbitration that was supposed to be slated, we were out by 2:00 o'clock even with lunch, and everybody was just going. I believe that Mr. Swanson had COVID. Because he wasn't feeling well. He didn't seem all there and as soon as I left to fly home from Chicago, they shut down**

**the AFA MEC office because of COVID exposure. So I think that it was a perfect storm of a lot of things, but when I tried to remain in contact with him, of course, he's sick, so granted you're not going to bother him.**

**But it was our -- it was his wording to me through e-mails and even referenced on phone conversations that we will work on the post brief together, and he also had mentioned that to my previous employment attorney, Mr. Evan Lange. And Evan Lange was trying to reach out to him through e-mails and getting extremely frustrated and, Can we not even see the transcript for accuracy? And, you know, She said that you're going to work on this postscript, that she will be able to put her story in the post -- post deposition.**

**And it completely broke down, and then he called me at one time with Maria on the phone and said, This is not your case. This is AFA's case, and we'll handle it from here. So I was completely stonewalled and blacked out. I had no communication with my attorney from -- that was on a Thursday, Friday. He had COVID Friday, Saturday, Sunday, Monday, maybe that week; I'm not sure. But I kept asking him, as soon as you feel better, can we go over -- go over this?**

**And if -- there were are two e-mails after**



**the long phone call where he told me that he's been instructed from AFA that this is not my case, this is AFA's case and I would have no other communication with him.**

**I didn't know -- the post briefs were supposed to be due 30 days after my hearing. Then there was an extension. My attorney was writing, what's the new extension? If you're not going to let her help with the post brief, can we see the transcript for accuracy? Nothing to my attorney. No, You're not going to see it; it's all confidential.**

**Then, finally, maybe in -- this was July, so maybe September I wrote Mr. Swanson an e-mail and said, you know, I don't know what I've done to create this communication breakdown between us or why I'm being ostracized and shut down from my union, but whatever you do, could you please present this letter along with your post brief to Mr. Berig? Never heard from him again until March, I want to believe, of 2022. Let's see. Was this in --**

Q. If you look on the first page of the document --

**A. Thank you. Sorry.**

Q. -- it indicates that the -- the --

**A. 2021. Yes, sir.**



Q. -- award was issued on March 17th.

**A. Okay. So I didn't hear from him -- on when? March 17th.**

Q. 2022.

**A. Okay. So that's when I heard from him, maybe on the 18th or 19th, by an e-mail that just said final award, it wasn't in our favor. Sorry. You know, I'm busy now. If you want to talk, we can talk about it at some point. Never heard from him again. I called, never heard from him.**

Q. So I take it you disagree with the decision of the system board of adjustment?

**A. Yes, sir. Vehemently.**

Q. What -- have you had a chance to review the transcript of the hearing?

**A. Yes, sir.**

Q. Okay.

**A. Oh this one? Yes. Not this.**

Q. Yes.

**A. What is this called? The --**

Q. No. That's the award.

**A. The award. Okay.**

Q. That's the decision essentially.

**A. I don't believe I have seen this but I'm --**

Q. You were told, though, that the -- the union



had --

**A. The ruling was for the company, yes, sir.**

Q. Right. The union had lost?

**A. Yes, sir.**

Q. Okay. So with respect to the transcript, when did you receive it and when did you have an opportunity to review it?

**A. It would be sometime after March 17th, 2022, and I had to fight for it. Mr. Roppolo, I'm sorry. I -- I couldn't tell you. Months after. Maybe -- I could look it up for you if you would like me to during a break. I don't -- I cannot remember.**

**It was -- it was a back-and-forth between Maria Torre, and I needed them to send me back my information. I had -- Mr. Swanson had asked for all my original paperwork, even though I had walked in the first day with a suitcase full for Kim Johnson, who was a first time grievant trainee, and Mr. Swanson.**

**And it was -- Maria Torre was extremely combative. We had issues before. In fact, the night before my -- two nights before my arbitration hearing, AFA had scheduled me to come up the day before my arbitration to fly in on that 6:00 o'clock flight, prep all day, and go to arbitration the next day. And I said, no, I'm -- I need to come in the night before**

Page 29

**because this is going to be an all day event, and then I'm going to have...**

**So I used my passes; I still have my passes which, as a flight attendant, to have unlimited travel, that's one of our benefits. That's one of our, Hey, this is one of the best perks of the job. That is the only time since I've been terminated that I have flown on United Airplanes because it's so painful.**

**So I went up the night before. We had words. She told me if I wasn't on that flight the next morning, that my arbitration was called off. And I told her, you know, to threaten me the day before I go into the arbitration I said I didn't ask you -- I'll pay for my own hotel. I'll do everything.**

**And then she rescinded because Peter got involved and was, Let her come in the night before, whatever. So I did.**

Q. So my question is you've reviewed the transcript?

**A. Yes, sir.**

Q. Okay. And you reviewed --

**A. But I don't remember when -- from March till when I received it, it was months.**

Q. It was prior to this deposition?

**A. Yes, sir.**

Page 30

Q. Okay.

**A. Yes, sir.**

Q. So you've reviewed the transcript before this deposition?

**A. Yes, sir.**

Q. All right. And so with respect to your testimony in the transcript, what do you believe that is missing that you believe was important for the board to hear?

**A. It would be a lot but mostly that Mr. Krabbe's position and the union's position is that they don't grieve contractual grievances, and in this testimony -- and I don't know for sure if there's three or four -- Mr. Krabbe testifies that in the last 30 years there's only been actually three or four other contractual grievances. They just don't hear them.**

**So my contention is if you have an employee group and we all have to abide by our contractual agreements, why the union and why the company would not grieve contractual grievances. They only grieve disciplinary grievances.**

**So I believe that I met every requirement that was contractually binding to me with the information that I was given by my known supervisor at the time who was conducting himself as my supervisor,**

Page 31

**who had my return-to-work interview as my supervisor, who gave me my pants option. Because I did have a reasonable accommodation to wear low shoes and orthotics, and I had to wear a brace around my ankle for the lymphedema swelling.**

**This was -- he was aware of it because in 2017, I believe, there was a lawsuit with the Slobin law firm with a flight attendant, Edi Hill [sic], who -- she was reprimanded for wearing her Danskos which we wear inflight during service, and she had had previous surgeries where she had plates and pins and a messed up foot, and these shoes were required for her to perform her job, and somewhere in that year, 2017, her supervisor told her that she could no longer wear those Danskos through the -- through the concourse, only for inflight. And she said they're a requirement from my doctor. And they harassed her so much that she filed a lawsuit against United so that she could wear those shoes comfortably.**

**So when I was in there, I had never worn pants. I always -- I brought pictures. I just wore heals and my dresses. I had never worn pants. So he gave me my pants; he gave me a copy of my JCBA; he went over my return-to-work interview and training, and mostly we just caught up and visited.**

Page 32

**And I wasn't given the proper materials to try -- I was assigned a link which is our iPhone that we use to do all of our onboard transactions and our scheduling. I was coming from a paper manual when I went out on injury. I didn't have proper training on my link. They just handed me one and logged me in. So I did double time and heavy lifting trying even just to catch up on the mechanism that would allow me to do my job.**

**And going to training, I did that; I passed; I qualified. I picked up my trip trades during June. I picked up seven trip trades for July. I built my line. Those were never produced. Getting paid for my trip that I reported an OJI on and then got, you know, taken off that trip, which I got paid for, and then being administratively terminated, I believe they didn't go through the proper steps of levels of discipline and how to address it instead of just coming to me and administratively terminating me.**

Q. So my question is what personal knowledge did you have that you did not testify about in the hearing?

**A. There were 209 pages, Mr. Roppolo, so I would tell you probably there were -- I don't know unless you have it -- 10 to 12 to 15 exhibits out of 209 pages that I had built my case and screenshots and everything and**

Page 33

**the union telling me that they had no personnel record whatsoever. I didn't have -- the union had not one piece of paper that they provided in my hearing. So I didn't have anything that I could present such as we have here today regarding e-mails or the conversations that led up to me going even to training while my mom was in heart surgery and trying to delay it.**

**There was -- it seemed that there was already a bull's-eye on my forehead for a number of reasons that I feel are deeply rooted and a history of being with United Continental, and it wasn't presented. I wasn't presented with -- I wasn't given the opportunity to speak at all after my first direct examination.**

**I left because -- the major issue with this and one of the reasons they've cleaned house is because flight attendants' retirement is based solely on your best five out of the last ten years. Okay? So 2014 was my last year of flying. When I got injured in August of 2014, I believe my W-2 was at $56,000. So I had August, September, October, November, December. I was on track to make $100.000. I was out on injury from 2014, 2016 until I reached my SMMI which is a statutory medical maximum improvement rate through Gallagher Bassett, which was full of delays, denials, changing in treating**

Page 34

**physicians. There were two six-month periods where I did not have a treating physician.**

**The company knew about this. I had talked to Tammy Holt about it, HR. I had talked to Stephanie Francis about it, San Francisco HR, because she had handled a very sensitive subject for me prior to this with relations to someone in upper management and making advancements on me that I did not want and I felt like it could have some fallout to that. Tammy Holt was aware of it. Terri Kushner, who was in occupational, was aware of it. Dina was aware of it. Dominic was aware of my problems. Princess Lott at United was aware of it. Ciara McCloud at Coventry was aware of it and had to literally write a letter and say, Someone become her treating physician.**

**So what you do here -- United's scheme is to delay and deny proper medical treatment because they know a clock is turning and running.**

**This provision even before this happened in 2016 when our JCBA was implemented we were on a six-year return-to-work grace period, and in that JCBA the first thing that was changed -- the first provision they implemented that they moved forward on was that it would be moved from six years to three years, and flight attendants lost our light-duty. Every other group has**

Page 35

**transitional-duty and light-duty. Which is why -- when I went to recruiting in 2016, that was a light-duty that I could be afforded. The JCBA took away for flight attendants, so you were targeting a protected group with something that -- flying is a very physical job, and if I can't do that and I have a sprained ankle or I, you know, have a cast on my arm and I can't quite fly -- unless you can be on the airplane, we have no safe harbor; we have no place to go to. So it immediately cut us off at the knees.**

MR. ROPPOLO: Okay. I'm going to object to your testimony because it's nonresponsive to my question.

**A. Okay.**

Q. (BY MR. ROPPOLO) But I -- let me ask a question.

**A. Okay.**

Q. And then you can answer the question. But you need to answer the question that I ask as opposed to providing your argument about this case. Okay?

**A. Okay.**

Q. Because I'm looking for facts. I'm not looking for argument. I'm looking for facts --

**A. Okay.**

Q. -- that you have personal knowledge of. All

Page 36

right?

**A. Okay.**

Q. Okay. So if you turn to the decision of the board and you look on Page 4, the arbitrator, at the bottom of the page, says, "Generally, the key facts in this matter are undisputed." Do you see that?

**A. Yes, sir.**

Q. All right. Do you agree with that fact? That statement?

**A. No, I don't.**

Q. What was disputed factually about what happened? Not about what decision was made but with respect to what happened to you and what you did, what was disputed?

**A. The dispute was surrounding the word "active," when a flight attendant is deemed active status.**

Q. And that's the contractual interpretation of the JCBA. What I am asking is with respect to what happened to you, what you did, what calls you made, et cetera, were there any disputes about those facts that United believed that you weren't telling the truth?

**A. I don't know how to answer that question because I don't know all the questions that they asked me. I don't think it was brought up. It was kind of railroaded through. I don't -- they just said their --**

**Ms. Cohen's opening statement on her PowerPoint that wouldn't light up was that she was going to show that I did not want to return to work and essentially that I was milking the workers' comp system and, even when they did provide a light-duty job, I wasn't able to do that.**
**But I did not want to return to work. I was more focused on working the system and just reporting an OJI, living off my OJI.**
Q. And who testified that in the hearing?
**A. Ms. Cohen.**
Q. Ms. Cohen -- she's the lawyer, though. She's not testifying about facts?
**A. Okay. It was in opening argument.**
Q. Well, she's arguing.
**A. Okay.**
Q. What I am asking about are the facts that were testified about in the hearing. And the arbitrator says that the key facts in this matter are undisputed. What facts -- actual facts about what happened are something that you believe were disputed? That you disagree with the arbitrator?
**A. That I did -- that I did regain active status and that I had completed my return-to-work three-year leave of absence and become active before the deadline. That deadline was May 26, 2019. I went to training on**



**June 2nd, 2019. So in theory, I had already passed my three-year leave of absence deadline because I was in the return-to-work process since April 5th of 2019.**
**You give -- you're required to give 30 days' notice if you're coming off a leave of absence. My doctor wrote the note on 4-5-19, and you have to go back through fingerprinting, drug testing, new IDs, whatever it is that the FAST team, the flight attendant support team -- gets all your paperwork and gets it to you, and then they assign you a training class.**
**So it took a period of time, and then I was return-to-work, but the word "active" -- they were saying that after I requal'd in Denver on the 16th and passed everything and was allowed to bid -- and because the bids closed at 7:00 o'clock on Monday morning and we finished training on Sunday night, we were told go ahead and bid for your July schedule but it's probably not going to show you as active yet because there's not enough time for the paperwork -- because it is done manually from the instructors -- to go do it.**
Q. So whether you were active or not is something that is the interpretation of the contract?
**A. Yes.**
Q. The union believed that you were active?
**A. (Nodding head.)**



Q. Correct?
**A. Yes, sir.**
Q. You believe that you were active?
**A. Yes, sir.**
Q. But United believed that you were not active and there was a disagreement about the language in the contract?
**A. Yes, sir.**
Q. All right. So following your administrative separation, did you seek employment with any other airline or other employer?
**A. After June 28th?**
Q. Correct.
**A. No, sir. I couldn't get out of bed for four months.**
Q. All right. You received disability payments through 2021?
**A. Yes, sir.**
Q. All right. So you were essentially unable to work for that period of time that you received those disability payments. Correct?
**A. Not necessarily. Because I was trying to get a doctor's release and I -- my injury was on June 16th, 2021, and by the time I got Sedgwick to even take a claim number and assign me a case, I received a letter**



**in July 2nd, so it was 18 days afterwards, and it was four days after being terminated that Sedgwick reported that -- or acknowledged that there was a workers' comp claim.**
**At that point it took me until -- September, October, November, I had a new -- I had two new adjusters, Chelsea Green and Delvin Hill, and one of the problems they have at Sedgwick is that when an old adjuster leaves your file, supposedly the new adjuster can get -- doesn't have any access to any of the notes, knows nothing.**
**Terri Guy had been the initial adjuster who called me and was on vacation and didn't want to take my written statement till after the weekend; however, she did call my doctor on file, Dr. Jim Muntz, prior to me even knowing about it, and prior to even taking my statement, she was calling my doctor. Yet on the form of my occupational injury, it says there's no known medical on here, no treating physician. He was not my workers' comp OJI doctor; Dr. Kevin Varner was, and Dr. Muntz referred me out to Kevin Varner.**
**But until I could get an appointment with Dr. Varner, I had to have an OJI claim number because I'm not going to falsify a claim and go see someone and say it's not work related when it is. That's one of my**


LEXITAS™

Page 41

first problems I had in 2014; I didn't want to falsify it, so I paid for my own surgery through -- anyway.

So I got in to see Kevin Varner in October, so -- June, July, August, September, October -- five months to get a doctor's visit, doctor's appointment. I saw Dr. Varner. He ordered an EMG and an MRI and some physical therapy.

It took I think seven months to get my MRI done, and by this time, when I went back in to see him, he said, Where's the EMG? I have all the e-mails between my new -- let me backtrack.

Delvin Hill could not process this because -- I have e-mails with him -- number one, he hit a barrier because the training department had not reported this as far as Sedgwick knew or as far as his knowledge. I had to keep calling the training department to ask them, Is this written up? Can you please contact Sedgwick?

He then had a problem with the fact that I had Dr. Kevin Varner as my treating physician because Terri Guy was telling him, She can't go to Varner because Varner is not within our network of physicians, which he clearly was because he had helped me with my previous injury with Dr. Klebuc who did the microsurgery.

Page 42

So I had to search, and thank goodness I found a screenshot of the Talispoint. Talispoint is the website you go in that Gallagher Bassett -- excuse me -- that Sedgwick has for within network treating physicians.

And I screenshot it to him, and I said, Yes, he is, and, yes, she already authorized it, and she's telling you that she never did. So it was delays and lies and delays, and once I got in there and he ordered the MRI -- I even went to Methodist once and they didn't have it authorized. It was back and forth, back and forth. So it took me, I think, seven months to get my MRI after I got my -- which was April of 20- -- no -- March -- so March -- what year was this? 19- -- '20 -- in '20. And then COVID hit, and COVID shut everything down.

And I know it's hard to think back now of how that was, but it was a time of unknown and doctors were not taking any -- there was no office visits; there was no PT; there was nothing. From -- I believe on March 3rd he closed his office, and through the summer my PT was off and on open/close. Then, you know, because of memorandums, it was, you know, whatever.

And then I finally got back in October of 2020, and they still didn't have my EMG ordered. And I

Page 43

have all the e-mails where we finally fought to have that done.

And they now are saying that that is part of your 2014 injury, that's not in your 2019, he never ordered that. Then I showed them where they did order it, and then they authorized it, I think, in April of 2021. So almost an entire year and five months that I couldn't get a doctor's release because he wasn't going to release me until he saw this.

And my mother had a massive stroke on April 7th, Easter Sunday, and I was supposed to finally go in to my EMG, I believe, it was that following Tuesday. So the 9th of April, I e-mailed my adjuster from the hospital and said, My mom is having emergency surgery. Can you please cancel the EMG, as a courtesy to them because I had fought so hard to get it. And I said, And I'll let you know.

And there was a three-week period there where my mom was on a ventilator for ten days and -- a lot, and, finally, I wrote her and said, My mom is being dismissed to acute rehab. We can reschedule. And I don't think I got my EMG -- those three weeks were on me and a personal situation delay. I don't think I got it till May.

So it's not that I'm not working. It's not

Page 44

that -- I'm not milking the system. You have third-party administrators who are delaying what your doctors are requesting, and, therefore, you're not getting treatment, and, therefore, they're running you out of time and trying to get you back up here on this three-year mark so that if you weren't already administratively terminated, you would be.

Q. So you indicated that you had the reinjury in -- on June 16th of 2019. Correct? While you were training?

A. I had a new injury on June 16th, 2019. If you ask me in layman terms, I will say I reinjured that same ankle, but it was a new injury. It had a new workers' comp claim number assigned to it.

Q. All right. And so you, I think, testified in your previous answer that you were essentially laid up for four months?

A. During this 2019?

Q. Yes. Following the 2019 injury on June 16th.

A. I could not get in to see a doctor. I didn't get a doctor's appointment until October. I emotionally and mentally was in bed and also hurting. I had a lot of physical pain, but it was mostly I had just been terminated from my 35-year career, and that's not something here that you can just kind of scoff over and

Page 45

**just go, she was a 35-year-career flight attendant. You have no idea the devastation of something like that. I hope you never do. But I couldn't get out of bed.**

Q. So my question is with respect to your ankle or your foot that was injured on June 16th of 2019, when were you able to walk and physically be able to perform the kinds of services that you would have been able to perform on a flight?

**A. Probably -- June 16th. My birthday was July 15th. Probably about by my birthday. Four weeks.**

Q. So about four weeks after the injury you were generally able to --

**A. I could walk.**

Q. -- to walk?

**A. Yes, sir.**

Q. And the -- your doctor had indicated, when you saw him after your injury, that it would be about four to six weeks before you would be able to be recovered from your ankle injury. Correct?

**A. Which doctor are you referring to? I saw Dr. Muntz, and I saw Dr. Kevin Varner.**

Q. Dr. Muntz was the individual who mentioned four to six weeks that you would be laid up?

**A. Yes, sir. On his return-to-work note, I believe, yes, sir.**

Page 46

Q. And you just testified that about four weeks after the injury you were able to walk?

**A. Yes, sir. I could walk.**

Q. Okay. And with respect to the -- the -- the foot injury, after the four weeks that you just described, were you able to physically perform the kinds of services that you would have had to perform had you still been employed by United?

**A. I believe so.**

Q. So I'm going to show you now what's Exhibit 5.

(Exhibit No. 5 was marked.)

Q. (BY MR. ROPPOLO) And this was showed to you in the arbitration hearing as well.

So do you recognize this document?

**A. Yes, sir, I do. It's a pay register from Sedgwick.**

Q. All right. Sedgwick was the occupational injury workers' comp administrator?

**A. The third party, yes, sir.**

Q. And so Sedgwick paid you -- made payments to you beginning in November of 2019. Correct?

**A. According to this, 11-15-2019.**

Q. If you turn to the fifth page -- they go backwards essentially -- it appears that the first payment of $938 was paid to you on November 27th of

Page 47

2019. Does that --

**A. I'm not on your page. I'm sorry. I've got.**

Q. Okay.

**A. 12-18.**

Q. Page -- the fifth page.

**A. Oh. I'm sorry. Sorry.**

Q. The fifth page of the document. The very last page.

**A. Well, that's -- okay. That's -- 11-22, yes, sir.**

Q. Okay. So there is also on the -- I think it's the third to last page, there appear to be payments of $938 that began in September of 2019. Do you see that?

**A. 10-4?**

Q. I'm looking at the -- this is the third to last page of the packet.

**A. Let me just -- let me number the pages real quick. Maybe that will be easier.**

Q. Okay. The last page of the packet appears to be blank, so we can just ignore that one.

**A. My third page is blank.**

Q. Oh, okay. Well --

**A. Do you want to adjust it from yours?**

Q. Yeah. I'm going to give you a -- I apologize for that. Okay. This is Exhibit 5, and this doesn't

Page 48

have a blank page as the third page.

**A. Okay. Sorry.**

Q. So the earliest payment that I see on this chart appears to be September 5th of 2019, which is the second to last page of the document.

**A. I've got -- I've got August 30th.**

Q. Okay. So August 30th is the date on the right, and September 5th is the date on the left?

**A. I'm sorry. Okay. Thank you. Sorry. Yes, sir yes, sir.**

Q. So whichever date that was, that was paid either August 30th or September 5th, one week difference, you started receiving the $938 at that time. Correct?

**A. Yes, sir.**

Q. And were these -- were these payments made weekly or?

**A. Weekly.**

Q. Okay. So you received $937 per week from Sedgwick?

**A. Yes, sir.**

Q. Beginning in September?

**A. I think it's referred to as T-I-B-S, temporary income benefits.**

Q. All right. If you look at the last page of the

Page 49

printed document, it says temporary total disability.
Do you see that?
**A. 102.**
Q. Yes?
**A. Yes, sir.**
Q. And it indicates that the total amount paid for these payments from Sedgwick was $76,514. Do you see that?
**A. For 8-23-2019 to 3-15-2021, yes.**
Q. And so do you disagree with that amount?
**A. I -- I will say -- I don't have my checks. I don't have the stubs. If you're telling me that this is what it is, I've never totaled it up. Based upon this paperwork, I don't disagree with the amount.**
Q. All right. And all of these payments were made after you were administratively separated from United. Correct?
**A. Yes, sir.**
Q. And was this -- were these payments made through 2021 because you were physically unable to work?
**A. It was -- there were ebbs and flows of when I couldn't once I went to -- I had setbacks. I had two setbacks in physical therapy. There were spans throughout COVID where my -- this is an injury that is complex and it has a lot of moving parts to it of the**

Page 50

**dynamics of your foot and ankle and of the nerve damage and when it flares up and when it doesn't. But there were times during COVID that I feel like I physically could have worked, but I could not get a release to go back.**
Q. And during that period you still received the benefit payments from Sedgwick?
**A. Yes. And if I hadn't received benefit, I would have been getting unemployment.**
Q. And is it your understanding that the benefits payments were paid because you were physically unable to work during this period?
**A. I believe it was because the injury was in a treatment phase and we weren't getting the treatment phase, therefore we didn't have any answers as to whether or not I was able to return to work because I had to have my doctor's release.**
Q. So from the period of -- from the time you were injured on June 16th of 2019 through when you stopped receiving payments from Sedgwick on March 15th, 2021, were you able to work at any other employer during that period of time?
**A. Physically capable of working at any other employer?**
Q. Yes.

Page 51

**A. Yes.**
Q. Okay. So you were physically capable of working for another employer, but you still were receiving disability payments from Sedgwick?
**A. It's in our leave of absence policy that you're not allowed to pursue outside employment if you are on any kind of medical leave of absence at United.**
Q. Right. But if you are no longer employed by United, you can obtain whatever job you feel you need to obtain. Correct?
**A. Well, I felt like this was in a reversal stage. I felt like my employment, based upon what Ken Diaz, what the AFA president had told me, that he guarantees I'll have my job back in six months and also Elizabeth Hibbard's telling me that this is going to be going to the grievance in -- this was June. I think they have it once in October. It didn't make it through that SBA, through the NOD, the notice of dispute, and then there was supposed to be another one early February.**
**So, essentially, I was just told you're going to have your job back. Don't worry about this. This is a done deal.**
**So I wasn't pursuing other employment because it was my belief system that I was going to be reinstated, that this just had to go through paperwork.**

Page 52

Q. So you didn't -- because you were pursuing your grievance and the arbitration hearing was in 2021, you didn't apply for any other positions during that period of time until the arbitration decision was issued. Correct?
**A. The arbitration was only pushed back to 2021 because of COVID and a lot of delays, but I never -- in July and August, September, October of 2019, when I was speaking with the union, we had no idea that that was going to be pushed back that far. And there were a lot of issues that I had with the union in trying to get them to even represent me.**
**But, yeah, I had no idea that that was -- it should have been done in February. I should have had my hearing, my arbitration hearing. I believe that my contract was violated in that regard as well, as far as hearings, because if you have something such as termination, they're supposed to be brought before the SBA and the NOD within 30 days.**
Q. So whenever the hearing was held, whether it was held -- it was held in July, but you thought it should have been held earlier. Whenever that was held, you decided not to apply for other employment because you believed you were going to be reinstated at United?
**A. Not just that. Because I had also started**

**having severe pain. I still get severe pain. And I was debilitated through portions of when COVID struck, and trying to find a job during COVID -- if I had gone out and tried to find something, it was very difficult to find a job.**

Q. So you did not apply for any positions through the period of time that you -- you received this award on March 2022?

**A. No, sir.**

Q. Okay. Let me ask the question this way: Have you applied for any job since you were administratively terminated by United?

**A. No. I -- I -- I'm 64 years old. I was 60 years old when I was terminated. Not exactly out there on the -- I have no computer skills. I'm not exactly on the big hiring criteria of what would be a great candidate, and, honestly, my heart is just, if I can't fly, I don't want another job.**

Q. So after you stopped receiving the disability payments from Sedgwick in March of 2021, did you, at that time, apply for unemployment?

**A. No, sir.**

Q. Okay.

**A. I've never applied for unemployment.**

Q. All right. After you stopped receiving these



disability payments, what was the source of any income that you had after March of 2021?

**A. My 401(k).**

Q. Okay.

**A. I have depleted it.**

Q. Do you have any --

**A. Excuse me. I should -- I should qualify that. My 401(k) that I moved into a Roth IRA, my 401(k) from United.**

Q. It converted into --

**A. Yes, sir.**

Q. -- into a Roth?

**A. I took it in 2020. I waited until September or October 2020 to pull it because I truly thought I was going back to work.**

Q. Do you consider yourself retired now?

**A. I consider myself still fighting for my job.**

Q. So you -- despite the fact that you haven't applied for any other positions, you still believe that you would like to work at United again?

**A. Yes, sir.**

Q. And as of right now, do you believe that you are physically capable of working for United?

**A. Yes, sir.**

Q. All right. When was it that you believe that



you were physically capable of working on a flight at United?

**A. Probably sometime during COVID, so that was March through August v. September of 2020, possibly there.**

**And then, like I said, it is a very tenuous injury. I actually just went back to Dr. Klebuc March of this year because I had been in the hospital and that had a complete fallout. I was scheduled to go see him last year in October and then pushed it back because I had to have some surgeries. But I went to go see him because I was having so much difficulty, and we opened up the discussion about having another -- second surgery because the way my nerve was cut, he tried to do minimal in one of the -- horizontal or the vertical, whatever. And we were discussing maybe that -- I contacted his office in August of last year and said I need to make an appointment. I need to come back in and talk to her. September, okay, come in in October, November. And then I had to have -- my surgeries were scheduled, so I thought I'll just wait and push back.**

**After I got out of the hospital for being in bed for seven days and not moving at all, I could barely walk again because my ankle had frozen up and the nerve damage was -- the neuropathy and everything was**



**hurting.**

Q. And when was it that you felt that you recovered from that surgery such that you could actually work at United or anywhere else?

**A. March. Right when COVID was kind of hitting. I'm not sure when everything shut down but February, March, April of 2020.**

Q. All right. So since March, thereabouts, of 2020, you have not had any impact with respect to your foot or your ankle that would impact you from -- preventing from -- you from working for United or any other employer?

**A. I don't understand. I haven't had any impact. What do you mean by that?**

Q. Sure. So following March --

**A. I haven't hurt it?**

Q. Following March of 2020, were there any other surgeries with respect to your ankle or your foot?

**A. No, sir.**

Q. Okay. And so you were able to walk after March of 2020. Correct?

**A. I was able to walk prior to March of 2020, but you're asking me if I felt I could physically meet all the demands and emergency situations onboard a flight. Yes, sir.**

Page 57

Q. You could?
**A. After March. I could walk before that.**
Q. Of 2020?
**A. Of 2019.**
Q. So what I'm asking is -- you mentioned in March of 2020 when COVID hit --
**A. Yes, sir.**
Q. That's when you believe that you were physically capable of performing the services that --
**A. Yes, sir.**
Q. -- of a flight attendant?
**A. Yes, sir.**
Q. All right. Did, at any point, because you were -- you knew that you were able to do that work, did you contact Sedgwick and say I really can't receive these disability payments anymore because I'm no longer disabled?
**A. I thought once you -- that is not my place to say; that is my doctor's place to say, and that is for them to get me to my proper treatments and medical advice and to be able to see what exactly was going on. I had an X-ray by Dr. Muntz on June 8 -- excuse me -- June 19th, I believe, of 2019 because I already had an appointment with him, and then my mom had heart surgery the next day. So at March, whatever -- COVID,**

Page 58

**everything had shut down. It wasn't in my realm of anything can occur at this time because I was told at that point Sedgwick wasn't making appointments. Everything was just -- you couldn't even reach your adjusters. Everybody was at home. I don't know how to -- how to get out of the system. I certainly don't want to be in this workers' comp system ever again in my life.**
Q. So from March of 2020 until March of 2021, you continue to receive disability payments --
**A. Yes, sir.**
Q. -- from Sedgwick?
**A. Yes, sir.**
Q. And that is -- you continued to receive those disability payments even though you believed you were able to work during that 12-month period?
**A. I believed I was physically capable of performing the duties of a flight attendant.**
Q. And you did not contact Sedgwick to let them know that. Correct?
**A. I spoke with my adjuster, Delvin, all the time and told him I was doing well and good and, you know, physical therapy. Just get me to my doctor to get a medical release. I can't get back to flying without a full release from a physician.**

Page 59

Q. Do you know whether Sedgwick told you anything about why you would stop receiving disability payments in 2021 of March?
**A. Because I had reached -- I have a letter that they said I had reached my statutory maximum medical improvement after I received my EMG but -- however, they said they'd stop it, but it was disputed, and they started it again because I had not -- Dr. Varner had not gotten the results of that test.**
Q. Okay. You testified, in the arbitration hearing, that you were physically capable of performing services as a flight attendant. Correct?
**A. At what point in time?**
Q. In July of 2021, when this transcript was taken, this arbitration hearing, you indicated that you were prepared to go back to United and work again as a flight attendant for them?
**A. In July of 2021?**
Q. Yes.
**A. Yes.**
Q. Do you have any documentation indicating the income that you received from the furniture work that you have done?
**A. I have some signed just, you know, purchased a table or did furniture for a friend, or they would pay**

Page 60

**me cash because I'd go over and consult for them or do -- decorate a Christmas tree or, you know -- nothing -- no documents, no contracts of a business. I just formed my business this year.**
Q. Were any of the -- cash that you received or any income that you received from the clients that you worked with, with respect to the furniture, did you report that on any tax returns that you filed with the Internal Revenue Service?
**A. I don't believe so.**
Q. Was -- and these -- this was income that you received as it related to services that you were providing to -- to individuals that related to the furniture. Correct?
**A. Or social functions. I would help decorate. I would help someone organize a party or get provisions or set things up.**
Q. And you received some income for that?
**A. They would usually -- it's usually friends, and they would give me a nice tip.**
Q. And so why did you not report any of that income to the Internal Revenue Service?
**A. Because I -- it's just like if I was going to your house and doing something and you say, Hey, Christine, can you come hang these pictures? Can you do**

Page 61

this? What do you think about that? What about paint color? I didn't view it as a business entity until just recently where I want to expand on it. I haven't had any write-offs. I have stuff in storage. I've never used a write-off for any company -- used anything from a company.

Q. Are you receiving any Social Security payments?

**A. No, sir.**

Q. You have the opportunity at some point to apply to begin receiving Social Security payments. Correct?

**A. Yes, sir.**

Q. Have you made a decision about when you will do that?

**A. When I turned 64 last month.**

Q. All right. And so have you applied for Social Security?

**A. I made the phone call to apply for Social Security, but she told me just to go on and do it online. I think I did that -- I wanted to wait until I was 64 because that difference in that year between 63 and 64 was, you know, a few hundred dollars. And I just recently made that decision. Because I wasn't going to do it but...**

Q. So your initial injury that was your first injury to your left ankle was in August of 2014.

Page 62

Correct?

**A. Yes, sir.**

Q. All right. And that was in connection with a flight out of Washington National?

**A. Yes, sir.**

Q. All right. And then you were essentially on medical leave from August of 2014 until April of 2016 when you began the light-duty recruiting position. Correct?

**A. Yes, sir.**

Q. All right. And why did you stop performing the light-duty recruiting position?

**A. Because I couldn't walk.**

Q. Was the recruiting position something that required you to walk?

**A. The recruiting position originally didn't require much walking because we were at the Inflight Training Center on JFK, which is a one-story building, maybe has 15 big large steps going up, and my office was in the very first office. So I might have had 20 stairs to navigate through the day. That was it.**

**Soon after we received notice that the recruiting, the four other ladies and myself, were going to be taken out of that office and sent over to the pilot sim building, which is also on JFK. Which, if you**

Page 63

**know how large that building is, it houses the three mock aircraft for the pilots.**

**And my office was in the -- we had to park up front, and it was a two-story building, and I remember one day videoing it when I was just like -- it literally took me 10 to 12 minutes to walk to the back of this office, and then you had to navigate the catwalk which is where the sim aircraft are.**

**We were stuck in the back with this office. It was freezing cold, and we had space heaters. And I was elevating my ankle and then -- I also in this injury -- which Gallagher Bassett has accepted in my contested case hearing. I have a torn labrum and all sorts of issues with my hip that need to be addressed. I also have two bulging disks in my back, L4 and L5.**

**And because of the walking and the strain from trying to sit and elevate it, my hip and my ankle were killing me. So I finally gave notice, and I went back to my treating physician who refused to do an MRI. I never had an MRI for the whole two years I was out.**

**In July of 19- -- excuse me -- 2019 they denied three MRIs. I finally called Stephanie Francis in HR in San Francisco because I had a problem with this treating physician that was trying to return me to work and I -- and yet she's prescribing a cane for me, but**

Page 64

**they're releasing me for full duty, and it got very messy because my adjuster, Avon Jackson, at Gallagher Bassett was telling her, Her statutory MMI is August the 3rd, and just kind of wait because this is a done deal. And Stephanie Francis got involved with it. She had spoken to them. She called Dina and -- at Inflight who was handling my workers' comp.**

**So it was a very well-known fact that they were sharing information that was against the law to be telling my doctor, and, therefore, the doctor rescinded and said, Oh, well, Okay. Well, we'll keep her back out.**

**So I never received the MRI. I ran out of time on my statutory MMI on August the 3rd of 2016, and I believe it's three or four days after that, so August the 8th. And it wasn't until I sought my own personal out-of-pocket treatment with Dr. Varner that they did the MRI, and he called me up -- the soonest I could get in to him was Thanksgiving. He called me the night before Thanksgiving and said, Christine, I know why you can't walk; you've got a neuroma in your perineal nerve in your ankle. And no amount of physical therapy is going to get that better.**

**So for two years -- two years I went through physical therapy. Then I went through not**

Page 65

having a treating physician, six months. I paid for physical therapy out of pocket. They owe me tens of thousands of dollars that they did not pick up. I paid for my surgery -- to have that surgery for my ankle with microsurgeon, Dr. Michael Klebuc, who he referred me out to.

I had -- as soon as -- it was November, we found out I had a neuroma; I had a tumor. So this entire two years that they have sat here and said it was a sprain and strain, that was not it at all. I -- then we found out my hip had all the impingement and torn labrum and everything else. I went to see Dr. Joshua Harris at Methodist; he also said We've got to get one thing fixed first and we've got to make sure you can walk first before we do this, which I still haven't even done.

And I -- that was Thanksgiving. He got me in to see Dr. Michael Klebuc in January, after the holidays. I had my surgery scheduled for sometime in February, and then I fell because I wasn't walking well, and I completely skinned up on my legs. He said let's push it back a month because you need to be able to walk. And I had my microsurgery on, I believe, March 7th of 2020 -- 2017.

Q. So in the first two years following your

Page 66

original injury in August of 2014, what did your doctor diagnose the injury was?

A. I had two treating physicians. Or do you mean Dr. Varner at the ultimate --

Q. I'm asking whatever doctor you saw --

A. The workers --

Q. -- between -- let me just ask the question.

A. Okay.

Q. So between August 3rd of 2014 and when you began light duty in April of 2016, what did any doctor tell you was the issue with respect to your ankle or foot?

A. Sprain and strain is what it was coded as, and that's what the treating physicians were saying until I went to a peer review and the -- and Gallagher Bassett's designated doctors -- I'm not sure -- RME, required medical exam. I'm not sure what the term was for each one, but my treating physicians were just saying it was a sprain and strain until Avon Jackson made me wait to go to this specific doctor, Dr. N-A-I-K, and she told them that I had all sorts of issues -- and I don't know the medical terms for it.

So they kept pushing it back. They ordered more physical therapy. They never allowed the MRI for that point either.

Page 67

Another -- Dr. Burton, another designated doctor told them that there's issues here that are not being resolved, but no one would allow proper treatment. They were just running me out of time, stonewalled, put obstacles in my way. I didn't have a treating physician for one total year between two six-months doctor -- two six -- another six-month no doctor.

Q. Okay. So you -- the doctor -- the doctors that you had between August 3rd, 2014, and April 2016, described it as a strain and sprain?

A. Sprain and strain.

Q. Sprain and strain?

A. That was it. Yes, sir.

Q. Okay.

A. Unless it was a peer review or designated doctor. My treating physicians only treated me for -- I think Dr. Loncarich put torn -- I don't know -- or contracture of something in my Achilles, maybe. But it was always coded as just a sprain and strain.

Q. And those were all related to the injury that occurred on August 3rd, 2014?

A. Yes, sir.

Q. And then you mentioned you did light duty but you essentially couldn't continue in that capacity because of your injury?

Page 68

A. Because of my pain.

Q. Okay. And so you then began, in May of 2016, to go back on medical leave?

A. Yes, sir.

Q. All right. And in that context, once you went back on medical leave in May of 2016, your -- you were advised that you had three years of maximum medical leave that you could take and that you would be required to come back on May 26th of 2019 if your disability or your injury continued during this period of time?

A. I was never told that. I received a letter in October of 2016 that the JCBA -- that there was a new change in the JCBA. That's how I was notified of the three-year -- from the six years to the three years. I was never told that.

Q. So if you look at Exhibit 1, there is a letter attached to the letter that Ms. Stansbery sent you advising of the administrative termination. It's the third page of the document.

A. Yes, sir. That's the letter I received in October, I believe, of 2016.

Q. It's dated September 29th. You received it sometime in early October?

A. Yes, sir.

Q. Okay. And at this time, they advised you that

the current JCBA had a maximum medical leave of three years. Correct?
**A. Yes, sir.**
Q. All right. And --
**A. This letter advised me.**
Q. This letter advised you of that?
**A. They didn't advise me. Yes, sir.**
Q. They advised you through this letter?
**A. Okay. Yes, sir, they did.**
Q. Correct?
**A. But I had no verbal communication to anybody. Through this letter, yes, I was advised -- I was notified.**
Q. Did this letter -- was it -- was it confusing to you about what the -- the -- the length of the maximum leave was?
**A. No, sir.**
Q. Okay. So they did clearly explain, via a letter, that your maximum medical leave would be three years from your leaving light duty. Correct?
**A. Yes, sir.**
Q. All right. And it says, at the bottom of this letter, that your leave will expire on May 26 of 2019?
**A. Yes, sir.**
Q. And that's three years from the period of when



you came off light duty. Correct?
**A. Yes, sir.**
Q. All right. Now, you received a notice from your doctor indicating that you were fully capable of coming back to work in April of 2019, that you were able to come back to work on May 23rd of 2019. Correct?
**A. Initially, and then he rescinded it. That's the -- that's the doctor's note I was telling you about, that Avon Jackson had to get involved with -- I mean that Stephanie Francis called my doctor.**
Q. I think we're on 6.
(Exhibit No. 6 was marked.)
**A. Yes, sir.**
Q. (BY MR. ROPPOLO) All right. So I'm going to show you now a packet of medical documents that were provided to you at the arbitration hearing. So the very first document on this packet is the workers' compensation employee work status form that related to your August 3rd, 2014, injury. Correct?
**A. I'm sorry. Just a moment. August 3rd. And the question is what? I'm sorry?**
Q. Sure. The date of the injury, your original injury, was August 3rd, 2014, and this document indicates you were not capable of performing the job because of the physical limitations. Correct?



**A. No. I believe it says that I have reached maximum -- oh -- the maximum medical improvement, yes, at 8-5-16, correct, and that I was to keep going with physical therapy and probably a future surgery which was going to be an Achilles lengthening and another microsurgery.**
Q. All right. With respect to the checkmarks that the doctor included here, were these indicating that you were not able to work on a flight given the length of time that you would have to perform these various functions?
**A. It would depend on the length of the flight because with my seniority, I can fly from here to San Antonio for 28 minutes, and I could perform the functions.**
Q. So did you request that you would come back to work under a reasonable accommodation of working short flights to San Antonio or somewhere else where it would be less than two hours?
**A. On -- what is this date? I'm sorry. This is the original injury that we're looking at?**
Q. Yes. Well, this -- this document is dated --
**A. 8-3-14.**
Q. Correct. Well, that's the date of the injury.
**A. Oh. I'm sorry. Okay. So --**



Q. Kevin Varner signed this document on February 13th, 2000- -- it appears '18?
**A. '18? Okay. I'm sorry. I was lost for a minute. I'm going back and forth. Could you please repeat the question?**
Q. Sure. If you want to look also at the second page, that's when the February 13th of 2018 doctor's notes from Kevin Varner -- it relates to that same office visit. So if you want to take a look at that, you can.
**A. Okay.**
Q. So based upon what the doctor had indicated were your current symptoms, were you able to report back to work and fly as of February of 2018?
**A. I had full duty -- based upon this, no. Because I couldn't lift 50 pounds. I couldn't climb. Probably, basically, the lifting part of this -- lift or carry would have limited my ability as far as stowing luggage and pulling out bar carts and carriers and all of the equipment that we have. And we were talking about a future surgery at this point.**
Q. And that's why you didn't come back to work during the three-year period following the light-duty. Correct?
**A. Correct. Because three years following from**

Page 73

**2016 -- August the 4th 2016 until my release of May 23rd of 2019, I was having surgeries and going to physical therapy, paying by myself. I had no temporary income benefits for those three years. I was on crutches for nine months after my microsurgery. I had two setbacks in physical therapy which put me back in a boot.**

**So, yes, I was struggling to try and get better and just to meet my three-year deadline that we are now starting over by the clock of my leaving recruiting in 2016.**

Q. So the amount of leave that you had that dates back to your original injury was a little -- just a little less than five years?

**A. Yes, sir.**

Q. Okay. And during that period of time, you were unable to work. Correct?

**A. As a flight attendant?**

Q. Yes.

**A. Yes.**

Q. Okay. And that's why you remained on medical leave during that period?

**A. Yes. Because I was denied proper diagnosis and proper treatment which included surgery, and nothing was going to make this injury better until that neuroma came out of my nerve sheath.**

Page 74

Q. When were you advised of the neuroma?

**A. Thanksgiving of 20- -- bear with me -- 2016.**

Q. 2016?

**A. Right after I had -- had to stop my light-duty and recruiting. By the time I went back to Dr. Gueler, who was my network treating physician, who -- I walked in and couldn't even walk, and she's prescribing a cane for me, but she said, We're releasing you to full duty.**

**And I said, You've got to be kidding me; I can't even walk.**

**And at that point, she and my adjuster, Avon Jackson, had been talking, and she was telling her they're not going to give me any more time. She told me that. We have letters. She said, Avon Jackson hoodwinked me.**

**Stephanie Francis with HR had to call and tell them it was against the law for them to be talking and that way -- she said, Fine. We will rescind her full-duty release. And, you know, We know that she needs more medical treatment. However, they denied that MRI three times in the month of July, knowing that I -- my statutory was in August.**

Q. So --

**A. If they had allowed it, they would have seen the tumor.**

Page 75

Q. So once you were advised by your doctor that you had the neuroma, was --

**A. Dr. Varner.**

Q. Right. Was there a surgery associated with that neuroma?

**A. Yes, sir.**

Q. All right. And once that surgery took place, was the neuroma removed?

**A. Yes, sir.**

Q. And then you went through physical therapy to try to recover from that surgery. Correct?

**A. Yes, sir.**

Q. Did the neuroma ever return?

**A. Neuroma, I'm going to use the word cyst. So did that particular cyst return?**

Q. Yes.

**A. I do not believe so, but after seeing Dr. Michael Klebuc, it's the nerve damage because him going in to remove the cyst, they cut away my nerve endings and inserted them into the muscle on my shin, that muscle where your bone is, so that they would regenerate and hopefully move down to my foot. I had to do mirror therapy and physical therapy because my leg -- and I have pictures. My left leg from the knee down was dead. I could not move it; I couldn't walk on it. I**

Page 76

**was on crutches nine months, and I was having extreme neuropathic issues with it, which I still get on and off.**

Q. And did your doctor indicate that the neuroma was something that related back to that August 3rd, 2014, injury?

**A. Yes, sir. From the impact of the metal cart. And I read my injury report, which was in these pages, from my initial injury, and I absolutely love the way it's worded, that we hit a tiny bit of turbulence. It wasn't a tiny bit of turbulence. I was in the back of the 737, and the airplane -- the 737, the tail end -- we know up front you don't feel it. It fishtails, and the turbulence is always so bad in the back.**

**We hit an air pocket after climbing out of D.C., and the plane essentially went like this, wham, wham. The wings went. I was setting up the bar cart. The bar cart fell on me. A milk carton came out, and the metal part of the door jammed into my ankle.**

Q. And that's --

**A. That's what --**

Q. That's how the neuroma developed?

**A. That's what -- Dr. Klebuc and Dr. Varner feel that's where the neuroma -- the impact from that structure.**

Page 77

Q. I'm going to show you now what I marked as Exhibit 7, and this is relating to the return-to-work in April and May of 2019.

(Exhibit No. 7 was marked.)

Q. (BY MR. ROPPOLO) So this is a multi-page document, and I'm going to ask you some questions about the various forms that are attached. So if we can turn to the second page.

**A. Yes, sir.**

Q. It says this is an employee status form that was completed by Kevin Varner?

**A. Mm-hmm.**

Q. And the date of the office visit was April 5th of 2019. Correct?

**A. Yes, sir.**

Q. So at this time, the doctor indicated that your physical limitations were essentially no longer preventing you from work and that you could return to work with no restrictions on May 23rd, '19 -- 2019. Correct?

**A. I could return to work with the instruction -- with the restrictions and reasonable accommodation of wearing compression brace on my ankle and orthotics, and, therefore, per United's uniform policy, I would have to wear the pants and the flat shoes, which we would call like for inflight shoes. Yes, sir.**

Page 78

Q. And did United permit that?

**A. I never got a chance to have that permitted.**

Q. Did anyone indicate to you that this was being rejected? That you could not use compression garments or orthotics?

**A. Through the discovery that we went through that you provided, there were some disturbing facts about this injury and something that my ankle had been flagged, and there were e-mails to Karen Parker to discuss whether or not they were going to let me continue in the return-to-work process.**

Q. My question is what you knew at the time. So I'm not asking about documents that you've reviewed in connection with this litigation. What I'm asking, at the time, was did anyone tell you from the time when you were fully released to return to work on this April 5th document -- did anyone tell you you could not wear compression garments or orthotics in connection with your work?

**A. No, sir.**

Q. So --

**A. I didn't hear anything from anybody regarding this.**

Q. All right. So you received a letter from United on April 19th, 2019, after this document was completed by Dr. Varner. Correct?

Page 79

**A. Where are you? I'm sorry.**

Q. That first page.

**A. I'm sorry. Yeah.**

Q. This is a letter indicating that you were permitted to return to work full duty and you had been medically cleared for full-duty assignment effective May 23rd, 2019. Correct?

**A. Yes, sir.**

Q. All right. And I'm going to show you now Exhibit 8 as well.

(Exhibit No. 8 was marked.)

Q. (BY MR. ROPPOLO) It's dated the same day, April 19th, 2019. And this letter indicates that, based upon medical documentation received by United's medical department, your treating health provider has listed your restrictions as, quote, clear to return to work full duty.

**A. I'm sorry. Based upon the medical department? I don't see that. I see this from the RAP specialist.**

Q. Right. But the -- United's medical department was referencing your treating health provider who listed the restriction as being cleared to return to work for full duty. Do you see that?

Page 80

**A. I see where it was cc'd to the medical department, but this was to me from the RAP specialist. Per our conversation on April 18th, "an accommodation is not required at this time as you are able to perform all the essential functions of your current position as outlined in your job description." This was from reasonable accommodation; this wasn't from the medical department.**

Q. And with respect to the document that is Exhibit 7, I think you indicated that no one had told you that you could not be permitted to wear compression garments or orthotics?

**A. No one had contacted me about anything regarding my reasonable accommodation restrictions.**

Q. All right. Did you have a conversation with your supervisor about those accommodations that were requested?

**A. Yes, sir.**

Q. And what did Dominic say about that?

**A. He said -- honestly, he said, I hate to hear that because you've got the best legs in the company, and, We're going to get you some pants when you come in for your return-to-work interview. I'll pull them from the -- we have a place in the crew room that has spare uniform pieces in case someone is sick or has to come**

fly or needs an emergency uniform. So he said we'll pull -- because Cintas at the time was not fulfilling our orders.
And I said, If I'm required to wear the pants and there's no way to get the pants.
And he said, I'll pull two pants for you from the uniform -- uniform room.
Q. So that's what -- that's what Dominic said?
A. Yes, sir.
Q. And he was your supervisor at the time?
A. Yes, sir.
Q. All right. With respect to the physical restrictions, other than the compression garments and the orthotics, you were able to perform all of the essential functions of the job as of May 23rd, 2019?
A. Yes, sir.
Q. Now, the effective date of your no restrictions was three days before the three-year period ended. Correct?
A. May 26th, yes, sir.
Q. Right. Was that just a coincidence, that it just worked out that you were able to perform all of these functions just three days prior to the end of three-year medical leave?
A. That was something Dr. Varner did. I knew on



May 5th, when he released me, I said I have to give the company 30 days' notice. So that would have been -- excuse me -- April 5th. That would have been May 5th, and I believe that the -- I had a surgical procedure for my mother that he knew I had to attend, and for whatever reason, to get everything done, he said May 23rd. I don't know why he picked that day. To the haunting of my life, I have no idea.
That would be something you'd have to ask Dr. Varner, too. I don't know if it was just an oversight, if he just -- he knew. You know, I said I've got to be back. This is it. He knows. Everybody panicked with me. I was in there always trying to do everything I could to push this forward, to get my treatment so that I could return to flying.
Q. And you had made it clear to Dr. Varner that your leave ended on May 26th of 2019. Correct?
A. I made it clear, through my patient-doctor confidentiality and treatment phase, that I wanted my job back, and every time something happened, like a setback or physical therapist had hurt me or I went back in a boot, I, of course, let him know the importance of we've got a clock ticking on us, and I've got to get back to work.
I think my original -- excuse me. I think



my original last day of physical therapy was August of 2018, and we were all celebrating because knowing that May 26 or -- I don't know if -- I'm not going to infer that he knew the date, but let's just say he knew May 2019 was a three-year deadline. In August at Methodist when my physical therapist had me push a slide too much and I was complaining, my foot swelled back up, I was on my very last physical therapy session, thinking we are there; we're done.
And then I had to go back in. I had to go see Dr. Sweeney in The Woodlands over the weekend because I couldn't get in to Varner, and I thought I had torn something. And when I went in to go see Steven Perez, Dr. Varner's PA, he was like, Oh, my gosh, you've just pulled it again and strained, so I had to go back in a boot for, I think, six weeks again, and at that point, the wheels came off, and I was panicking because I thought I'm going to run out of time.
Q. So your last physical therapy session was in, you said, August of 2000- --
A. I believe it was August, yes, sir.
Q. And during that physical therapy session, you were reinjured in some way?
A. Yes, sir. I was asked to push that skid across 200 pounds, and I said I couldn't do it, and he was



like, You could do it. And I couldn't even walk, and I was back -- I went to Dr. Sweeney in The Woodlands, who was a foot doctor, to get X-rays that weekend.
Q. Can you tell me what -- during the times of your medical leave, what benefits you continued to receive as a flight attendant?
A. It -- when I went out on leave, I was continental, so the benefits varied a little bit. I believe we received vacation pay and -- certainly my flight privileges, but vacation pay and profit sharing or maybe it was a Christmas bonus at that time. I can't remember how they worded it.
I -- in -- my injury in the 2016 injury, I think there was one year when they didn't include vacation but I did receive -- I had my insurance, vacation pay -- no. Did I have my insurance? From 2016 to 2019, I don't think I had insurance. I think -- I'm getting my years confused here. No. Excuse me. I did have my insurance. I had my health insurance that I paid.
Q. So during the nearly five years that you were on leave, you had -- you -- you continued to receive medical insurance. Correct?
A. Yes, sir.
Q. You continued to receive vacation pay.

Correct?

**A. Maybe. It's -- I don't think I did on two of the years. I cannot remember.**

Q. All right.

**A. Originally, on the original claim. I did receive vacation pay on the 2016, yes, sir.**

Q. All right.

**A. On that one.**

Q. And you continued to receive your -- or be able to use your -- your travel pass?

**A. Yes, sir.**

Q. So the travel pass was still active during this entire almost -- almost five years?

**A. Yes, sir.**

Q. Okay. During the period of time that you were on leave, did you receive any form of compensation other than vacation pay from United?

**A. Profit sharing, I believe.**

Q. Okay. And that was quarterly?

**A. Yearly.**

Q. Yearly. Were there any quarterly incentives that were paid as part of your compensation during that period of time?

**A. No. Because the only quarterly incentives that we got were, if we were on-time arrivals, you had to be**



**working, and also if you flew a certain number of hours every quarter, you would get an additional five, whatever, hours -- $5 an hour more per those, but you had to be a flying flight attendant to receive those quarterly incentives.**

Q. So were there any other employment benefits that you received while you remained on medical leave during that nearly five-year period?

**A. I had my personal accident insurance. I had -- I had a long-term disability policy, but somewhere it -- in all of this, it lapsed. I also had a life insurance policy, and I had a company-offered life insurance policy as well, and I think an accident insurance policy, that the company picked up $40,000.**

Q. Did you continue to receive, in addition to medical insurance, dental insurance?

**A. I think at some point dental and vision separated. I'm -- I -- I'm not sure of that answer.**

Q. Well, this is the leave of absence packet that indicates that medical, dental, and/or vision insurance will continue for you --

**A. Okay.**

Q. -- and your dependents throughout your medical leave.

**A. Okay. Then, yes, I did.**



Q. You continued to receive dental and vision as well as medical during this period of time?

**A. Yes, sir.**

Q. Okay. Do you recall how much you received with respect to the profit sharing on an annual basis during this period of time?

**A. No, sir. It would be in the -- it -- I know one year it was 3 percent. It was dependent upon obviously our earnings and the -- and I think the -- I think the most I ever made from the time I've been -- after 2014, after the 56,000, at that point in time, I think the most I made was 13,000 or 19,000 from my vacation pay that I accrued. There was 35 days of that, and we would buy an additional year -- excuse me -- an additional week, so I think it was 42 days or 45 days of vacation pay.**

**I don't remember the profit sharing.**

Q. Following your original accident in August of 2014, did you have to apply for family and medical leave?

**A. Did I have to apply for family medical leave? I was on an occupational leave.**

Q. Right. Because it was occupational leave, you did not have to apply for family and medical leave?

**A. I didn't think I was entitled to. There's been**



**a lot of problems surrounding how you can do family medical leave when that was in -- when it was -- you had to have a certain amount of hours. I don't remember if that was even brought up to me as an option.**

Q. And as we -- as you sit here right now, are you physically able to walk?

**A. Yes, sir.**

Q. Are you physically able to perform flight attendant services?

**A. Yes, sir.**

Q. And there is -- is there any current physical limitation with your foot or your ankle?

**A. I wouldn't run a marathon, or I wouldn't do -- I'm very careful with it as far as physical limitations. As far as being a flight attendant, could I perform the job? Yes. As far as running a triathlon, no.**

Q. When was the last time you went to a doctor related to your ankle or foot?

**A. I saw Dr. Klebuc in March or April of this -- or I don't know, and I'm sorry because, you know, my hospital thing was an ordeal. So I was in -- January, February I was out. So either March or April of this year, I had a follow-up with him that I had already scheduled from 2022, had called to schedule it, but then I had to have these surgeries. So because of the**



LEXITAS

**complications, it got pushed back. So I believe it was March or April or maybe May.**

Q. And so the surgeries that you described in -- I think in January or February, were those related to your accident in your foot and ankle?

**A. No, sir.**

Q. Or were those different issues?

**A. No, sir.**

Q. What were -- were those unrelated to your injury?

**A. They were unrelated. I'm happy to discuss what they were. I don't --**

Q. You have to.

**A. Okay.**

Q. I'm just trying to make sure that they're not related to the injury.

**A. It was unrelated. It was a total hysterectomy. It was hernia surgery and then eventually gallbladder surgery which led to gallbladder leakage and back in the hospital with emergency surgery and seven days in the hospital over Christmas.**

Q. During that period of time, you were incapacitated?

**A. (Nodding head.)**

Q. I mean, you were not able to -- if you had been



still working for United, you would not have been able to work during that period of time?

**A. No, sir.**

Q. How long a period of time would you have been essentially out because of this, you know, medical issue with respect to gallbladder and the other issues you described?

**A. I went in December 16th. I went back into the hospital December 18th for emergency surgery. I got out on Christmas Day, December 25th. I had a collapsed lung, and then I had to have a stent taken out that they put in for my gallbladder in the end of February or March. I'm sorry. I don't know exactly.**

Q. So December 15th or thereabout --

**A. Through --**

Q. -- through --

**A. -- March --**

Q. -- March of 20- --

**A. -- 15th. Yes, sir.**

Q. -- 2023 or?

**A. Yes, sir. This year.**

Q. I see. And that period of time you would not have been able to work really anywhere because of your incapacity recovering from these surgeries?

**A. I was very hurt, and I had a collapsed lung,**



**yes, sir.**

Q. Whoa.

**A. But I did complete my -- my discovery for you, though; so I did do that.**

Q. Well, and I appreciate that.

**A. And I appreciate your grace for the two weeks.**

Q. All right.

MR. ROPPOLO: You want to take a break for lunch?

MR. FRACHTMAN: That would be great.

MR. ROPPOLO: Great. So we can go off the record.

(Recess taken.)

Q. (BY MR. ROPPOLO) Ms. Finger, we are back after a lunch break. You understand that you're still under oath. Correct?

**A. Yes, sir.**

Q. Okay. Good deal. One of the answers that you provided earlier was about how either Sedgwick or, you know, Gallagher Bassett refused to provide certain medical treatments or medical tests that you thought that you should have, and I think you said you even paid for a surgery. Is that correct as well?

**A. Yes, sir.**

Q. So did you, at any point, with respect to those



refusals for medical treatment or medical tests, did you appeal to Sedgwick to ask them to pay for those items?

**A. I appealed to Sedgwick, and I appealed to Gallagher Bassett for four years.**

Q. All right. Did you, at any point, retain a lawyer to send a demand letter to recoup those funds?

**A. No. I retained a lawyer at the last moment before my CCH, which was a disaster. But in the findings of the CCH, they were supposed to reimburse me for all my medical, and since that time -- throughout that time, I have -- every adjuster I've had, their supervisors, I have asked for reimbursement of medical bills.**

**And I even called -- prior to my surgery, I called the TDI because I wasn't -- they're all saying that that was because Sedgwick took over in 2017 -- I believe it was -- 2016. I'm not sure exactly the year. But because it was a prior TPA. They really don't want to pay the bills from a 2014 claim with Gallagher Bassett. And I've tried to get Sedgwick to reimburse me.**

**They did reimburse me for the surgery, I think $9,000 and some other whatever. But I have tens of thousands of dollars in physical therapy and orthotics and other doctors' notes that -- because they**

Page 93

**accepted the extent of injury and part of my CCH was that they're supposed to reimburse me, and it's still not done.**

Q. All right. Have you sued Sedgwick for those unpaid treatments?

**A. No sir.**

Q. Okay.

**A. I don't want any more lawsuits in my life.**

Q. Okay. Are you still requesting those reimbursements?

**A. Yes, sir.**

Q. From Sedgwick?

**A. Yes, sir.**

Q. Okay. If you could turn to Exhibit 7. This is the letter dated April 19th. Subject, occupational return to work full duty.

**A. I'm sorry. I have 5, 6, and 7. Okay. Thank you. Yes, sir.**

Q. So this particular letter says, in the first paragraph, You have been medically cleared to return to full duty effective May 23, 2019, and then it says, However, there may be additional requirements you need to comply with prior to your return.

So did you understand that there was the retraining that needed to be done that you took in

Page 94

Denver before you could actually fly again?

**A. It was my understanding that the return-to-work process -- which there's a page here -- included fingerprinting, the issuance of a new badge, drug testing. I think they do a background check on you as well, the full medical release, and then once you've gone through all of that and cleared that through medical, then the FAST team, the flight attendants support team, will contact you and notify you of your training date to requalify, yes, sir.**

Q. All right. So that is on the page that you were --is.

**A. Oh, I'm sorry. Yes, it is. Yes.**

Q. Okay. And so this is the indication that there are certain things you need to go through, but it says, "If you are a flight attendant, you will be contacted by the FAST and advised of any additional actions you must take to bring your TSA mandates and training requirements up to date."

So what are the TSA mandates and training requirements that you would need to do before you could go back and work again?

**A. I would need to be requalified, which was the 15 days in Denver to complete all the -- every year we have requal training, and that is to make us cleared per**

Page 95

**FAA requirements that we are capable of evacuating the plane in 90 seconds, that we know where all the scenarios, where all of our emergency equipment is, know our manuals, ditching -- all of the safety-related issues.**

**And also TSA would be to get the known crew member, our IDs, so we don't go through regular TSA screening. We go through a known crew member line, a separate line.**

**And then we will go back to training and get requalified. Once we're requalified per FAA, it means I have passed this, and I am eligible to take a jump seat, work in aircraft, and evacuate, and I'm qualified for the year. So I had to do -- instead of -- since I had missed the three years, I had to do basically three years of requalifying that other flight attendants had done, and this was -- they deemed it to be 15 days' worth of training in Denver.**

Q. So after you received Exhibit 7, which is in front of you, what happened next to go through this process of you returning to work?

**A. I -- this was April 19th. I'm not sure when I received it. They received my notice on April 5th from Dr. Varner. So I spoke with someone in fingerprinting. I think that's the first thing we had to do,**

Page 96

**fingerprinting, and then I got my new ID. I reference that in an e-mail to Dominic. I scheduled my -- one of the requirements was to schedule a return-to-work interview with your supervisor. That was Dominic Cordova. So I set that up for May 23rd and met with him in the crew room and also discussed with him, via the e-mail, that I was going to need the pants option prior to going to training. Because afterwards -- before you fly your first trip, you're subsequently supposed to have another interview to show that you are uniform compliant once you've requalified. It's just like a professional standards type of thing.**

Q. So when you had the return-to-work interview with Dominic on May 23rd, how long did that visit last?

**A. About -- from the time I got there to -- maybe two hours.**

Q. Okay. And what were the subjects that were discussed between you and Dominic in that return-to-work interview?

**A. Honestly, it was more of a, I'm glad you're back. My wings are on his bulletin board in his office. I hope I was one of his favorite flight attendants. We had a very good relationship. He was an excellent supervisor. It was more just, What are the changes that are going on?**

Page 97

He did mention some strifes about -- we had merged, Continental versus United. There's certainly a lot of dissension and a lot of disparate treatment that Continental has -- has felt in the merge, especially supervisors.

And he just was -- it was more social and just here, and we talked, and we spoke. We caught up on his family and my mom's health. And then he said let me go get you the link at the check-in desk, and I went to get that, and then he took me to the uniform room in the back behind the concierge desk, the check-in desk. I got my two pairs of pants. He handed me my blue JCBA.

And prior to signing off on the checklist that he was doing, he gave me the sheets of what my requal training was, which is in here also, like getting to Denver, what requal would do, what your days would be.

And then upon that, I went to the restroom by sheer coincidence and the grace of God, I believe, now, and as I was turning the corner to go to the restroom, in the very corner office -- it was dark, and I was just zipping around the corner, but I saw a computer screen lighting up the room, and I noticed Alita Stansbery in there, and I didn't know -- that was not her office when I left. And I just peeked my head

Page 98

in, and I said, Hey, Alita; I'm back.

And she looked at me and she said, I know; you're in my group. Three more days, and I would have had you.

And I was -- I was totally blindsided, and I said, What do you -- I'm in Dominic's group.

And she goes, No. I have the -- When the leave gets down to the 90 days prior to the leave running out, it comes into my group, and I handle all the termination letters, and three more days, and I would have had you.

And I just said, Gosh, should I apologize for disappointing you or what? It was so intimidating. And I went to the restroom, and then I came back around the corner, and I told Dominic what she had said. And I said, What is going on?

And then I went to the union desk where Elizabeth Hibbard, who was the -- this is close to the transition period of the July 1st -- you know, when she's coming. She was there talking with Denny Wheeling, who is the outgoing president, and Beth Fortner Rogers, and I said, Why would she say this? And I just said, That's crazy. What is -- Where is the animosity? Why is that so aggressive?

And then Tammy Holt walked by, and they all

Page 99

said she's the "B word," and they said she's just -- yeah. And I -- I didn't know where to put it. I didn't know how to take it. It felt very threatening to me and very intimidating.

And I believe if I had been nothing but a white woman, it would have been taken right then to Crystal Heckman's desk because it was very threatening coming from a manager, to say something like that, Three more days, and I would have had you; I was writing out your termination letter.

Q. So it sounds like there wasn't a formal meeting with Alita but you just kind of popped into her office for just a few seconds?

A. I didn't even pop into her office.

Q. Oh.

A. I stuck my head in the door.

Q. Okay. So this conversation lasted for maybe a minute or 30 seconds, or how long did it -- did it last?

A. A minute, two minutes.

Q. Okay. And did Alita say anything else besides you what you just -- you just testified?

A. I think I just said, Wow. Should I -- you know, I'm sorry to disappoint you or whatever. And she just turned and looked at the computer. She was very -- I don't know.

Page 100

Q. So no other statements other than what you --

A. Not that I recall after that. It was so abrasive to me and so startling, if I -- I guess I just said, Okay. Well, good-bye. And then I just walked off. I don't know what she said.

Q. All right. And you said that you reported this to Dominic, and what did Dominic say in response to it?

A. Dominic said, Do you think she was just kidding?

And I said, No, she's not kidding.

And he said, Don't worry about Alita. He said she's just very different and it just -- there's -- there's rumor and there's facts. And in my opinion you would be hard pressed to walk into our crew room and find one flight attendant out of a hundred that had anything kind to say about Alita. And she was -- her reputation was that of she -- before, when she was doing the FMLAs, instead of trying to be an advocate for flight attendants and helping them, it was almost like -- she was referred to as the "hatch girl." She -- I don't know -- found pleasure in this job to try and not help her fellow flight attendants. I don't know. I've known her for 25 years or whatever, and there was rumor as to why you're sitting in a black -- pitch black office. She physically was coming to work. She had

Page 101

**greasy hair. Her teeth were gray and blacked out. And there was, you know, some comments about -- there was some rumors that she probably wasn't in the best place in her life and just to -- that she was the "B word."**

Q. Did you have any further conversations with Alita after that encounter when you popped your head in the office?

**A. Not one word.**

Q. Okay. Any other written communications that you had with her?

**A. Oh, yes. I'm sorry. I thought you meant during that day.**

Q. Yeah. No. I'm just -- between -- between you and her about any -- between that time when you popped your head in the office and ultimately when you received that letter from her indicating that you were administratively terminated, what communications took place between those two times?

**A. I never heard anything back from her. I e-mailed her -- excuse me, I called her, I think, four to six times. I called her the day -- the 16th was the day of my injury. The 17th was the day that I was back in training to complete the four-hour core4 class when the instructors had to ice me down, and they reported it.**

Page 102

**I left Denver. I left the training department, I believe, around -- we got out around 1:00-ish, 2:00-ish. I was on the van to Denver airport -- Denver International, calling her, Dominic, the FAST team.**

**When I left, it was just crew scheduling. Now we had the FAST team, which is the flight attendants support team. We had Flightline. We also had a crew scheduling, and I was just trying to call any number I could to get through to figure out how to report this injury.**

**And I e-mailed Dominic the very next day -- excuse me -- let me go back -- on 6- -- 6-17 at 7:00 in the morning. The injury was 6-16. I had e-mailed to say I had passed with flying colors and I'm back, and he said, Great, I knew you would. What an ordeal, blah, blah, blah.**

**And then I tried to -- on 6-18 I wrote him the e-mail, after calling in the Flightline and the FAST team where they notified me that you contact your supervisor and the supervisor, in turn, updates what's called an occupational injury status form, that we have to go through our supervisors for them to report it to Sedgwick. Also, in the training department the day of my injury Maria -- the instructor who saw me that tried**

Page 103

**to come pick me up and help me and carry the lead of Denver training, they all said they would document it. When I said what do I do, they said we'll document it here from the training department. So I started calling her immediately.**

**I wrote him back, and he just said I've been on the concourse. Did you talk to Alita? I'm paraphrasing. And I said I left her voicemails, haven't heard back. And then I called again, and he said I told them to make sure you talk to Alita, and I said she's never called me back. She never responded, never, since that day when I poked my head in her office, did I hear anything back from Alita.**

Q. Gotcha. So no communication -- even though you had reached out to her, there were no communications between when you popped in -- into her office and then when you received that letter from her about administrative termination, correct?

**A. Yes, sir. Correct.**

Q. All right. So did Dominic indicate to you, when you had the return-to-work interview, that -- when the requal training would take place and where it would be taking place?

**A. Yes, sir. I think we both were under -- I -- he said -- I think we both knew, from my paperwork, I**

Page 104

**was to fly out on June 2nd and training started that Monday, on the 3rd.**

Q. All right. So the training took place at the airport at Denver?

**A. It's not at the airport. It's at --**

Q. Oh, okay. Where is it?

**A. -- the training center. It's about 45 minutes from the airport in Denver.**

Q. I see. And then were there actual planes there for the training itself even though it wasn't at the airport?

**A. There's mock aircrafts.**

Q. Oh. I see.

**A. It's not actual -- it is -- actually, it is a real fuselage, but it's not a real plane. It's one of our older planes that they have. And then we have our cabin-trainer doors which have all the windows and doors, mock-ups. The mock aircraft that I actually stepped out of, it is an actual plane, but there's no wheels, it's just the fuselage.**

Q. And when did the training get completed?

**A. On Sunday, 6-16 we finished all of our testing, and then we did our written test, and then we got dismissed.**

**My requal class, my 15 days of training,**

Page 105

coincided in and out with some other flight attendants who had to have certain portions of training so we would maybe be a few in our class.

On 6-16 that was the one-day training that flight attendants that were doing their annual qualification came in. So we probably had 30 flight attendants in that class, and once we all passed the test and received written verification, they all are dismissed because now their requal is done and they take their flights and try and get out of town and -- and leave.

So on 6-16 I would say at about 4:00 o'clock. We always try and get out early. It was about 4:00 o'clock.

Q. So on the last day of training, on 6-16, that's the day that you injured your foot again?

A. The very last -- we had already taken our test, and then we went to the mock aircraft and did what's called EMEs, which are emergency drills and scenarios. And that's when I injured my foot, stepping out of the door, but I had already finished requal training, maybe at 1:00, and I think we were doing this where you have to have flight attendants in there. The instructors watch you from the lavatories, and we may have a computer fire; we may have a heart attack; we may have a

Page 106

bomb threat; we may have whatever, and you are graded to, you know, see -- and then the other -- your other coworkers, the other flight attendants, give feedback, like what could you have done better, whatever.

That is the last part of the training, but we had already taken our test, and everybody had requalified, and that's when everybody goes, You can sigh relief because you're qualified for another year.

Q. And what happened when you reinjured your foot or your ankle?

A. I had already completed my module, and like a dummy, I volunteered to be the purser for the last scenario because they were lacking a flight attendant, so I thought, okay, well I'll do it so everybody can get out of here.

And upon completion of it, I went to Door 2L which is the main cabin door, and outside of that door there's a jetway, stairs, which are set up where the instructors will be sitting, you know, to debrief or to evaluate or to have something else, flight attendants. And when I stepped out of the aircraft, I was so excited, and when I was like, Yay, we did it; we're done, and I stepped out -- and it's like an -- it's called an auto door leveler on a jetway where if when you're flying you see that the jetway should be

Page 107

within 2 to 3 inches of the main cabin door framework so that you walk on and off, but this had dropped down maybe 10 inches -- 10 to 12 inches is what Maria said. And so when I stepped out, thinking that it was just going to be a little step, I -- my right foot did not hit here, so on my left foot, it went down into the impact of me dropping down the 10 inches.

And Maria was in the chairs with some other flight attendants. They heard it. She rushed to try and pick me up, and she immediately went over and said, Oh, my God, who dropped down the jetway? And she adjusted it, and she was trying to pick me up, and I was in shock. I was -- just couldn't believe it. I was hurting. I knew everybody was trying to get out of class and get going, and I, in denial and just trying to talk myself -- I said, I'm going to be okay. It's just a stinger. I'm going to be okay. Just, Yeah, it's hurting, but I'll be okay.

And so we left. Everybody left. Everybody that was Denver based went to go get cocktails, and I took the van -- we stay across the street at the Holiday Inn. The van picks us up at the training center. And I took the van, took flight attendants back to the hotel that were staying that couldn't catch their flights out until the next day, and I went to Walmart, and I got an

Page 108

ankle brace. And then I went to my room, and I iced and elevated my ankle all night.

Q. So who is it that came over to you when you got injured?

A. Maria Bravachavo. I'm not sure how to spell the last name. I's in the paperwork.

Q. So in -- in your testimony before the arbitration board, you indicated that it was Francisca that came over --

A. Excuse me. Am I saying Maria?

Q. You said Maria.

A. I'm sorry so sorry. Francisca. I'm so sorry.

Q. Okay. So Francisca was the person who came over to you and -- when you -- when you fell?

A. Oh, I know. I'm sorry. It's Francisca -- what is her full name? Francisca Maria Bravachavo. She goes by -- she has three names. So it's -- I think that's where I'm getting the Maria. Francisca Maria Bravachavo.

Q. Okay. So Francisca is -- we can just use that name --

A. Okay. Okay. I'm sorry.

Q. -- for purposes. She was one of the instructors, correct?

A. Yes, sir.

Page 109

Q. All right. And she indicated to you that you would have to report this injury. Correct?

**A. No. She indicated to me -- oh. You mean, right then, when that happened?**

Q. Mm-hmm.

**A. She said, Do you want to report this injury? She said, Do you want to fill this out as an OJI?**

**And I honestly was scared to death of like I just got back to training and I'm going to report another OJI, and I just was trying to think positively and that it's just a little setback and I'm going to be okay.**

Q. If you can go back to the transcript, which is Exhibit 3, and turn to Page 51.

**A. Yes, sir.**

Q. So at line 8 on Page 51, your testimony is, quote, "So I told her I would be fine. It is just a stinger, and she said, 'We have got to report it.'"

So she didn't -- according to your testimony, she didn't ask you if you would prefer to report it. You testified that she said you've got to report it. So which of -- which is the accurate statement?

**A. You mean, she said, "We've got to report it," meaning the training department.**

Page 110

Q. Right.

**A. Where is it? I'm lost.**

Q. Right. Line 8 through 11.

**A. Oh. Thank you. Yeah, I told her I would be fine, it is just a stinger, and she said, "We have got to report it." And I said, "No, please don't, you know." I don't know what that means. "Please don't. This is the last thing I want to do," and so I said, I'm just going to go home and ice it -- because we were leaving that day to the hotel -- excuse me -- I'm going to go to the hotel and ice it, and I'll be fine tomorrow.**

Q. So why did you tell Francisca that you did not want to report the injury to United?

**A. Because I was scared to death of this. I was scared of retaliation.**

Q. You were scared of retaliation?

**A. Because there are systemic stories of flight attendants who have lost their jobs over OJIs and I know that through this company, through one of our safety bulletins, through Oscar Munoz is that, you know, repeat OJI offenders are -- we don't -- you know, they're -- they're an at-risk group. You need to make sure that OJIs -- we need to, you know, stop OJIs. There's a bulletin that went out that a supervisor is supposed to**

Page 111

**meet with you and make you understand that OJIs are not acceptable here and, if you are a repeat offender, then that could be terms for corrective action.**

Q. But if you were physically unable to work, you would be eligible, arguably, in your opinion, to go on another three years of medical leave?

**A. I truly was in shock at the moment that it happened. I truly was in shock. I had fought so hard to get there. I had made an emotional decision to leave my mom, who was in heart surgery when the FAST team called me initially to notify me of my class training date, and then her cardiologist came out and said, She has to have a second heart surgery, and we cannot push it back because she's on Plavix -- she's on blood thinners -- and I'm not comfortable with that.**

**And I said, Okay. Let me notify my company. And I tried to tell them she needs heart surgery. The surgeon will write this. It can't wait, and it can't wait till I come back from training because he'll be out of the country.**

**And I made a horrible guilt decision to -- after reaching out to Dominic and Sabrina Clark asking to please push back my training, where Sidney in the FAST team said, It's not a problem; we'll put you in for the June 28th training. I had already been reslotted,**

Page 112

**and then I called Dominic, and there's some back-and-forth with that and Sabrina and Mr. Krabbe. And Sabrina told me that if I was not in the June 2nd requal class, that I would be terminated.**

**And so I made the decision to leave my mom and go back to training for 15 days knowing that she was very sick and postponing this heart surgery and now I've just -- it seemed like here I have fallen and reinjured myself and now what? I had so much on my plate, and I was in shock, and I was -- I just -- I was in shock. I was in denial.**

**I believe I e-mailed Dominic and told him on the 22nd, I said, I am just in disbelief. I just cannot believe God has -- I've been through all this, and now God would allow this to happen.**

Q. So previously you testified that you believe that United would get rid of individuals who had OJI claims. Is that what you testified?

**A. I believe that, understandably, from a management position, that injured workers are a liability and that certainly there's more risk. If you have one injury, percentages show that you are susceptible to sustaining more injuries, and I believe that -- and I have witnessed on a Facebook group of closed flight attendants that discuss OJIs and the**

Page 113

problems that we've met and the TPAs and the treating physicians and the force to retire before the three years or you're going to lose your passes. I believe that there was incentive for United to get rid of especially older flight attendants because we are a 30-year, 35-year cog in the wheel.

I certainly understand it. I'm making $67 an hour, and you can have three of me with a new hire at $18 an hour. I understand it. It's in your best interest to get rid of these senior flight attendants. That's why we had an early-out and had two -- VSL1 and VSL2 in 2022 to get that seniority level down and that pay scale down and certainly --

Q. What is VSL?

A. Voluntary separation leave.

Q. So United offered to employees who were senior employees the opportunity to leave the company in exchange for severance payments?

A. Yes. In 2016 they offered the first EO which was an early-out, and in 2022 they had one in January which, I think, was 45,000 and five years of medical benefits, and it got where they didn't get enough senior flight attendants to take it. So then I think it was Oscar that came out and said, look, if we offer -- no, in 2016 they didn't get enough to do it, so he said if

Page 114

-- everybody thought they'll offer another early-out program; we'll wait. And he said, If we offer another early-out program within a year, it will be retroactive, so go ahead and take it. It didn't. 2016 in January they had a VSL1, and they only had a certain number of flight attendants take it, and then I believe in August of 2022 they offered the $100,000 plus $45.000 in a five-year gap for your medical.

And I know from backstage in Chicago, which Dominic was scheduling me for that in June also when I got back after my mom's surgery. This was what we called charm school, where you had to go to Chicago.

And it was all over the news, so you probably saw it, where Scott Kirby was on the stage and trying to -- every employee was required to go. And he -- it went all over Facebook; it went viral. Because he stated he did not want the flight attendant job to be a career. This was not a career position. He doesn't care for tenure as a flight attendant. He wants you in and out three to four years.

And then they blasted the new faces of United which were put up on all the jetways, and everyone on there -- while it was a diverse group, it was all young; there were no older flight attendants. He made it very clear that that was not the direction

Page 115

that United Airlines was going in.

Q. So the V in VSL stands for voluntary?

A. Voluntary.

Q. And so --

A. Meaning if you are close --

Q. No. I -- I understand voluntary is the word.

A. Okay.

Q. That's all I'm asking.

A. Yes, sir.

Q. And so the question that I had was -- you were -- one of the reasons you did not want to report your injury was because you were worried about retaliation. And can you identify any flight attendants who had occupational injuries who were terminated as a result of that injury?

A. Of their injury?

Q. Yes.

A. Yes. Tammy Bodie, who was an Inflight supervisor, was terminated. She was at the same three-year time frame as I was -- oh, excuse me. She took forced retirement. She was not going to make it back, so she ended up taking retirement when she pleaded with them to give her more time. She had two surgeries. She fell over her suitcase, had knee surgery.

Jodi Greer was terminated even though she

Page 116

had reasonable accommodation and also family leave issued. She was terminated.

Vicky Howard Clark was reaching out to me the night before she was forced to sign a voluntary retirement because, if not, she was going to be terminated. She put in for light duty as a recruiter, and they told her that -- no, because sometimes -- which has happened once in the 35 years I've been employed there -- when irregular operations would present themselves, whether disasters, sometimes recruiters or anybody that was flight attendant qualified would have to get their uniform and go work an emergency flight, and they told her that she couldn't be a recruiter after 42 years here at United -- United Legacy because there might be a time when they might need her to throw on her uniform and go work a flight and she cannot do the job. So she -- she signed a retirement sheet.

Q. So where did you obtain any personal knowledge of the separations of Tammy Bodie, Jodi Greer, and Vicky Howard Clark? Did you speak with them?

A. Tammy Bodie was a very close friend of mine. Jodi Greer was a very close friend of mine. Vicky Howard Clark reached out to me on our private Facebook group and was like, My world is ending. I don't know what to do.

Page 117

**And part of the caveat with United is that if you didn't retire, voluntarily retire, take early retirement, you would lose your passes. So that was part of the reason that nobody wanted to be terminated. I -- when I was terminated, they gave me retirement status, and I kept my passes; my passes were intact. And they gave me a retirement plaque. Dominic Cordova ordered my retirement plaque in August. On my separation sheet it says retirement. I wasn't retired; I was terminated. And then it says available for rehire, and it says no, non-dependable -- not dependable.**

Q. So you did not have your travel pass or you did?

**A. I do. I'm the only one in any of these cases and some of them coming before you where part of the discipline was that they've taken away their passes.**

Q. So normally if United terminates an employee, they do not keep their travel passes?

**A. Correct.**

Q. But in your circumstances they allowed you to keep it?

**A. Correct. Because I had my 35 years.**

Q. And so the information that you say you learned about Tammy, Jodi, and Vicky all came from them. That's

Page 118

where you learned about that information?

**A. Tammy and Jodi were very good friends of mine, so I had a very personal relationship and saw it firsthand in their struggles and the issues that they had with going through workers' comp and the return to work and the delays and the denials. Vicky --**

Q. My question is this: Did you learn this information from them, or did you learn it from some other source?

**A. From them.**

Q. Okay.

**A. Always.**

Q. All right. Now, once you mentioned to Francisca that you did not want to report it, did she insist that you report the injury?

**A. She said, Well, you're coming back tomorrow to class, which I had to be back at 8:00 in the morning. She said, Let's see how you're doing then.**

Q. And what happened then?

**A. I came back to class after icing and elevating it and the brace, and I couldn't get my shoe on.**

Q. So she believed that it was necessary to report the injury?

**A. We all agreed, and there was another instructor -- so this was a Sunday, so, you know, a**

Page 119

**training department is kind of skeletal at that point, and on a Monday when Stephanie Pollak, the -- the training center director -- and there was another instructor that came in, and they saw it with my -- I was icing it down, and they said, We have to report it.**

Q. All right. I'm going to show you the e-mail.

And I just want make sure. We're on 9, I think, or did I -- is it 8?

MS. LEMON: I believe it's 9.

MR. ROPPOLO: Thank you. I appreciate that.

Okay. Here's Exhibit 9.

(Exhibit No. 9 was marked.)

Q. (BY MR. ROPPOLO) This is the e-mail exchange between you and Dominic. You just described this, I think, just a few minutes ago.

**A. Yes, sir.**

Q. All right. So you e-mailed Dominic on Monday June 17th?

**A. Mm-hmm.**

Q. The next day, at 7:24 a.m.?

**A. Mm-hmm.**

Q. But you didn't mention anything about your injury. Correct?

**A. No. This was just 7:24 in the morning. I was**

Page 120

**just thrilled to have been qualified.**

Q. All right. At some point did you notify Dominic of your injury?

**A. The very next day.**

Q. And why did you not tell him on June 17th?

**A. I believe because at 7:24 in the morning I was probably getting ready for training. I was hoping that, you know, this would all be said and done. I can tell him personally. But I believe I was trying to catch the van downstairs for an 8:00 o'clock class.**

Q. But I thought the training was over on the 16th. You said you completed it on the 16th.

**A. That was requal training. This was core4 training on the 17th.**

Q. What is core4 training?

**A. I brought a sheet of it, which is in your production. It's all the very last pages, 500 pages or whatever. It's about what direction the company is taking, so for -- it was something that Scott Kirby had put through. This -- it was kind of along with the backstage that we were required to go to. It was just, you know, what United -- the changes. We had just merged the two largest airlines, you know. They were trying to get everybody on the same page and just here's the direction of the new United. It was all classroom**

Page 121

**and just -- help me here -- projection screen. There was no physical anything about it, or any testing.**

Q. You had previously obtained a schedule of flights prior to your training?

**A. No, sir.**

Q. Okay. When did you obtain your schedule of flights?

**A. After you -- it's in the return-to-work process after you completed training, which was on the 16th. We bid that night; three girls and I bid, and on the 17th at 7:00 a.m., the bids were due, and we realized that, yes, we didn't get put in. The instructors didn't get us put in as active for the month of July.**

**And we also had to pick up a required amount of hours for the end of June because our training, I think -- you're required to -- 71 hours -- your lines are built to, I think, 71 hours. And I think our training constituted 40-plus hours of that, so you would hear from the FAST team within 24 to 48 hours, once they see that you've been updated in the system. And then you will go through the FAST team, and you will go into open time which shows the available trips for the month, since we didn't get to bid for June, and you pick up your trip trades.**

Q. And on the 17th did you have a schedule of flights for June?

**A. No, sir. I believe it's somewhere in one of the e-mails. I didn't hear back from them within 24 to 48 hours, so I called -- it said, if you don't hear from them, call them. So I believe on the 19th or 20th I contacted the FAST team scheduler, and we picked up two of the trips, and then I called back the next day or so and picked up the remaining third trip for June.**

Q. All right. And so the first trip was on June 26th?

**A. Yes, sir.**

Q. All right. And you called in sick for that trip because of your injury. Correct?

**A. I called in occupational injury, and because it had not been converted in the occupational injury system, they told me that all they could do was just mark it as sick occupational until my supervisor/Sedgwick, someone had contacted them to update it in the system that it was an OJI.**

Q. So do you recall in your testimony in the arbitration hearing that you stated that you called in sick at 6:00 p.m.?

**A. I called in to report an occupational injury sick because there was no -- I could not achieve occupational status at that time.**

Page 123

Q. All right.

**A. It had to go through my supervisors and Sedgwick.**

Q. Okay. If you could turn to Exhibit 3 and flip to Page 75 of your testimony.

**A. I'm there.**

Q. All right. And line 15 you testify, "I called in sick for it at 6:00 p.m."?

**A. Where am I? On what page? I'm not --**

Q. Page 75.

**A. I'm at 78. Sorry. Y'all are so good at this, and I'm clearly not. Yes.**

Q. That's what you testified. Correct?

**A. Called in sick because I was notifying them, and I had already spoken with the schedulers, and it could not be slotted on that. I said it's an occupational, but as for right now, it has to be a sick call until my supervisor changes it. And I was giving them a 12-hour grace so they could cover the trip. You're required to give eight hours if you know you're going to call in sick.**

Q. So if you could turn to Page 142. This is your testimony on cross-examination.

**A. Yes, sir.**

Q. All right. So line 17 the question from United's lawyer says, "That's my point, Ms. Finger. You were not capable of working on" -- she says September 26th, but that's incorrect -- "when you called in sick." She says, "I'm sorry -- June 26th when you called in sick?"

And your answer was, "No, I was not capable of working." Is that correct?

**A. Correct.**

Q. All right. Was United -- was United's position that, because you called in sick, that was in their view that you were not an active employee during that three-year period?

**A. It was their position that by my calling in sick, that it had extended the -- I had extended the three-year leave of absence deadline, thereby being administratively terminated because I had not returned to work.**

Q. And when did you return to Houston after your time in Denver?

**A. We left the training department at 2:00 o'clock that afternoon. I was supposed to catch a 6:00 o'clock flight because there was weather delays. I have on my phone log where I called my mom at 1:43 a.m. in the morning for a minute and -- just to tell her I'm home, and I'm safe, and I'll call you in the morning. So it**

Page 125

**was about 1- -- about -- I don't know. I probably got home at 2:30, 2:45 in the morning on the 18th, the morning of the 18th.**

**And then I e-mailed Dominic, I believe, at 11:00 o'clock on the 18th when I woke up.**

Q. And so when you returned to Houston, did you go see a medical provider?

**A. No, sir. I was exhausted.**

Q. Well, at some point, did you go to see a doctor for your ankle?

**A. Yes, sir. I had already had an appointment with Dr. Muntz that was just -- as my physician. And so this was Wednesday, and my mom was having her heart surgery Thursday. When I went in for my appointment, he did an X-ray to see if I had broken anything, and I had not, and so he referred me back to my treating physician for my workers' comp, Dr. Kevin Varner.**

Q. And who was it that told you that you would likely not be able to work for four to six weeks?

**A. Dr. Muntz at that time.**

Q. Dr. Muntz?

**A. Yes, sir.**

Q. Based upon his examination of your ankle?

**A. Yes, sir. He just said it was a bad sprain from what he could tell just initially.**

Page 126

Q. Did you call in sick for any other flights besides the June 26th flight?

**A. I called in on the occupational. There was a two-day trip on June 26th and 27th, and then I had picked up a turn for the 28th, and so I called back in and said, you know, there's no way I'll make that trip. So I called in for a two-day on the 26th, and I called in for a turn on the 28th of June.**

Q. And I think you testified earlier that after this injury from Denver, you were essentially bedridden for about four weeks? You couldn't walk for about four weeks after that injury?

**A. No, sir. I said after I returned from Denver and got terminated, I mentally -- and depression, I couldn't get out of bed. It's not that I couldn't walk. I just could not deal emotionally with the mental acknowledging of my being terminated.**

Q. So I want to focus on the physical aspect of your ankle --

**A. I could walk.**

Q. -- following that. So you could walk, and you could perform flight attendant duties during that period of time?

**A. No, sir.**

Q. Okay. So you would not have been able to work

Page 127

even if you were an active employee working with no leave previous because you had this physical ankle issue that occurred in Denver. Correct?

**A. I know that on the 26th of June and the 27th of June and the 28th of June, I knew that I would not be able to safely perform my flight attendant duties. I testified in my arbitration that I would never get onboard an aircraft knowing that, should there be an evacuation -- I could have gone to the airplane and gotten through a flight and made it through a flight, whatever, suffered to San Antonio and back, touched the metal like they say when they try and do it and then go back out on and OJI. That's not my integrity. That's not who I am. I would never show up for something where I knew I was compromised.**

**So I don't -- I cannot tell you. I can't speculate from July 1st on. I will tell you that of June 26, 27th, and 28th, I knew it was not feasible for me to go occupy a jump seat and say that I'm responsible to evacuate those 50 people that I'm responsible for in 90 seconds.**

Q. And because you received disability payments from Sedgwick beginning in September, from that point through, you know, at least the beginning of the pandemic -- is what you said, that you were not able

Page 128

until then to actually perform the services of a flight attendant. Is that correct?

**A. Until when? I'm sorry. Until what date?**

Q. I think you said in March 2020 when the pandemic began?

**A. No. That's not true. I couldn't get a doctor's appointment to -- I -- I couldn't get a doctor's appointment to say whether or not I had a physical release, and you cannot get on an airplane without a doctor's physical full medical release.**

Q. Well, what I want to know, then, is about your symptoms associated with that injury. So when did the pain subside that would have permitted you to physically perform the essential functions of the job of a flight attendant?

**A. The pain never fully subsides; I live with pain every day. So when I would have been able to get back on an aircraft, probably July or August. I didn't drop my trips in July or August when I called in sick for my June 26, and 27th, and 28th trip even though it was July 1st -- I believe it was -- because I really believed I was going to be able to make it back at that point.**

Q. So from September through March of 2021, when you received disability payments from Sedgwick, you

Page 129

were, in your view, able to perform the essential
functions of your job as a flight attendant?
**A. I believe that we -- I didn't know because I didn't have an MRI, and I didn't want to -- I had gone two years, from 2014 to 2016, with a nondiagnosed neuroma, and I wanted to make sure for my life and my quality of life and whether or not, as their peer review doctor told them, We don't even know if this flight attendant is going to walk again, much less have her job.**
**So I wanted to ensure that after I'm flying, my job, that I'm not doing something detrimental to my health that maybe I'm not aware of but perhaps there is something internally here that would compromise my well-being. So I don't know how to answer that question. I don't know. I've pushed through a lot of things that I shouldn't have pushed through in two years, from 2014 to 2016, including taking on the recruiting position when I had an injury that medically I did more damage to myself. I wasn't willing to further any damage.**
Q. So I'm not talking about 2016.
**A. I understand that.**
Q. I'm talking about after your separation, so for the period from September of 2019 until March of 2021,

Page 130

when you received these disability payments. My question is: Did you believe that you were physically able to serve as a flight attendant?
**A. I felt that I was physically able, but I didn't know if there was a medical condition that should prohibit me from pursuing that, foregoing back to work.**
Q. And during that period of time, from 2019 until 2021, you didn't see any doctors?
**A. I'm sorry. 2019 to 2021?**
Q. September 2019 when you began receiving disability payments --
**A. Yes, sir.**
Q. -- until March of 2021, are you saying that you did not see any doctors during that period of time?
**A. No, sir. I saw Dr. Varner and Dr. Steven Perez.**
Q. And what -- did they conclude that you were unable to perform the functions of a flight attendant?
**A. During certain months, yes. I did not see them through March of 2020 until -- I believe it was September. When they initially ordered the MRI in October of 2019, I never received that test, so they're not going to -- they're not going to release me. I don't know how you want me to address that question because whether I'm medically able to or not, what I**

Page 131

**would push through in my own pain to go to a job I love, I've done a lot.**
Q. I'm just looking for the information you received from your doctors. So during that period of time, when you were visiting your doctors, did they ever tell you you were released to -- you had the physical abilities to perform the essential functions of a flight attendant?
**A. They would never do that because I hadn't received the EMG and MRI that they ordered.**
Q. So did they ever physically examine your ankle to determine whether you were able to perform those essential functions?
**A. Yes, sir, of course, they did.**
Q. And they never concluded that you could. Correct?
**A. They wanted to make sure that I was not doing more damage to an injury. And they also know that they had to give me a full medical release before releasing me back to work, so how do you do that without proper diagnostic testing?**
Q. As of today, do you still have your travel pass?
**A. Yes, sir.**
Q. Okay. And that travel pass essentially will

Page 132

remain in your possession until --
**A. I die.**
Q. Until you pass away?
**A. Yes, sir.**
Q. Okay. Have you used that travel pass with respect to any flights since your separation?
**A. I have not used that travel pass except for the one trip to arbitration on July -- I can't remember when it was.**
Q. 2021.
**A. Okay. I have not used my pass benefits because I don't want to go talk about it. Most people at United don't even know that I've been terminated because it's so embarrassing, and I'm so ashamed, and I'm still fighting. And it's just too painful to get on an airplane and see the job I loved and not be able to do it.**
Q. Previously you testified that you were not satisfied with the union's and the union lawyer's processing of your grievance. Did you ever file an unfair labor practice charge or any other legal action against the union?
**A. It's in the works right now.**
Q. Okay.
**A. It is being worked right now.**

Page 133

Q. Tell me about that.
A. I have notified everyone at the MEC. I have notified Elizabeth here at local. When this all happened in 2021 -- excuse me. When did I have my arbitration? I'm sorry. I'm so lost.
Q. The arbitration hearing was in July of 2021, and then the award was in March of 2022.
A. Okay. Yes. So after the hearing -- my mom's stroke was that Easter Sunday in April of 2021. When I got back from this hearing, I was full-time caregiver for my mom, who was paralyzed on her right side and couldn't speak, so I was doing tube feeding and diaper changing, and it was a full-time job, and I had to put this as -- it just -- I had to -- I had to shelf this, and my mom passed in November of 2021.
So it just couldn't become a priority right now, but it is -- I did write Mr. Berig. I wrote within the 90-day time frame. I've asked him to reverse it and review it. I've mentioned with Julie, and we were going to put in for an appeal, file for an appeal.
And I never heard back from him. I did hear back from Maria Torre with MEC and Peter Swanson, my attorney, stating that, Oh, by the way, Mr. Berig has notified us that you've sent him some documents, and he wants me to tell you that the arbitration ruling is

Page 134

final and he will not be looking at your documents, and so do not have any further contact with him.
Q. So -- and those documents that you sent to Arbitrator Berig were what kind of documents?
A. It was showing where the union not only washed my paperwork, the documents that we -- that I did present to them and the 209 pages, they didn't present -- we worked on our presentation the day before the arbitration. Elizabeth had flown up for it. The documents that they told me that we were going to be presenting, they never came forward.
Most importantly was the fact that my pension was so compromised because, as I was starting earlier and got distracted, our pension is based upon the best five of ten years. So my pension just got annihilated because I have never been able to get back to flying and make my 100,000 per year. I'm making 3,000 and 19,000, so that is what my total pension was based upon for the last five years.
And I told him that I did not have adequate counsel, that I had a very contentious relationship with Ken Diaz, the MEC president.
He never communicated back with me for a year and a half. Michael Hickey, who was the AFA MEC attorney, got very contentious with him because Mr. Bob

Page 135

Krabbe, when we were filing our federal lawsuit, he had a sworn affidavit which was not accurate. He swore that he's aware of the case and that the union has refused to grieve it to the next level, which was not true. They were doing it, and it had stalled out in the NOD, and it was basically just very threatening.
And then because of my threats -- and they were going to give me my arbitration in two years, and they switched counselors four weeks before to a -- to an attorney who had never seen my JCBA before, who came in and said, Oh, my gosh, I'm just going to tell you I'm going to try and take this home to Minneapolis, catch up to speed. It was inadequate representation.
And I also feel like it was a lot of the facts were not presented. I feel like it was a very internal, rigged -- the fight was already fought before I got there. I think it was set up. MEC -- AFA MEC was not happy with me. I was not happy with them. I was very outspoken. I was helping other flight attendants with a trip-trading termination for them for parking, and the AFA was making them sign nondisclosures before you could even talk to an attorney. I was very vocal with that, writing letters and telling them that was illegal.
So I didn't have a good place in the MEC,

Page 136

but I still thought that they would uphold their responsibility to represent me to the fullest, and I believe it was just a, She wants her arbitration. Give her her arbitration. And I literally was walked in and sat down, and there was just a bull's-eye on my forehead, and that was it, and I was only -- I was lied to. I was told it would be a two-day and I would be able to go through all of the facts, and none of that happened.
Q. So the testimony that is in the transcript that we have been going over, those aren't facts that you testified about?
A. They are facts, but they're inconclusive and incomplete facts.
Q. Okay. And what are the material facts that you did not testify about in that hearing that you wanted to testify about?
A. There was nothing -- it was contractual grievance, that the company had broken its contractual agreement with me. And on that part of it, my contractual agreement was that -- I returned to work, and I was active, and they came in, and after I had already requalified and become active status, they found a clause which had been implemented into the leave of absence packet, which was there, but I had never been

**given it; I had never seen it, that Elizabeth Hibbard, incoming AFA president; Danny Wheeling, outgoing AFA president; Tammy Holt, my HR director in Houston for over 25 years; Dominic Cordova, my supervisor -- no one had seen this clause. But I was terminated on something that was a clause that no one at Continental/United in Houston, Texas was aware of.**

Q. And you're saying that that's not part of the arbitration proceeding? What you just described -- what you're saying is that, that's not what was discussed at the arbitration hearing?

**A. It was discussed, but there was no evidence presented. There was nothing from the company showing that I had my flights here; that when I had called sick OJI, that that was paid for; that my benefit status reinstated; that my occupational hours were reinstated to 45 hours; my sick bank was reinstated; my FMLA was reinstated -- all of these things that go into action once a flight attendant has retained an active status.**

**There were so many clauses in, contractually, what is the proper steps of discipline when you're going to terminate an employee, what are you supposed to do, what happened at the Level 1 grievance filing with a new chairperson that didn't know how to file it and it wasn't even heard and now I'm sitting**



**here floating as a NOD, a notice of dispute, with AFA MEC for two years, trying to fight to get my facts forwarded when the AFA president told me he is going to go pull my case personally and get it to mediation, get my job back and, blah, blah, blah?**

Q. And what are you pursuing against the union?

**A. Whatever I can. And right now I will tell you there's a class action lawsuit that I just found out about last night that I hope to be included in.**

Q. A class action lawsuit that has been filed against the union?

**A. That is being created to file against the union for the disparate treatment. There's so much with our union. There's so much between -- dissension between United and Continental.**

**United employees are protected by Illinois, the State of Illinois. Their workers' comp cannot even be challenged.**

**Continental, everybody else, what -- the treatment we receive, what we're going through, the differences within a protected work group, and all of the occupational injuries that have been set up and the delays -- my girlfriend fell down the crew rest stairs on a Triple Seven, and the only person that contacted her in the emergency room was a United attorney. She**



**has not heard from her supervisors. We have no care; we have no guidance; we have no protection.**

Q. So when you referenced disparate treatment, what are you referring to?

**A. The disparate treatment in a protected work group between what's United's policies are how they are treated, how they were treated. Because most of our -- the first implementation was we lost our six-year leave of absence. We went down to their three-year leave of absence. They are protected. Any -- it doesn't matter what base you're in, if you're with United, you fall under Illinois work rules. We fall under Texas, California, wherever it is, New Jersey.**

Q. So the disparate treatment that you are referring to is between the former Continental flight attendants and United?

**A. Yes. Sub-Continental and sub-United.**

Q. I see.

MR. ROPPOLO: All right. Let's take a break real quick so we can run to the restroom. We'll be off the record for a moment.

(Recess taken.)

Q. (BY MR. ROPPOLO) Ms. Finger, in your lawsuit against United, which we're here about and deposing you for, you assert that you were retaliated against by



United. What was the basis of the retaliation?

**A. I believe it was because I was disabled, and I believe it's because of my age, because I'm a senior flight attendant there.**

**And I believe I was retaliated from Alita Stansbery before I even left for training by making a threatening comment to me like that. That is a form of retaliation.**

**I feel that the silent treatment that I received after I had my incident in the training department on the 16th where on the phone log there are two instances, I believe on the 17th, where someone from Flightline and FAST team did call me back to try and navigate through, you know, I need to let my supervisor know and do it -- and other than Dominic writing me the one thing, did you talk to Alita? I've been on the concourse, I was stonewalled from them, and I believe it was set up from Alita to postpone -- to see what I would do with this injury and to see if there was any way that they could -- she could proceed with that letter of termination that she was so eager to tell me about on my return-to-work interview.**

Q. So what is your disability?

**A. My disability?**

Q. Yes.

Page 141

A. I have an ankle issue; I have neuropathy; I have an Achilles issue; I have a ruptured disc in my back; I have a hip injury. I'm functioning; I still have ability. I have since suffered autoimmune diseases and -- have taken a toll on me physically, but I feel whether it's through reasonable accommodation or because of my seniority -- and I know what I can fly, and I know what my seniority would hold, and I know the trips I can do or -- whether it's a charter or whatever, I know the physical capabilities.

And I also was elected in June -- when I was in training in Denver, I was elected to be the LEC OJI chairperson here in Houston, Texas. And it is my desire ultimately to protect flight attendants, that it's a systemic treatment from United against their injured workers, their older injured workers especially who are maxed out on pay and who have had maybe a number of injuries. And they're certainly an at-risk group; I get it. I want to do what I can do to protect them. I want to change the union and the treatment of our flight attendants, how to provide that better for them.

And I also had written a letter to -- I've had breakfasts with Texas representatives, Representative Culberson, to try and change some laws so that Texas can be a more employee-friendly state, to

Page 142

where the employee is protected somewhat more against corporations, such as in California, their rights, or in Illinois with the United rights. Our Continental flight attendants are suffering, and we're subject to that. And I don't want to see abuses.

On the same side of that, I don't want flight attendants that are going out and abusing the system because that hurts the legitimate worker who is injured and trying their best to get back here because it gives the company this, you know, They're just milking the system. That's the feeling that you get. You're a loser. It is so hard being on workers' comp because you are -- if you have any kind of moral compass or desire to be contributing and be a part of this company that you love, you feel like a loser because you are in that category. I'm on workers' comp. It has such a negative connotation to it.

I can't tell you how many workers' comp offices I would sit in the lobby and look at everybody and go, You've got to be kidding me.

And then I'd hear them through the thin walls with the doctors in the system going, Here's how you do this, and here's how you pass your urine sample, and come back in, and then we'll test you, and we'll say, okay, and then we can put you back out for more

Page 143

medical.

And I have ingested to the part where I'm sick of every doctor in here that's in this treating physician network that will sit there and tell me, It's just the way it is. It's just how the system is built. But yet you are a part of that because, if you don't tell them what they want to hear regarding an employee that gets sent to you and you're being monitored to give them the feedback they want, you will not be utilized. And I've had more doctors tell me that.

Even when Dr. Naik wrote that thing where my -- Avon Jackson insisted I wait to see her, he said she'll never be used again. And I'm sick of it. I am sick of this. I'm sick of the whole -- when you're hurting and you're already in such a deep hole, to have this kind of collateral damage thrown on top of you and the battle that you have to go through not only just physically to get back to health but emotionally what it does to you, and it's a very deep, dark rabbit hole, and it's just the system. And I'm sick of the system.

And it is -- I love our local president now, Elizabeth Hibbard. She fights MEC; she stands up for what's right. She doesn't care; she protects her employees. She protects the flight attendants. She lost the MEC president runoff here lately because -- I

Page 144

guarantee you it's because it's the internal good old boys. They're going to keep it that way until Ken Diaz gets out of there.

I'm sick of the food chain, and ultimately you're at the end of this food chain because you're the law firm that will litigate these lawsuits for wrongful termination for whatever the multitude of reasons is, because you're protecting your client, and that's great when that client has been wronged, but you-all have got to stop annihilating injured workers who have truly tried and are telling the truth.

Q. Can you identify a younger person than you who engaged in the same conduct that you did, that is, calling in sick at the end of the three-year leave process who was not fired?

A. I can't substantiate that. There are rumors of flight attendants who have passed that deadline and who -- now, since I was terminated, it doesn't happen anymore because the union protects it and they make sure -- just like a girl that was here coming up on her three-year, the union hand walks them through this and makes sure that they are making it back before their -- and doing the trip trade, personal drop, hitting a button.

Q. So you don't have any personal knowledge of a

younger person who was in this same situation who was not fired?

**A. I have -- I have personal knowledge, but I don't know it to be factual. I have --**

Q. I'm looking for accurate factual information.

**A. I --**

Q. If you have it, tell me. If you don't, then don't tell me.

**A. I -- I have heard that it's occurred, but I don't have facts.**

Q. You don't have any information about that. Correct?

**A. I don't have a -- I don't have a factual black-and-white statement about it.**

Q. Got it. All right. I'm going to show you what I've marked as Exhibit 10.

(Exhibit No. 10 was marked.)

Q. (BY MR. ROPPOLO) Do you recognize this document?

**A. Now I do.**

Q. Okay. Did you receive a copy of this document at the arbitration hearing?

**A. I can't recall.**

Q. Okay. During your employment at United, do you recall ever reviewing this leave of absence packet?



**A. No, sir.**

Q. Okay. Where are United documents kept for employees who are flight attendants so they can access? Are they online? Are they in someone's office? How would you obtain documents like this?

**A. I don't know. I believe that my supervisor was supposed to give me this packet when I returned from my leave, Dominic, to have it printed out. I know that you can go on through Flying Together. I learned of that when I called in for my OJI report and I received an e-mail from Brenda Jordan stating go onto Flying Together, workers' comp leave, so I know it has all the leaves in it.**

**Once I was terminated, I went in and printed all the different leaves, and because of the different -- this was revised February 2018. There will be a 2015. There is a 2019. There is an April 2019, which is what I thought I was looking. There is a June 2019.**

**So it is a -- on one of these pages, it will tell you this is a living document. Because of the JCBA merge, it is always changing; it is constantly changing.**

Q. But when you were returning to medical leave from your light-duty, you were advised that it was a



three-year leave. Correct? That wasn't a disputed fact. Right?

**A. When I -- when I -- returned from my --**

Q. When you returned from your light-duty as a recruiter.

**A. 2016.**

Q. In 2016 --

**A. Mm-hmm.**

Q. -- you were given a letter that indicated, in September, that your leave was for three years?

**A. Yes, sir. I think I got it in October of 2016.**

Q. Okay. It's dated September 29th.

**A. Okay.**

Q. But you got it in October.

**A. Okay.**

Q. So at that time, you were aware that the six-year Continental leave of absence maximum had reduced to three -- three years. Correct?

**A. Yes. And we also lost our light-duty.**

Q. Okay. Have you heard of any other employer who allows for three years of medical leave?

**A. I wouldn't have that knowledge. It's not something I bring up in a conversation, how long is your medical leave?**

**I do know that it is a -- seems to be a**



**very lenient leave of absence policy, but I do know because we don't have light-duty and we have a full-duty release without restrictions, quote/unquote, and -- to be able to do the physicality of the job -- it's not like if something happens to me, and I can come in here and work the front desk for a little bit until I can rehab -- that that was why the leniency was to three years, because as you can see, and by the delay of treatments, it takes a toll to get through this process.**

Q. And do you believe that a three-year medical or occupational leave of absence is a reasonable amount of time?

**A. If you are giving your employees reasonable and fair and proper medical treatment, yes, I do.**

Q. So who are Ken and Wanda Harris?

**A. They are -- when I -- when I first moved to The Woodlands to take care of my mother, I rented a home next door to them before I moved in with her to take care of her after the stroke.**

Q. And what information do Ken and Wanda Harris have about your allegations of age discrimination, disability discrimination, and retaliation?

**A. They are my parents by heart, and I have confided in them, and they live next door, and they saw the struggles, and they saw my demise and my battles.**

Page 149

**And it was just a very confidential sharing of information to someone because nobody else -- I'm very private, and I don't share this with a lot of people.**

Q. So Mr. and Mrs. Harris have information about your struggles after your separation, but they don't have any information about the nature of your leave or the nature of your separation?

**A. The nature of my second leave in 20- --**

Q. Of either of your leaves.

**A. They do because they were right next door to me, and they -- I don't know what you mean "nature of." They saw the fallout of from it. They saw me on crutches. She brought me breakfast, lunch, and dinner. I had a two-story house. I couldn't navigate stairs.**

Q. Are they familiar with the Joint Collective Bargaining Agreement?

**A. No, sir.**

Q. Are they familiar with the United's leave policy?

**A. No, sir.**

Q. All right. Are they familiar with the --

**A. Let me -- I'm sorry. May I take that back?**

Q. Well, let me --

**A. Okay.**

Q. Let me finish answering [sic] the question, and

Page 150

then you can correct your answer if you need to.

**A. Okay.**

Q. Are they familiar with United's decision to administratively terminate you?

**A. By "familiar," what do you mean? Are they aware of it, or do they know the details or based upon --**

Q. What can they testify about? I'm just looking to -- you've identified a number of individuals in your answer to Interrogatory No. 1 who have facts related to this lawsuit, and I just want to know what they know. So if they know about your struggles and your emotional distress and your mental anguish and all of that that occurred after you were separated, then that -- that's what you need to tell me.

If they have information relating to the decision and the idea that the decision to terminate you was protectoral or retaliatory or something like that because they're familiar with United's policies, then let me know that as well.

**A. Well, they're in their 80s; so -- her son-in-law is an attorney with Vinson Elkins, so it has been discussed there, so from a legal standpoint, that would probably be the only reference to that.**

**They saw everything from my initial injury.**

Page 151

**I moved in there in 2014 when I was still flying. So they -- I lived beside them the entire time, so they are aware of it.**

**If you're asking me do they know of the leave of -- did we ever sit down at the coffee table and go over the leave of absence policy or -- not to that extent, but they are very familiar with my treatment, what happened, my going to training, and the injury, and the fallout past that.**

Q. Anything else that they have information about regarding this lawsuit? Other than what you just have testified about?

**A. Just the -- 2014 till now -- nine years of fragmented life. They've seen it and witnessed it firsthand.**

Q. What do you mean by fragmented life?

**A. Blown-up. Not recognizable. Destroyed.**

Q. What do you mean not recognizable?

**A. My life is not recognizable, Mr. Roppolo, from what I had. I'm not who I was. I don't -- I'm changed. I'm different. They've seen my struggles emotionally. You can't lose a career of 35 years and think that you're just Sally Sunshine, you know, doing cartwheels down the street.**

Q. What information does Michelle Eremea have

Page 152

relating to this lawsuit?

**A. She's my half sister. She's a flight attendant. She was with TWA. She now flies for the Penski team. And she and I have shared information. She has a friend with American Airlines that has some contract knowledge and just as my half sister just, you know -- I would say majority of this is just a sounding board because nobody wants to keep talking about this, and, unfortunately, it's all that I can regurgitate because it is all-consuming in my life.**

Q. So anything she knows about this lawsuit would have come from you?

**A. Yes, sir.**

Q. Okay. Who is Keith Eremea?

**A. My brother.**

Q. All right. Is -- does he have the same information that Michelle has? Information from you?

**A. Probably not as extensive. Just he knows, you know, the -- the titles and the subcategories but not so much detail. He was a state trooper for 43 years in Arkansas.**

Q. The titles and -- what -- what are you referring to?

**A. Meaning he knows what's going on, you know, you're terminated, the union says you're going to get**

Page 153

**your job back. Hang in there. What's happening? You're waiting for arbitration. You know, nothing -- not as detailed as my half sister or Ken and Wanda Harris because they lived it on a daily with me. Unfortunately, my brother didn't.**
Q. Who is Patrick Garner?
**A. He's one of my closest friends.**
Q. And what information does he have about the facts of this lawsuit?
**A. Same level as Wanda and Ken, very intimate, very detailed, very caring, very -- you know, when you call someone because you're just -- just personal, and the proceedings of it.**
Q. Proceedings of what?
**A. Meaning what's happening, you know, Now you're going to arbitration. Now you've had this. Now Elizabeth is trying to do this. Now you went to Chicago. Now we're waiting for the arbitration ruling. Now you've got this. Now -- You had Evan Lange; now you've got, you know, Julian.**
**So he knows the lawyer I'm going -- what's happening with the lawsuit.**
Q. And these are all facts that you have relayed to him?
**A. Yes, sir.**

Page 154

Q. Who is Cort Halverson?
**A. He is a friend of mine.**
Q. All right. Does he have the same information that Patrick Garner had?
**A. Yes, sir. Not as -- probably not as intimately because I've only known him about three years. I've known Patrick about 25 years.**
Q. So any information that Cort Halverson would have would have been by conversation with you?
**A. Yes, sir.**
Q. All right. Who is Allan Wallace?
**A. He is a very good friend of mine, retired HPD officer, now works with TBC. And he also has very intimate details of this.**
Q. Intimate details, meaning your conversations with him about your concerns about this case?
**A. Yes. And my concerns about where this leaves me and where I am and the struggles that you have once you've been terminated.**
Q. Who is Leslie Rios?
**A. That is a flight attendant that is in one of your parking cases that just got reinstated back to the company, who was terminated after me, in 2019, who was flight attendant of the year in September, and then in November she was terminated. And now they have just had**

Page 155

**a reversal on their arbitration where she is reinstated.**
**And because of all this and the fallout, we don't speak anymore because it just got too -- I had severe concerns over her and notified her doctor and everything else. She was in a very bad place. She lost everything.**
Q. So what information does she have about this lawsuit, your lawsuit?
**A. Very intimate and shared discussions, shared feedback, shared updates daily.**
Q. Updates relating to your -- your -- you know, experience --
**A. The status.**
Q. -- after your separation?
**A. The status of what the union is doing, when we heard from Elizabeth, what Ken said, what Michael Hickey said, what Chris Thurber said, what the MEC said, what Maria Torre said.**
Q. And all of that is after the separation. Correct?
**A. Yes. Because, you know what, I never had a problem with United. On a employee level, I always felt very -- it used to be called "Connie Continental." I used to feel very -- I never -- it wasn't until I was separated that there was any kind of discussions to be**

Page 156

**had about Continental or United that weren't favorable.**
Q. Elizabeth Hibbard is the -- this says that she's the AFA IAH Local 42 president?
**A. Yes, sir.**
Q. All right. What information does she have about your separation or any of the issues related to this lawsuit?
**A. Is the easier answer that she's going to be deposed in this? Is that the way for me to tell you that she has the -- she has the most internal corporate information about the e-mail, the dealings with the MEC, her Zoom meetings where she was calling everybody out because they weren't helping me. She had reached out to attorneys. She's reached out to the grievance committee. She did all the heavy lifting, and she would not -- she kept pushing. She would not let it go because she truly believed that myself as well as some of the other flight attendants in the parking situation here, which were in her group -- that it was so wrong on so many levels.**
**And she had assisted me in my return-to-work process, along with Tammy Holt, making sure that I met the criteria for what they termed "active."**
**She also knows that I'm very adamant and**

**passionate about workers' comp and the rights for the employees.**
Q. Does Ms. Hibbard believe that the union was incompetent in connection with your grievance?
**A. Yes, sir.**
Q. Was she involved with the grievance herself?
**A. She was involved at my insistence. They were not going to allow her to be in the arbitration, and I insisted with Peter that she be able to testify.**
Q. And she did?
**A. She did.**
Q. And did her -- did the arbitrator or any of the panel determine that she could not testify about any specific facts at the hearing?
**A. I can't answer that question, but I do know that she got a lot of pushback from Maria Torre and Ken Diaz about whether they would even take this contractual grievance. They did not want to do it. I've been in the room downstairs, in the crew room, where Maria Torre was screaming at her. So, yes, she did receive a lot of pushback from the MEC.**
Q. And what is the MEC?
**A. Master executive counsel.**
Q. For the AFA?
**A. Yes, sir. In Chicago.**



Q. And who -- who is Ken Diaz?
**A. He's the president of it.**
Q. All right. And who is Kim Johnson?
**A. She was the grievance rep that was assigned to my case. And I was one of her first grievances, and knowing later that I was so outspoken with Ken Diaz, that when she was driving me to my hotel that night, she said if it hadn't have been for Ken Diaz, she would have lost her job because she was the LEC president in Guam, and when COVID hit, Guam base was closed. So all the flight attendants that were in Guam were terminated based upon structuring and no longer needed. And Ken Diaz created this position for her so she could keep her job. So she was commuting to Chicago but Houston based, and now she was a new grievance rep.**
Q. Do you believe that the AFA's approach to the grievance has caused you to not be employed or reemployed by United?
**A. Absolutely.**
Q. Who is Maria Torre?
**A. She is the -- I want to say lead chairperson for the -- I don't know her exact title. She is the MEC head -- lead -- chair -- grievance chairman. I'm sorry. That's not a very good title.**
Q. And so Mr. Diaz -- and is Kim Johnson a woman



or a man?
**A. A woman.**
Q. Okay. So Mr. Diaz, Ms. Johnson, and Ms. Torre, were they all part of the incompetence associated with your grievance?
**A. Absolutely.**
Q. Who is Dr. Brandi Wisenbaker-Valenzuela?
**A. She's my PCP.**
Q. And what does that stand for?
**A. Primary care physician.**
Q. And what information does Dr. Wisenbaker-Valenzuela have about any aspects of this case?
**A. As my -- she was -- she may currently be, she was Leslie Rios's PCP, and I went to her as a referral, and there were two other flight attendants that I'm not going to mention that also went to her. And she would hear of our stories and the stress that it was causing us.**
**And she's the one that put me on alprazolam and zolpidem to sleep because I could not shut down for anything.**
**And she was also the one that I turned to when I was worried about Leslie. I tried to contact EAP, but because we were no longer employed, I didn't**



**know who to turn to, so I would confide in her as to the concerns I had regarding Leslie Rios's comments and statements and the place that she was in life, especially after one of the flight attendants that is in that group of 23 flight attendants terminated committed suicide. And that was a very bad turning point for her.**
Q. Can you refer -- who are the 23 --
**A. There is an incident where 23 flight attendants were terminated because they were found to have illegally parked trips, senior flight attendants and illegally parking trips.**
**And it has taken them until just two months ago, three months ago to -- each one of them, it took them two years to get to arbitration. The first one was a settlement. The second one was a loss. The third one was a settlement, and then they all were offered their job back.**
**She took it because she has leukemia and she has no medical insurance.**
Q. Who's "she"?
**A. Leslie Rios. And she needs to get to MD Anderson to have her health insurance, so she took this reinstatement of her job. She has not been back to training yet because the MEC is stalling on that too, to prepare a letter. But everybody else took their job**


LEXITAS

Page 161

**back except for what I believe is two flight attendants that I believe you're familiar with because they have separate lawsuits with attorneys, and their attorney was like, You're not because you would have to cease the lawsuit. So they did not take the return-to-work position.**

Q. So did you have any conversations with Ms. Sjoberg or Ms. Palova?

**A. I have.**

Q. Okay.

**A. Not -- not Ms. Sjoberg.**

Q. Okay.

**A. Not Ms. Sjoberg.**

Q. Ms. Palova?

**A. Mm-hmm.**

Q. When was the last time you had a conversation with her?

**A. Early, early on. Right after they got terminated. And the rest of it, I just would receive information from Leslie Rios, who was friends with them, because I didn't talk to them.**

**I've never spoken to Ms. Sjoberg. I just would get updates through Leslie. She was very close to Ana and very close to Rosemary.**

Q. So what information did you receive from Leslie

Page 162

about the Palova and Sjoberg lawsuits?

**A. As it progressed, what their attorneys -- she was trying to find -- Leslie Rios was trying to find representation. She had not filed her federal lawsuits within the 90 days of turning in his EEOC complaint, so she kind of didn't have protection. They were trying to get her involved with their attorney -- included in their lawsuit with their attorneys. And she didn't have the money to -- let me rephrase that. She didn't feel like she could spend the money to have the representation.**

Q. And tell me about your conversation with Ms. Palova that had happened early, as you say?

**A. It was just that we couldn't believe that we were all terminated.**

Q. In Interrogatory No. 3, we ask about any expert witness that has been identified, and you indicate Peter Elmendorrf. Do you know who Peter Elmendorrf is?

**A. It is -- Paul Elmendorrf? Is it Peter or Paul? Sorry. I'm --**

Q. I'm just reading what is on the interrogatory. It says --

MS. LEMON: It's Peter.

**A. Peter? Okay. Yes. I'm sorry.**

Q. (BY MR. ROPPOLO) -- Peter.

Page 163

**A. He is a financial advisor.**

Q. Have you had conversations with Mr. Elmendorrf?

**A. Yes, sir.**

Q. All right. Has Mr. Elmendorrf prepared a report in this case?

**A. I have forwarded all my paperwork to Mr. Elmendorrf, and I believe he has done a list of damages. He's in Austin, so we've never met personally.**

Q. You indicated that you had been prescribed certain medication for sleep by Dr. Wisenbaker-Valenzuela?

**A. Yes, sir.**

Q. Are you still taking that medication?

**A. Sporadically. As needed.**

Q. How often do you take that medication?

**A. Probably once a week to sleep and once or twice a month for half of the alprazolam. It kind of depends on what is going on with this lawsuit.**

Q. So Dr. Wisenbaker is a -- is she an internal medicine doctor?

**A. I believe so. I'm not -- she also referred me to my rheumatologist who diagnosed my autoimmune, so I'm -- she -- I -- I don't -- I think she is internal medicine, yes, sir.**

Q. She's not a psychiatrist. Correct?

Page 164

**A. No, she's not a psychiatrist.**

Q. Or a psychologist?

**A. No.**

Q. Okay. You indicated earlier that you submitted some documents to Steven Berig, the neutral arbitrator, in connection with the grievance that was filed and the arbitration hearing that was held in 2021. What were the documents that were submitted to him?

**A. Well, I didn't refer to him as a neutral arbitrator. I referred to him as the arbitrator that overheard my SBA hearing. It was extensive; it was 50 pages. So it was in regards to the treatment. It was with regards as to why I felt like it could be reviewed and reversed, and it was, as I stated earlier, a misrepresentation, a setup. There were items that were deleted out of my phone from Kim Johnson. They took my documents, and prior to my exhibits Maria Torre came in -- and if I had my handwriting which I'm -- it's the only way I can keep my life straight -- they were washed; those -- those pages had been altered. Prior to my arbitration, Peter --**

Q. What documents have been altered?

**A. My 209 pages that I gave the union from my screenshots. That's the only documentation that was provided at my arbitration hearing. The company -- they**

Page 165

**pulled nothing from the company. They said that they could not go back that far, and the AFA had no documents other than my 209 pages that, inadvertently, I was able to screenshot because Alita or whoever -- once you're terminated, you're taken out of what's called our crew -- crew -- crew communication system, CCS. You are terminated within hours.**

**For some reason I wasn't, and I was able to go back in here, and that's where you get some of our production -- is that I have the screenshots of my master schedules, of my training screens, of my trips, of my calling in sick, of my benefits paid, of my restored sick banks. Those were all actual screenshots because otherwise they would not have existed; so --**

Q. Who -- who altered these documents?

**A. The AFA altered them.**

Q. How did they alter them?

**A. They washed them.**

Q. What does -- what do you mean by washing them?

**A. They took a document, and if it had any writing on it, they washed it. So I could barely read it, number one. So in arbitration, when they handed me something, even in my arbitration -- and it's got to be documented somewhere -- I said, I can't even read this, and this is my document.**

Page 166

Q. So when you say that there were things washed from the document, was this handwritten information?

**A. My handwriting. Yes.**

Q. So they removed your handwriting that took place after the screenshots were taken and removed those from the screenshots before they presented them to the arbitration panel?

**A. And before they presented them to me in arbitration.**

Q. Okay.

**A. They were there the day before when we were preparing, and I thought that's what I was going to be getting, and then Maria took them out, and then when I got them at the arbitration hearing, they were different.**

Q. And you believe that the handwritten information that you documented after the separation, as you did the screenshots, should have been entered into evidence at the arbitration. Right?

**A. Yes. Because it was explaining what was happening and it was showing what was happening on the real time and it was also a -- an indication of everything that I had evidenced.**

**And then Peter Swanson, two days before my arbitration, told me to send all of my original**

Page 167

**documents up to him, which I did, and I FedExed those in a box. I don't know how many pages there were. And they looked at those, and I never received those back. I had to ask for them to give me my documents back, and they were not the same as what I gave, and I have no clue.**

Q. And they weren't the same because the handwritten information was removed?

**A. These were also additional paperwork, but there were missing items. I gave them the originals. They wanted me to give them the originals.**

Q. So other than your handwriting that was removed, what was altered with respect to the documents you gave to the union?

**A. There was nothing else that was altered. There was deleted pictures off my phone that they did in my arbitration hearing, which was only complimentary towards United, and they also did not present documents, which I felt were incriminating, that we had reviewed the day before my arbitration hearing.**

Q. Do you believe that the union was trying to lose your grievance?

**A. 100 percent.**

MR. ROPPOLO: If we can go off the record.

( Recess taken.)

Page 168

Q. (BY MR. ROPPOLO) All right, Ms. Finger. Are there any questions that I asked during the course of this deposition that you did not understand or were not clear for you?

**A. No, sir. I don't believe so.**

Q. All right. Are there any answers that you would like to change or clarify at this point?

**A. No, sir. Not that I can think of.**

MR. ROPPOLO: All right. I'm going to pass the witness at this time.

MR. FRACHTMAN: Okay. Thank you.

EXAMINATION

BY MR. FRACHTMAN:

Q. Ms. Finger, thank you for showing up today and giving testimony to the best of your ability. I've got some follow-up questions that I'd like to ask.

**A. Okay.**

Q. And I think I'll just go back to the beginning so I can -- take a look here. Let's see.

Earlier when you testified that you were at your arbitration in July of 2021 -- that's when the hearing was. Correct?

**A. Yes, sir.**

Q. Okay. You testified that you were examined -- that you were told that it would be a two-day hearing

Page 169

but they carved it in under one. Is that correct?
**A. It was carved down to -- I think with lunch we were out by 2:30.**
Q. Okay. You testified that you had provided documents that you believe were relevant that you wanted to be exhibits in that hearing. Is that correct?
**A. Yes.**
Q. Who did you provide those to?
**A. To Peter Swanson, Kim Johnson, and Maria Torre, the day before.**
Q. And all three of those were the union attorneys or?
**A. Peter Swanson is the -- is -- he was assigned -- Michael Hickey was the union attorney that I had been working with or alongside for two years. Peter Swanson was the substitute counsel that was substituted once they said you're going to have your arbitration date on this date and your attorney will be Peter Swanson. I had never heard of him, and he evidently is an international lawyer for Air Wisconsin and one of the commuter flights.**
Q. So your original union attorney was Mr. Hickey?
**A. Michael Hickey.**
Q. And then he was replaced four weeks --
**A. Before my arbitration.**

Page 170

Q. -- before the hearing with Mr. Swanson. Is that correct?
**A. Yes, sir.**
Q. And the other two individuals you named, were they also attorneys?
**A. Kim Johnson was a new grievance. I can't remember --**
Q. Is she AFA or United?
**A. AFA is United.**
Q. I'm sorry.
**A. She's a new grievance MEC representative. And Maria Torre is the lead grievance. I probably should have Googled their names -- their titles. She's the lead -- the chairperson.**
Q. Of those three, who was representing you?
**A. Peter Swanson.**
Q. Okay. But you provided these documents to all of those individuals. Correct?
**A. Yes, sir.**
Q. Were those documents submitted during the hearing? Let me rephrase that.
Was the totality of those documents submitted in an unaltered fashion?
**A. No.**
Q. Did you -- and when you testified earlier that

Page 171

some of the documents were washed, is it your testimony that your handwriting was removed from those documents?
**A. Yes. They said that they were going to clean up the documents, and they handed them to Maria Torre.**
Q. Okay. And when that -- when those documents were returned to you, did you receive the totality of the documents that you submitted?
**A. No. I had given them each a white binder of the 209 pages that we had at arbitration. I had my binder. And when I left arbitration that day, Maria said that they'll shred my binders, and I said, no, I'll just take them. And the original FedEx box that I sent, for $58 the two days before, was not returned to me until three or four months after the ruling.**
Q. When it was returned to you, did you receive all the documents that you had submitted?
**A. No.**
Q. Did they remove any documents in particular that you recall?
**A. I have no idea.**
Q. Okay. Earlier you also indicated that you didn't have an opportunity to testify, but your testimony is in the arbitration transcript. Is that right?
**A. Yes, sir.**

Page 172

Q. When you say you didn't have an opportunity to testify, are you -- what -- what -- what do you mean by that?
**A. I was not afforded my due process. I was not afforded the right to tell my story, to have a thorough testimony. Which in church Sunday, they brought up when you testify about something and you're going to tell the truth and you tell your story -- I was never given that opportunity, and I was cut short, and the details and the incriminating evidence that I felt that was critical, the union did not present.**
**And in the room, prior to us being dismissed, in front of -- there were three observers that are on the SBA panel for the company, three for the union, and then Mr. Berig in the middle. And I told them, when we were in the room, that I absolutely needed to be put back on. And Maria and Peter walked in, and they said, No more questions, and it was done.**
Q. When you say "put back on," do you mean --
**A. To the stand. And -- it wasn't a stand; it was a chair in the middle of the room.**
Q. Okay. Let me -- let me finish my sentence?
**A. Okay. Sorry.**
Q. When you say "put back on," you mean re-crossed or redirected?

Page 173

**A. Yes, sir.**

Q. Okay. And when you say you weren't allowed to give full or complete testimony, does that mean that, even though you responded to the questions that they asked you, you still had more information that you wanted to expand upon?

**A. Yes. I felt that there was a lot of incriminating evidence as far as a contractual grievance with the policies and procedures that the company is outlined as to how they should conduct and what their prerequisites were for rendering disciplinary action against me.**

Q. Okay. So it's your testimony today that the AFA didn't completely argue your case?

**A. It's my testimony here today that I feel very maligned by the AFA MEC and I feel like it was very intentional.**

Q. Okay. Earlier today we discussed -- I'm sorry. Earlier today you testified regarding the third-party administrators for United, Gallagher Bassett and Sedgwick. To the best of your recollection, when did the -- when did United switch from one to the other?

**A. I believe it was early 2017, we were given a letter, which I have produced in discovery, that states that Gallagher Bassett -- that United was switching TPAs**

Page 174

**from Gallagher Bassett to Sedgwick to better align with caring for their employees because they had had so many complaints and they knew there was a lot of problems.**

Q. When you say they had complaints, what does that -- what are you talking about?

**A. Flight attendants most especially were very vocal about delays.**

Q. Delays by whom?

**A. Gallagher Bassett. In getting paperwork done, getting diagnostic testing done, getting you to treating physicians, getting proper medical care, or denials --**

Q. Okay?

**A. -- most importantly of what doctors did request.**

Q. Okay. Thank you. Earlier you also testified that -- and, actually, this -- you testified at length on this -- that you were out sick after your injury on June 16th of 2019. Can you walk us through the delineation between being out sick and having an occupational injury?

**A. The delineation is that I personally am not able to code my injury -- my sick call as an OJI. It was -- it had to be changed in the OIS, the operational -- the occupational reporting system, from a supervisor; they had to do it. And then Sedgwick --**

Page 175

**once they noted it in the system, then you could proceed to tell Sedgwick, but it couldn't be done from the flight attendant.**

Q. So if I'm understanding this correctly -- and correct me if I'm wrong -- once there is an injury, the employee informs their supervisor?

**A. (Nodding head.)**

Q. Their supervisor then informs the OIS, occupational injury --

**A. System.**

Q. -- system. And then OIS informs what?

**A. It has to be changed -- your status has to be changed from a sick call to OJI by a supervisor.**

Q. Oh. But -- let me -- let me rephrase. What is the process of communication? You're going from the supervisor to whom?

**A. I'm not sure specifically how it goes internally. I know that I was told to report it to my supervisor. They in, then, turn it to the FAST team, which is our support team or Flightline. And internally those schedulers change it from sick to an occupational, and at that point you can proceed. You get a claim number to call Sedgwick -- excuse me -- Sedgwick will take your report and then assign a claim number. It doesn't mean that your injury is accepted, but you do**

Page 176

**get a claim number from it.**

Q. Okay. So if I'm hearing this correctly, you can't even be declared as having an on-the-job injury until it's cleared by the third-party administer. Is that correct?

**A. You cannot be declared to have an occupational injury until your supervisor makes note of it and acknowledges it as a supervisory position.**

Q. Okay. Did you -- who was your supervisor at the time of your injury?

**A. Dominic Cordova.**

Q. Okay. And so earlier you testified that you e-mailed Mr. Cordova about your injury June 17th? June 18th?

**A. June 18th.**

Q. Okay. And how long did Mr. Cordova take to get back to you to let you know that he had reported the injury up the chain?

**A. He never got back to me to say he reported it; he wrote back to me on June 22nd saying, I was on the concourse. Were you able to talk to Alita? And he said, Let me know what happens next.**

Q. Okay.

**A. He never got back to me to say he reported it.**

Q. When he said Alita, did he mean Alita

Stansbery?
**A. Alita Stansbery.**
Q. Okay. So you don't know if Dominic Cordova reported that injury?
**A. I have no idea.**
Q. When you -- and I'll be getting into this in some detail in a minute. When you began to schedule or -- I'm sorry. Let me rephrase this.
After you completed your requalification training and you had reported this injury to Mr. Cordova, did you then have any flights that you had scheduled for the month of -- the rest of June or any of July of 2019?
**A. I had three trips that I had done trip trades for with the FAST team for June, and I had seven trips pairings -- pairings is the number of trips -- flights within a pairing, like it could be a turn, a two-day, or a three-day. I had seven. I was required to build my line to, I think, 73 hours in July. So I had seven pairings on my July schedule.**
Q. Okay. And it was noted that you had called in sick for one or more of those flights. Is that correct?
**A. I had called in for the pairing, the two-day, on the 26th and 27th, and the pairing on the 28th, which was a turn.**



Q. Okay. So even though you had an OJI, you were calling in sick, or you were designated as being sick?
**A. I was designated as sick until -- from my understanding with the scheduler -- I believe her name was Kim -- until my supervisor changed it or someone had changed it because there was a comment that I know she said, Because I'm seeing here that you are coming off of a preexisting OJI, so your supervisor will have to change this.**
Q. Okay. And that was Mr. Cordova. Correct?
**A. Yes, sir.**
Q. Was he your supervisor at the time of your injury?
**A. From everything I knew, he was. On the 24th of June, I received an internal e-mail which I never saw because we were having a hard time getting into our corporate e-mails because Outlook Explorer was very complicated and unless you were flying together, it wouldn't take you there. It was a big glitch they had in the commuter system, trying to merge everybody. I did receive -- later I saw that there was a letter from Brenda Jordan, on 6-24 at 7:00 in the morning, stating that, We were in receipt of new OJI injury, and it said, Please contact your supervisor, Rick Velez, at such and such number and to reference the workers' comp**



**return-to-work guideline for the new injury.**
Q. But you just said that your supervisor was Dominic Cordova?
**A. Yes.**
Q. So when did Rick Velez become your supervisor?
**A. I have no idea.**
Q. Was Rick your supervisor from then moving forward?
**A. I have no idea. I was communicating with Dominic, and he was communicating back with me, and Dominic ordered my retirement plaque in August, so I don't know if he was my supervisor moving forward or not.**
Q. So if I'm understanding this, Mr. Cordova continued acting as though he was your supervisor?
**A. Yes.**
Q. But United told you that Mr. Velez was your supervisor?
**A. Yes.**
Q. Did Mr. Velez communicate with you as though he was your supervisor?
**A. I never heard from Mr. Velez.**
Q. Okay. Who at United would have the power to change your supervisor while you were doing your requalification training or during the course of your



injury?
**A. I don't know that answer, who assigns supervisor positions or who reassigns or who makes the changes on a supervisor position.**
Q. Is it possible that were the base manager -- the Houston base manager would have that authority?
**A. It's possible.**
Q. Okay. Earlier you were asked about your employment -- and, Ms. Finger, I apologize. How long have you been a flight attendant?
**A. 35 years.**
Q. When did you begin your time as a flight attendant?
**A. 1984.**
Q. 1984?
**A. (Nodding head.)**
Q. Okay. Did you begin with United or Continental?
**A. Continental.**
Q. Okay. And you stayed on as a United employee after the merger in 2016?
**A. I believe it was 20- -- that was when the JCBA was implemented. I don't know when the two entities merged. We flew separate. We had separate carriage agreements for, I think, two years.**


LEXITAS

Page 181

Q. Okay. But there was a merger?
**A. Yes.**
Q. And you stayed on as an employee?
**A. Yes.**
Q. Prior to 1984, did you have any other jobs?
**A. Just right out of college, I was social director at a country club.**
Q. How long was that?
**A. A year and a half.**
Q. Okay. So being a flight attendant is the only thing you've ever known?
**A. It's the only thing I've ever done.**
Q. After your separation from United, if you -- and let me ask what was your status as a flight attendant with United at the time of your separation? Were you a senior flight attendant? Were you -- what -- is there a different name for it?
**A. I was a dinosaur. I was -- I think within the Houston base after the merge, even, I think I was within the top 200 flight attendants, so very senior. I could hold what I wanted pretty much.**
Q. If you had gone to work after your separation from United at KLM or Virgin Air, would that seniority -- would that status have transferred with you?

Page 182

**A. No. I would have become a new hire and on reserve.**
Q. What would be the difference in pay, speculatively speaking, between what you were earning as a senior flight attendant versus what you would have had as a first year?
**A. I believe with American, Delta, some that I've seen, they start off between 18, 19, 20. And I was at 65, 67. And then I saw recently, in the discovery, on one of Alita's paperwork, that I had just received a pay increase, which I didn't even know about.**
Q. And when you say 65, 66 [sic], you mean dollars an hour?
**A. Yes.**
Q. Okay.
**A. Plus I had purser override. I had night pay override. I had -- so we had white pay incentive, white flag incentive, purple, where you're making up to 110, 120 an hour. Recently with this July Fourth burnout, there were flight attendants that were making 300 percent to flight their trips, and then you throw in holiday pay of time and a half, so they were making about 6- or $700 an hour.**
Q. If you could go back to work and be a flight attendant today, would you?

Page 183

**A. Yes.**
Q. If you were allowed to be reinstated, would you take that?
**A. 100 hundred percent.**
Q. Do you enjoy being a flight attendant?
**A. I love it.**
Q. Okay. Earlier you discussed a transition to light duty, as a recruiting position. Can you tell us when, about, that happened?
**A. April in 2016.**
Q. Okay. And you indicated that you had trouble walking. Is this April 2016 position prior to the diagnosis of the neuroma in your ankle?
**A. Yes.**
Q. So even though you had been accommodated with light duty your physical status prohibited even this. Is that right?
**A. Yes. I was accommodated with light duty, but I wasn't accommodated with proper medical treatment.**
Q. Okay. So as you sit here today, it's your testimony that -- well, let me strike that.
Do you recall when your -- when this new diagnosis was, of the neuroma, in 2016?
**A. Right before Thanksgiving, he called me.**
Q. Who is "he"?

Page 184

**A. Excuse me. Dr. Kevin Varner called me right before Thanksgiving, before he went out on holiday break.**
Q. And he's the one that made that diagnosis?
**A. He's the one that ordered the MRI and made the subsequent diagnosis.**
Q. Had you had an MRI prior to that?
**A. No.**
Q. Earlier you testified that you were given the release to return to work May 23rd of 2019. Is that right?
**A. Yes.**
Q. And that your cut-off window would have been May 26th of 2019. Is that correct?
**A. Yes.**
Q. And you indicated -- and forgive me if I wasn't paying attention -- that the doctor had actually cleared you back in April?
**A. April 5th.**
Q. And which doctor was that?
**A. Dr. Kevin Varner, and Dr. Michael Klebuc also had to sign off on it, the microsurgeon who did my surgery.**
Q. Did Dr. Klebuc sign off on that?
**A. He did through internal -- I had to go --**

**Dr. Kevin Varner was my orthopedic. He referred me to Dr. Klebuc for the surgery. So as a surgeon, he made me see him before he did the release from the orthopedic surgeon.**

Q. So, technically, you could have gone back to work April 5th of 2019. Is that what I'm hearing?

**A. I believe that they -- United had a, Get it as soon as you can, the release, because you are required to give them 30 days' notice when you're coming back from an extended leave of absence.**

Q. So did you notify United in April of 2019?

**A. April 5th, 2019.**

Q. Okay. Who did you contact at United?

**A. I contacted Dominic. I had written him an e-mail and -- saying that I'm back and that I've been released full duty, and I contacted the -- I believe it was the FAST team, which initiates all of the fingerprinting, criminal background check. You had to have a passport. You had to show them your passport, updated. It takes a while.**

Q. Prior to the 23rd of May, did you engage in any processes to reinstate or return to work? Like the fingerprinting or drug screening?

**A. Yes. It took -- it took a process.**

Q. What actual processes did you initiate or



undergo?

**A. Fingerprinting, criminal background check, getting a new ID, getting a badge, getting a parking permit, getting known crew member, pictures. What else did I do? And scheduled my training.**

Q. Okay.

**A. They waited until -- they place you in the next available training.**

Q. All right. So this was a multi-week process?

**A. This was multi-week because they lost my first paperwork. I kept saying, Please get this back to me for my badge. You could not do anything until you got an activated badge back and stopped the process.**

Q. Let me ask you when you say "they lost my paperwork," who is "they"? And what paperwork did you lose?

**A. In the FAST team, my initial here's my release and here is my request for new badging. So until you received your new badge, you could not proceed further in the process.**

Q. Okay. Let's go back a minute. You submitted your doctors' -- the release to full duty to the FAST team sometime after April -- April 5th?

**A. April 5th was when I --**

Q. But before May 23rd?



**A. Yes, sir.**

Q. And you're saying that the FAST -- the -- what is F-A-S-T?

**A. Yes.**

Q. Flight attendant?

**A. Support team.**

Q. Support team. That they lost your initial return-to-work submission?

**A. He lost my -- my four pages of my requesting the new badging, the fingerprinting, to sign the releases that you allow them to run your background checks, the fingerprinting and produce a new badge for you.**

Q. Who is "he"?

**A. I can't remember his name, but I have the e-mail somewhere.**

Q. But he was with the F-A-S-T?

**A. F-A-S-T. He's in charge of the FAST team. And I finally said we're running out of time here because we can't proceed with anything else, and he said, I can expedite it. Just get it back to me.**

Q. Okay. Earlier you -- and forgive me for jumping around. Earlier you testified, a moment ago, that Mr. Cordova told you to discuss things with Ms. Stansbery after your June 2019 injury. Is that



right?

**A. On June 22nd, when I -- had written him on June 18th and told him you're -- I was told by the FAST team and scheduling and Flightline that you're the one that has to change this in the operating system, you report the OJI, that I can't do it. And I asked him to please get back with me and let me know what else to do further.**

**And four days later, he said, Were you able -- you need to talk to Alita. And I said, I've already left her voicemails. She's not calling me back.**

**And then I wrote him again, and he said, I was on the concourse the other day when you called me. I told them to make sure you talk to Alita. You know, Let me know what happens. There was nothing.**

Q. Is four days a common turnaround time after you report an occupational injury?

**A. It's supposed to be within 24 hours, that a supervisor is supposed to notify United of an occupational injury if they have a flight attendant in their group.**

Q. And so at that point in time, sometime between June 16th and June 22nd, you were still under the impression that Dominic Cordova was your supervisor?

**A. Yes.**

Page 189

Q. In fact -- and earlier -- a minute ago, you testified that Rick Velez was made your supervisor at some point prior to the 24th, was it? 23rd? 24th?
**A. That's when I received notice to contact my supervisor, Rick Velez.**
Q. Okay.
**A. Dominic did not know -- when I came down on July 1st for my -- my grievance and I saw him in the crew room, he still had no idea at that time that he was not my supervisor.**
Q. So even Mr. Cordova didn't know he was no longer your supervisor?
**A. He did not know.**
Q. Okay.
**A. He did tell me in an e-mail, I'm sorry. I feel like I dropped the ball on you because I was out on vacation from the 23rd. And he said, So I feel horrible about all this.**
Q. And a moment ago you indicated that had also reached out to Ms. Stansbery multiple times. Is that correct?
**A. Yes.**
Q. And when did she get back to you in response to any of your e-mails or phone calls?
**A. Never.**

Page 190

Q. If you don't mind turning to Exhibit 3, the arbitration transcript, and if you could go to Page 71.
**A. Okay.**
Q. Let me see if I'm doing this right. I'm sorry. It would be 72. I apologize.
71 starting at line 8, going until line 19, and I won't ask you to read that whole portion for the record, but if you could take a moment to review it and just let me know when you're done.
**A. Yes.**
Q. Okay. And so in this portion here, you indicate that you discussed things with Mr. Cordova. You had a 42-minute phone call with him. Is that right?
**A. Mm-hmm.**
Q. Okay. And you were inquiring as to how to report this when you spoke to him on -- is that June 22nd?
**A. Hold on just a moment, please. I'm wondering if this is -- I don't know if that was with Dominic or if that was with the FAST team, the 42-minute conversation. I'm trying to go above it to see. On 6-22 at 11:52, I think it says, "I'm on the phone with them now." I think that was with Sedgwick. And I called and was still asking how to report this, and they were still just trying to get the information down.**

Page 191

Q. Okay. That's good. So that's -- I had you review that so I can get you to review this: Page 72, lines eight through 15. Could you read that for the record, please?
**A. They just said that they had not heard from the training department yet. I told them that --**
MR. ROPPOLO: Objection. If you could ask the question before the answer is given so that it is clear what she's responding to.
MR. FRACHTMAN: Certainly.
MR. ROPPOLO: I can -- I can ask the question or you can.
MR. FRACHTMAN: Certainly.
Q. (BY MR. FRACHTMAN) In this -- in your testimony -- and this is your testimony, Ms. Finger. Correct?
**A. From the arbitration, yes.**
Q. Okay. From the arbitration. You testified that -- and Francheska (phonetic) -- Francisca -- the trainer at the Denver location had told you that they wrote a report on the 20th and submitted it. Is that correct?
**A. Yes.**
Q. Okay. If this is one of the trainers that had observed your injury on the 16th, why did she wait until

Page 192

the 20th to write a report and submit it?
**A. I can't answer that question.**
Q. Okay. Lower down on that same page, lines 17 through 22, you testified that she told you that she documented it on the 20th. Is that right?
**A. Yes.**
Q. Okay.
**A. She also told me on the phone that she was very disillusioned with the company and the way that she was instructed to have to write it and that she was very unhappy about it -- and coached on it -- and that she was leaving the training department if this was the kind of company that we had and she was going back to her line of --**
MR. ROPPOLO: Objection; hearsay.
**A. Okay.**
Q. (BY MR. FRACHTMAN) And let me stop you there, Ms. Finger. That's a little extra.
MR. FRACHTMAN: Okay. If we can do about a five-minute break off the record.
(Recess taken.)
Q. (BY MR. FRACHTMAN) Ms. Finger, earlier you testified that you felt you had been retaliated against. Who do you feel that you were retaliated against by?
**A. I feel that I was retaliated against initially**

**by Alita from her threatening statement prior to my leaving for training.**

**I've learned through discovery production that there were e-mails that referenced communication between Bob Krabbe, Sabrina Clark, and Alita.**

Q. Can I -- let me interrupt you here. Sabrina Clark, what was her position?

**A. She's base manager. Crystal Heckman is base direct.**

Q. And is this in Texas? Houston?

**A. Houston, Inflight.**

Q. Earlier you testified that you had called Mr. Cordova about your on-the-job injury and that you had also contacted Ms. Stansbery. Did you call anyone else at United?

**A. I called Elizabeth Hibbard. I called the FAST team. I called Flightline.**

Q. Okay. Let me -- let me ask you what -- what day did you call these individuals?

**A. There are 47 phone calls from -- excuse me -- just a moment, please -- that were logged. There were some that weren't even logged on my T-Mobile at the time to -- from June 17th starting at 2:00 o'clock until --**

Q. June 17th 2:00 p.m. or a.m.?

**A. 2:30 p.m. in the afternoon, when I left the**



**training center, I immediately called from the van going to Denver.**

Q. Did you testify to these phone calls in your arbitration?

**A. Yes.**

Q. Okay.

**A. Ah. Excuse me. I don't know if they were presented or not. I'm sorry. I believe they were.**

Q. Okay. But did you testify that you had reached out?

**A. Yes. Yes.**

Q. Okay.

**A. Yes.**

Q. Of these communications that you made of your on-the-job injury, who or what got back to you first?

**A. On the 18th or the eve of the 17th, when I was at the airport, someone from one of the 800-numbers that I have documented as United. Is either Flightline or FAST team or scheduling. I don't know who it was, but they -- I talked to them for one minute, three minutes, and 16 minutes to discuss that I had received a new OJI and how to go about reporting it to the company.**

Q. Was that the e-mail that indicated that you needed to discuss things with Mr. Velez?

**A. Mr. Velez?**



Q. Velez? Your new supervisor.

**A. No. This is my -- I never even -- that was on 6-17. I didn't know Mr. Velez was my supervisor till 6-24 when I received that e-mail from Brenda Jordan.**

Q. Okay.

**A. This was just my trying to do damage control and reach out to the company and go through the proper procedures, knowing that the training department was reporting it. I wanted to know what my responsibility was in reporting it to the company.**

**When you asked me about how I feel I was retaliated against, in my -- in the discovery that I recently received, I noticed e-mails from Sabrina Clark to Bob Krabbe with Dominic cc'd in regarding the fact that I had called to try and postpone my training date and push it back until I could have my mom's second surgery, and there was some dissection and misinformation as to who said no. I had already contacted the FAST team. I had contacted Josh downstairs, a supervisor. And I had spoken with Claire at the FAST team.**

**And I had also already had my training day changed from Sidney in the FAST -- FAST team to June 28th, and they rescinded that, and I spoke with Dominic, and he said speak with Sabrina, that his hands were**



**tied. That was it.**

**I spoke with Sabrina. I tried to tell her that they said that this is a common occurrence. If something were to happen, you push it back a month and that I had been put in the other class.**

**And then Sabrina told me that she had reached out Bob Krabbe and Bob Krabbe had told her to tell me if I wasn't in the June 2nd class, that I would be terminated. And I asked her for his e-mail address or his phone number and could I please call him to explain the circumstances. She said that she couldn't tell me not to call anyone in this company but that she had already spoken with him. It had reached its highest level. That was his answer and to not pursue it anymore.**

**In the e-mails, I see where she notified Mr. Krabbe that I was insistent upon getting an answer and I had already called downstairs three times and that I might be calling him even though she told me not to.**

MR. ROPPOLO: Objection; nonresponsive. There was no question asked.

But please proceed.

Q. (BY MR. FRACHTMAN) Earlier you testified that you had taken, after your requalification training, that you had had the chance to sign up for flights. I

Page 197

believe you called them pairings. Is that correct?
**A. We were required to pick up trips and build our schedule -- our flying schedule once we were qualified. We had a minimum requirement of flight time to do trip trades with open time to build our schedules.**
Q. And so after your requalification but before your notice of administrative termination, you had, according to your testimony at the arbitration, you had signed up for a flight to Cozumel. Is that correct?
**A. I believe that was the one on the 26th. We did a Cozumel turn, came back, and then did something else on the 27th. It was a two-day.**
Q. Did you have any other flights that you had, to the best of your recollection, scheduled?
**A. There was a turn worth nine hours and 38 minutes for the 28th, and I believe that probably was either a Calgary turn, or it had to be a three-legged turn for that amount of time.**
Q. Would that constitute a contractual schedule change?
**A. Yes. That was a trip trade with scheduling out of open time.**
Q. Okay. Do you feel that you were discriminated against by United in any form or fashion?
**A. Yes. I feel, because I reported an on -- a new**

Page 198

**on-the-job injury, that I was administratively terminated. They knew I had a reasonable accommodation process and had a -- an accommodation, and it is their responsibility once they learn of a new injury or a new change in that status to reach out to the employee and see what can be done to modify or what assistance I might need, which also includes intermittent leaves of absence, unpaid intermittent leaves of absence.**
**And it is warranted that -- with strict leave of absence policies that companies will have to edit a personal -- a leave of absence policy in order to accommodate someone with a restriction that --**
Q. Okay.
**A. -- versus admin terming.**
Q. Let me ask do you believe there's any other reason besides your disability that you were treated in the way you were?
MR. ROPPOLO: Objection. That's misstating her testimony.
But go ahead.
**A. I believe my age and my seniority, because of pay scales and my age and Scott Kirby not wanting that to be what he had for his new vision with United, that I was targeted and discriminated against and they took an opportunistic plan to -- when I was injured -- and in**

Page 199

**the e-mail where Alita writes Bob Krabbe and says, Can we admin terminate her? It's like Toto -- and her dog, Toto. It was the wicked witch.**
Q. (BY MR. FRACHTMAN) Okay. All right. Earlier you testified about VSL, forced retirement employees, and that included Tammy Bodie, Jodi Greer, Vicky Howard Clark.
MR. ROPPOLO: Objection. That's not what she testified about. You are combining VSL and the individuals who were terminated because of on-the-job injuries. Those are two different things.
Q. (BY MR. FRACHTMAN) Okay. Well, Ms. Finger, can you please clarify between the two issues?
**A. VSL was what the company offered the senior flight attendants. I think you had to have 20 years and be a certain age to receive the voluntary separation leave that was in January of '22 and August of '22.**
**And the -- what Mr. Roppolo is referencing was the three flight attendants named were ones who ran out of time on their three-year leave of absences due to occupationals.**
Q. Okay. All right. So those would be occupational injury terminations. Correct?
**A. Yes.**
Q. Not associated with the VSL program?

Page 200

**A. Not in --**
Q. To the best of your knowledge.
**A. Well, no. There was incentive to get rid of the senior flight attendants by offering early-outs and VSLs.**
Q. Are you aware of any other flight attendants who were terminated because of their age?
**A. I do have a private page of flight attendants that are terminated and that are also ongoing right now who are --**
Q. Are you aware of any other flight attendants who were terminated because of their age?
**A. Yes.**
Q. Are you aware of any other flight attendants who were terminated because of their disability status or injury status?
**A. Yes.**
MR. FRACHTMAN: Okay. No further questions. Remain till trial.
MR. ROPPOLO: Reserve all the questions for trial.
MR. FRACHTMAN: I'd like a read and sign.
(Proceedings concluded.)

CHANGES AND SIGNATURE

WITNESS NAME: CHRISTINE FINGER

DATE OF DEPOSITION: SEPTEMBER 7, 2023

PAGE LINE CHANGE REASON

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________



I, CHRISTINE FINGER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

________________________________

CHRISTINE FINGER

THE STATE OF __________)
COUNTY OF _____________)

Before me, ___________________________, on this day personally appeared CHRISTINE FINGER, known to me (or proved to me under oath or through ___________________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

________________________________

NOTARY PUBLIC IN AND FOR
THE STATE OF ___________________
COMMISSION EXPIRES: _____________



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CHRISTINE FINGER )
)
Plaintiff )
) CIVIL ACTION
v. )
) NO.: 4:22-cv-04205
UNITED AIRLINES, INC. )
)
Defendant )

----------------------------------

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
CHRISTINE FINGER
SEPTEMBER 7, 2023

----------------------------------

I, Velma C. LaChausse, Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, CHRISTINE FINGER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ____________________ to the witness or to the attorney for the witness for examination, signature and return to



me by ____________________;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. H. Julian Frachtman, Counsel for Plaintiff;
Mr. Stephen J. Roppolo, Counsel for Defendant;

That $__________ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 22nd of September, 2023.

________________________________
Velma C. LaChausse
Notary Public in and for the
State of Texas
Commission Expires: 03/23/2026
Lexitas
Firm Registration No. 95
13101 Northwest Freeway
Suite 210
Houston, Texas 77040
281-469-5580

**Exhibits**

**Finger 001** 11:4,5,7 68:16

**Finger 002** 16:23,24

**Finger 003** 21:17,18 109:14 123:4 190:1

**Finger 004** 24:1,2

**Finger 005** 46:10,11 47:25

**Finger 006** 70:12

**Finger 007** 77:2,4 80:10 93:14 95:19

**Finger 008** 79:12,13

**Finger 009** 119:12,13

**Finger 010** 145:16,17

**$**

**$100,000** 114:7

**$100.000** 33:22

**$18** 113:9

**$40,000** 86:14

**$45.000** 114:7

**$5** 86:3

**$56,000** 33:20

**$58** 171:13

**$67** 113:7

**$700** 182:23

**$76,514** 49:7

**$9,000** 92:23

**$937** 48:19

**$938** 46:25 47:13 48:13

**-**

**--is** 94:12

**1**

**1** 11:4,5,7,13 18:18,19 19:21 68:16 137:23 150:10

**1-** 125:1

**10** 32:24 63:6 107:3,7 145:16,17

**10-4** 47:14

**100** 21:11 23:22 167:23 183:4

**100,000** 134:17

**102** 22:2 49:3

**11** 110:3

**11-15-2019** 46:22

**11-22** 47:9

**110** 182:18

**11:00** 125:5

**11:52** 190:22

**12** 32:24 63:6 107:3

**12-18** 47:4

**12-hour** 123:19

**12-month** 58:16

**120** 182:19

**13,000** 87:12

**13th** 72:2,7

**142** 22:10 123:22

**144** 22:7,13

**15** 32:24 62:19 94:24 95:18 104:25 112:6 123:7 191:3

**15.E** 11:13

**1589** 14:7

**15th** 17:5,19 45:10 50:20 90:14,19

**16** 194:21

**1600** 14:10

**16th** 38:13 39:23 44:9,11, 19 45:5,9 50:19 90:8 101:21 120:12 121:9 140:11 174:18 188:23 191:25

**17** 123:25 192:3

**17th** 27:1,3 28:8 101:22 119:19 120:5,14 121:10, 25 140:12 176:13 193:23, 24 194:16

**18** 40:1 72:2,3 182:8

**18th** 27:6 80:3 90:9 125:2, 3,5 176:14,15 188:3 194:16

**19** 77:19 182:8 190:6

**19,000** 87:12 134:18

**19-** 42:14 63:21

**1984** 180:14,15 181:5

**1998** 8:25

**1999** 12:9

**19th** 27:6 57:23 79:1,15 93:15 95:22 122:5

**1:00** 105:22

**1:00-ish** 102:3

**1:43** 124:23

**1st** 17:7,10 19:7 98:19 127:17 128:21 189:8

**2**

**2** 11:13 16:23,24 107:1

**20** 42:15 62:20 182:8 199:15

**20-** 42:13 74:2 90:18 149:8 180:22

**200** 83:25 181:20

**2000** 9:3,4

**2000-** 72:2 83:20

**2000-something** 8:25

**2003** 9:4

**2004** 9:4

**2014** 33:18,20,22 41:1 43:4 61:25 62:7 66:1,9 67:9,21 70:19,23 76:6 87:11,19 92:19 129:5,18 151:1,13

**2015** 146:17

**2016** 33:22 34:20 35:2 62:7 64:14 66:10 67:9 68:2,6,12,21 73:1,10 74:2,3 84:13,16 85:6 92:17 113:19,25 114:4 129:5,18,22 147:6,7,11 180:21 183:10,12,23

**2017** 31:7,13 65:24 92:16 173:23

**2018** 72:7,14 83:2 146:16

**2019** 11:1 17:5 22:23 37:25 38:1,3 43:4 44:9, 11,18,19 45:5 46:21 47:1, 13 48:4 50:19 52:8 57:4, 23 63:21 68:9 69:23 70:5, 6 73:2 77:3,14,19 79:1,9, 15 81:15 82:17 83:5 84:17 93:21 129:25 130:7,9,10,22 146:17,19 154:23 174:18 177:13 184:10,14 185:6,11,12 187:25

**2020** 42:25 54:13,14 55:4 56:7,9,17,21,22 57:3,6 58:9 65:24 128:4 130:20

**2021** 26:25 39:17,24 43:7 49:20 50:20 52:2,6 53:20 54:2 58:9 59:3,14,18 128:24 129:25 130:8,9,13 132:10 133:4,6,9,15 164:7 168:21

**2022** 26:19 27:4 28:8 53:8 88:24 113:12,20 114:7 133:7

**2023** 10:15 90:20

**209** 21:2 32:22,24 134:7 164:23 165:3 171:9

**20th** 122:5 191:21 192:1,5

**22** 192:4 199:17

**22nd** 112:13 176:20 188:2,23 190:17

**23** 93:21 160:5,7,8

**23rd** 11:21 70:6 73:1 77:19 79:9 81:15 82:6 96:5,14 184:10 185:21 186:25 189:3,17

**24** 121:19 122:3 188:18

**24th** 178:14 189:3

**25** 100:23 137:4 154:7

**25th** 90:10

**26** 37:25 69:23 83:3 127:18 128:20

**26th** 15:2 68:9 81:20 82:17 122:10 124:3,4 126:2,4,7 127:4 177:24 184:14 197:10

**27th** 15:4 46:25 126:4 127:4,18 128:20 177:24 197:12

**28** 71:14

**28th** 11:2,8 17:8 39:12 111:25 126:5,8 127:5,18 128:20 177:24 195:24 197:16

**29** 21:20,24

**29th** 68:22 147:12

**2:00** 24:22 124:20 193:23, 24

**2:00-ish** 102:3

**2:30** 125:2 169:3 193:25

**2:45** 125:2

**2L** 106:17

**2nd** 11:23 38:1 40:1 104:1 112:3 196:8

## 3

**3** 21:17,18 87:8 107:1 109:14 123:4 162:16 190:1

**3,000** 134:18

**3-15-2021** 49:9

**30** 26:6 30:14 38:5 52:19 82:2 99:18 105:6 185:9

**30-year** 113:6

**300** 182:20

**30th** 48:6,7,12

**35** 87:13 116:8 117:23 151:22 180:11

**35-year** 44:24 113:6

**35-year-career** 45:1

**38** 197:16

**3rd** 11:23 42:21 64:4,14 66:9 67:9,21 70:19,20,23 76:5 104:2

## 4

**4** 24:1,2 36:4

**4-5-19** 38:6

**40,000** 6:22

**40-plus** 121:18

**401(k)** 54:3,8

**42** 87:15 116:14 156:3

**42-minute** 190:13,20

**43** 152:20

**45** 15:18 87:15 104:7 137:17

**45,000** 113:21

**47** 193:20

**48** 121:19 122:4

**4:00** 105:13,14

**4th** 73:1

**5**

**5** 46:10,11 47:25 93:17

**50** 72:16 127:20 164:12

**500** 120:17

**51** 109:14,16

**56,000** 87:11

**5th** 38:3 48:4,8,12 77:13 78:17 82:1,3 95:23 184:19 185:6,12 186:23, 24

**6**

**6** 70:11,12 93:17

**6-** 102:13 182:23

**6-16** 102:14 104:22 105:4, 12,15

**6-17** 102:13 195:3

**6-18** 102:18

**6-22** 190:22

**6-24** 178:22 195:4

**60** 53:13

**60th** 17:18

**63** 61:20

**64** 53:13 61:14,20,21

**65** 182:9,12

**66** 182:12

**67** 182:9

**6:00** 28:23 122:22 123:8 124:21

**7**

**7** 77:2,4 80:10 93:14,17 95:19

**71** 121:16,17 190:2,6

**72** 190:5 191:2

**73** 177:19

**737** 76:12

**75** 123:5,10

**78** 123:11

**7:00** 38:15 102:13 121:11 178:22

**7:24** 119:21,25 120:6

**7th** 43:11 65:24

**8**

**8** 57:22 79:12,13 109:16 110:3 119:8 190:6

**8-23-2019** 49:9

**8-3-14** 71:23

**8-5-16** 71:3

**800-numbers** 194:17

**80s** 150:21

**8:00** 17:10 118:17 120:10

**8th** 64:16

**9**

**9** 119:7,9,12,13

**90** 23:15 95:2 98:8 127:21 162:5

**90-day** 133:18

**9th** 43:13

**A**

**a.m.** 119:21 121:11 124:23 193:24

**abide** 30:18

**abilities** 131:7

**ability** 9:17 72:18 141:4 168:15

**abrasive** 100:3

**absence** 37:24 38:2,5 51:5,7 86:19 124:15 136:25 139:9,10 145:25 147:17 148:1,11 151:6 185:10 198:8,10,11

**absences** 199:20

**absolutely** 15:23 20:3,6 76:9 158:19 159:6 172:16

**abuses** 142:5

**abusing** 142:7

**acceptable** 111:2

**accepted** 63:12 93:1 175:25

**access** 40:10 146:3

**accident** 86:9,13 87:18 89:5

**accommodate** 198:12

**accommodated** 183:15, 18,19

**accommodation** 31:3 71:17 77:22 80:3,7,14 116:1 141:6 198:2,3

**accommodations** 80:16

**accordance** 11:12

**accrued** 87:13

**accuracy** 25:13 26:9

**accurate** 109:22 135:2 145:5

**accurately** 23:2

**achieve** 122:24

**Achilles** 67:18 71:5 141:2

**acknowledged** 40:3

**acknowledges** 176:8

**acknowledging** 126:17

**acting** 179:15

**action** 18:23 111:3 132:21 137:18 138:8,10 173:11

**actions** 94:17

**activated** 186:13

**active** 36:15,16 37:22,24 38:12,18,21,24 39:3,5 85:12 121:13 124:11 127:1 136:22,23 137:19 156:24

**actual** 37:19 104:9,14,19 165:13 185:25

**acute** 43:21

**adamant** 156:25

**addition** 86:15

**additional** 86:2 87:14,15 93:22 94:17 167:9

**address** 32:18 130:24 196:9

**addressed** 63:14

**adequate** 134:20

**adjust** 47:23

**adjusted** 107:12

**adjuster** 40:9,12 43:13 58:21 64:2 74:11 92:11

**adjusters** 40:7 58:5

**adjustment** 24:4 27:12

**adjustments** 24:5

**admin** 11:25 12:2 15:8 16:3,10 198:14 199:2

**administer** 176:4

**administrative** 12:16 16:1,13,19 18:13 20:2 39:9 68:18 103:18 197:7

**administratively** 11:12 12:18 32:16,19 44:7 49:16 53:11 101:17 124:16 150:4 198:1

**administrator** 46:18

**administrators** 44:2 173:20

**advancements** 34:8

**advice** 57:21

**advise** 69:7

**advised** 68:7,25 69:5,6,8, 12 74:1 75:1 94:17 146:25

**advising** 68:18

**advisor** 163:1

**advocate** 100:18

**AFA** 17:5 18:9 19:9,12 20:14 21:2,21 23:18,19, 23 24:11 25:1 26:2 28:22 51:13 134:24 135:17,21 137:2 138:1,3 156:3 157:24 165:2,16 170:8,9 173:14,16

**AFA's** 25:18 26:3 158:16

**affidavit** 135:2

**afforded** 35:3 172:4,5

**afternoon** 124:21 193:25

**age** 4:9 140:3 148:21 198:21,22 199:16 200:7, 12

**aggressive** 98:24

**agree** 36:8

**agreed** 118:24

**agreement** 11:14 136:20, 21 149:16

**agreements** 30:19 180:25

**ahead** 16:14 38:16 114:4 198:20

**air** 20:16 76:15 169:20 181:23

**aircraft** 63:2,8 95:13 104:18 105:18 106:21 127:8 128:18

**aircrafts** 104:12

**airline** 39:11

**airlines** 4:7 115:1 120:23 152:5

**airplane** 35:8 76:12 127:9 128:9 132:16

**Airplanes** 5:19 9:23 29:8

**airport** 13:17 102:4 104:4, 5,8,11 194:17

**align** 174:1

**Alita** 11:16 12:23 13:1,4,6, 15,18 15:4,21 16:2,12 97:24 98:1 99:12,20 100:11,16 101:6 103:7, 10,13 140:5,16,18 165:4 176:21,25 177:2 188:10, 14 193:1,5 199:1

**Alita's** 12:13 182:10

**all-consuming** 152:10

**Allan** 154:11

**allegations** 148:21

**allowed** 38:14 51:6 66:24 74:24 117:21 173:2 183:2

**alongside** 169:15

**alprazolam** 159:20 163:17

**alter** 165:17

**altered** 164:20,22 165:15, 16 167:13,15

**amend** 7:12

**American** 152:5 182:7

**amount** 6:20 8:12 49:6,10, 14 64:22 73:11 88:3 121:15 148:11 197:18

**Ana** 161:24

**and/or** 86:20

**Anderson** 160:22

**anguish** 150:13

**animosity** 98:24

**ankle** 31:4 35:6 44:13 45:4,19 50:1 55:24 56:10, 18 61:25 63:11,17 64:22 65:4 66:11 76:19 77:23 78:9 88:12,18 89:5 106:10 108:1,2 125:10,23 126:19 127:2 131:11 141:1 183:13

**annihilated** 134:16

**annihilating** 144:10

**annual** 87:5 105:5

**answering** 149:25

**answers** 14:19 50:15 91:18 168:6

**Antonio** 71:14,18 127:11

**anymore** 57:16 144:19 155:3 196:15

**apologize** 47:24 98:12 180:9 190:5

**appeal** 92:2 133:20

**appealed** 23:17 92:3

**appears** 46:24 47:19 48:4 72:2

**applied** 53:11,24 54:19 61:15

**apply** 52:3,23 53:6,21 61:9,17 87:19,21,24

**appointment** 17:10 40:22 41:5 44:21 55:18 57:24 125:11,14 128:7,8

**appointments** 58:3

**approach** 158:16

**April** 10:12,13 38:3 42:13 43:6,11,13 56:7 62:7 66:10 67:9 70:5 77:3,13 78:17 79:1,15 80:3 82:3 88:19,22 89:2 93:15 95:22,23 133:9 146:17 183:10,12 184:18,19 185:6,11,12 186:23,24

**arbitration** 4:21 5:17 19:4, 23 20:9,18 21:14,22 23:11,15 24:4,7,16,21 28:21,23,24 29:11,13 46:13 52:2,4,6,15 59:10, 15 70:16 108:8 122:21 127:7 132:8 133:5,6,25 134:9 135:8 136:3,4 137:9,11 145:22 153:2, 16,18 155:1 157:8 160:14 164:7,21,25 165:22,23 166:7,9,14,19,25 167:17, 20 168:21 169:17,25 171:9,10,23 190:2 191:17,18 194:4 197:8

**arbitrator** 23:15 36:4 37:17,21 134:4 157:12 164:5,10

**arguably** 111:5

**argue** 23:20 173:14

**arguing** 37:14

**argument** 35:20,23 37:13

**Arkansas** 152:21

**arm** 35:7

**arrivals** 85:25

**ashamed** 132:14

**aspect** 126:18

**aspects** 22:23 159:12

**assert** 139:25

**asserted** 8:16

**asserting** 4:8

**assign** 38:10 39:25 175:24

**assigned** 8:14 32:2 44:14 158:4 169:14

**assignment** 79:8

**assigns** 180:2

**assistance** 198:6

**assisted** 156:21

**at-risk** 110:23 141:18

**attached** 68:17 77:7

**attack** 105:25

**attend** 82:5

**attendant** 9:22 14:24 29:4 31:8 36:16 38:8 45:1 57:11 58:18 59:12,17 73:17 84:6 86:4 88:9,15 94:16 100:15 106:13 114:17,19 116:11 126:22 127:6 128:2,15 129:2,9 130:3,18 131:8 137:19 140:4 152:3 154:21,24 175:3 180:10,13 181:10, 15,16 182:5,25 183:5 187:5 188:20

**attendants** 4:18 5:19 34:25 35:4 94:8 95:17 96:22 100:19,22 102:7 105:1,5,7,23 106:3,21 107:9,23 110:19 112:25 113:5,10,23 114:6,24 115:13 135:19 139:16 141:14,21 142:4,7 143:24 144:17 146:3 156:18 158:11 159:16 160:4,5,8, 10 161:1 174:6 181:20 182:20 199:15,19 200:4, 6,8,11,14

**attendants'** 33:17

**attending** 11:22

**attention** 184:17

**attorney** 6:23 14:9 20:12 25:10,21 26:7,10 133:23 134:25 135:10,22 138:25 150:22 161:3 162:7 169:14,18,22

**attorneys** 156:14 161:3 162:2,8 169:11 170:5

**August** 33:19,20 41:4 48:6,7,12 52:8 55:4,17 61:25 62:7 64:3,14,16 66:1,9 67:9,21 70:19,20, 23 73:1 74:22 76:5 83:1, 5,20,21 87:18 114:6 117:8 128:18,19 179:11 199:17

**Austin** 163:8

**authority** 16:14 180:6

**authorized** 42:7,11 43:6

**auto** 106:24

**auto-generated** 18:5

**autoimmune** 141:4 163:22

**avenue** 18:10

**Avon** 64:2 66:19 70:9 74:12,14 143:12

**award** 27:1,7,21,22 53:7 133:7

**aware** 18:7 31:6 34:10,11, 12,13 129:13 135:3 137:7 147:16 150:6 151:3 200:6,11,14

**B**

**back** 6:13,14 9:2 14:10,14 15:3,10,17 18:6 19:17 20:11,20,25 21:5 28:14 38:7 41:9 42:11,12,17,24 44:5 50:5 51:14,21 52:6, 10 54:15 55:7,10,18,21 58:24 59:16 63:6,9,15,19 64:11 65:22 66:23 68:3,6, 9 70:5,6 71:16 72:4,13,22 73:6,12 74:5 76:5,11,14 82:12,20,21,24 83:7,10, 15 84:2 89:1,19 90:8 91:14 94:22 95:10 96:21 97:11 98:1,14 101:19,22 102:13,15 103:6,9,11,13 107:23 109:9,13 111:14, 19,23 112:6 114:11 115:22 118:16,17,20 122:3,7 125:16 126:5 127:11,13 128:17,22 130:6 131:20 133:10,21, 22 134:16,23 138:5 140:13 141:3 142:9,24,25 143:18 144:22 149:22 153:1 154:22 160:17,23 161:1 165:2,9 167:3,4 168:18 172:17,19,24 176:17,19,20,24 179:10 182:24 184:18 185:5,9,15 186:11,13,21 187:21 188:7,11 189:23 192:13 194:15 195:16 196:4 197:11

**back-and-forth** 28:13 112:2

**background** 94:5 185:18 186:2 187:11

**backstage** 114:9 120:21

**backtrack** 41:11

**backwards** 46:24

**bad** 76:14 125:24 155:5 160:6

**badge** 94:4 186:3,12,13, 19 187:12

**badging** 186:18 187:10

**ball** 189:16

**bank** 137:17

**banks** 165:13

**bar** 72:19 76:17,18

**barely** 55:24 165:21

**Bargaining** 11:13 149:16

**barrier** 41:14

**base** 11:20 13:16 17:15 18:16 19:21 139:11 158:10 180:5,6 181:19 193:8

**based** 14:18 33:17 49:13 51:12 72:12,15 79:15,20 107:20 125:23 134:14,19 150:6 158:12,14

**basically** 72:17 95:16 135:6

**basis** 87:5 140:1

**Bassett** 33:24 42:3 63:12 64:3 91:20 92:4,20 173:20,25 174:1,9

**Bassett's** 66:15

**battle** 143:17

**battles** 148:25

**battling** 20:14

**bear** 74:2

**bed** 39:14 44:22 45:3 55:23 126:15

**bedridden** 126:10

**began** 21:24 22:2,8,13 47:13 62:8 66:10 68:2 128:5 130:10 177:7

**begin** 61:10 180:12,17

**beginning** 46:21 48:22 127:23,24 168:18

**begins** 21:19

**behalf** 4:18

**belief** 51:24

**believed** 6:10 36:21 38:24 39:5 52:24 58:15,17 118:22 128:22 156:17

**benefit** 50:7,8 137:15

**benefits** 29:5 48:24 50:10 73:4 84:5,8 86:6 113:22 132:11 165:12

**Berig** 23:14 26:18 133:17, 23 134:4 164:5 172:15

**Beth** 98:21

**Beto** 19:13

**bid** 38:14,17 121:10,23

**bids** 38:15 121:11

**big** 53:16 62:19 178:19

**bills** 92:13,19

**binder** 171:8,10

**binders** 171:11

**binding** 30:23

**birthday** 17:19 45:9,10

**bit** 14:4,5,14,16 76:10,11 84:8 148:6

**black** 100:24

**black-and-white** 145:14

**blacked** 25:20 101:1

**blah** 102:16,17 138:5

**blank** 47:20,21 48:1

**blasted** 114:21

**blind** 15:16

**blindsided** 98:5

**blood** 111:14

**Blown-up** 151:17

**blue** 97:12

**board** 21:22 23:7 24:4,5 27:12 30:8 36:4 96:21 108:8 152:8

**Bob** 17:14 20:11 134:25 193:5 195:14 196:7 199:1

**Bodie** 115:18 116:19,21 199:6

**bomb** 106:1

**bone** 75:21

**bonus** 84:11

**boot** 73:6 82:22 83:16

**bot** 14:12

**bother** 25:4

**bottom** 22:12 36:5 69:22

**box** 167:2 171:12

**boys** 144:2

**brace** 31:4 77:23 108:1 118:21

**Brandi** 159:7

**Bravachavo** 108:5,16,19

**break** 5:8,15 28:12 91:8, 15 139:20 184:3 192:20

**breakdown** 14:8 26:15

**breakfast** 149:13

**breakfasts** 141:23

**breakroom** 20:23

**Brenda** 146:11 178:22 195:4

**briefs** 26:5

**bring** 94:18 147:23

**broke** 25:16

**broken** 24:15 125:15 136:19

**brother** 152:15 153:5

**brought** 31:21 36:24 52:18 88:4 120:16 149:13 172:6

**build** 177:18 197:2,5

**building** 7:7 62:18,25 63:1,4

**built** 32:12,25 121:17 143:5

**bulging** 63:15

**bull's-eye** 33:9 136:5

**bulletin** 96:21 110:25

**bulletins** 110:21

**burnout** 182:19

**Burton** 67:1

**business** 10:7 60:3,4 61:2

**busy** 27:8

**button** 144:24

**buy** 10:22 87:14

## C

**cabin** 106:17 107:1

**cabin-trainer** 104:17

**Calgary** 197:17

**California** 139:13 142:2

**call** 12:25 13:4 15:15 26:1 40:15 61:17 74:16 78:1 102:9 122:5 123:18,21 124:25 126:1 140:13 153:12 174:22 175:13,23 190:13 193:14,19 196:10, 12

**called** 15:1 17:9 25:17 27:9,20 29:11 40:13 63:22 64:6,18,19 70:10 88:24 92:14,15 101:20,21 102:22 103:9,11 105:19 106:24 111:11 112:1 114:12 122:4,7,12,14,21, 23 123:7,14 124:3,5,10, 23 126:3,5,7 128:19 137:14 146:10 155:23 165:5 177:21,23 183:24 184:1 188:13 190:24 193:12,16,17 194:1 195:15 196:18 197:1

**calling** 40:17 41:16 102:4, 19 103:4 124:13 144:14 156:12 165:12 178:2 188:11 196:19

**calls** 22:24 36:19 189:24

193:20 194:3

**cancel** 43:15

**candidate** 53:17

**cane** 63:25 74:7

**capabilities** 141:10

**capable** 50:23 51:2 54:23 55:1 57:9 58:17 59:11 70:4,24 95:1 124:2,6

**capacity** 67:24

**cardiologist** 111:12

**care** 114:19 139:1 143:23 148:17,19 159:10 174:11

**career** 44:24 114:18 151:22

**careful** 88:14

**caregiver** 133:10

**caring** 153:11 174:2

**carriage** 180:24

**carriers** 72:19

**carry** 72:18 103:1

**cart** 76:7,17,18

**carton** 76:18

**carts** 72:19

**cartwheels** 151:23

**carved** 169:1,2

**case** 15:21 23:6,20 25:18 26:2,3 32:25 35:20 39:25 63:13 80:25 135:3 138:4 154:16 158:5 159:13 163:5 173:14

**cases** 117:15 154:22

**cash** 60:1,5

**cast** 35:7

**catch** 32:8 107:24 120:9 124:21 135:12

**category** 142:16

**catwalk** 63:7

**caught** 31:25 97:7

**caused** 158:17

**causing** 159:18

**caveat** 117:1

**cc'd** 80:1 195:14

**cc's** 15:16

**CCH** 92:8,9 93:1

**CCS** 165:6

**cease** 161:4

**celebrating** 83:2

**center** 62:18 104:7 107:22 119:3 194:1

**cetera** 36:20

**chain** 144:4,5 176:18

**chair** 158:23 172:21

**chairman** 158:23

**chairperson** 137:24 141:13 158:21 170:14

**chairs** 107:8

**challenged** 138:18

**chance** 27:14 78:3 196:25

**change** 68:13 141:20,24 168:7 175:21 178:9 179:24 188:5 197:20 198:5

**changed** 24:20 34:22 151:20 174:23 175:12,13 178:5,6 195:23

**changing** 33:25 133:13 146:22,23

**charge** 132:21 187:18

**charges** 7:10 8:16

**charm** 114:12

**chart** 48:4

**charter** 141:9

**check** 94:5 185:18 186:2

**check-in** 97:9,11

**checklist** 97:13

**checkmarks** 71:7

**checks** 49:11 187:12

**Chelsea** 40:7

**Chicago** 13:12 19:19 24:25 114:9,12 153:18 157:25 158:14

**choice** 14:21

**Chris** 155:17

**Christine** 4:2 60:25 64:20

**Christmas** 60:2 84:11 89:21 90:10

**church** 172:6

**Ciara** 34:13

**Cintas** 81:2

**circled** 15:17

**circumstance** 8:15

**circumstances** 117:21 196:11

**civil** 7:12 8:18,20

**claim** 15:7 39:25 40:4,23, 24 44:14 85:5 92:19 175:22,24 176:1

**claims** 4:8 112:18

**Claire** 195:20

**clarify** 168:7 199:13

**Clark** 15:17 16:2 111:22 116:3,20,23 193:5,7 195:13 199:7

**class** 11:23 38:10 101:23 104:25 105:3,7 107:15 111:11 112:4 118:17,20 120:10 138:8,10 196:5,8

**classroom** 120:25

**clause** 136:24 137:5,6

**clauses** 137:20

**clean** 171:3

**cleaned** 33:16

**clear** 9:14 79:18 82:16,18 114:25 168:4 191:9

**cleared** 79:8,24 93:20 94:7,25 176:4 184:17

**clearheaded** 9:15

**cliches** 14:24

**client** 144:8,9

**clients** 10:5,21,23 60:6

**climb** 72:16

**climbing** 76:15

**clock** 34:18 73:9 82:23

**close** 98:18 115:5 116:21,22 161:23,24

**closed** 38:15 42:21 112:25 158:10

**closest** 153:7

**club** 181:7

**clue** 167:6

**coached** 192:11

**cocktails** 107:20

**code** 174:22

**coded** 66:13 67:19

**coffee** 151:5

**cog** 113:6

**Cohen** 20:10 22:4 37:10,11

**Cohen's** 37:1

**coincided** 105:1

**coincidence** 81:21 97:19

**cold** 63:10

**collapsed** 13:24 90:10,25

**collateral** 143:16

**Collective** 11:13 149:15

**college** 181:6

**color** 61:2

**colors** 102:15

**combative** 28:20

**combining** 199:9

**comfortable** 111:15

**comfortably** 31:19

**comment** 140:7 178:6

**comments** 101:2 160:2

**committed** 160:5

**committee** 156:15

**common** 188:16 196:3

**communicate** 179:20

**communicated** 134:23

**communicating** 179:9,10

**communication** 24:15 25:20 26:3,15 69:11 103:14 165:6 175:15 193:4

**communications** 101:9,17 103:15 194:14

**commuter** 169:21 178:20

**commuters** 20:15

**commuting** 158:14

**comp** 37:4 40:3,20 44:14 46:18 58:7 64:7 118:5 125:17 138:17 142:12,16,18 146:12 157:1 178:25

**companies** 198:10

**company** 10:12 28:2 30:19 34:3 61:5,6 80:21 82:2 86:14 110:20 111:17 113:17 120:18 136:19 137:13 142:10,15 154:23 164:25 165:1 172:14 173:9 192:9,13 194:22 195:7,10 196:12 199:14

**company-offered** 86:12

**compass** 142:13

**compensation** 70:18 85:16,22

**competently** 23:20

**complaining** 83:7

**complaint** 162:5

**complaints** 174:3,4

**complete** 15:9 55:9 91:3 94:24 101:23 173:3

**completed** 37:23 77:11 79:2 104:21 106:11 120:12 121:9 177:9

**completely** 21:9 24:15 25:16,19 65:21 173:14

**completion** 106:16

**complex** 49:25

**compliant** 96:11

**complicated** 178:18

**complication** 6:22

**complications** 14:3 89:1

**complied** 23:9

**complimentary** 167:17

**comply** 93:23

**compression** 77:23 78:5,19 80:11 81:13

**compromise** 129:14

**compromised** 127:15 134:13

**computer** 53:15 97:23 99:24 105:25

**concerns** 154:16,17 155:4 160:2

**concierge** 97:11

**concise** 9:14

**conclude** 130:17

**concluded** 23:8 131:15 200:23

**concourse** 31:15 103:7 140:17 176:21 188:13

**condition** 130:5

**conduct** 144:13 173:10

**conducting** 30:25

**confide** 160:1

**confided** 148:24

**confidential** 26:11 149:1

**confidentiality** 82:19

**confused** 84:18

**confusing** 69:14

**connection** 4:7 9:6 22:25 62:3 78:15,19 157:4 164:6

**Connie** 155:23

**connotation** 142:17

**constantly** 146:22

**constitute** 197:19

**constituted** 121:18

**consult** 60:1

**consulted** 13:6

**contact** 8:13 17:13,14 25:3 41:18 57:15 58:19 94:9 102:20 134:2 159:24 178:24 185:13 189:4

**contacted** 55:16 80:13 94:16 122:6,18 138:24 185:14,16 193:14 195:19

**contacting** 15:11

**contention** 30:17

**contentious** 134:21,25

**contested** 63:13

**contesting** 18:13

**context** 12:2 68:5

**continental** 33:11 84:8 97:2,4 138:15,19 139:15 142:3 147:17 155:23 156:1 180:18,19

**Continental/united** 137:6

**continuance** 14:2

**continue** 58:10 67:24 78:12 86:15,21

**continued** 58:14 68:10 84:5,22,25 85:9 87:1 179:15

**contract** 38:22 39:7 52:16 152:6

**contracts** 60:3

**contractual** 30:12,15,18, 20 36:17 136:18,19,21 157:17 173:8 197:19

**contractually** 30:23 137:21

**contracture** 67:18

**contributing** 142:14

**control** 195:6

**conversation** 80:3,15 99:17 147:23 154:9 161:16 162:12 190:21

**conversations** 25:8 33:5 101:5 154:15 161:7 163:2

**converted** 54:10 122:15

**copies** 24:10

**copy** 24:9 31:23 145:21

**Cordova** 11:21 96:5 117:7 137:4 176:11,13,16 177:3,11 178:10 179:3,14 187:24 188:24 189:11 190:12 193:13

**core4** 101:23 120:13,15

**corner** 97:20,21,22 98:15

**corporate** 12:2 156:10 178:17

**corporations** 142:2

**correct** 4:12,15,20,25 11:1,9 13:10,13 16:15,19 19:5 20:7 21:8,11,22 22:5,8,18,25 23:3,9,24 24:6,7 39:1,13,21 44:9 45:19 46:21 48:14 49:17 51:10 52:5 56:21 58:20 59:12 60:14 61:10 62:1,9 69:2,10,20 70:1,6,19,25 71:3,24 72:24,25 73:16 75:11 77:14,20 79:2,9 81:19 82:17 84:23 85:1 91:16,23 103:18,19 108:24 109:2 117:20,23 119:24 122:13 123:13 124:7,8 127:3 128:2 131:16 145:12 147:1,18 150:1 155:20 163:25 168:22 169:1,6 170:2,18 175:5 176:5 177:22 178:10 184:14 189:21 191:16,22 197:1,9 199:23

**corrective** 111:3

**correctly** 175:4 176:2

**Cort** 154:1,8

**counsel** 20:15 21:20,21 22:3 134:21 157:23 169:16

**counselors** 135:9

**country** 111:20 181:7

**County** 8:3

**court** 4:8 7:5 9:10,11

**courtesy** 43:15

**courtroom** 5:21,24 9:13

**Coventry** 34:13

**cover** 123:19

**COVID** 24:23 25:1,22 42:15 49:24 50:3 52:7 53:2,3 55:3 56:5 57:6,25 158:10

**coworkers** 106:3

**Cozumel** 197:9,11

**crazy** 98:23

**create** 26:14

**created** 138:12 158:13

**crew** 17:7 19:11 80:24 95:6,8 96:6 100:14 102:6, 8 138:23 157:19 165:6 186:4 189:9

**criminal** 7:7,10 8:16,18,20 9:9 185:18 186:2

**criteria** 53:16 156:23

**critical** 172:11

**cross-examination** 123:23

**cross-examined** 20:10 22:3

**crutches** 73:4 76:1 149:13

**Crystal** 17:15 18:17 19:16 99:7 193:8

**Culberson** 141:24

**current** 69:1 72:13 80:5 88:11

**cut** 35:10 55:14 75:19 172:9

**cut-off** 184:13

**cyst** 75:14,15,19

## D

**D.C.** 76:16

**daily** 153:4 155:10

**damage** 50:1 55:25 75:18 129:20,21 131:18 143:16 195:6

**damages** 163:8

**Danny** 137:2

**Danskos** 31:9,15

**dark** 97:21 143:19

**date** 48:7,8,11 70:22 71:20,24 77:13 81:17 83:4 94:10,19 111:12 128:3 169:18 195:15

**dated** 6:5,11 68:22 71:22 79:14 93:15 147:12

**dates** 73:11

**day** 14:11 19:7,9,12 28:17,22,24 29:1,12 57:25 62:21 63:5 79:14 82:7 83:1 90:10 101:12, 21,22 102:12,24 103:12 105:15,16 107:25 110:10 119:21 120:4 122:7 128:17 134:8 166:11 167:20 169:10 171:10 188:13 193:19 195:22

**days** 23:15 26:6 40:1,2 43:19 52:19 55:23 64:15 81:18,23 87:13,15 89:20 94:24 97:16 98:3,8,10 99:9 104:25 112:6 162:5 166:24 171:13 188:9,16

**days'** 38:5 82:2 95:18 185:9

**dead** 75:25

**deadline** 37:24,25 38:2 73:8 83:5 124:15 144:17

**deal** 51:22 64:4 91:18 126:16

**dealings** 156:11

**Dean** 17:13

**death** 109:8 110:15

**debilitated** 53:2

**debrief** 106:20

**December** 13:22 33:21 90:8,9,10,14

**decide** 16:14

**decided** 23:7 52:23

**decision** 12:17,19 24:3,6 27:11,23 36:3,12 52:4 61:12,22 111:9,21 112:5 150:3,17

**declared** 176:3,6

**decorate** 60:2,15

**decorating** 10:6

**deemed** 36:16 95:17

**deep** 143:15,19

**deeply** 33:10

**delay** 33:7 34:17 43:23 148:8

**delaying** 44:2

**delays** 33:25 42:8,9 52:7 118:6 124:22 138:23 174:7,8

**deleted** 164:16 167:16

**delineation** 174:19,21

**Delta** 182:7

**Delvin** 40:7 41:12 58:21

**demand** 92:6

**demands** 56:24

**demise** 148:25

**denial** 107:15 112:11

**denials** 33:25 118:6 174:11

**denied** 63:22 73:22 74:20

**Denny** 19:10 98:20

**dental** 86:16,17,20 87:1

**Denver** 11:22 15:3 22:23 38:13 94:1,24 95:18 97:16 102:1,3,4 103:2 104:4,8 107:20 124:19

126:10,13 127:3 141:12 191:20 194:2

**deny** 34:17

**department** 9:9 41:14,17 79:17,20,22 80:2,8 102:2, 24 103:4 109:25 119:1 124:20 140:11 191:6 192:12 195:8

**depend** 71:12

**dependable** 117:12

**dependent** 87:8

**dependents** 86:23

**depends** 163:17

**depleted** 54:5

**deposed** 156:9

**deposing** 139:24

**deposition** 4:10 5:5 6:2 9:7,8 13:25 14:10 25:15 29:24 30:4 168:3

**depositions** 9:7

**depression** 126:14

**description** 80:6

**designated** 66:16 67:1,15 178:2,3

**desire** 141:14 142:14

**desk** 97:9,11 98:17 99:7 148:6

**Destroyed** 151:17

**detail** 152:20 177:7

**detailed** 153:3,11

**details** 23:13 150:6 154:14,15 172:9

**determine** 131:12 157:13

**detrimental** 129:12

**devastation** 45:2

**developed** 76:22

**diagnose** 66:2

**diagnosed** 163:22

**diagnosis** 73:22 183:13, 23 184:4,6

**diagnostic** 131:21 174:10

**diaper** 133:12

**Diaz** 51:12 134:22 144:2 157:17 158:1,6,8,13,25 159:3

**die** 132:2

**difference** 48:13 61:20 182:3

**differences** 138:21

**difficult** 53:4

**difficulty** 55:12

**Dina** 12:12 34:11 64:6

**dinner** 149:13

**dinosaur** 181:18

**direct** 20:7 21:25 33:13 193:9

**direction** 114:25 120:18, 25

**director** 17:6,15 18:20 119:3 137:3 181:7

**disability** 4:9 39:16,21 49:1 51:4 53:19 54:1 57:16 58:10,15 59:2 68:9 86:10 127:22 128:25 130:1,11 140:23,24 148:22 198:16 200:15

**disabled** 57:17 140:2

**disagree** 27:11 37:20 49:10,14

**disagreement** 39:6

**disappoint** 99:23

**disappointing** 98:13

**disaster** 92:8

**disasters** 116:10

**disbelief** 112:13

**disc** 141:2

**disciplinary** 18:23 19:15 30:21 173:11

**discipline** 17:17 32:18 117:17 137:21

**discovery** 13:25 14:1,19 78:7 91:3 173:24 182:9 193:3 195:12

**discriminated** 197:23 198:24

**discrimination** 4:9 148:21,22

**discuss** 18:16 19:9 78:11 89:11 112:25 187:24 194:21,24

**discussed** 14:9 96:6,18 137:10,12 150:23 173:18 183:7 190:12

**discussing** 55:16

**discussion** 55:13

**discussions** 155:9,25

**diseases** 141:4

**disillusioned** 192:9

**disks** 63:15

**dismissed** 43:21 104:24 105:9 172:13

**disparate** 97:3 138:13 139:3,5,14

**dispute** 36:15 51:18 138:1

**disputed** 36:11,14 37:20 59:7 147:1

**disputes** 36:20

**dissection** 195:17

**dissension** 97:3 138:14

**distracted** 134:14

**distress** 150:13

**disturbing** 78:8

**ditching** 95:4

**diverse** 114:23

**doctor** 31:17 38:6 40:15, 17,20 44:20 45:16,20 58:23 64:10 66:1,5,10,20 67:2,6,7,8,16 70:4,10 71:8 72:12 75:1 76:4 77:16 84:3 88:17 125:9 129:8 143:3 155:4 163:20 184:17,20

**doctor's** 39:23 41:5 43:8 44:21 50:17 57:19 70:8 72:7 128:7,8,10

**doctors** 42:18 44:3 66:16 67:8 130:8,14 131:4,5 142:22 143:10 174:13

**doctors'** 92:25 186:22

**document** 15:20 17:1,2,4 26:22 46:14 47:7 48:5 49:1 68:19 70:17,23 71:22 72:1 77:6 78:18 79:1 80:9 103:2,3 145:19, 21 146:21 165:20,25 166:2

**documentation** 59:21 79:16 164:24

**documented** 165:24 166:17 192:5 194:18

**documents** 12:6 14:25 60:3 70:15 78:14 133:24 134:1,3,4,6,10 146:2,5 164:5,8,17,22 165:2,15 167:1,4,13,18 169:5 170:17,20,22 171:1,2,4,5, 7,16,18

**dog** 16:4 199:2

**dollars** 61:21 65:3 92:24 182:12

**Dominic** 11:21 34:11 80:19 81:8 96:2,4,14,18 98:15 100:7,8 102:4,12 103:20 111:22 112:1,12 114:10 117:7 119:15,18 120:3 125:4 137:4 140:15 146:8 176:11 177:3 179:3,10,11 185:14 188:24 189:7 190:19 195:14,24

**Dominic's** 98:6

**door** 76:19 99:16 105:21 106:17,18,24 107:1 148:18,24 149:10

**doors** 104:17,18

**double** 32:7

**downstairs** 18:24 120:10 157:19 195:20 196:18

**downtown** 7:7 9:9,13

**dresses** 31:22

**drills** 105:19

**driving** 158:7

**drop** 128:18 144:23

**dropped** 107:2,11 189:16

**dropping** 107:7

**drug** 38:7 94:4 185:23

**due** 6:21 14:1 26:6 121:11 172:4 199:20

**duly** 4:3

**dummy** 106:12

**duties** 58:18 126:22 127:6

**duty** 5:24 64:1 66:10 67:23 69:20 70:1 72:15 74:8 79:7,19,25 93:16,21 116:6 183:8,16,18 185:16 186:22

**dynamics** 50:1

## E

**e-mail** 14:25 15:4 18:1,5 24:14 26:13 27:6 96:2,7 102:19 119:6,14 146:11 156:11 178:15 185:15 187:16 189:15 194:23 195:4 196:9 199:1

**e-mailed** 43:13 101:20 102:12,14 112:12 119:18 125:4 176:13

**e-mails** 15:15 25:7,11,25 33:5 41:10,13 43:1 78:10 122:3 178:17 189:24 193:4 195:13 196:16

**eager** 140:21

**EAP** 159:25

**earlier** 52:22 91:19 126:9 134:14 164:4,14 168:20 170:25 171:21 173:18,19 174:15 176:12 180:8 183:7 184:9 187:22,23 189:1 192:22 193:12 196:23 199:4

**earliest** 48:3

**early** 51:19 68:23 105:13 117:2 161:18 162:13 173:23

**early-out** 113:11,20 114:1,3

**early-outs** 200:4

**earning** 182:4

**earnings** 87:9

**easier** 13:4 47:18 156:8

**Easter** 43:11 133:9

**ebbs** 49:21

**Edi** 31:8

**edit** 198:11

**EEOC** 162:5

**effective** 79:8 81:17 93:21
**elected** 141:11,12
**elevate** 63:17
**elevated** 108:2
**elevating** 63:11 118:20
**eligible** 95:12 111:5
**Elizabeth** 17:6,9,12 19:7, 11,19 51:14 98:18 133:3 134:9 137:1 143:22 153:17 155:16 156:2 193:16
**Elkins** 150:22
**Elmendorrf** 162:18,19 163:2,4,7
**embarrassing** 132:14
**emergency** 43:14 56:24 81:1 89:20 90:9 95:3 105:19 116:12 138:25
**EMES** 105:19
**EMG** 41:6,10 42:25 43:12, 15,22 59:6 131:10
**emotional** 111:9 150:12
**emotionally** 44:21 126:16 143:18 151:21
**employed** 9:19 46:8 51:8 116:8 158:17 159:25
**employee** 15:25 21:5 30:17 70:18 77:10 114:15 117:18 124:11 127:1 137:22 142:1 143:7 155:22 175:6 180:20 181:3 198:5
**employee-friendly** 141:25
**employees** 113:16,17 138:16 143:24 146:3 148:13 157:2 174:2 199:5
**employer** 10:6 14:17 39:11 50:21,24 51:3 56:12 147:20
**employment** 25:10 39:10 51:6,12,23 52:23 86:6 145:24 180:9
**encounter** 101:6
**end** 76:12 81:23 90:12 121:15 144:5,14
**ended** 81:18 82:17 115:22
**ending** 116:24
**endings** 75:20
**engage** 185:21
**engaged** 144:13
**enjoy** 183:5
**ensure** 129:11
**entered** 166:18
**entire** 43:7 65:9 85:13 151:2
**entities** 180:23
**entitled** 87:25
**entity** 10:17 61:2
**EO** 113:19
**equipment** 72:20 95:3
**ER** 13:23
**Eremea** 151:25 152:14
**essential** 80:5 81:15 128:14 129:1 131:7,13
**essentially** 16:18 21:10 27:23 37:3 39:19 44:16 46:24 51:20 62:6 67:24 76:16 77:17 90:5 126:10 131:25
**establishing** 10:19
**evacuate** 95:13 127:20
**evacuating** 95:1
**evacuation** 127:9
**evaluate** 106:20
**Evan** 25:10 153:19
**eve** 194:16
**event** 29:1
**events** 22:21
**eventually** 89:18
**evidence** 19:14 137:12 166:19 172:10 173:8
**evidenced** 166:23
**evidently** 19:15 169:19
**exact** 158:22
**exam** 66:17
**examination** 4:4 21:25 33:14 125:23 168:12
**examine** 131:11
**examined** 20:7,8,9 168:24
**excellent** 96:23
**exchange** 113:18 119:14
**excited** 106:22
**excuse** 9:2 13:25 15:2 42:3 54:7 57:22 63:21 82:3,25 84:18 87:14 101:20 102:13 108:10 110:10 115:20 133:4 175:23 184:1 193:20 194:7
**executive** 157:23
**exhausted** 125:8
**exhibit** 11:4,5,7 16:23,24 21:17,18 24:1,2 46:10,11 47:25 68:16 70:12 77:2,4 79:12,13 80:10 93:14 95:19 109:14 119:12,13 123:4 145:16,17 190:1
**exhibits** 32:24 164:17 169:6
**existed** 165:14
**expand** 61:3 173:6
**expedite** 187:21

**experience** 155:12

**expert** 162:16

**expire** 69:23

**explain** 69:18 196:11

**explaining** 166:20

**Explorer** 178:17

**exposure** 25:1

**Express** 11:9

**extended** 124:14 185:10

**extension** 26:7,8

**extensive** 152:18 164:11

**extent** 93:1 151:7

**extra** 192:18

**extreme** 76:1

**extremely** 25:12 28:19

**F**

**F-A-S-T** 187:3,17,18

**FAA** 95:1,11

**Facebook** 112:24 114:16 116:23

**faces** 114:21

**fact** 21:12 28:20 36:8 41:19 54:18 64:8 134:12 147:2 189:1 195:14

**facts** 14:20 35:22,23 36:5, 20 37:12,16,18,19 78:8 100:13 135:15 136:8,11, 13,14,15 138:2 145:10 150:10 153:9,23 157:14

**factual** 145:4,5,13

**factually** 36:11

**fair** 148:14

**fairness** 19:7

**fall** 139:11,12

**fallen** 112:8

**fallout** 17:7 34:9 55:9 149:12 151:9 155:2

**falsify** 40:24 41:1

**familiar** 149:15,18,21 150:3,5,19 151:7 161:2

**family** 11:25 87:19,21,24 88:1 97:8 116:1

**fashion** 170:23 197:24

**FAST** 38:8 94:8,17 102:5, 7,19 111:10,24 121:19,21 122:6 140:13 175:19 177:15 185:17 186:17,22 187:2,18 188:3 190:20 193:16 194:19 195:19,21, 23

**favor** 27:7

**favorable** 156:1

**favorite** 96:22

**feasible** 127:18

**February** 10:11 51:19 52:14 56:6 65:20 72:2,7, 14 88:22 89:4 90:12 146:16

**federal** 4:8 11:9 135:1 162:4

**Fedex** 17:24 171:12

**Fedexed** 167:1

**feedback** 106:3 143:9 155:10

**feeding** 133:12

**feel** 15:12 25:24 33:10 50:3 51:9 76:13,23 135:14,15 140:9 141:5 142:15 155:24 162:9 173:15,16 189:15,17 192:24,25 195:11 197:23, 25

**feeling** 24:24 142:11

**fell** 65:20 76:18 108:14 115:24 138:23

**fellow** 100:22

**felt** 20:1 34:8 51:11,12 56:2,23 97:4 99:3 130:4 155:22 164:13 167:19 172:10 173:7 192:23

**fight** 23:11 24:11 28:9 135:16 138:2

**fighting** 54:17 132:15

**fights** 143:22

**figure** 102:10

**file** 7:17 10:8 18:14 40:9, 15 132:20 133:20 137:25 138:12

**filed** 4:8 7:4,15 8:3 19:1,6, 13,15 31:17 60:8 138:10 162:4 164:6

**filing** 135:1 137:24

**fill** 109:7

**final** 27:6 134:1

**finally** 23:16 26:12 42:24 43:1,11,20 63:18,22 187:19

**financial** 163:1

**find** 14:20 53:3,4,5 100:15 162:3

**finding** 6:21 23:10

**findings** 23:11 92:9

**fine** 74:18 109:17 110:5, 11

**fined** 8:12

**Finger** 4:2,6 91:14 124:1 139:23 168:1,14 180:9 191:15 192:18,22 199:12

**fingerprinting** 38:7 94:4 95:24 96:1 185:18,23 186:2 187:10,12

**finish** 149:25 172:22

**finished** 38:16 104:22 105:21

**fire** 105:25

**fired** 144:15 145:2

**firm** 14:8,22 31:8 144:6

**firsthand** 118:4 151:15

**fishtails** 76:13

**five-minute** 192:20

**five-year** 86:8 114:8

**fixed** 65:14

**flag** 182:18

**flagged** 78:10

**flares** 50:2

**flat** 77:25

**flew** 11:22 86:1 180:24

**flies** 152:3

**flight** 4:17 5:18 9:22 14:24 28:23 29:4,10 31:8 33:17 34:24 35:3 36:16 38:8 45:1,8 55:1 56:24 57:11 58:18 59:12,17 62:4 71:9, 12 73:17 84:6,10 86:4 88:8,15 94:8,16 95:16 96:22 100:15,19,22 102:7 105:1,5,6,23 106:3,13,20 107:9,23 110:18 112:25 113:5,10,23 114:6,17,19, 24 115:13 116:11,12,16 124:22 126:2,22 127:6,10 128:1,14 129:2,8 130:3, 18 131:7 135:19 137:19 139:15 140:4 141:14,20 142:3,7 143:24 144:17 146:3 152:2 154:21,24 156:18 158:11 159:16 160:4,5,8,10 161:1 174:6 175:3 180:10,12 181:10, 14,16,20 182:5,20,21,24 183:5 187:5 188:20 197:4,9 199:15,19 200:4, 6,8,11,14

**Flightline** 102:8,19 140:13 175:20 188:4 193:17 194:18

**flights** 71:18 105:10 107:24 121:4,7 122:1 126:1 132:6 137:14 169:21 177:11,16,22 196:25 197:13

**flip** 10:22 123:4

**flipping** 10:4

**floating** 138:1

**flown** 29:7 134:9

**flows** 49:21

**fly** 24:25 28:23 35:7 53:18 71:13 72:14 81:1 94:1 96:9 104:1 141:7

**flying** 33:19 35:5 58:24 82:15 86:4 102:15 106:25 129:12 134:17 146:9,11 151:1 178:18 197:3

**FMLA** 137:17

**FMLAS** 12:9,10 100:18

**focus** 126:18

**focused** 37:7

**follow-up** 22:22 88:23 168:16

**food** 144:4,5

**foot** 31:12 45:5 46:5 50:1 56:10,18 66:12 75:22 83:7 84:3 88:12,18 89:5 105:16,20 106:9 107:5,6 85:16 102:22 140:7 197:24

**force** 113:2

**forced** 115:21 116:4 199:5

**foregoing** 130:6

**forehead** 33:9 136:6

**forgive** 184:16 187:22

**form** 40:17 70:18 77:10

**formal** 19:1 99:11

**formed** 10:12 60:3

**forms** 77:7

**Fortner** 98:22

**forward** 12:21 15:8 34:23 82:14 134:11 179:8,12

**forwarded** 138:3 163:6

**fought** 43:1,16 111:8 135:16

**found** 8:19 9:10 17:8 42:2 65:8,11 100:21 136:23 138:8 160:9

**four-hour** 101:23

**Fourth** 182:19

**FRACHTMAN** 91:10 168:11,13 191:10,13,14 192:17,19,22 196:23 199:4,12 200:18,22

**fragmented** 151:14,16

**frame** 17:23 115:20 133:18

**framework** 107:1

**Francheska** 191:19

**Francis** 34:5 63:22 64:5 70:10 74:16

**Francisca** 108:8,12,13,15, 16,18,20 110:13 118:14 191:19

**Francisco** 34:5 63:23

**freezing** 63:10

**Friday** 25:21,22

**friend** 59:25 116:21,22 152:5 154:2,12

**friends** 10:23 60:19 118:2 153:7 161:20

**front** 9:12 63:4 76:13 95:20 148:6 172:13

**frozen** 55:24

**frustrated** 25:12

**fulfilling** 81:2

**full** 28:17 33:25 58:25 64:1 72:15 74:8 79:7,19, 25 93:16,21 94:6 108:16 128:10 131:19 173:3 185:16 186:22

**full-duty** 74:19 79:8 148:2

**full-time** 133:10,13

**fullest** 136:2

**fully** 70:4 78:17 128:16

**functioning** 141:3

**functions** 60:15 71:11,15 80:5 81:15,23 128:14 129:2 130:18 131:7,13

**funds** 92:6

**furniture** 10:4,20,22 59:22,25 60:7,14

**fuselage** 104:15,20

**future** 71:4 72:21

**G**

**Gallagher** 33:24 42:3 63:12 64:2 66:15 91:20 92:4,19 173:20,25 174:1, 9

**gallbladder** 13:23 89:18, 19 90:6,12

**gap** 114:8

**garments** 78:5,19 80:12 81:13

**Garner** 153:6 154:4

**gave** 9:7,8 31:2,23 63:18 97:14 117:5,7 164:23 167:5,10,14

**generally** 36:5 45:12

**gentleman** 6:12 7:15

**girl** 100:20 144:20

**girlfriend** 138:23

**girls** 121:10

**give** 6:13,14 38:4 47:24 60:20 74:13 82:1 106:3 115:23 123:20 131:19 135:8 136:3 143:8 146:7 167:4,11 173:3 185:9

**giving** 15:5 123:18 148:13 168:15

**glad** 96:20

**glitch** 178:19

**God** 97:19 107:11 112:14, 15

**good** 58:22 91:18 96:23 118:2 123:11 135:25 144:1 154:12 158:24 191:1

**good-bye** 100:4

**goodness** 42:1

**Googled** 170:13

**gosh** 83:14 98:12 135:11

**Gotcha** 103:14

**grace** 14:5,16 34:21 91:6 97:19 123:19

**graded** 106:1

**granted** 25:4

**gray** 101:1

**greasy** 101:1

**great** 53:16 91:10,11 102:16 144:8

**Green** 40:7

**Greer** 115:25 116:19,22 199:6

**grievance** 4:17 18:14 19:1,3,6,13,16,22 23:7 51:16 52:2 132:20 136:19 137:23 156:14 157:4,6,18 158:4,15,17,23 159:5 164:6 167:22 170:6,11,12 173:8 189:8

**grievances** 30:12,16,20, 21 158:5

**grievant** 28:18

**grieve** 30:12,20 135:4

**grieved** 18:9

**group** 30:18 34:25 35:4 98:3,6,9 110:23 112:24 114:23 116:24 138:21 139:6 141:18 156:19 160:5 188:21

**Guam** 158:9,10,11

**guarantee** 144:1

**guarantees** 51:13

**Gueler** 74:5

**guess** 100:3

**guidance** 15:21,24 139:2

**guideline** 179:1

**guilt** 111:21

**guilty** 8:19 9:11

**Guy** 40:12 41:21

**H**

**hair** 101:1

**half** 20:13 134:24 152:2,6 153:3 163:17 181:9 182:22

**hall** 5:10

**Halverson** 154:1,8

**hand** 144:21

**handed** 32:6 97:12 165:22 171:4

**handle** 25:19 98:9

**handled** 34:6

**handling** 12:8,9 64:7

**hands** 195:25

**handwriting** 164:18 166:3,4 167:12 171:2

**handwritten** 166:2,16 167:8

**handwrote** 17:13

**hang** 60:25 153:1

**happen** 112:15 144:18 196:4

**happened** 15:5 17:15 34:19 36:12,13,19 37:19 82:20 95:20 106:9 109:4 111:8 116:8 118:19 133:4 136:9 137:23 151:8 162:13 183:9

**happening** 153:1,15,22 166:21

**happy** 89:11 135:18

**harassed** 31:17

**harbor** 35:9

**hard** 22:9 42:17 43:16 100:14 111:8 142:12 178:16

**Harris** 8:3 65:13 148:15, 20 149:4 153:4

**hatch** 100:20

**hate** 80:20

**haunting** 82:7

**he'll** 111:20

**head** 38:25 89:24 97:25 99:16 101:6,15 103:12 158:23 175:7 180:16

**heals** 31:22

**health** 79:17,23 84:19 97:8 129:13 143:18 160:22

**hear** 18:11 19:17 27:2 30:9,16 78:23 80:20 103:12 121:19 122:3,4 133:22 142:21 143:7 159:18

**heard** 19:6,20 21:1 26:18 27:5,9,10 101:19 103:9 107:9 133:21 137:25 139:1 145:9 147:20 155:16 169:19 179:22 191:5

**hearing** 4:19,21 5:17 9:11 19:4,8,23 20:13,19 21:8, 14 24:7 26:6 27:15 28:21 32:21 33:3 37:9,17 46:13 52:2,15,20 59:11,15 63:13 70:16 122:21 133:6,8,10 136:16 137:11 145:22 157:14 164:7,11, 25 166:14 167:17,20 168:22,25 169:6 170:1,21 176:2 185:6

**hearings** 52:17

**hearsay** 192:15

**heart** 33:7 53:17 57:24 105:25 111:10,13,17 112:7 125:13 148:23

**heaters** 63:10

**heavily** 23:11

**heavy** 32:7 156:15

**Heckman** 17:15 18:17 19:17 193:8

**Heckman's** 99:7

**held** 9:21 52:20,21,22 164:7

**helped** 41:23

**helping** 100:19 135:19 156:13

**hernia** 89:18

**Hey** 29:5 60:24 98:1

**Hibbard** 17:6 22:8,13 98:18 137:1 143:22 156:2 157:3 193:16

**Hibbard's** 51:15

**Hickey** 134:24 155:16 169:14,22,23

**highest** 196:13

**Hill** 31:8 40:7 41:12

**hip** 63:14,17 65:11 141:3

**hire** 113:8 182:1

**hiring** 53:16

**history** 33:10

**hit** 41:13 42:15 57:6 76:10,15 107:6 158:10

**hitting** 56:5 144:23

**hobby** 10:24

**hold** 141:8 181:21 190:18

**hole** 143:15,19

**holiday** 107:21 182:22 184:2

**holidays** 65:19

**Holt** 17:6 18:20 34:4,9 98:25 137:3 156:22

**home** 24:25 58:5 110:9 124:24 125:2 135:12 148:17

**honestly** 53:17 80:20 96:20 109:8

**hoodwinked** 74:15

**hope** 45:3 96:22 138:9

**hoping** 120:7

**horizontal** 55:15

**horrible** 111:21 189:17

**hospital** 14:2 43:14 55:8, 22 88:21 89:20,21 90:9

**hotel** 29:14 107:23 110:10,11 158:7

**hour** 86:3 113:8,9 182:13, 19,23

**hours** 71:19 86:1,3 88:3 96:16 121:15,16,17,18,19 122:4 123:20 137:16,17 165:7 177:19 188:18 197:15

**house** 9:3 33:16 60:24 149:14

**houses** 63:1

**Houston** 7:6 13:15,16 124:18 125:6 137:3,7 141:13 158:14 180:6 181:19 193:10,11

**Howard** 116:3,20,23 199:6

**HPD** 9:8 154:12

**HR** 17:6 18:21 34:4,5 63:23 74:16 137:3

**hundred** 61:21 100:15 183:4

**hurt** 56:16 82:21 90:25

**hurting** 44:22 56:1 107:14,18 143:15

**hurts** 142:8

**hysterectomy** 89:17

**I**

**I's** 108:6

**IAH** 156:3

**ice** 101:24 110:9,11

**iced** 108:1

**icing** 118:20 119:5

**ID** 96:1 186:3

**idea** 45:2 52:9,13 82:8 150:17 171:20 177:5 179:6,9 189:9

**identified** 150:9 162:17

**identify** 115:13 144:12

**IDS** 38:7 95:7

**ignore** 47:20

**illegal** 135:24

**illegally** 160:10,11

**Illinois** 138:16,17 139:12 142:3

**immediately** 35:9 103:5 107:10 194:1

**impact** 9:16 56:9,10,13 76:7,24 107:7

**impingement** 65:11

**implementation** 139:8

**implemented** 34:20,23 136:24 180:23

**importance** 82:22

**important** 30:8

**importantly** 134:12 174:13

**impression** 188:24

**improvement** 33:24 59:6 71:2

**inadequate** 135:13

**inadvertently** 165:3

**incapacitated** 89:23

**incapacity** 90:24

**incentive** 113:4 182:17,18 200:3

**incentives** 85:21,24 86:5

**inches** 107:1,3,7

**incident** 140:10 160:8

**include** 84:14

**included** 71:8 73:23 94:3 138:9 162:7 199:6

**includes** 198:7

**including** 129:18

**income** 10:3 48:24 54:1 59:22 60:6,11,18,22 73:3

**incoming** 137:2

**incompetence** 159:4

**incompetent** 157:4

**incomplete** 136:14

**inconclusive** 136:13

**incorrect** 124:3

**increase** 182:11

**incriminating** 167:19 172:10 173:8

**independent** 10:7

**indicating** 11:11 16:3 59:21 70:4 71:8 79:6 101:16

**indication** 94:14 166:22

**individual** 7:11 8:10 45:22

**individuals** 12:6 60:13 112:17 150:9 170:4,18 193:19 199:10

**infer** 83:3

**inflight** 12:14,16 13:16 18:24 31:10,16 62:17 64:6 78:1 115:18 193:11

**influence** 9:16

**informal** 18:22 19:8

**information** 14:14 23:3 24:18 28:15 30:24 64:9 117:24 118:1,8 131:3 145:5,11 148:20 149:2,4, 6 150:16 151:10,25 152:4,17 153:8 154:3,8 155:7 156:5,11 159:11 161:20,25 166:2,17 167:8 173:5 190:25

**informs** 175:6,8,11

**ingested** 143:2

**initial** 40:12 61:24 76:9 150:25 186:17 187:7

**initially** 17:22 70:7 111:11 125:25 130:21 192:25

**initiate** 185:25

**initiated** 6:7,15

**initiates** 185:17

**injunction** 8:9

**injured** 33:19 45:5 50:19 105:16,20 108:4 112:20 141:16 142:9 144:10 198:25

**injuries** 112:23 115:14 138:22 141:18 199:11

**injury** 15:7 22:22,24 32:5 33:22 39:23 40:18 41:24 43:4 44:11,13,19 45:11, 17,19 46:2,5,18 49:24 50:13 55:7 61:24,25 63:12 66:1,2 67:20,25 68:10 70:19,22,23 71:21, 24 73:12,24 76:6,8,9 78:9 84:13 89:10,16 93:1 101:22 102:11,14,22,25 109:2,6 110:14 112:22 115:12,15,16 118:15,23 119:24 120:3 122:13,14, 15,23 126:10,12 128:12 129:19 131:18 140:19 141:3 150:25 151:8 174:17,20,22 175:5,9,25 176:3,7,10,13,18 177:4, 10 178:13,23 179:1 180:1 187:25 188:17,20 191:25 193:13 194:15 198:1,4 199:23 200:16

**Inn** 107:22

**input** 16:15

**inquiries** 5:4

**inquiring** 190:15

**inserted** 20:13 75:20

**insist** 118:15

**insisted** 143:12 157:9

**insistence** 157:7

**insistent** 196:17

**instances** 140:12

**instructed** 26:2 192:10

**instruction** 77:21

**instructor** 102:25 118:25 119:4

**instructors** 38:20 101:24 105:23 106:19 108:24 121:12

**insurance** 84:15,16,17,19, 23 86:9,11,12,13,16,20 160:19,22

**intact** 117:6

**integrity** 127:13

**intentional** 173:17

**interest** 113:10

**interior** 10:5

**intermittent** 198:7,8

**internal** 60:9,22 135:16 144:1 156:10 163:19,23 178:15 184:25

**internally** 129:14 175:18, 20

**international** 102:4 169:20

**interpretation** 36:17 38:22

**interrogatory** 150:10 162:16,21

**interrupt** 193:6

**interview** 11:20 31:1,24 80:23 96:4,10,13,19 103:21 140:22

**intimate** 153:10 154:14,15 155:9

**intimately** 154:5

**intimidating** 98:13 99:4

**investigation** 15:10

**involved** 29:16 64:5 70:9 157:6,7 162:7

**involving** 7:24

**iphone** 32:2

**IRA** 54:8

**irregular** 116:9

**issuance** 94:4

**issue** 33:15 66:11 90:5 127:2 141:1,2

**issued** 24:3 27:1 52:4 116:2

**issues** 13:22 28:20 52:11 63:14 66:21 67:2 76:2 89:7 90:6 95:5 118:4 156:6 199:13

**it.'** 109:18

**items** 92:2 164:15 167:10

**J**

**Jackson** 64:2 66:19 70:9 74:12,14 143:12

**jammed** 76:19

**January** 10:11 13:22 65:18 88:21 89:4 113:20 114:4 199:17

**Jarvet** 19:13

**JCBA** 20:15,17 23:9 31:23 34:20,21 35:3 36:18 68:12,13 69:1 97:12 135:10 146:22 180:22

**Jersey** 139:13

**jetway** 106:18,24,25 107:11

**jetways** 114:22

**jewelry** 6:4,10,11,12,20, 22

**JFK** 62:18,25

**Jim** 40:15

**job** 9:21 16:20 29:6 31:13 32:9 35:5 37:5 51:9,14,21 53:3,5,11,18 54:17 70:24 80:6 81:15 82:20 88:16 100:21 114:17 116:16 128:14 129:2,10,12 131:1 132:16 133:13 138:5 148:4 153:1 158:9,14 160:17,23,25

**jobs** 110:19 181:5

**Jodi** 115:25 116:19,22 117:25 118:2 199:6

**Johnson** 28:17 158:3,25 159:3 164:16 169:9 170:6

**Joint** 11:13 149:15

**Jones** 12:12

**Jordan** 146:11 178:22 195:4

**Josh** 195:19

**Joshua** 65:12

**judgment** 8:10

**Julian** 153:20

**Julie** 14:9 133:19

**July** 17:5,7,10,19 19:7 26:12 32:12 38:17 40:1 41:4 45:10 52:8,21 59:14, 18 63:21 74:21 98:19 121:13 127:17 128:18,19, 21 132:8 133:6 168:21 177:13,19,20 182:19 189:8

**jump** 95:13 127:19

**jumping** 187:23

**June** 10:16 11:2,8,23 15:2,4 17:8 22:22 32:12 38:1 39:12,23 41:4 44:9, 11,19 45:5,9 50:19 51:16 57:22,23 104:1 111:25 112:3 114:10 119:19 120:5 121:15,23 122:1,8, 10 124:4 126:2,4,8 127:4, 5,18 128:20 141:11 146:18 174:18 176:13,14, 15,20 177:12,15 178:15 187:25 188:2,3,23 190:16 193:23,24 195:23 196:8

**jury** 5:24

**justice** 7:7

## K

**K-R-A-B-B-E** 13:9

**Karen** 78:10

**Keith** 152:14

**Ken** 51:12 134:22 144:2 148:15,20 153:3,10 155:16 157:16 158:1,6,8, 12

**Kevin** 40:20,21 41:3,20 45:21 72:1,8 77:11 125:17 184:1,21 185:1

**key** 36:5 37:18

**kidding** 74:9 100:9,10 142:20

**killing** 63:18

**Kim** 28:17 158:3,25 164:16 169:9 170:6 178:5

**kind** 6:23 10:24 12:5,6 36:24 44:25 51:7 56:5 64:4 99:12 100:16 119:1 120:20 134:4 142:13 143:16 155:25 162:6 163:17 192:12

**kinds** 45:7 46:6

**Kirby** 114:14 120:19 198:22

**Klebuc** 41:24 55:7 65:5,18 75:18 76:23 88:19 184:21,24 185:2

**KLM** 181:23

**knee** 75:24 115:24

**knees** 35:10

**knew** 11:24 13:22 34:3 41:15 57:14 78:13 81:25 82:5,11 83:4 102:16 103:25 107:14 127:5,15, 18 174:3 178:14 198:2

**knowing** 40:16 74:21 83:2 112:6 127:8 158:6 195:8

**knowledge** 8:24 20:14 23:4 32:20 35:25 41:16 116:18 144:25 145:3 147:22 152:6 200:2

**Krabbe** 12:20 13:7,12,19 15:5,14,22 16:12,15,18 17:14,20 20:11 30:14 112:2 135:1 193:5 195:14 196:7,17 199:1

**Krabbe's** 20:21 30:10

**Kushner** 12:12 34:10

## L

**L4** 63:15

**L5** 63:15

**lab** 9:9

**labor** 14:11 132:21

**labrum** 63:13 65:12

**lacking** 106:13

**ladies** 62:23

**laid** 44:16 45:23

**Lange** 25:10 153:19

**language** 39:6

**lapsed** 86:11

**large** 62:19 63:1
**largest** 120:23
**lasted** 99:17
**latitude** 14:16
**lavatories** 105:24
**law** 14:21 31:7 64:9 74:17 144:6
**laws** 141:24
**lawsuit** 4:7 6:1,3,6,16,24, 25 7:2,3,15,17 8:8 31:7, 18 135:1 138:8,10 139:23 150:11 151:11 152:1,11 153:9,22 155:8 156:7 161:5 162:8 163:18
**lawsuits** 7:4,22 8:2,6,23 9:6 93:8 144:6 161:3 162:1,4
**lawyer** 37:11 92:6,7 124:1 153:21 169:20
**lawyer's** 132:19
**layman** 44:12
**lead** 103:1 158:21,23 170:12,14
**leak** 13:23
**leakage** 89:19
**learn** 118:7,8 198:4
**learned** 117:24 118:1 146:9 193:3
**leave** 12:1 37:24 38:2,5 51:5,7 62:7 68:3,6,8 69:1, 16,19,23 73:11,21 81:24 82:17 84:5,7,22 85:16 86:7,19,24 87:20,21,22, 23,24 88:2 98:8 105:11 111:6,9 112:5 113:15,17 116:1 124:15 127:2 136:24 139:8,9 144:14 145:25 146:8,12,24 147:1,10,17,21,24 148:1, 11 149:6,8,18 151:5,6 185:10 198:10,11 199:17, 20
**leaves** 40:9 146:13,15 149:9 154:17 198:7,8
**leaving** 12:8 69:20 73:9 110:10 192:12 193:2
**LEC** 141:12 158:9
**led** 19:3 33:6 89:19
**left** 24:25 33:15 48:8 61:25 75:24 97:25 102:1, 6 103:8 107:6,19 124:20 140:6 171:10 188:11 193:25
**leg** 75:23,24
**Legacy** 116:14
**legal** 132:21 150:23
**legitimate** 142:8
**legs** 5:9 65:21 80:21
**LEMON** 119:9 162:23
**length** 69:15 71:9,12 174:16
**lengthening** 71:5
**leniency** 14:4 148:7
**lenient** 148:1
**Leslie** 154:20 159:15,24 160:2,21 161:20,23,25 162:3
**letter** 11:8,11,16 16:17 17:18,21 18:2,3,8 26:17 34:14 39:25 59:4 68:11, 16,17,20 69:5,6,8,12,14, 19,23 78:25 79:6,15 92:6 93:15,19 99:10 101:16 103:17 140:20 141:22 147:9 160:25 173:24 178:21
**letters** 74:14 98:10 135:23
**leukemia** 160:18
**level** 18:9,18,19 19:21 113:12 135:4 137:23 153:10 155:22 196:14
**leveler** 106:24
**levels** 32:17 156:20
**liability** 112:21
**lied** 136:6
**lies** 42:9
**life** 58:8 82:8 86:11,12 93:8 101:4 129:6,7 151:14,16,19 152:10 160:3 164:19
**lift** 72:16,17
**lifting** 32:7 72:17 156:15
**light** 37:2 66:10 67:23 69:20 70:1 116:6 183:8, 16,18
**light-duty** 34:25 35:1,2 37:5 62:8,12 72:23 74:4 146:25 147:4,19 148:2
**lighting** 97:23
**limitation** 88:12
**limitations** 70:25 77:17 88:14
**limited** 72:18
**lines** 121:17 191:3 192:3
**link** 32:2,6 97:9
**list** 163:7
**listed** 79:17,23
**listened** 23:17
**literally** 23:12 34:14 63:6 136:4
**litigate** 144:6
**litigation** 6:19 78:15
**live** 128:16 148:24
**lived** 151:2 153:4

**living** 37:8 146:21

**lobby** 142:19

**local** 17:5 18:9,16 19:9 133:3 143:21 156:3

**location** 191:20

**log** 124:23 140:11

**logged** 32:6 193:21,22

**Loncarich** 67:17

**long** 8:21 26:1 90:4 96:14 99:18 147:23 176:16 180:9 181:8

**long-term** 86:10

**longer** 31:14 51:8 57:16 77:17 158:12 159:25 189:12

**looked** 98:2 99:24 167:3

**lose** 113:3 117:3 151:22 167:22 186:16

**loser** 142:12,15

**loss** 160:15

**lost** 28:3 34:25 72:3 110:2,19 133:5 139:8 143:25 147:19 155:5 158:9 186:10,14 187:7,9

**lot** 14:14,23 16:5 25:2 30:10 43:20 44:22 49:25 52:7,10 88:1 97:3 129:16 131:2 135:14 149:3 157:16,20 173:7 174:3

**Lott** 34:12

**love** 76:9 131:1 142:15 143:21 183:6

**loved** 132:16

**low** 31:3

**Lower** 192:3

**luckily** 21:2

**luggage** 72:19

**lunch** 24:22 91:9,15 149:13 169:2

**lung** 13:24 90:11,25

**Luxury** 10:12,18,19

**lymphedema** 31:5

## M

**made** 12:17,19 15:15 22:24 24:7 36:12,19 46:20 48:16 49:15,19 61:12,17,22 66:19 82:16, 18 87:10,12 111:9,21 112:5 114:25 127:10 184:4,5 185:2 189:2 194:14

**main** 106:17 107:1

**major** 33:15

**majority** 152:7

**make** 5:4 7:9 33:22 51:17 55:17 65:14 73:24 89:15 94:25 103:10 110:23 111:1 115:21 119:7 126:6 128:22 129:6 131:17 134:17 144:19 188:14

**makes** 144:22 176:7 180:3

**making** 34:7 58:3 113:7 134:17 135:21 140:6 144:22 156:22 182:18,20, 22

**maligned** 173:16

**man** 159:1

**management** 18:17,24 34:7 112:20

**manager** 99:8 180:5,6 193:8

**mandates** 94:18,20

**manual** 32:4

**manually** 38:20

**manuals** 95:4

**marathon** 88:13

**March** 10:11 26:19 27:1,3 28:8 29:22 42:14,21 50:20 53:8,20 54:2 55:4,7 56:5,7,8,15,17,20,22 57:2,5,25 58:9 59:3 65:24 88:19,22 89:2 90:13,17, 18 128:4,24 129:25 130:13,20 133:7

**Maria** 24:14 25:17 28:14, 19 102:25 107:3,8 108:5, 10,11,16,18 133:22 155:18 157:16,19 158:20 164:17 166:13 169:9 170:12 171:4,10 172:17

**mark** 11:3 16:23 21:17 44:6 122:17

**marked** 11:5 16:24 21:18 24:2 46:11 70:12 77:1,4 79:13 119:13 145:16,17

**married** 10:1

**massive** 43:10

**master** 157:23 165:11

**material** 136:15

**materials** 32:1

**matter** 36:6 37:18 139:10

**maxed** 141:17

**maximum** 33:24 59:5 68:7 69:1,16,19 71:2 147:17

**Mccloud** 34:13

**MD** 160:22

**meaning** 109:25 115:5 152:24 153:15 154:15

**means** 95:12 110:7

**meant** 101:11

**MEC** 19:19 25:1 133:2,22 134:22,24 135:17,25 138:2 143:22,25 155:17

156:11 157:21,22 158:22 160:24 170:11 173:16

**mechanism** 32:8

**mediation** 138:4

**medical** 13:21 33:23 34:17 40:19 51:7 57:20 58:24 59:5 62:7 66:17,22 68:3,6,7 69:1,19 70:15 71:2 73:20 74:20 79:16, 20,22 80:1,7 81:24 84:5, 23 86:7,16,20,23 87:2,19, 21,24 88:2 90:5 91:21 92:1,10,12 94:6,8 111:6 113:21 114:8 125:7 128:10 130:5 131:19 143:1 146:24 147:21,24 148:10,14 160:19 174:11 183:19

**medically** 79:8 93:20 129:19 130:25

**medication** 9:16 163:10, 13,15

**medicine** 163:20,24

**meet** 17:11 18:23 73:8 111:1

**meet all** 56:23

**meeting** 17:12 18:16,18, 22,25 19:9 99:11

**meetings** 156:12

**member** 23:23 95:7,8 186:4

**memorandums** 42:23

**mental** 126:16 150:13

**mentally** 44:22 126:14

**mention** 97:1 119:23 159:17

**mentioned** 25:9 45:22 57:5 67:23 118:13 133:19

**merge** 97:4 146:22 178:20 181:19

**merged** 97:2 120:23 180:24

**merger** 180:21 181:1

**messed** 31:11

**messy** 64:2

**met** 17:5 30:22 96:5 113:1 156:23 163:8

**metal** 76:7,19 127:12

**Methodist** 42:10 65:13 83:5

**Michael** 65:5,18 75:18 134:24 155:16 169:14,23 184:21

**Michelle** 151:25 152:17

**microsurgeon** 65:5 184:22

**microsurgery** 41:25 65:23 71:6 73:5

**middle** 172:15,21

**milk** 76:18

**milking** 37:4 44:1 142:11

**mind** 190:1

**mine** 6:4 116:21,22 118:2 154:2,12

**minimal** 55:14

**minimum** 197:4

**Minneapolis** 135:12

**minute** 72:4 99:18,19 124:24 177:7 186:21 189:1 194:20

**minutes** 15:18 63:6 71:14 99:19 104:7 119:16 194:20,21 197:16

**mirror** 75:23

**misinformation** 195:18

**misrepresentation** 164:15

**missed** 95:15

**missing** 6:4 30:8 167:10

**misstating** 198:18

**Mm-hmm** 7:10 77:12 109:5 119:20,22 147:8 161:15 190:14

**MMI** 64:3,14

**mock** 63:2 104:12,18 105:18

**mock-ups** 104:18

**modify** 198:6

**module** 106:11

**mom** 33:6 43:14,19,20 57:24 111:10 112:5 124:23 125:13 133:11,15

**mom's** 97:8 114:11 133:8 195:16

**moment** 70:20 92:7 111:7 139:21 187:23 189:19 190:8,18 193:21

**Monday** 17:10 25:22 38:15 104:2 119:2,18

**money** 8:12 162:9,10

**monitored** 143:8

**month** 61:14 65:22 74:21 121:13,23 163:17 177:12 196:4

**months** 28:10 29:23 39:15 41:5,8 42:12 43:7 44:17 51:14 65:1 73:5 76:1 130:19 160:12,13 171:14

**moral** 142:13

**morning** 29:11 38:15 102:14 118:17 119:25 120:6 124:24,25 125:2,3 178:22

**mother** 43:10 82:5 148:17

**move** 75:22,25

**moved** 9:3 34:23,24 54:8 148:16,18 151:1

**moving** 49:25 55:23 179:7,12

**MRI** 41:6,8 42:10,13 63:19,20 64:13,18 66:24 74:21 129:4 130:21 131:10 184:5,7

**MRIS** 63:22

**multi-page** 77:5

**multi-week** 186:9,10

**multiple** 189:20

**multitude** 144:7

**Munoz** 110:21

**Muntz** 40:15,21 45:21,22 57:22 125:12,20,21

**muscle** 75:20,21

## N

**N-A-I-K** 66:20

**Naik** 143:11

**named** 170:4 199:19

**names** 108:17 170:13

**National** 62:4

**nature** 149:6,7,8,11

**navigate** 14:12 62:21 63:7 140:14 149:14

**NDA** 7:2

**necessarily** 39:22

**needed** 28:14 93:25 158:12 163:14 172:16 194:24

**negative** 142:17

**neighbors** 10:23

**nerve** 50:1 55:14,25 64:22 73:25 75:18,19

**network** 41:22 42:4 74:6 143:4

**neuroma** 64:21 65:8 73:24 74:1 75:2,5,8,13,14 76:4,22,24 129:6 183:13, 23

**neuropathic** 76:2

**neuropathy** 55:25 141:1

**neutral** 164:5,9

**news** 114:13

**nice** 60:20

**night** 28:20,25 29:9,16 38:16 64:20 108:2 116:4 121:10 138:9 158:7 182:16

**nights** 28:21

**NOD** 51:18 52:19 135:5 138:1

**nodding** 38:25 89:24 175:7 180:16

**non-dependable** 117:11

**nondiagnosed** 129:5

**nondisclosures** 135:21

**nonresponsive** 35:12 196:20

**note** 38:6 45:24 70:8 176:7

**noted** 175:1 177:21

**notes** 40:10 72:8 92:25

**notice** 38:5 51:18 62:22 63:18 70:3 82:2 95:23 138:1 185:9 189:4 197:7

**noticed** 97:23 195:13

**notified** 68:13 69:13 102:20 133:2,3,24 155:4 196:16

**notify** 94:9 111:11,16 120:2 185:11 188:19

**notifying** 123:14

**November** 33:21 40:6 46:21,25 55:19 65:7 133:15 154:25

**number** 33:9 39:25 40:23 41:13 44:14 47:17 86:1 102:9 114:5 141:17 150:9 165:22 175:23,24 176:1 177:16 178:25 196:10

## O

**oath** 4:12,15,25 19:5 91:16

**object** 35:11

**Objection** 191:7 192:15 196:20 198:18 199:8

**observed** 191:25

**observers** 172:13

**obstacles** 67:5

**obtain** 51:9,10 116:18 121:6 146:5

**obtained** 121:3

**occupational** 12:11 34:10 40:18 46:17 87:22,23 93:15 102:22 115:14 122:14,15,17,23,25 123:17 126:3 137:16 138:22 148:11 174:20,24 175:9,21 176:6 188:17,20 199:23

**occupationals** 199:21

**occupy** 127:19

**occur** 58:2

**occurred** 22:21 67:21 127:3 145:9 150:14

**occurrence** 196:3

**October** 33:21 40:6 41:3,4 42:24 44:21 51:17 52:8 54:14 55:10,19 68:12,21,

23 130:22 147:11,14

**offender** 111:2

**offenders** 110:22

**offer** 113:24 114:1,2

**offered** 113:16,19 114:7 160:16 199:14

**offering** 200:4

**office** 18:5 25:1 42:19,21 55:17 62:19,20,24 63:3,7, 9 72:9 77:13 96:21 97:21, 25 99:12,14 100:25 101:7,15 103:12,16 146:4

**officer** 9:13 154:13

**offices** 142:19

**officials** 20:24

**OIS** 174:23 175:8,11

**OJI** 32:14 37:8 40:20,23 109:7,10 110:22 112:17 122:19 127:13 137:15 141:13 146:10 174:22 175:13 178:1,8,23 188:6 194:21

**OJIS** 110:19,24 111:1 112:25

**older** 104:16 113:5 114:24 141:16

**on-the-job** 176:3 193:13 194:15 198:1 199:10

**on-time** 85:25

**onboard** 32:3 56:24 127:8

**one-day** 105:4

**one-story** 62:18

**ongoing** 200:9

**online** 61:19 146:4

**open** 121:22 197:5,22

**open/close** 42:22

**opened** 55:12

**opening** 21:21 37:1,13

**operating** 188:5

**operational** 174:24

**operations** 116:9

**opinion** 100:13 111:5

**opportunistic** 15:12 198:25

**opportunity** 21:7,15 28:6 33:13 61:9 113:17 171:22 172:1,9

**opposed** 35:19

**option** 31:2 88:4 96:7

**ordeal** 88:21 102:16

**order** 8:11,14 43:5 198:11

**ordered** 41:6 42:10,25 43:5 66:23 117:8 130:21 131:10 179:11 184:5

**orders** 81:3

**organize** 60:16

**organized** 10:9

**organizing** 12:6

**original** 28:16 66:1 70:22 71:21 73:12 82:25 83:1 85:5 87:18 166:25 169:22 171:12

**originally** 62:16 85:5

**originals** 167:10,11

**orthopedic** 185:1,3

**orthotics** 31:4 77:23 78:6, 19 80:12 81:14 92:25

**Oscar** 110:21 113:24

**ostracized** 26:16

**out-of-pocket** 64:17

**outgoing** 19:10 98:21 137:2

**outlined** 80:6 173:10

**Outlook** 178:17

**outraged** 20:22

**outspoken** 135:19 158:6

**overheard** 164:11

**override** 182:16,17

**oversight** 82:11

**owe** 65:2

## P

**p.m.** 122:22 123:8 193:24, 25

**PA** 83:14

**packet** 47:16,19 70:15,17 86:19 136:25 145:25 146:7

**packets** 12:15

**pages** 14:7,11,13 21:2,11 32:22,24 47:17 76:8 120:17 134:7 146:20 164:12,20,23 165:3 167:2 171:9 187:9

**paid** 6:20 32:13,15 41:2 46:20,25 48:11 49:6 50:11 65:1,3 84:20 85:22 91:22 137:15 165:12

**pain** 44:23 53:1 68:1 128:13,16 131:1

**painful** 29:8 132:15

**paint** 10:23 61:1

**pairing** 177:17,23,24

**pairings** 177:16,20 197:1

**pairs** 97:12

**Palova** 161:8,14 162:1,13

**pandemic** 127:25 128:5

**panel** 157:13 166:7 172:14

**panicked** 82:13

**panicking** 83:17

**pants** 31:2,21,22,23 77:25 80:22 81:5,6 96:7 97:12

**paper** 32:4 33:3

**papers** 12:5 21:1

**paperwork** 12:10,15 28:16 38:9,19 49:14 51:25 103:25 108:6 134:6 163:6 167:9 174:9 182:10 186:11,15

**paragraph** 93:20

**parallel** 14:21

**paralyzed** 133:11

**paraphrasing** 103:8

**parents** 148:23

**park** 63:3

**parked** 160:10

**Parker** 78:10

**parking** 135:20 154:22 156:18 160:11 186:3

**part** 13:19 43:3 72:17 76:19 85:22 93:1 106:5 117:1,4,16 136:20 137:8 142:14 143:2,6 159:4

**parts** 49:25

**party** 46:19 60:16

**pass** 85:10,12 117:13 131:23,25 132:3,5,7,11 142:23 168:9

**passed** 32:11 38:1,14 95:12 102:15 105:7 133:15 144:17

**passes** 29:3 113:3 117:3,6,17,19

**passionate** 157:1

**passport** 185:19

**past** 151:9

**patience** 14:5

**patient-doctor** 82:18

**Patrick** 153:6 154:4,7

**Paul** 162:19

**pay** 29:13 46:15 59:25 84:9,10,16,25 85:6,17 87:13,16 92:2,19 113:13 141:17 182:3,10,16,17,22 198:22

**paying** 73:3 184:17

**payment** 46:25 48:3

**payments** 39:16,21 46:20 47:12 48:16 49:7,15,19 50:7,11,20 51:4 53:20 54:1 57:16 58:10,15 59:2 61:7,10 113:18 127:22 128:25 130:1,11

**PCP** 159:8,15

**peeked** 97:25

**peer** 66:15 67:15 129:7

**pending** 5:14

**pension** 134:13,14,15,18

**Penski** 152:4

**people** 16:5 127:20 132:12 149:3

**percent** 23:22 87:8 167:23 182:21 183:4

**percentages** 112:22

**Perez** 83:14 130:16

**perfect** 25:2

**perform** 31:12 45:6,8 46:6,7 71:10,14 80:4 81:14,22 88:8,15 126:22 127:6 128:1,14 129:1 130:18 131:7,12

**performing** 57:9 58:18 59:11 62:11 70:24

**perineal** 64:22

**period** 34:21 38:11 39:20 43:18 50:6,12,18,22 52:3 53:7 58:16 68:10 69:25 72:23 73:15,21 81:18 85:15,23 86:8 87:2,6 89:22 90:2,4,22 98:19 124:12 126:22 129:25 130:7,14 131:4

**periods** 34:1

**perks** 29:6

**permit** 78:2 186:4

**permitted** 78:3 79:7 80:11 128:13

**person** 6:1 7:18,20 108:13 138:24 144:12 145:1

**personal** 18:1 32:20 35:25 43:23 64:17 86:9 116:18 118:3 144:23,25 145:3 153:12 198:11

**personally** 120:9 138:4 163:8 174:21

**personnel** 33:1

**Peter** 20:12 24:15 29:15 133:22 157:9 162:17,18,19,23,24,25 164:21 166:24 169:9,13,15,18 170:16 172:17

**phase** 50:14,15 82:19

**phone** 15:15 25:7,17 26:1 61:17 124:23 140:11 164:16 167:16 189:24 190:13,22 192:8 193:20 194:3 196:10

**phonetic** 191:19

**physical** 35:5 41:7 44:23 49:23 58:23 64:22,25 65:2 66:24 70:25 71:4 73:2,6 75:10,23 77:17 81:12 82:21 83:1,6,8,19,22 88:11,14 92:24 121:2 126:18 127:2 128:9,10 131:6 141:10 183:16

**physicality** 148:4

**physically** 45:6 46:6 49:20 50:3,11,23 51:2 54:23 55:1 56:23 57:9 58:17 59:11 88:6,8 100:25 111:4 128:13 130:2,4 131:11 141:5 143:18

**physician** 34:2,15 40:19 41:20 58:25 63:19,24 65:1 67:5 74:6 125:12,16 143:4 159:10

**physicians** 34:1 41:22 42:5 66:3,14,18 67:16 113:2 174:11

**pick** 65:3 103:1 107:10,12 121:14,24 197:2

**picked** 15:3 32:11,12 82:7 86:14 122:6,8 126:5

**picks** 107:22

**pictures** 31:21 60:25 75:24 167:16 186:4

**piece** 33:3

**pieces** 80:25

**pilot** 62:25

**pilots** 63:2

**pins** 31:11

**pitch** 100:24

**place** 8:23 18:25 35:9 57:18,19 75:7 80:24 101:3,18 103:22,23 104:3 135:25 155:5 160:3 166:5 186:7

**plaintiff** 8:5

**plan** 198:25

**plane** 76:16 95:2 104:15, 19

**planes** 104:9,16

**plaque** 117:7,8 179:11

**plate** 112:9

**plates** 31:11

**Plavix** 111:14

**plea** 17:14

**pleaded** 115:22

**pleading** 16:20

**pleasure** 100:21

**pocket** 65:2 76:15

**point** 18:15 27:9 40:5 57:13 58:3 59:13 61:9 66:25 72:21 74:11 83:17 86:17 87:11 91:25 92:5 119:1 120:2 124:1 125:9 127:23 128:23 160:6 168:7 175:22 188:22 189:3

**poked** 103:12

**police** 9:12

**policies** 139:6 150:19 173:9 198:10

**policy** 51:5 77:24 86:10, 12,13,14 148:1 149:19 151:6 198:11

**Pollak** 119:2

**pop** 99:14

**popped** 99:12 101:6,14 103:16

**portion** 190:7,11

**portions** 53:2 105:2

**position** 9:22 30:11 62:8, 12,14,16 80:5 112:20 114:18 124:9,13 129:19 158:13 161:6 176:8 180:4 183:8,12 193:7

**positions** 52:3 53:6 54:19 180:3

**positively** 109:10

**possession** 6:12 132:1

**possibly** 55:4

**post** 24:17,19 25:8,15 26:5,9,18

**postpone** 140:18 195:15

**postponing** 112:7

**postscript** 25:14

**pounds** 72:16 83:25

**power** 179:23

**Powerpoint** 37:1

**practice** 132:21

**preexisting** 178:8

**prefer** 12:25 13:2 17:1 109:20

**Premiere** 10:12,18,19

**prep** 28:23

**prepare** 160:25

**prepared** 21:3 59:16 163:4

**preparing** 166:12

**prerequisites** 173:11

**prescribed** 163:9

**prescribing** 63:25 74:7

**present** 22:17 26:17 33:4 116:9 134:7,8 167:18 172:11

**presentation** 134:8

**presented** 21:2 23:13 33:11,12 135:15 137:13 166:6,8 194:8

**presenting** 134:11

**president** 17:5 19:10,11, 12 51:13 98:21 134:22 137:2,3 138:3 143:21,25 156:3 158:2,9

**press** 7:10

**pressed** 100:14

**presumes** 16:13

**pretty** 181:21

**preventing** 56:11 77:18

**previous** 14:8,16 25:9 31:10 41:24 44:16 127:2

**previously** 112:16 121:3 132:18

**Primary** 159:10

**Princess** 34:12

**printed** 49:1 146:8,15

**prior** 10:19 11:21 12:8 29:24 34:6 40:15,16 56:22 81:23 92:14,18 93:23 96:7 97:13 98:8 121:4 164:17,20 172:12 181:5 183:12 184:7 185:21 189:3 193:1

**priority** 133:16

**private** 116:23 149:3 200:8

**privileges** 84:10

**problem** 13:23 41:19 63:23 111:24 155:22

**problems** 34:12 40:8 41:1 88:1 113:1 174:3

**procedure** 82:4

**procedures** 173:9 195:8

**proceed** 15:8,19 16:2 140:20 175:1,22 186:19 187:20 196:22

**proceeding** 4:17,24 5:20, 25 137:9

**proceedings** 4:1 9:1 153:13,14 200:23

**process** 13:19 18:12 19:25 38:3 41:12 78:12 94:3 95:21 121:8 144:15 148:9 156:22 172:4 175:15 185:24 186:9,13, 20 198:3

**processes** 185:22,25

**processing** 132:20

**produce** 187:12

**produced** 15:21 32:13 173:24

**production** 13:20 17:13 120:17 165:10 193:3

**professional** 96:12

**profit** 84:10 85:18 87:5,17

**program** 114:2,3 199:25

**progressed** 162:2

**prohibit** 130:6

**prohibited** 183:16

**projection** 121:1

**proper** 32:1,5,17 34:17 57:20 67:3 73:22,23 131:20 137:21 148:14 174:11 183:19 195:7

**property** 7:25

**protect** 141:14,19

**protected** 35:4 138:16,21 139:5,10 142:1

**protecting** 144:8

**protection** 139:2 162:6

**protectoral** 150:18

**protects** 143:23,24 144:19

**protesting** 16:18

**provide** 37:5 91:20 141:21 169:8

**provided** 21:4,21 33:3 70:16 78:8 91:19 164:25 169:4 170:17

**provider** 79:17,23 125:7

**providing** 35:20 60:13

**provision** 34:19,22

**provisions** 60:16

**psychiatrist** 163:25 164:1

**psychologist** 164:2

**PT** 42:20,22

**pull** 54:14 80:23 81:2,6 138:4

**pulled** 83:15 165:1

**pulling** 72:19

**purchase** 10:24

**purchased** 59:24

**purple** 182:18

**purpose** 17:3,4

**purposes** 108:23

**purser** 106:12 182:16

**pursue** 51:6 196:14

**pursued** 4:18 6:21 12:20 19:19

**pursuing** 51:23 52:1 130:6 138:6

**pursuit** 15:13

**push** 55:21 65:22 82:14 83:6,24 111:13,23 131:1 195:16 196:4

**pushback** 157:16,21

**pushed** 52:6,10 55:10 89:1 129:16,17

**pushing** 12:5 14:10 66:23 156:16

**put** 13:21 20:20,25 24:18 25:15 67:4,17 73:6 90:12 99:2 111:24 114:22 116:6 120:20 121:12,13 133:13, 20 142:25 159:20 172:17, 19,24 196:5

**Q**

**qualification** 105:6

**qualified** 32:11 95:14 106:8 116:11 120:1 197:3

**qualify** 54:7

**quality** 129:7

**quarter** 86:2

**quarterly** 85:19,21,24 86:5

**question** 5:6,14,15 8:22 29:18 32:20 35:13,16,18, 19 36:22 45:4 53:10 66:7 70:21 72:5 78:13 115:10 118:7 123:25 129:16 130:2,24 149:25 157:15 191:8,12 192:2 196:21

**questions** 4:11 5:3 36:23 77:6 168:2,16 172:18 173:4 200:19,20

**quick** 47:18 139:20

**quote** 79:18 109:17

**quote/unquote** 148:3

**R**

**rabbit** 143:19

**railroaded** 23:18 36:25

**ran** 64:13 199:19

**RAP** 79:21 80:2

**rate** 33:24

**re-crossed** 172:24

**reach** 25:11 58:4 195:7 198:5

**reached** 13:18 33:23 59:4, 5 71:1 103:15 116:23 156:13,14 189:20 194:9 196:7,13

**reaching** 111:22 116:3

**read** 14:19 17:1 76:8 165:21,24 190:7 191:3 200:22

**reading** 14:13 162:21

**ready** 120:7

**real** 47:17 104:15 139:20 166:22

**realized** 121:11

**realm** 58:1

**reason** 82:6 117:4 165:8 198:16

**reasonable** 31:3 71:17 77:22 80:7,14 116:1 141:6 148:11,13 198:2

**reasons** 33:10,16 115:11 144:7

**reassigns** 180:3

**recall** 7:6 24:12 87:4 100:2 122:20 145:23,25 171:19 183:22

**receipt** 178:23

**receive** 17:20 18:2,8 28:6 57:15 58:10,14 84:6,15, 22,25 85:6,9,16 86:4,15 87:1 138:20 145:21 157:20 161:19,25 171:6, 15 178:21 199:16

**received** 17:25 24:9 29:23 39:16,20,25 48:19 50:6,8 53:7 59:6,22 60:5,6,12,18 62:22 64:13 68:11,20,22 70:3 78:25 79:16 84:9 86:7 87:4 95:19,23 101:15 103:17 105:8 127:22 128:25 130:1,22 131:4,10 140:10 146:10 167:3 178:15 182:10 186:19 189:4 194:21 195:4,13

**receiving** 48:13 50:20

51:4 53:19,25 59:2 61:7, 10 130:10

**recently** 61:3,22 182:9,19 195:13

**recess** 91:13 139:22 167:25 192:21

**recognizable** 151:17,18, 19

**recognize** 46:14 145:18

**recollection** 173:21 197:14

**record** 13:21 16:22 33:1 91:12 139:21 167:24 190:8 191:4 192:20

**records** 21:5

**recoup** 92:6

**recover** 75:11

**recovered** 45:18 56:3

**recovering** 90:24

**recruiter** 116:6,13 147:5

**recruiters** 116:10

**recruiting** 35:2 62:8,12, 14,16,23 73:10 74:5 129:19 183:8

**redirected** 172:25

**reduced** 147:18

**reemployed** 158:18

**refer** 160:7 164:9

**reference** 96:1 150:24 178:25

**referenced** 25:7 139:3 193:4

**referencing** 79:23 199:18

**referral** 159:15

**referred** 40:21 48:23 65:5 100:20 125:16 163:21 164:10 185:1

**referring** 45:20 139:4,15 152:23

**refusals** 92:1

**refused** 63:19 91:20 135:3

**regain** 37:22

**regard** 52:16

**regenerate** 75:22

**register** 46:15

**regular** 95:7

**regurgitate** 152:9

**rehab** 43:21 148:7

**rehire** 117:11

**reimburse** 92:9,20,22 93:2

**reimbursement** 92:12

**reimbursements** 93:10

**reinjured** 44:12 83:23 106:9 112:8

**reinjury** 44:8

**reinstate** 185:22

**reinstated** 51:25 52:24 137:16,17,18 154:22 155:1 183:2

**reinstatement** 160:23

**rejected** 78:5

**related** 20:2 40:25 60:12,13 67:20 70:18 76:5 88:18 89:4,16 150:10 156:6

**relates** 72:8

**relating** 77:2 150:16 152:1 155:11

**relations** 34:7

**relationship** 96:23 118:3 134:21

**relayed** 153:23

**release** 39:23 43:8,9 50:4,17 58:24,25 73:1 74:19 94:6 128:9,10 130:23 131:19 148:3 184:10 185:3,8 186:17,22

**released** 78:17 82:1 131:6 185:16

**releases** 187:11

**releasing** 64:1 74:8 131:19

**relevant** 20:1 169:5

**relief** 106:8

**rely** 23:11

**remain** 25:3 132:1 200:19

**remained** 73:20 86:7

**remaining** 122:8

**remember** 28:12 29:22 63:5 84:12 85:3 87:17 88:3 132:8 170:7 187:15

**remove** 75:19 171:18

**removed** 75:8 166:4,5 167:8,13 171:2

**rendering** 173:11

**rented** 148:17

**rep** 158:4,15

**repair** 10:22

**repeat** 72:5 110:21 111:2

**rephrase** 5:5 162:9 170:21 175:14 177:8

**replaced** 169:24

**report** 60:8,21 72:13 76:8 102:10,23 109:2,6,9,18,21,22,24 110:6,14 115:11 118:14,15,22 119:5 122:23 146:10 163:5 175:18,24 188:6,17 190:16,24 191:21 192:1

**reported** 32:14 40:2 41:15 100:6 101:24 176:17,19,24 177:4,10 197:25

**reporting** 37:8 174:24 194:22 195:9,10

**reports** 12:7

**represent** 4:7 52:12 136:2

**representation** 135:13 162:4,11

**representative** 141:24 170:11

**representatives** 141:23

**representing** 170:15

**reprimanded** 31:9

**reputation** 100:17

**requal** 11:22 94:25 97:15,16 103:22 104:25 105:9,21 112:4 120:13

**requal'd** 15:6 38:13

**requalification** 177:9 179:25 196:24 197:6

**requalified** 94:23 95:11 96:11 106:7 136:23

**requalify** 94:10

**requalifying** 95:16

**request** 71:16 174:14 186:18

**requested** 15:21 24:10,14 80:17

**requesting** 44:3 93:9 187:9

**require** 62:17

**required** 31:12 38:4 62:15 66:16 68:8 80:4 81:4 114:15 120:21 121:14,16 123:20 177:18 185:8 197:2

**requirement** 30:22 31:16 197:4

**requirements** 93:22

94:19,21 95:1 96:3

**reschedule** 43:21

**rescind** 74:18

**rescinded** 29:15 64:10 70:7 195:24

**reserve** 182:2 200:20

**reslotted** 111:25

**resolved** 67:3

**respect** 5:18 7:3 8:8,15 10:20 15:25 17:21 22:22 23:8 28:5 30:6 36:13,18 45:4 46:4 56:9,18 60:7 66:11 71:7 80:9 81:12 87:5 90:6 91:25 132:6 167:13

**responded** 103:11 173:4

**responding** 191:9

**response** 15:14 17:20 18:12 100:7 189:23

**responsibility** 136:2 195:9 198:4

**responsible** 127:19,20

**rest** 138:23 161:19 177:12

**restored** 165:13

**restraining** 8:11,14

**restriction** 79:24 198:12

**restrictions** 77:19,22 79:18 80:14 81:13,17 148:3

**restroom** 97:18,21 98:14 139:20

**result** 6:18 8:9 115:15

**results** 59:9

**retain** 14:15 92:5

**retained** 92:7 137:19

**retaliated** 139:25 140:5 192:23,24,25 195:12

**retaliation** 110:16,17 115:13 140:1,8 148:22

**retaliatory** 150:18

**retire** 113:2 117:2

**retired** 54:16 117:9 154:12

**retirement** 33:17 115:21, 22 116:5,17 117:3,5,7,8,9 179:11 199:5

**retraining** 93:25

**retroactive** 114:3

**return** 37:3,6 50:16 63:24 75:13,15 77:18,21 78:17 79:7,18,24 82:15 93:16, 20,23 118:5 124:18 184:10 185:22

**return-to-work** 11:20 31:1,24 34:21 37:23 38:3, 12 45:24 77:2 78:12 80:23 94:2 96:3,13,18 103:21 121:8 140:22 156:22 161:5 179:1 187:8

**returned** 124:16 125:6 126:13 136:21 146:7 147:3,4 171:6,13,15

**returning** 95:21 146:24

**returns** 60:8

**Revenue** 60:9,22

**reversal** 51:11 155:1

**reverse** 133:18

**reversed** 17:17 23:17 164:14

**review** 27:14 28:7 66:15 67:15 129:7 133:19 190:8 191:2

**reviewed** 29:18,21 30:3 78:14 164:14 167:19

**reviewing** 145:25

**revised** 146:16

**rheumatologist** 163:22

**Rick** 178:24 179:5,7 189:2,5

**rid** 15:13 112:17 113:4,10 200:3

**rigged** 135:16

**rights** 142:2,3 157:1

**Rios** 154:20 160:21 161:20 162:3

**Rios's** 159:15 160:2

**risk** 112:21

**RME** 66:16

**Rogers** 98:22

**ROI** 10:18

**role** 11:17 12:13

**room** 17:7 19:11 23:12 80:24 81:7 96:6 97:10,23 100:14 108:1 138:25 157:19 172:12,16,21 189:9

**rooted** 33:10

**Roppolo** 4:5,6 11:7 16:25 21:19 24:3 28:9 32:22 35:11,15 46:12 70:14 77:5 79:14 91:8,11,14 119:10,14 139:19,23 145:18 151:19 162:25 167:24 168:1,9 191:7,11 192:15 196:20 198:18 199:8,18 200:20

**Rosemary** 161:24

**Roth** 54:8,12

**rule** 5:13

**rules** 139:12

**ruling** 23:16 28:2 133:25 153:18 171:14

**rumor** 100:13,24

**rumors** 101:3 144:16

**run** 83:18 88:13 139:20 187:11

**running** 14:21 34:18 44:4 67:4 88:16 98:9 187:19

**runoff** 143:25

**ruptured** 141:2

**rushed** 107:9

## S

**Sabrina** 15:17 16:2 111:22 112:2,3 193:5,6 195:13,25 196:2,6

**safe** 35:8 124:25

**safely** 127:6

**safety** 110:20

**safety-related** 95:4

**Sally** 151:23

**sample** 142:23

**San** 34:5 63:23 71:14,18 127:11

**sat** 65:9 136:5

**satisfied** 132:19

**Saturday** 25:22

**SBA** 51:17 52:19 164:11 172:14

**scale** 113:13

**scales** 198:22

**scan** 14:12

**scared** 109:8 110:15,16, 17

**scenario** 106:13

**scenarios** 95:3 105:19

**schedule** 38:17 88:24 96:3 121:3,6,25 177:7,20 197:3,19

**scheduled** 28:22 55:9,20 65:19 88:24 96:2 177:12 186:5 197:14

**scheduler** 122:6 178:4

**schedulers** 123:15 175:21

**schedules** 165:11 197:5

**scheduling** 32:4 102:6,9 114:10 188:4 194:19 197:21

**scheme** 34:16

**school** 114:12

**scoff** 44:25

**Scott** 114:14 120:19 198:22

**screaming** 157:20

**screen** 97:23 121:1

**screening** 95:8 185:23

**screens** 165:11

**screenshot** 21:3 42:2,6 165:4

**screenshots** 32:25 164:24 165:10,13 166:5, 6,18

**search** 42:1

**seat** 95:13 127:19

**seconds** 95:2 99:13,18 127:21

**secretary** 12:3,16

**Section** 11:13

**Security** 61:7,10,16,18

**Sedgwick** 15:10 39:24 40:2,8 41:15,18 42:4 46:16,17,20 48:20 49:7 50:7,20 51:4 53:20 57:15 58:3,12,19 59:1 91:19 92:2,3,16,20 93:4,12 102:24 123:3 127:23 128:25 173:21 174:1,25 175:2,23 190:23

**seek** 39:10

**send** 17:23 28:14 92:6 166:25

**senior** 113:10,16,22 140:3 160:10 181:16,20 182:5 199:14 200:4

**seniority** 71:13 113:12 141:7,8 181:24 198:21

**sense** 7:9

**sensitive** 34:6

**sentence** 172:22

**separate** 6:25 7:22 95:9 161:3 180:24

**separated** 10:25 11:18 49:16 86:18 150:14 155:25

**separation** 16:18 20:2 39:10 113:15 117:9 129:24 132:6 149:5,7 155:14,19 156:6 166:17 181:13,15,22 199:16

**separations** 116:19

**September** 10:10 26:13 33:21 40:6 41:4 47:13 48:4,8,12,22 52:8 54:13 55:4,19 68:22 124:3 127:23 128:24 129:25 130:10,21 147:10,12 154:24

**serve** 130:3

**service** 12:15 31:10 60:9, 22

**services** 10:20 45:7 46:7 57:9 59:12 60:12 88:9 128:1

**session** 83:8,19,22

**set** 17:9 23:12 60:17 96:5 106:18 135:17 138:22 140:18

**setback** 82:21 109:11

**setbacks** 49:22,23 73:5

**setting** 76:17

**settlement** 160:15,16

**setup** 164:15

**severance** 113:18

**severe** 53:1 155:4

**sexual** 9:9

**share** 149:3

**shared** 152:4 155:9,10

**sharing** 64:9 84:10 85:18 87:5,17 149:1

**she'll** 143:13

**sheath** 73:25

**sheer** 97:19

**sheet** 116:17 117:9 120:16

**sheets** 97:14

**shelf** 133:14

**shin** 75:20

**shock** 107:13 111:7,8 112:10

**shoe** 118:21

**shoes** 31:3,12,19 77:25 78:1

**short** 71:17 172:9

**show** 11:3 16:21 21:13 37:2 38:18 46:10 70:15 77:1 79:11 96:10 112:22 119:6 127:14 145:15 185:19

**showed** 43:5 46:12

**showing** 134:5 137:13 166:21 168:14

**shows** 121:22

**shred** 171:11

**shut** 24:25 26:16 42:15 56:6 58:1 159:21

**sic** 31:8 149:25 182:12

**sick** 15:1 25:4 80:25 112:7 122:12,17,22,24 123:8, 14,17,21 124:4,5,10,14 126:1 128:19 137:14,17 143:3,13,14,20 144:4,14 165:12,13 174:17,19,22 175:13,21 177:22 178:2,3

**side** 133:11 142:6

**Sidney** 111:23 195:23

**sigh** 106:8

**sign** 116:4 135:21 184:22, 24 187:10 196:25 200:22

**signed** 11:16 12:14 59:24 72:1 116:17 197:9

**signing** 97:13

**silent** 140:9

**sim** 62:25 63:8

**similar** 5:2

**sir** 4:13,16,23 5:1,16 6:8, 17 7:6,21,23 8:1,4,7,11 9:18,20 10:2,16 11:2,10, 15 12:4 13:8,14,16 16:20 19:2,24 21:23 22:1,6,12, 14,16,19 23:1,25 24:5,8 26:25 27:13,16 28:2,4 29:20,25 30:2,5 36:7 39:2,4,8,14,18 45:15,24, 25 46:3,15,19 47:10 48:9, 10,15,21 49:5,18 53:9,22 54:11,21,24 56:19,25 57:7,10,12 58:11,13 61:8, 11 62:2,5,10 67:13,22 68:4,20,24 69:3,7,9,17, 21,24 70:2,13 73:14 75:6, 9,12 76:7 77:9,15 78:1,21 79:10 80:18 81:9,11,16, 20 83:21,24 84:24 85:6, 11,14 87:3,7 88:7,10 89:6,8 90:3,19,21 91:1, 17,24 93:6,11,13,18 94:10 103:19,24 108:25 109:15 115:9 119:17 121:5 122:2,11 123:24 125:8,11,22,24 126:13,24 130:12,15 131:14,24 132:4 146:1 147:11 149:17,20 152:13 153:25 154:5,10 156:4 157:5,25 163:3,12,24 168:5,8,23 170:3,19 171:25 173:1 178:11 187:1

**sister** 152:2,6 153:3

**sit** 63:17 88:5 142:19 143:4 151:5 183:20

**sitting** 100:24 106:19 137:25

**situation** 5:22 8:17 18:7 23:8 43:23 145:1 156:18

**situations** 56:24

**six-** 34:20

**six-month** 34:1 67:7

**six-months** 67:6

**six-year** 139:8 147:17

**Sjoberg** 161:8,11,13,22 162:1

**skeletal** 119:1

**skid** 83:24

**skills** 53:15

**skinned** 65:21

**slated** 24:21

**sleep** 159:21 163:10,16

**slide** 83:6

**Slobin** 31:7

**slotted** 123:16

**SMMI** 33:23

**social** 60:15 61:7,10,15, 17 97:6 181:6

**solely** 33:17

**someone's** 146:4

**son-in-law** 150:22

**soonest** 64:18

**sort** 14:15

**sorts** 63:14 66:21

**sought** 64:16

**sound** 9:14

**sounding** 152:7

**sounds** 99:11

**source** 10:3 54:1 118:9

**space** 63:10

**span** 18:4

**spans** 49:23

**spare** 80:24

**speak** 33:13 116:20 133:12 155:3 195:25

**speaking** 12:20 52:9 182:4

**specialist** 79:21 80:2

**specific** 66:20 157:14

**specifically** 175:17

**speculate** 127:17

**speculatively** 182:4

**speed** 20:18 135:13

**spell** 108:5

**spelled** 13:9

**spend** 162:10

**spoke** 58:21 95:24 97:7 190:16 195:24 196:2

**spoken** 64:6 123:15 161:22 195:20 196:13

**Sporadically** 163:14

**sprain** 65:10 66:13,19 67:10,11,12,19 125:24

**sprained** 35:6

**stage** 51:11 114:14

**staging** 10:4

**stairs** 62:20 106:18 138:23 149:14

**stalking** 7:16,24 8:8,15,19

**stalled** 135:5

**stalling** 160:24

**stand** 20:12,21,25 159:9 172:20

**standards** 96:12

**standpoint** 150:23

**stands** 115:2 143:22

**Stansbery** 11:17 12:22,25 68:17 97:24 140:6 177:1, 2 187:25 189:20 193:14

**Stansbery's** 11:17

**start** 182:8

**started** 48:13 52:25 59:8 103:4 104:1

**starting** 73:9 134:13 190:6 193:23

**startling** 100:3

**state** 138:17 141:25 152:20

**stated** 114:17 122:21 164:14

**statement** 36:9 37:1 40:14,17 109:23 145:14 193:1

**statements** 21:21 100:1 160:3

**states** 173:24

**stating** 18:5 133:23 146:11 178:22

**status** 36:16 37:22 70:18 77:10 102:22 117:6 122:25 136:23 137:15,19 155:13,15 175:12 181:14, 24 183:16 198:5 200:15, 16

**statutory** 33:23 59:5 64:3, 14 74:22

**stay** 8:14 107:21

**stayed** 180:20 181:3

**staying** 107:24

**stent** 90:11

**step** 18:15,18,22 107:5

**Stephanie** 34:4 63:22 64:5 70:10 74:16 119:2

**stepped** 104:19 106:21,23 107:4

**stepping** 105:20

**steps** 32:17 62:19 137:21

**Steve** 4:6

**Steven** 83:13 130:15 164:5

**stinger** 107:17 109:18 110:5

**stonewalled** 25:19 67:4 140:17

**stop** 16:10 59:2,7 62:11 74:4 110:24 144:10 192:17

**stopped** 50:19 53:19,25 186:13

**storage** 61:4

**stories** 110:18 159:18

**storm** 25:2

**story** 25:15 172:5,8

**stowing** 72:18

**straight** 164:19

**strain** 63:16 65:10 66:13, 19 67:10,11,12,19

**strained** 83:15

**street** 107:21 151:24

**stress** 159:18

**stretch** 5:9

**strict** 198:9

**strifes** 97:1

**strike** 183:21

**stroke** 43:10 133:9 148:19

**struck** 53:2

**structure** 76:25

**structuring** 158:12

**struggles** 118:4 148:25 149:5 150:12 151:21 154:18

**struggling** 73:7

**stubs** 49:12

**stuck** 63:9 99:16

**stuff** 61:4

**Sub-continental** 139:17

**sub-united** 139:17

**subcategories** 152:19

**subject** 34:6 93:15 142:4

**subjects** 96:17

**submission** 187:8

**submit** 192:1

**submitted** 15:7 164:4,8 170:20,23 171:7,16 186:21 191:21

**subsequent** 184:6

**subsequently** 96:9

**subside** 128:13

**subsides** 128:16

**substantiate** 144:16

**substitute** 169:16

**substituted** 169:16

**sudden** 16:9

**sued** 6:9 93:4

**suffered** 127:11 141:4

**suffering** 142:4

**suicide** 160:6

**suitcase** 28:17 115:24

**summer** 42:21

**Sunday** 25:22 38:16 43:11 104:22 118:25 133:9 172:6

**Sunshine** 151:23

**supervisor** 11:21 12:14 30:24,25 31:1,14 80:16 81:10 96:4,24 102:21 110:25 115:19 123:18 137:4 140:14 146:6 174:25 175:6,8,13,16,19 176:7,9 178:5,8,12,24 179:2,5,7,12,15,18,21,24 180:3,4 188:19,24 189:2, 5,10,12 195:1,3,20

**supervisor/sedgwick** 122:18

**supervisors** 92:12 97:5 102:23 123:2 139:1

**supervisory** 176:8

**supplement** 10:5

**support** 38:9 94:9 102:8 175:20 187:6,7

**supposed** 20:8,11 24:21 26:6 43:11 51:19 52:18 92:9 93:2 96:9 110:25 124:21 137:23 146:7 188:18,19

**supposedly** 40:9

**surgeon** 111:18 185:2,4

**surgeries** 10:11 31:11 55:11,20 56:18 73:2 88:25 89:3 90:24 115:23

**surgery** 13:24 33:7 41:2 43:15 55:13 56:3 57:24 65:4,19 71:4 72:21 73:23 75:4,7,11 89:18,19,20 90:9 91:23 92:14,22 111:10,13,18 112:7 114:11 115:24 125:14 184:23 185:2 195:17

**surgical** 82:4

**surrounding** 36:15 88:1

**susceptible** 112:23

**sustaining** 112:23

**Swanson** 20:12 21:25 24:15,23 26:13 28:15,18 133:22 166:24 169:9,13, 16,19 170:1,16

**Sweeney** 83:11 84:2

**swelled** 83:7

**swelling** 31:5

**switch** 173:22

**switched** 135:9

**switching** 173:25

**swore** 135:2

**sworn** 4:3,12,25 19:5 135:2

**symptoms** 72:13 128:12

**synopsis** 15:5

**system** 16:8 21:4 24:5 27:12 37:4,7 44:1 51:24 58:6,7 121:20 122:16,19 142:8,11,22 143:5,20 165:6 174:24 175:1,10,11 178:20 188:5

**systemic** 110:18 141:15

## T

**T-I-B-S** 48:23

**T-MOBILE** 193:22

**table** 59:25 151:5

**tail** 76:12

**takes** 148:9 185:20

**taking** 40:16 42:19 103:23 115:22 120:19 129:18 163:13

**Talispoint** 42:2

**talk** 27:8 55:18 103:7,10 107:16 132:12 135:22 140:16 161:21 176:21 188:10,14

**talked** 19:4 34:3,4 97:7 194:20

**talking** 72:20 74:12,17 98:20 129:22,24 152:8 174:5

**Tammy** 17:6,12 18:20 34:4,9 98:25 115:18 116:19,21 117:25 118:2 137:3 156:22 199:6

**targeted** 198:24

**targeting** 16:7 35:4

**tax** 60:8

**taxes** 10:8

**TBC** 154:13

**TDI** 92:15

**team** 38:8,9 94:8,9 102:5, 7,8,20 111:10,24 121:19, 21 122:6 140:13 152:4 175:19,20 177:15 185:17 186:17,23 187:6,7,18 188:4 190:20 193:17 194:19 195:19,21,23

**technically** 185:5

**teeth** 101:1

**telling** 33:1 36:21 41:21 42:8 49:12 51:15 64:3,10 70:8 74:12 135:23 144:11

**temporary** 48:23 49:1 73:3

**ten** 33:18 43:19 134:15

**tens** 65:2 92:23

**tenuous** 55:6

**tenure** 114:19

**term** 15:8 16:3 66:17

**termed** 156:23

**terminate** 12:18,21 16:10 137:22 150:4,17 199:2

**terminated** 11:12 17:9 19:16 29:7 32:16 40:2 44:7,24 53:12,14 101:17 112:4 115:14,19,25 116:2,6 117:4,5,10 124:16 126:14,17 132:13 137:5 144:18 146:14 152:25 154:19,23,25 158:11 160:5,9 161:19 162:15 165:5,7 196:9 198:2 199:10 200:7,9,12, 15

**terminates** 117:18

**terminating** 32:19

**termination** 16:1,13,19 17:17 18:13 52:18 68:18 98:10 99:10 103:18 135:20 140:21 144:7 197:7

**terminations** 199:23

**terming** 198:14

**terms** 44:12 66:22 111:3

**Terri** 12:11 34:10 40:12 41:21

**test** 59:9 104:23 105:8,17 106:6 130:22 142:24

**testified** 4:3,14,19 5:18,20 9:12 21:10 22:7,15,21 23:2 37:9,17 44:15 46:1 59:10 99:21 109:21 112:16,18 123:13 126:9 127:7 132:18 136:12 151:12 168:20,24 169:4 170:25 173:19 174:15,16 176:12 184:9 187:23 189:2 191:18 192:4,23 193:12 196:23 199:5,9

**testifies** 30:14

**testify** 9:10,12,17 19:25 20:4 21:7 32:21 123:7 136:16,17 150:8 157:9,13 171:22 172:2,7 194:3,9

**testifying** 21:24 22:8,13 37:12

**testimony** 20:21 21:1,11, 19 22:17,20 30:7,12 35:12 108:7 109:16,20 122:20 123:5,23 136:10 168:15 171:1,23 172:6 173:3,13,15 183:21 191:15 197:8 198:19

**testing** 38:7 94:5 104:22 121:2 131:21 174:10

**tests** 91:21 92:1

**Texas** 137:7 139:12 141:13,23,25 193:10

**Thanksgiving** 64:19,20 65:17 74:2 183:24 184:2

**theory** 38:1

**therapist** 82:21 83:6

**therapy** 41:7 49:23 58:23 64:23,25 65:2 66:24 71:4 73:3,6 75:10,23 83:1,8, 19,22 92:24

**thereabout** 90:14

**thereabouts** 56:8

**thin** 142:21

**thing** 34:22 65:14 88:21 95:25 96:12 110:8 140:16 143:11 181:11,12

**things** 20:1,5 25:2 60:17 94:15 129:17 137:18

166:1 187:24 190:12 194:24 199:11

**thinking** 7:16 83:8 107:4

**thinners** 111:15

**third-party** 44:2 173:19 176:4

**thought** 20:5 52:21 54:14 55:21 57:18 83:12,18 91:21 101:11 106:14 114:1 120:11 136:1 146:18 166:12

**thousands** 65:3 92:24

**threat** 106:1

**threaten** 29:12

**threatening** 99:3,7 135:6 140:7 193:1

**threats** 135:7

**three-day** 177:18

**three-legged** 197:17

**three-week** 43:18

**three-year** 37:23 38:2 44:6 68:14 72:23 73:8 81:18,24 83:5 115:20 124:12,15 139:9 144:14, 21 147:1 148:10 199:20

**thrilled** 120:1

**throw** 116:15 182:21

**thrown** 143:16

**Thurber** 155:17

**Thursday** 25:21 125:14

**ticking** 82:23

**tied** 196:1

**till** 29:22 40:14 43:24 111:19 151:13 195:3 200:19

**time** 5:8 8:21 11:17 12:9, 11 17:23 22:9 25:17 28:18 29:7 30:25 32:7 38:11,19 39:20,24 41:9 42:18 44:5 48:13 50:18, 22 52:4 53:7,21 58:2,21 59:13 64:14 67:4 68:10, 25 71:10 73:15 74:5,13 77:16 78:13,16 80:4 81:2, 10 82:20 83:18 84:11 85:15,23 87:2,6,10,11 88:17 89:22 90:2,4,22 92:10,11 96:15 101:14 115:20,23 116:15 121:22 122:25 124:19 125:20 126:23 130:7,14 131:5 133:18 147:16 148:12 151:2 161:16 166:22 168:10 176:10 178:12,16 180:12 181:15 182:22 187:19 188:16,22 189:9 193:22 197:4,5,18,22 199:20

**times** 50:3 74:21 84:4 101:18,21 189:20 196:18

**tiny** 76:10,11

**tip** 60:20

**title** 158:22,24

**titles** 152:19,22 170:13

**today** 4:10 9:17 14:5 33:5 131:22 168:14 173:13,15, 18,19 182:25 183:20

**told** 18:19 20:16,20 26:1 27:25 29:10,11 31:14 38:16 51:13,20 58:2,22 59:1 61:18 66:20 67:2 68:11,15 74:13 80:10 98:15 103:9 109:17 110:4 112:3,12 116:7,13 122:16 125:18 129:8 134:10,20 136:7 138:3 166:25 168:25 172:15 175:18 179:17 187:24 188:3,14 191:6,20 192:4,8 196:6,7, 19

**toll** 141:5 148:9

**tomorrow** 110:12 118:16

**top** 143:16 181:20

**torn** 63:13 65:11 67:17 83:13

**Torre** 24:14 28:14,19 133:22 155:18 157:16,19 158:20 159:3 164:17 169:9 170:12 171:4

**total** 49:1,6 67:6 89:17 134:18

**totaled** 49:13

**totality** 170:22 171:6

**totally** 23:18 98:5

**Toto** 16:4 199:2,3

**touch** 18:6

**touched** 127:11

**town** 105:10

**TPA** 92:18

**TPAS** 113:1 173:25

**track** 33:21

**trade** 144:23 197:21

**trades** 32:11,12 121:24 177:14 197:5

**trainee** 28:18

**trainer** 191:20

**trainers** 191:24

**training** 11:22 15:6 22:22, 25 31:24 32:5,10 33:6 37:25 38:10,16 41:14,16 44:10 62:18 94:10,18,20, 25 95:10,18 96:8 97:15 101:23 102:1,24 103:2,4, 22 104:1,3,7,10,21,25 105:2,4,15,21 106:5 107:22 109:9,25 111:11, 19,23,25 112:6 119:1,3 120:7,11,13,14,15 121:4, 9,16,18 124:20 140:6,10 141:12 151:8 160:24

165:11 177:10 179:25 186:5,8 191:6 192:12 193:2 194:1 195:8,15,22 196:24

**transactions** 32:3

**transcript** 21:11,14,20 25:13 26:9 27:15 28:5 29:19 30:3,7 59:14 109:13 136:10 171:23 190:2

**transcripts** 24:10

**transferred** 181:24

**transition** 98:19 183:7

**transitional-duty** 35:1

**transparency** 14:19

**transpired** 19:15

**travel** 29:4 85:10,12 117:13,19 131:22,25 132:5,7

**treated** 67:16 139:7 198:16

**treating** 33:25 34:2,15 40:19 41:20 42:4 63:19, 24 65:1 66:3,14,18 67:5, 16 74:6 79:17,23 113:1 125:16 143:3 174:10

**treatment** 34:17 44:4 50:14 64:17 67:3 73:23 74:20 82:15,19 92:1 97:3 138:13,20 139:3,5,14 140:9 141:15,20 148:14 151:7 164:12 183:19

**treatments** 57:20 91:21 93:5 148:9

**tree** 60:2

**trespassing** 8:19

**trial** 200:19,21

**triathlon** 88:16

**trip** 15:2 32:11,12,14,15 96:9 121:24 122:8,9,13 123:19 126:4,6 128:20 132:8 144:23 177:14 197:4,21

**trip-trading** 135:20

**Triple** 138:24

**trips** 15:3 121:22 122:7 128:19 141:8 160:10,11 165:11 177:14,15,16 182:21 197:2

**trooper** 152:20

**trouble** 183:11

**true** 128:6 135:4

**truth** 14:20 23:5 36:21 144:11 172:8

**truthfully** 22:21

**TSA** 94:18,20 95:6,7

**tube** 133:12

**Tuesday** 43:13

**tumor** 65:8 74:25

**turbulence** 76:10,11,14

**turn** 36:3 46:23 77:7 93:14 102:21 109:14 123:4,22 126:5,8 160:1 175:19 177:17,25 197:11,15,17, 18

**turnaround** 188:16

**turned** 61:14 99:24 159:23

**turning** 34:18 97:20 160:6 162:5 190:1

**TWA** 152:3

**two-day** 20:9 24:20 126:4, 7 136:7 168:25 177:17,23 197:12

**two-story** 63:4 149:14

**two-week** 14:2

**type** 5:21 96:12

## U

**ultimate** 12:19 23:10 66:4

**ultimately** 19:4,22 101:15 141:14 144:4

**unable** 39:19 49:20 50:11 73:16 111:4 130:18

**unaltered** 170:23

**undergo** 186:1

**understand** 4:11 13:6 23:6 56:13 91:15 93:24 111:1 113:7,9 115:6 129:23 168:3

**understandably** 112:19

**understanding** 10:25 15:20 18:8 23:19 50:10 94:2 175:4 178:4 179:14

**undisputed** 36:6 37:18

**unemployment** 50:9 53:21,24

**unfair** 132:21

**unhappy** 192:11

**uniform** 77:24 80:25 81:1, 7 96:10 97:10 116:12,16

**union** 4:18 5:19 20:7,8,9, 12,24 21:4 26:16 27:25 28:3 30:19 33:1,2 38:24 52:9,11 98:17 132:19,22 134:5 135:3 138:6,11,12, 14 141:20 144:19,21 152:25 155:15 157:3 164:23 167:14,21 169:11, 14,22 172:11,15

**union's** 30:11 132:19

**United** 4:7 5:19 9:22,24 11:1,8 20:10 21:20 22:3 23:8 29:8 31:18 33:11 34:12 36:21 39:5 46:8 49:16 51:7,9 52:24 53:12 54:9,20,23 55:2 56:4,11

59:16 78:2 79:1 85:17 90:1 97:2 110:14 112:17 113:4,16 114:22 115:1 116:14 117:1,18 120:22, 25 124:9 132:12 138:15, 16,25 139:11,16,24 140:1 141:15 142:3 145:24 146:2 155:22 156:1 158:18 167:18 170:8,9 173:20,22,25 179:17,23 180:17,20 181:13,15,23 185:7,11,13 188:19 193:15 194:18 197:24 198:23

**United's** 34:16 77:24 79:16,22 124:1,9 139:6 149:18 150:3,19

**unknown** 42:18

**unlimited** 29:4

**unpack** 14:23

**unpaid** 93:5 198:8

**unrelated** 89:9,11,17

**update** 122:19

**updated** 121:20 185:20

**updates** 102:21 155:10,11 161:23

**uphold** 136:1

**upper** 34:7

**UPS** 17:24

**upset** 20:24 24:17

**urine** 142:23

**USPS** 18:1

**utilized** 143:9

V

**vacation** 40:13 84:9,10, 15,16,25 85:6,17 87:13, 16 189:17

**van** 102:3 107:21,22,23 120:10 194:1

**varied** 84:8

**Varner** 40:20,21,23 41:3, 6,20,21,22 45:21 59:8 64:17 66:4 72:1,8 75:3 76:23 77:11 79:2 81:25 82:10,16 83:12 95:24 125:17 130:15 184:1,21 185:1

**Varner's** 83:14

**Vehemently** 27:13

**Velez** 178:24 179:5,17,20, 22 189:2,5 194:24,25 195:1,3

**ventilator** 43:19

**verbal** 69:11

**verification** 105:8

**versus** 97:2 182:5 198:14

**vertical** 55:15

**Vicky** 116:3,19,22 117:25 118:6 199:6

**videoing** 63:5

**view** 61:2 124:10 129:1

**Vinson** 150:22

**violated** 52:16

**viral** 114:16

**Virgin** 181:23

**vision** 86:17,20 87:1 198:23

**visit** 41:5 72:9 77:13 96:14

**visited** 31:25

**visiting** 131:5

**visits** 42:19

**vocal** 135:22 174:7

**voicemails** 103:8 188:11

**voluntarily** 117:2

**voluntary** 113:15 115:2,3, 6 116:4 199:16

**volunteered** 106:12

**VSL** 113:14 115:2 199:5,9, 14,25

**VSL1** 113:11 114:5

**VSL2** 113:12

**VSLS** 200:5

W

**W-2** 33:20

**wait** 55:21 61:19 64:4 66:19 111:18,19 114:2 143:12 191:25

**waited** 54:13 186:7

**waiting** 153:2,18

**walk** 5:10 45:6,13,14 46:2, 3 55:24 56:20,22 57:2 62:13,15 63:6 64:21 65:15,23 74:7,10 75:25 84:1 88:6 100:14 107:2 126:11,15,20,21 129:9 174:18

**walked** 28:16 74:6 98:25 100:4 136:4 172:17

**walking** 62:17 63:16 65:20 183:12

**walks** 144:21

**Wallace** 154:11

**walls** 142:22

**Walmart** 107:25

**Wanda** 148:15,20 153:3, 10

**wanted** 18:11 61:19 82:19 117:4 129:6,11 131:17 136:16 167:11 169:5 173:6 181:21 195:9

**wanting** 198:22

**warning** 19:18

**warranted** 198:9

**washed** 134:5 164:20 165:18,21 166:1 171:1

**washing** 165:19

**Washington** 62:4

**watch** 105:24

**wear** 31:3,4,9,14,18 77:25 78:18 80:11 81:4

**wearing** 31:9 77:23

**weather** 124:22

**website** 42:3

**Wednesday** 125:13

**week** 14:6 25:22 48:12,19 87:15 163:16

**week's** 18:4

**weekend** 14:11 17:9 40:14 83:11 84:3

**weekly** 48:17,18

**weeks** 20:18 43:22 45:10, 11,18,23 46:1,5 83:16 91:6 125:19 126:11,12 135:9 169:24

**well-being** 129:15

**well-known** 64:8

**wham** 76:16,17

**whatsoever** 33:2

**wheel** 113:6

**Wheeling** 19:10 98:21 137:2

**wheels** 83:17 104:20

**whichever** 13:2 48:11

**white** 99:6 171:8 182:17

**Whittaker** 17:14

**Whoa** 91:2

**wicked** 199:3

**window** 184:13

**windows** 104:17

**wings** 76:17 96:21

**Wisconsin** 20:16 169:20

**Wisenbaker** 163:19

**Wisenbaker-valenzuela** 159:7,12 163:11

**wishing** 18:11

**witch** 199:3

**Withdraw** 19:18

**witnessed** 112:24 151:14

**woke** 125:5

**woman** 99:6 158:25 159:2

**wondering** 190:18

**Woodlands** 83:11 84:2 148:17

**word** 17:1 36:15 38:12 75:14 99:1 101:4,8 115:6

**worded** 76:10 84:12

**wording** 16:4 25:6

**words** 16:6 29:10

**wore** 31:21

**work** 24:17 25:8,14 37:3,6 39:20 40:25 49:20 50:12, 16,21 54:15,20 56:4 57:14 58:16 59:16,22 63:24 70:5,6,18 71:9,17 72:14,22 73:16 77:18,19, 21 78:17,20 79:7,18,24 82:24 90:2,23 93:16 94:22 95:13,21 100:25 111:4 116:12,16 118:6 124:17 125:19 126:25 130:6 131:20 136:21 138:21 139:5,12 148:6 181:22 182:24 184:10 185:6,22

**worked** 13:15 50:4 60:7 81:22 132:25 134:8

**worker** 142:8

**workers** 66:6 112:20 141:16 144:10

**workers'** 37:4 40:3,20 44:13 46:18 58:7 64:7 70:17 118:5 125:17 138:17 142:12,16,18 146:12 157:1 178:25

**working** 37:7 43:25 50:23 51:3 54:23 55:1 56:11 71:17 86:1 90:1 124:2,7 127:1 169:15

**works** 132:23 154:13

**world** 116:24

**worn** 31:20,22

**worried** 115:12 159:24

**worry** 51:21 100:11

**worth** 95:18 197:15

**Wow** 99:22

**write** 17:14 34:14 111:18 133:17 192:1,10

**write-off** 61:5

**write-offs** 61:4

**writes** 199:1

**writing** 26:7 99:9 135:23 140:15 165:20

**written** 40:14 41:17 101:9 104:23 105:8 141:22 185:14 188:2

**wrong** 156:19 175:5

**wronged** 144:9

**wrongful** 144:6

**wrote** 15:4 16:17 17:22 18:6 19:17 23:16 26:13 38:6 43:20 102:18 103:6 133:17 143:11 176:20 188:12 191:21

**X**

**X-RAY** 57:22 125:15

**X-RAYS** 84:3

**Y**

**Y'ALL** 123:11

**Yay** 106:22

**year** 10:14 31:13 33:19 34:21 42:14 43:7 55:8,10, 17 60:4 61:20 67:6 84:14 87:8,14 88:23 90:21 92:17 94:24 95:14 106:8 114:3 134:17,24 154:24 181:9 182:6

**Yearly** 85:20,21

**years** 11:25 20:14 30:14 33:18 34:24 53:13,14 63:20 64:24 65:9,25 68:7, 14 69:2,20,25 72:25 73:4, 13 84:18,21 85:3,13 92:4 95:15,16 100:23 111:6 113:3,21 114:20 116:8,14 117:23 129:5,18 134:15, 19 135:8 137:4 138:2 147:10,18,21 148:8 151:13,22 152:20 154:6,7 160:14 169:15 180:11,25 199:15

**you-all** 144:9

**young** 114:24

**younger** 144:12 145:1

**Z**

**zipping** 97:22

**zolpidem** 159:21

**Zoom** 156:12