IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CHRISTINE FINGER, *
Plaintiff, Pro Se *
v. * Case No. 4:20-cv-04205
UNITED AIRLINES, INC. *
Defendant. *

------------------------------------------------

ORAL DEPOSITION OF
ALETA STANSBERRY
FRIDAY, JANUARY 30, 2026

------------------------------------------------

Oral deposition of ALETA STANSBERRY, produced as a witness at the instance of Plaintiff, and duly sworn was taken in the above-styled and numbered cause on January 30, 2026 from 12:54 p.m. to 6:35 p.m. before Nephtali Diaz, stenographic court reporter in the State of Texas, and NOTARY in and for the State of Texas, reported by machine shorthand method, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

FINAL COPY - TEXAS CERT #714
JANE ROSE REPORTING 1-800-825-3341



A P P E A R A N C E S

PLAINTIFF:
CHRISTINE FINGER, PRO SE
47 NORTH HIGH OAKS CIRCLE
THE WOODLANDS, TX 77380
(832)656-6999
1Ladyfinger@gmail.com

FOR DEFENDANT:
AMIT MISRA, ESQUIRE
MISRA LEGAL GROUP
639 HEIGHTS BOULEVARD
HOUSTON, TX 77007
(832)723-4776
amit@misralegal.com

JANE ROSE REPORTING
TEXAS CERT #714
74 Fifth Avenue
New York, New York 10011
1-800-825-3341
Neph Diaz, Court Reporter



EXAMINATION INDEX PAGE

Appearances................................ 2
MS. ALETA STANSBERRY
Examination by Ms. Finger.................. 5
Reporter's Certificate..................... 185
Witness Changes............................ 187

E X H I B I T S

Exhibit 1, medical history................. 7
Exhibit 2, charge of discrimination form.... 16
Exhibit 3, email thread.................... 26
Exhibit 4, email thread.................... 36
Exhibit 5, email thread.................... 43
Exhibit 6, email thread.................... 51
Exhibit 7, email thread.................... 52
Exhibit 8, email thread.................... 57
Exhibit 9, document........................ 79
Exhibit 10, document....................... 93
Exhibit 11, declaration.................... 95
Exhibit 12, appeal......................... 132
Exhibit 13, emails......................... 134
Exhibit 14, documents...................... 140
Exhibit 15, documents...................... 140
Exhibit 16, call logs...................... 163
Exhibit 17, safety handbook................ 172



P R O C E E D I N G S

THE REPORTER: All right. We are now on the record. The time is 12:54 p.m. The date is January 30, 2026. My name is Neph Diaz, stenographic court reporter representing Jane Rose Reporting. This is the oral deposition of Aleta Stansberry in the matter of Christine Finger, Plaintiff, pro se, v. United Airlines, Inc., Defendant.

Counsel, would you please state your appearances after which I will swear in the witness.

MR. MISRA: Amit Misra for Defendant United Airlines.

THE REPORTER: All right. Ms. Stansberry, would you please raise your right hand?

Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

(Witness sworn.)

THE REPORTER: All right. Ma'am, you may begin.

ALETA STANSBERRY,
having been first duly sworn, testified as follows:

EXAMINATION

BY MS. FINGER

Q. Okay. So my name is Christine Finger. I'm the plaintiff here today. And I -- sorry. I'm trying to get a Google doc here. I -- this is a deposition of Aleta Stansberry, and I'm conducting this deposition under extreme duress due to withdraw of attorneys and abandonment by prior counsel.

By proceeding today, I don't waive any right to future counsel or any objections to the conduct of the defendants. I'm here solely just to protect my interests under court scheduling order.

So I guess with that, moving forward, I have to ask you if you're under any medication or something that would influence your answers today that you feel would inhibit your answers.

A. No.

Q. No? Okay.

And if you don't understand a question, just say so and I'll repeat it. Whenever you want a break, just let me know, I'm sure with all this, it's gonna be -- I appreciate your patience because it's a lot. Please let me finish the question before answering and if you don't understand, let me know.

I would like to get started. I don't know. This is a seven-year-old case, obviously 2019, coming on seven years, so I'm not sure how refreshed you are on this. I mean, obviously I live it, so it's -- I know, but I don't know if this is something that you are familiar with or as far as the history of it and the incidents and details and what all you want me to recount.



I don't know if you -- I don't know what your familiarity, I guess, with it, is, your memory or versus looking at documents or how you have prepared for the deposition today.

MR. MISRA: Is there a question?

MS. FINGER: Yeah.

Q. (By Ms. Finger) How did you prepare for the deposition today?

A. Met with counsel. He brought forward some different documents, not nearly that, so...

Q. Not nearly this, you mean (indicating)?

A. No.

Q. No. I know. But just so you -- I'm just trying to see if I kind of need to go back. You're familiar with the years and the incidents and storyline of --

A. My partner?

Q. Uh-huh.



A. Yes, okay. So I guess what I'd like to do, just to go on record and just kind of started. We can do Exhibit 1.

(Exhibit 1 was marked.)

Q. (By Ms. Finger) And I don't want to have you read all day, so I'm having to read a little bit.

Just basically, I sustained a turbulence-related on-the-job injury on August 3rd, 2014, crushed by a bar cart, at the time Continental flight attendants.

This was prior to the United's merger. We're entitled to a six-year medical leave policy allowing them time to recover and return to work. In April 2016 I attempted to returned to work for a light-duty position and recruiting.

However, the office relocation from the training department to the pilot simulator building required excessive walking and stair climbing in a cold environment exacerbating my ankle, left hip, and injuries.

After struggling with prolonged sitting and mobility issues, I fought -- I sought further medical evaluation. A new treating physician prescribed a cane and then took me off of work again. I was not -- my experiences with Gallagher Bassett and Sedgwick were extremely frustrating and I was not provided proper medical care, delays, or diagnosis.



So finally, my new doctor ordered an MRI of my left hip and back which revealed extensive damage; however, they wouldn't do an MRI of my left ankle despite the pain.

(As read): "In September 2016 United unilaterally reduced the six-year medical leave policy to three years under the new Joint Collective Bargaining Agreement. This policy change disproportionately impacted injured long-term flight attendants cutting their recovery time in half and effectively enabling Gallagher Bassett to continue stalling treatments until injured employees ran out of time.

Faced with numerous complaints regarding Gallagher Bassett's handling of OJI claims, United switched to a third-party administrator, Sedgwick, claiming it would provide better care for injured employees; however, the same patterns of delay and denial continued. By August 4th, 2016, Plaintiff was forced to accept statutory MMI despite never receiving prior diagnostic or treatment."

My injuries were still classified as mere sprains and strains and I was assigned a 6 percent impairment rating, effectively shutting me out of

further workers' compensation benefits.

Determined to regain my ability to work, I sought private medical treatment at my own expense and my new surgeon immediately identified a perineal tumor in my left ankle, a direct result of the bar cart impact, which Gallagher Bassett had failed to diagnosis, and I was referred to a microsurgeon who performed surgery on March 3rd, 2017.

This surgery was extensive, revealing significant nerve damage. I was on crutches for nine months and intensive physical therapy to learn how to walk again, faced complications including Achilles tendon shortening and setbacks and recovery due to the severity of the injuries.

Part of my light duty and recruiting, Plaintiff's three-year medical leave clock was reset, so that extended my return-to-work deadline to May 26, 2019; however, recognizing the severity of my injuries and ongoing limitations, I began proactively seeking accommodations in August 2018.

I also applied, since I had done a stint in recruiting from April to May of 2016 and I was on crutches, I did apply for in-flight recruiter back in, I think, August of 2017 and I was told that I wasn't qualified.



So I wasn't qualified for the position even though I just worked there and had my phone and everything else and had rave reviews, but -- so on August 22nd, 2018, I met with Dr. Varner, my treating physician, and formerly discussed reasonable accommodations for returning to work with United and Dr. Varner initiated the accommodation request with United.

December 21st, 2018, United's reserve -- oh, excuse me -- reasonable accommodation -- I don't know how I did that -- team invited me to initiate the accommodation process.

February 26, 2019, emails revealed that my injury had been flagged with an alert in the system where Karen Parker, who I'd expressed a lot of issues with Gallagher Bassett's treatment of the injured workers and I, escalated it all the way up to her and Derrick Bidaldi, I think his name is, and just said there has to be some kind of whistleblowing.

I have the letter here with all this and injured workers with these delays and denials and just running employees out of time, and nothing happened except for they issued a private investigator to follow me which I found out in my file later.

So that alert had -- there's some documentation



that I'll read later, but it had stalled my return to work because they wanted to make sure that it was authorized or I don't know -- because I was already injured.

March 2019, emails between Tammy Holt and Dominic Cordova, my supervisor, confirmed that I had formally requested reasonable accommodation, was awaiting a decision on accommodations. Tammy asked Karen what it was.

During the ongoing restrictions, I had to wear orthotics, a compression band, the flat shoes, and I had to pump with a lymphedema pump prior to and after flying, but because I could accommodate, I could self-accommodate without a restriction, they told me I didn't need a reasonable accommodation at the time. But they said that I had no restrictions, but that is not what my doctors' notes say. I had to wear the shoes the compression bandage and that.

So on April 15th, Dr. Varner cleared me to return to work full duty with a medical release effective May 23rd, and I was just waiting on a call to requalify for active status.

And that was to the -- it says when you're on a extended leave of absence that you allow the company 30 days to do all the fingerprinting and processing and



criminal background and everything else and that's kind of the intro as to where we are.

MS. FINGER: I'm gonna put this over there where it belongs.

MR. MISRA: Let me just get an objection on the record as far as Ms. Finger offering testimony as opposed to asking question and also objecting to Exhibit 1 because it appears to be testimony rather than any document that was produced in discovery.

MS. FINGER: I was just trying to give a background --

MR. MISRA: You're gonna hear a lot of objections from me.

MS. FINGER: Okay.

MR. MISRA: So that's just -- I need it on the record.

MS. FINGER: All right.

MR. MISRA: And you go on with what you're doing.

MS. FINGER: Okay. All right. So -- well, if you don't tell me to bring up documents, I'm just trying to familiarize Aleta.

Q. (By Ms. Finger) Do you remember the core of this complaint when I originally filed it that it's my recollection that when I came down from my

return-to-work interview with Dominic, that I came through the crew room going to the restroom and I saw you in your office, which was dark.

And I popped my head in and I said, "Hey, Aleta. I'm back," because it had been five years with the continual delay going back and then going back out.

And you looked at me and you said, "I know." You were kicking your leg and very aggressive, and you said, "I know. Three more days and I would've had you. You're in my group."

And I was like, "I'm in Dominic's group. Am I coming to your group?"

And you said, "I handle the -- the OJIs and the family leaves and I do -- once the person is 90 days, you know, to running out of their three-year leave of absence that they're assigned to you."

And you were very aggressive and said, "I was writing out your termination letter."

Like, you were -- and that's what totally hit me. That's where all of this came from. I don't know if you know the story if I went to the -- I don't know if you've read this is all I'm saying. I don't know what you know, that I went into the crew room; Dominic was waiting for me. Elizabeth Hibbard -- it was July 1st. No, it was right before July when she was



taking over as the new AFA President.

Denny Wheeling was there; Beth Fortner Rogers was there, and I just walked out of the restroom and came back and said, "Wow. What is going on here?"

Because I've known you for 20-plus years, it seems, and I just was taken back. And Tammy Holt walked up and she said, "That's very disturbing," and she said she was gonna open an investigation because that was just very -- I felt it was very aggressive, very threatening, very retaliatory. I didn't know what it was, and then 28 days later you did get me.

So are you -- do you know this part of the -- I don't know if you have any reference to this.

MR. MISRA: So are you asking her if she knows your allegation, or are you asking her if she remembers the incident?

MS. FINGER: Well, either.

MR. MISRA: I'm gonna object as the question is ambiguous the way it's asked. So I don't want to quote/unquote, "coach" you, Ms. Finger, but if you could try to ask a succinct question that Ms. Stansberry can answer --

MS. FINGER: Okay.

MR. MISRA: -- this process would move along a little quicker.



Q. (By Ms. Finger) Do you remember saying this comment to me? Do you have any -- or did you hear anything from the company regarding this comment?

A. What comment?

Q. Three more days and I would have had you.

A. I didn't say that.

Q. Okay. Do you -- what did you say to me?

MR. MISRA: Objection. Calls for a narrative. Go ahead ask answer.

A. I remember you coming to the door. I remember saying "hi." I remember us having a conversation, but I do not remember and I would not say: Three more days and I would have had you. Didn't happen.

Q. (By Ms. Finger) Okay. So -- and have you read the original complaint that I wrote on this lawsuit where it names you specifically about -- that's why I'm saying. Would you like this?

A. I've never read this, if that's what you're asking --

Q. No, no, no, no. That's just me trying to kind of put us where, what happened. It's seven years ago. I'm just trying to recollect. I had an injury in 2014. I was out, and I came back. 2016 was off. I had surgery for three years on my own merits, my own everything and then came back to work at 2019 and that's



when this second injury happened.

A. I'm confused by the question.

Q. Okay. Do you -- have you ever seen the document that names you and specifically what my allegations are about what you said and how retaliatory it was and that Tammy Holt said she was opening up an investigation and that the union said that it was, you know, threatening?

Do you -- have you not ever heard of this part of the lawsuit? Because you're mentioned in it --

A. I have no idea what --

Q. -- specifically.

A. -- she's talking about. I have no idea what you're talking about.

Q. Okay. So let me give this to you to... so we'll list it as Exhibit 2.

(Exhibit 2 was marked.)

Q. (By Ms. Finger) And actually, I can give you -- this is part of it too. Sorry. Let me pass this to you.

MR. MISRA: Ms. Finger, did you want her to read the whole document?

MS. FINGER: I just -- she can familiar- -- it seems like she's not even familiar with this incident. I just find it hard to believe that for seven

years, six years and a termination and pretty well-known in in-flight that this is -- been insulted where she had no clue that this was -- she's been named in the...
MR. MISRA: You're done reading?
THE WITNESS: I'm done reading.
Q. (By Ms. Finger) Do you have any recollection of any of this, or have you seen anything from United as far as you have been named specifically as a person in this lawsuit over the years?
MR. MISRA: Objection. Compound question. Go ahead and answer.
A. As far as these documents? No.
Q. (By Ms. Finger) As far as just knowing. Did you -- have -- do you know that I -- it is my opinion that you retaliated against me and terminated me when I got injured in the training department and you and Mr. Krabbe and Sabrina misclassified my OJI, my new occupational injury, as a sick call and got me out of there within two hours?
MR. MISRA: Objection. Compound question. Go ahead and answer.
MS. FINGER: Okay.
Q. (By Ms. Finger) Do you know that I feel that you retaliated against me when I called in an occupational injury?



A. Based on this? I'm confused.
Q. Based on anything that you've heard from United. You've been there six years. Has my -- I can't imagine my name never coming up downstairs, especially with you, Sabrina, Crystal, and Tammy, knowing that you're involved as witnesses in this lawsuit for some reason. You're being subpoenaed or you're being deposed, so there has to be something that you know.
A. Well --
MR. MISRA: I'm gonna, again, object. It's an ambiguous question, but go ahead and answer if you can.
A. I don't know this detail. What detail I do know is that I did the administrative termination of your employment. I know about your occupational injury as a administrator. These claims? No.
Q. (By Ms. Finger) And --
A. In this paper? No.
Q. Okay. What was your position as the administrator?
A. To monitor someone that was out on occupational injury. I didn't actually handle the paperwork. That was handled by the employee service center and F.A.S.T. because you were on a nonpaid status.
So all I typically did was monitor and



track the occupational injury. Whether you turned in documentation was my responsibility to send the letters. As far as whether people turned in documentation or they needed to turn in documentation and whether they were out up to the max leave, that was my job.
Q. What was your title as that job?
A. Well, I had two -- basically two roles at the base, at the time, which was -- I was a base administrator for occupational and family leave at that time, and I was a operational supervisor, so ran one up to the concourse and sat at the duty desk. So I had two roles. So in-flight service as a supervisor and in-flight service and I was the base admin supervisor
Q. And what -- your declaration, you say -- when did you start with Continental/United? When did you start? However, you wanna say it. Continental first, then we merged, so when did you start for Continental?
A. '84, September of '84.
Q. Okay. And with what were you -- what was your position?
A. Flight attendant.
Q. Okay. I remember you being on -- when I was flying my charters, you were working through the kitchen. You were catering when we first met. You were catering my charters. You were handling the catering in



my charters.
A. What year?
Q. 1984.
A. Not in '84. I was a flight attendant --
Q. '86 maybe?
A. No. I was -- '86, I was either an online instructor in '86. I didn't go into the kitchen until the '90s.
Q. Okay. Maybe the '90s then. I don't know. So when did you -- so you left Continental at the time --
A. No.
Q. -- and when --
A. It was still part of Continental. The catering division was still a part of Continental.
Q. Was it Sky Chefs, or was it --
A. No. It was Chelsea. It was a division of the company.
Q. And so you maintained your flight attendant status but then worked in the kitchen?
A. Correct.
Q. Okay. How long were you working there?
A. 15 years.
Q. So that would put you until -- when did you move to in-flight?
A. Back to in-flight?

Q. Well, I mean, yeah. I mean, if you're in the kitchen for 15 years, I'm trying to think of the math of when you came back or were in the crew room. I remember you being in the crew room. I remember you catering my charters for me and I saw you in the crew room.
So I'm just trying to ask you: How long were you at Chelsea, Continental, the kitchen, and then when did you come back downstairs?
MR. MISRA: Objection. Compound question. Go ahead and answer.
A. I was in the -- I worked for in-flight the entire time basically because the catering division was under in-flight at the time that I went over there. So I came back to work on base in 2011.
Q. (By Ms. Finger) And what was your position then?
A. Supervisor in-flight. And I was in operations for one month, and then I became the base administrator supervisor.
Q. Because I remember you being in charge of -- in fact, I have a document where family leave was denied. I remember you handled all the family leave at that time --
A. I did until --
Q. -- is that correct?



Okay. Which was when? When did that get integrated about?
A. I don't recall the exact date. It was sometime between 2016 and 2019.
Q. Okay. So I got injured in 2019 when I came back.
So when I came to your office that day, are you telling me that Tammy Holt or the union or anyone else never said anything else to you about the comment that I made or that Tammy didn't say there was an investigation or that was a little off-handed or anything to that effect?
MR. MISRA: Objection. Compound question. Go ahead and answer the question.
MS. FINGER: Okay.
Q. (By Ms. Finger) Did Tammy come to you after I left the crew room and ask you anything about any comment that you made?
A. No.
Q. Okay. So for all these years, you knew I was terminated because you wrote my letter, correct?
A. Correct.
Q. And it was just strictly based upon the fact that I had run out of my three-year leave of absence by calling in sick, quote/unquote, for my first trip back



and that's why I was administratively separated?
A. Correct.
Q. Okay. And did you come up with that decision yourself or who told you that was authorized?
MR. MISRA: Objection. Compound question.
Q. (By Ms. Finger) Did you come up with that decision yourself?
A. No.
Q. Who directed you under -- who guided you with that decision or gave you authority to make that decision?
A. Bob Krabbe.
Q. And what is his title?
A. I don't know his title right now.
Q. Director of labor?
A. It's labor regulations, yeah. He's director, managing director. I'm not sure.
Q. Okay. And how did he find out about my injury in the training department?
MR. MISRA: Objection. Calls for speculation. Go ahead and answer, if you can.
A. I don't know if he knows that it was an injury, but yeah, I don't know.
Q. (By Ms. Finger) If I have an email that shows you -- at 3:44 p.m. you immediately emailed him and told



him as well as Sabrina, telling him that I have been injured in the training department and your email says: "Can we admin terminate??"
Would that be a way of letting him know that I got injured?
MR. MISRA: Objection. Improper hypothetical. If you want to show her the document, she can --
MS. FINGER: Yeah, I'm happy to do that.
MR. MISRA: It might make it simpler.
MS. FINGER: Yeah, let me show you.
Q. (By Ms. Finger) Okay. So I'm gonna -- let me back up real quick so it doesn't get so confusing.
So I returned to work, three-year maximum was May 29th, and by the time my doctor released me on April the 5th and we got the RAP thing resolved for the 30 days. I had 5/23 April -- excuse me -- May 23rd class day -- or returned to work. And May 29th was my dead date -- May 26th -- excuse me.
So when the F.A.S.T. team called me -- and it was Carol from the F.A.S.T. team and I've got it. I was in the hospital with my mom. She was in heart surgery and I was so excited because I just thought, Yay. She's gonna be good. I'm going back to training. I've worked so hard to do this, crutches nine months, learned how to

walk, so happy to be back.

And at that time when she told me, I didn't realize, but my mom's surgeon came out and told me that -- he took me back there and said, "We've got a lot of blockage. We can either try now that -- her age of 88 is a lot of anesthesia. I'd rather pull her out and redo this. She's on Plavix. Whatever we can do, I'll schedule it right away, but give her a break."

So I made that decision with him and then realized I'm in heart surgery with my mom that Carol had just called me, so I immediately went and called her and I said, "I'm sorry. You know, my mom, she had a June 2nd class date for me," and this was May something, May 17th.

And I said, "I'm sorry. You know, my mom needs to" --

She said, "It's not a problem at all. You can go in your next month, the grace month. Just have your supervisor fill out the form. Everybody does it. It's no big deal."

And I was like, "Okay. Great."

So I called Dominic and I leave him a voicemail and say, "Can you please" -- she said he fills out a form.

I said, "Can you please fill out a form, get it



to F.A.S.T. team, and postpone my training?"

And I didn't talk to him and he was gone on vacation, and so the -- I called Nick in training. And he said, "Just get any supervisor to authorize it."

So Josh Raygo was downstairs at the concierge desk, and he said, "Not a problem at all. Give him my name, you know, hope your mom gets better," whatever.

So that week goes by and I'm waiting on Dominic to get back with me not realizing he's out of the office, and I finally get an email from him. We talked and then I get an email. There's so many of these copies. It's kind of hard to -- this is Exhibit 3.

(Exhibit 3 was marked.)

Q. (By Ms. Finger) And if you look at it where Dominic is writing to Sabrina, he first checks with Cleverly -- Susan Cleverly -- and says that my mom's having surgery. Can it be pushed back?

Then Bob Krabbe gets involved. I'll give you the other one in just a moment.

A. Can I ask a question?

MR. MISRA: Hold on. Are you done?

THE WITNESS: Oh, sorry.

MS. FINGER: Yeah.

A. Which is the first page?

Q. (By Ms. Finger) It's -- I know. That's the way



that it was produced. This one on the back --

A. Okay.

Q. Dominic writes Sabrina on May 28th at 10:01 a.m. and says (as read): "Cristine might try and contact you. She was almost administered terminated three days. She has CQ in Denver starting the 2nd. She asked if she could move her CQ. Bob Krabbe was involved in the administrative department. They said no, and the next class won't be until July" -- which I had already been slated into July 5th.

"She is trying to push her CQ back again, even though I told her it cannot be done. She said in an email that Josh Raygo said it shouldn't be a problem, that he didn't know the background. Her mom is having surgery."

So then Sabrina answers back because Dominic tells me to call Sabrina. He writes me an email and says: "It's out of my hands," and he had already talked to Krabbe. Hold on.

So then on your next page you'll see at 11:52, she writes Bob Krabbe and says: "You may hear directly from Christine Finger. She's already called here three times before she was transferred to me. I explained that she would have to go to CQ on June 2nd. Now she's saying her mom's surgery has been moved up. I told her



that may be out of her control, that her administrative term date has passed; therefore, CQ cannot be delayed.

Dominic told her he spoke to you and her CQ cannot be postponed, which I confirmed with her. However, she is persistent, so she may send you an email."

I asked her if I could call him and she said, "I can't tell you not to call someone, but I've already" -- I was like, "This is my mom's heart surgery. You're making me choose between my mom and training, and I don't want to lose my job of 35 years."

But she said, "Well, that's a decision you have to make."

So then Bob Krabbe writes back at 12:24 and says: "Sabrina, thanks for the heads-up. I'm a bit concerned that Dominic is sharing with the flight attendant his consultation with me. When he and I reviewed the situation with him, I made clear it is in-flight's decision. We reviewed the fact that she has been out for three years and that the next class isn't until July, and he made the decision that she should stay in class."

And then she writes back at 12:57: "Bob, thanks for the clarification. That is not how he presented it. What are the ramifications that she goes

next month? Does she stay inactive until she goes, or is she now active once she starts the process? Thanks for your assistance as always, Sabrina."

Because that was part of the problem with in-flight and not knowing when a flight attendant was considered active. Elizabeth and T.G. Miller had gotten emails from Tammy Holt saying as long as the flight attendant was in the return-to-work process and had scheduled fingerprinting and everything else, they were considered active.

Then we got shut down with a little -- hold on. Let me give you this other page. So I go to training and I made that decision and I leave my mom and I go to training from June 2nd 'til June 17th. I pass training, and on the last day, the 16th, we had all passed. We did everything. We did the testing. We were getting ready to bid.

And because it was a Sunday and bids were closing, there was nobody there at the training center to put us in to be able to update the computer, we didn't get a bid for the 16th. It didn't bid so we were gonna be going through the F.A.S.T. team.

And I'll find the paperwork on here that says that: "If you're going back to training and you don't make it by the 16th" -- in my paperwork from my -- it



says you'll be bidding for August, so you'll have to build your line.

So on the last day of training during the EME, just in the very end on the stimulator, I -- we were done and four of us had to stay for core4 because we had been out for these three years. So we were gonna be coming back. Everybody else got on their planes and went home. They're done with CQ, were current.

And on the very last thing, I stepped out on the mock aircraft; I stepped out of door at 2L and Maria and the instructors were out there waiting because I volunteered to do the last module, and someone had not lowered the -- I guess, the fake jetway. They had raised the fake jetway to the door after lunch when they're not supposed to be -- so people know not to go into the aircraft.

And I stepped out with my good ankle, my right ankle, and, of course my left ankle, which had surgery, goes straight down. I just collapsed. Everybody in the airplane comes out; the instructors come out. I'm afraid that it's gonna be an issue of. I'm like, "Oh my gosh. You're kidding me. Here's another OJI."

I begged her not to report it. I'm like, "I'm good. I'm just gonna go to the hotel and ice it and elevate it," which I did.



And the next day, I could barely get it in my shoe. So when I walked in for the core4 with the other ladies, Kari Lake came and -- I have their names. The other specialist, Maria, and everybody -- and they said "we gotta write that up as occupational."

So this was on the 16th, and this was on the 17th that they wrote it up. So I immediately go home that evening. I start making phone calls to United trying to figure the -- how to report the injury. You know, Kari told me, "You know, we're gonna report it, but you report it, but your supervisor reports it now."

Because, I guess, in the occupational system, a flight attendant can't say it's an occupational. They just call in with a sick occupational or a sick leave, injured and then the sup- -- a supervisor has to change it from my understanding because I couldn't do it. Kim, in scheduling, told me that.

So I make 47 phone calls. I can't get anybody to call me back. I'm calling you; I'm emailing Dominic. He's telling me to call you, so I call you. I leave at least three voicemails on my phone register, and I get nothing from anyone. I call Sedgwick. On hold. No claim number, no nothing. Can't get anybody to talk to me.

And then the 26th is coming where I built my



line. I built, I think 19 hours for June with training, and then I built my July line. So I've picked up all those trips. I'm active. Everything says I'm active and I, you know, got my known crew member. I'm assigned pairings. I'm on the pairings, the jump seats.

And then I call in on the night of the 26th at 6:55 at night for a 6 o'clock show the next day -- which I've got the phone lock for -- and say, "I've got a claim number from Sedgwick that is not a claim umber."

They just give me a claim number, but it's not authorized yet 'til supervisor -- so this is 10 days after my injury, which they're supposed to get back in touch with you 24 hours and they don't. And so when I call in sick that next day, the 26th, then here on the emails on the 27th, I start seeing emails from you, Sabrina, and Bob Krabbe initiating my termination.

And these are very hard to read because this is how law does it and it's all choppy and everything else, but we can paste them together. And then this is what we got from Fischer Phillips, who was the law firm before Mr. Misra, and then when Mr. Misra submitted the rest of them, he redacted a portion of them.

So hold on just a moment, please. So Dominic emails. I start telling him prior to training that Claire and F.A.S.T. team and Carol says it's no problem

and everything was great and fine. And he was my supervisor.
At what point were you my supervisor?
A. Before -- I believe I was for I don't know what period, probably during the 30 to 60 maybe up to 90 days before the max lead. And once you got the return to work, you would have been put back to another supervisor.
Q. To Dominic or...
A. I don't recall. Let me take that back. I think it was Rick Velazquez (phonetic).
Q. Rick Velez?
A. Yeah.
Q. Is he still there?
A. No.
Q. Is he flying, or is he -- just not as a supervisor?
A. I don't know.
Q. So if you look on that same page and it's all -- if you look an 4421, you'll see 5/28. It should be the second page.
A. This one? (indicating).
Q. Yes.
A. Okay.
Q. So you'll see the last one where Sabrina writes



Bob prior to my leaving for training on 5/28 at 12:57 p.m. And then on this same page, on June 27th Sabrina writes Bob at 3:44:49 and says: "Important, Christine Finger." That's the name of this thread.
(As read): "Christine Finger completed her training; however, has not flown a trip. She called in a WKCP, work comp, stating she reinjured herself during training, parenthesis, left ankle.
She picked up her required but had been dropped workers' comp 6/28 and" -- "6/26 through 6/28. Her next scheduled trip is 6/29. Her admin term date was 5/25/19. What is our next course of action?"
Why would she have written that?
MR. MISRA: Objection. Form. Calls for speculation. If you know, you can answer.
A. I don't know.
Q. (By Ms. Finger) That doesn't seem like maybe I'm targeted someone's -- like, she just has this thread here of: "I'm a bit concerned that Dominic is sharing with the flight attendant his consultation with me" and then she's telling him, you know: "Here's a heads-up; she might try and reach you."
So this just came -- would all flight attendants that get hurt -- would it be protocol for Sabrina just to reach out to Bob Krabbe and say that I



have another injury?
MR. MISRA: Objection. Calls for speculation.
A. I can't speak for Sabrina. I don't know. I wasn't included in those emails.
Q. (By Ms. Finger) Okay.
MS. FINGER: Then let's go --
THE REPORTER: Before we continue, ma'am, would you like that marked as Exhibit 4?
MS. FINGER: I think I did.
MR. MISRA: He does not have it.
MS. FINGER: I'm sorry. I'm so sorry. Yes, sir. Thank you.
THE REPORTER: They know, but I don't.
MS. FINGER: Okay. Sorry.
THE REPORTER: No problem.
THE WITNESS: It's actually 3.
MR. MISRA: Well, this email is 4.
Okay. A little bit of confusion here. This 4 and your 4, they're not the same.
MS. FINGER: Did I mark the wrong -- I marked the cover sheet. It's the same -- take out that from page. It should be the thread. There's a lot, as you can tell, how they're redacted.
Do you have this as the --



MR. MISRA: No. That handwritten sheet is not in my copy of Exhibit 4.
MS. FINGER: Yeah, I took it off for you. Aleta, do you have it?
THE WITNESS: The other one? Yes.
MS. FINGER: Yes. Okay. Here, Amit.
THE WITNESS: This is 4?
MR. MISRA: The whole packet's 4?
MS. FINGER: Yes.
(Exhibit 4 was marked.)
MS. FINGER: Here is the -- do you have this one? They're very -- it's all butchered. I have one copy of it. How about I just read it to you?
Yeah, there's about -- the way I got these, there must be 350 some-odd pages the way these have been redacted and chopped and cut and -- well, how about I just read it on the record and we can make a copy if that's the -- so after Sabrina...
THE WITNESS: If you can hold up what page you're on.
MS. FINGER: Let me read it for the record and then we can find it. It's not that.
MR. MISRA: Can you refer to the Bates No.?
MS. FINGER: Yes, if it has one. 4425.

MR. MISRA: So that's back in Exhibit 3, I think. Oh, it's something you haven't given us.
MS. FINGER: No. It's something you haven't gotten yet.
MR. MISRA: Okay. Sorry.
MS. FINGER: No. Because I don't know where I got this -- a nightmare. Sorry.
Q. (By Ms. Finger) So after Sabrina -- I'll give you this thread. This'll be afterwards. This is the thread of -- well, let me read this first then I'll give you those.
So after Sabrina says at 12:57 p.m.: "Bob, thanks for the clarification. That is not how we presented it. What are the ramifications if she goes next month? Does she stay inactive until she goes or is she now active once she starts the process? Thanks for your assistance as always."
That was May 28th. On June 27th, she writes at 3:44: "Bob, Christine Finger completed her training; however, has not flown a trip. She called in a WKCP stating she reinjured herself during training, parenthesis, left ankle. She picked up her required hours, but they have been dropped workers' comp, 6/26 through 6/28. Her next scheduled trip is 6/29. Her admin term date was 5/25/19. What is our next



corporation of action?"
And then Aleta, you write at 4:22 -- so that was 3:44. So then you write to -- these are all going to Bob, Crystal, and Sabrina Clark: "Employee, EE, Matt Felipe, was 5/25/19. She was released to return to full duty on 5/23/19 and was in the return-to-work process. She was scheduled for re-qual," R-E, dash, Q-U-A-L, "training starting at 6 -- starting 6/2/2019.
She claimed a reinjury of previous injury from August 2014. I have attached both claims. I just received the new claim. She failed to return for her first trips on 6/26/19. I've attached all the information.
Would this be a violation of sections 15E medical leave 1B as she failed to meet the three-year max leave? Can we admin terminate?
I am trying to complete the new injury claim at this time. Please let me know ASAP so that I can get back with Sedgwick and complete my investigations."
Would that be something you normally do with a flight attendant just to reach out to Bob Krabbe? Because this is just an email thread that seems to be very personable from -- before I leave for training, and then now immediately when I get injured, it seems like the wagons are circling.



MR. MISRA: Is there a question?
MS. FINGER: I said: Is that something that you would normally do in the protocol? Would you -- within 45 minutes of receiving this, would you and Sabrina start emailing Bob?
Which, number one, you forwarding my medical claims to Mr. Krabbe, Sabrina, and Crystal Heckman is a violation of our HIPPA, and our contract, 4453 (as read): "Upon request, the company shall review with the LEC president or designate copies of reports concerning occupational injuries; currently, OIS injury report and our in-flight incidents involving flight attendants.
Copies of such a report shall be provided, if requested, providing that any report that contains medical information must have the flight attendant's approval before being released.
Section 449(c): All information contained in or related to a flight attendant's medical file shall be kept confidential and not released to anyone except by the flight attendant's written consent when required by a court order of the legal requirement. To release information, the flight attendant will be notified of such action."
MR. MISRA: I'm gonna object as improper



hypothetical, but you can go ahead and try to answer.
A. First, Bob Krabbe would have access to OIS. It's not medical documentation; it's a report. It's not from a doctor's office, so he would have access to that.
Q. (By Ms. Finger) So my two claims and all my medical information on this document do not --
MS. FINGER: And I'll get you a thing --
Q. (By Ms. Finger) -- because when I look at my medical things, it sure has my medical information on there.
A. This is a copy of IR, which is an employee record, which is available to all in-flight management and Bob would have access to. The top is just a copy from the spreadsheet, so...
Q. Okay. So on this spreadsheet here --
A. That's my spreadsheet, yes.
Q. Right. It says supervisor's name is Aleta Stansberry.
A. Correct.
Q. Dominic is my supervisor?
A. No, not at that time.
Q. How come I'm talking to him prior to going to training? I'm emailing him. I'm doing everything through him. He did my return-to-work interview. You just said once that I completed my return-to-work

Page 41

clearance that I get reassigned back to my supervisor, so why would you be my supervisor here?
A. You were on the return-to-work process.
Q. No. I had already completed training.
A. You were in the return-to-work process.
Q. You just said once the flight attendant -- and I'll pull it out -- once a flight attendant has initiated the return-to-work process, they will be reassigned if they're in a Houston -- in a hub. They will be reassigned to their supervisor. I'll find that document.
So you don't see anything -- this would be something that you and Sabrina just pop on within 45 minutes to call Bob, and then Sabrina gets on at 4:45 and writes Stephanie Pollock, who was the Denver manager trainer who did come in with my injury and she cc's you.
And she says: "Stephanie, I hope you're doing well. I know you are out of the office but hopefully looking at email. Can you tell me who taught Christina Finger's re-qual in Denver TQ -- TK this month? She reported while training on the door trainer. It appears that she was allowed to complete her re-qual but is now calling out WKCP. Is it possible to get a report from any witnesses? She was at her admin term date, so we will put any reports we receive in her file."

Page 42

MR. MISRA: Is there an open question?
Q. (By Ms. Finger) What -- what would the fact that I'm at my admin term date -- what does that have to do -- anything? I had already completed training, and I didn't go to training after my admin term date because of the scheduling of the class.
Why would she need to put that on there? She said her admin term date -- "So we will put any reports we receive in her file."
Why does that seem pretextual that -- why didn't she just say: I'm looking for the report if we have an injured flight attendant, but why at my admin term date?
MR. MISRA: Objection. Calls for speculation. Go ahead and answer if you can.
A. Yeah, you would have to ask Sabrina why she wrote that.
Q. (By Ms. Finger) So you two weren't communicating about this? You don't remember talking to her about -- because you were 45 minutes away from each other and cc'g each other in on the email.
MR. MISRA: Do you remember having a conversation with Sabrina?
THE WITNESS: Yeah. I mean, obviously I'm cc'd on these emails.

Page 43

Q. (By Ms. Finger) Do you remember having a phone call or anything else other than just these -- after the cc of these emails, what happened?
A. I don't recall.
MS. FINGER: I'll get you copies of these. Is it -- that'll be Exhibit 5?.
THE REPORTER: Yes, ma'am, if it's different.
(Exhibit 5 was marked.)
MS. FINGER: I'm gonna just read this for the record, and I'll get you copies.
Q. (By Ms. Finger) So that was at -- you wrote Bob at 4:22; Sabrina wrote him initially at 3:44 p.m., then she followed up with Stephanie Pollock at 4:45 p.m. And then -- and then these are all redacted and cut so it's very hard to -- I'm gonna read it and I'll give you these two so it's just on the record.
So that was at 4:45 and then so on this thread at 3:45, she says: "Christine Finger completed her training; however, has not flown a trip. She called in a WKCP."
So I didn't call in sick; I called in a workers' comp, so that's an injury, correct?
A. I'm lost on the pages. I'm sorry.
MR. MISRA: She's not even showing you --

Page 44

A. Can you repeat the question? Sorry.
Q. (By Ms. Finger) So when Sabrina writes Bob at 3:45 and says: "Christine Finger completed her training; however, has not flown a trip. She called in a" -- capital W-K-C-P, so that's workers' comp. That's not -- I didn't call in sick, correct?
A. Correct.
Q. Okay. (As read): "She picked up her required hours, but they had been dropped WKCP on 6/26 through 6/28. Her next scheduled trip is 6/29."
You were cc'd in on this. Then Bob writes back. This was 3:45, and this is why it's so hard because the pages are cut like this on purpose. At 4:30 Bob writes back and says: "Sabrina, it doesn't look like she went active so she is separated. To go active, she would need to sit a day of reserve, fly a trip, or engage in a contractual schedule change.
I looks" -- it looks -- "like she just built the line then called in sick. As such, her leave was not broken and since she is past the three-year mark, she has exceeded her maximum leave length and gets separated. I expect a fight from her, but this is straight contract."
So he says I built a line and called in sick. Where would he get I called in sick when Sabrina just

told him I called in a workers' comp?

MR. MISRA: Objection. Calls for speculation.

A. So there's a process when you file an occupational injury, a report. Initially, even if she's calling it a workers' comp, it's because you've reported a workers' comp. It has not been processed yet by Sedgwick, approved by Sedgwick, so it would be coded initially as sick.

Q. (By Ms. Finger) Right. It's a work sick and it's, like, sick leave OI until a -- like I said, a supervisor, Dominic, or whoever at the time, could go in and change it, right, to -- to -- once Sedgwick has given them authorization or the claim number or whatever you want to say, then they're authorized, but a flight attendant cannot call in an occupation on an injury.

They can call in sick with an OI but they cannot say: Hey, it's occupational. Because that has to go through management, correct? Now, they can. I believe now they can, but this was 2019.

A. Okay. So you asked multiple questions there, really the first one being --

Q. I'll ask it individually.

A. Okay. Thank you.

Q. Could a flight attendant change the status of a



sick call to an occupational injury?

A. No.

Q. Okay. It had to go through a supervisor to change that classification to authorize it being occupational?

A. Yes. Once it's approved.

Q. Right. Through Sedgwick?

A. Correct.

Q. Okay. And then they give a claim number and all that. Okay.

So then after that, then -- they did such a nice email on this. This has been my life. So that's at 4:30, then Sabrina writes back at 4:45 and says (as read): "I am assuming we go ahead and withhold her from service and send our HR 48-hour notice, question mark. We'll set up a meeting for her early next week."

Now you're also cc'd on this whole thread. Do you remember any of this?

A. I don't recall.

Q. At 4:40, five minutes later -- so these are within five-minute intervals, Bob Krabbe writes back and says: "There is no investigation needed because there is no rule violation. She just came to the end of her leave. We can just administratively separate her."

So what is the policy for a 48-hour HR notice



from --

A. I don't know.

Q. You don't know?

A. No.

Q. Don't you deal with this all the time with the classification and the return-to-works and the occupational injuries and when someone's getting an HR notice? You don't know what that is?

A. You're asking multiple questions.

Q. Okay. You don't know what the 48-hour HR notice is?

A. No. I'm not HR.

Q. But you deal with flight attendants who are being administratively separated due to running out of their leaves, do you not? Are you aware of any other flight attendants that have gotten an HR 48-hour notice?

A. No.

Q. So United's not giving 48-hour notices? You don't have any collection of this?

MR. MISRA: I mean, she can't testify on behalf of the whole company.

MS. FINGER: I --

MR. MISRA: You asked her what she knows and she's telling you what she knows.

MS. FINGER: She's administrative -- I'm



sure that it seems to be something that would be given out. So here Sabrina says -- I'm assuming -- it seems like it's procedural. I look in our contract and it certainly is. I find it disturbing that someone that's an admin or on charge, on top of these flight attendants that has never heard of the HR 48-hour notice.

THE WITNESS: Is there a question?

Q. (By Ms. Finger) How long have you been downstairs in your role right now?

A. In the current role?

Q. Which is what, admin and supervisor?

A. Currently, I'm operations supervisor.

Q. What is an operations supervisor? What does that mean?

A. Currently, I work up on the concourse. I work in the SFC, and I work at the DD desk. There's no longer a base admin supervisor.

Q. Okay. And you've never seen a 48-hour HR notice?

MR. MISRA: Objection. Asked and answered. Go ahead and answer it again.

A. No. I wasn't HR.

Q. (By Ms. Finger) Have you ever witnessed someone being called in for an investigation going: We're calling this flight attendant in on such and such day

because she has the 48-hour notice?

Because I've heard about it a million times. When someone's under an investigation, before it goes to the next step of discipline, they get a 48-hour notice where they come downstairs to the base.

A. I've been involved in investigations, yes.

Q. But you didn't know they were called a 48-hour notice with that name on it or --

A. Correct.

Q. Okay. All right. So after he said there's no investigation needed because there's no rule violation -- hold on because it jumps. That's at 4:40 p.m.

Then Sabrina writes back at 4:43 and says: "Got it."

And then I believe at -- I can't see the time. Oh, at 4:50: "Maeve," M-A-E-V-E "in Denver probably has the separation from leave template letter, if you need one."

And then -- and this is addressed to you. This is going to you. Okay. So there's two things here at 4:35. "I'm assuming we go ahead and withhold her from service and send our HR 48-hour."

Then he says at 4:40, "There's no investigation needed.



And then you say at 5:02: "Do you have any changes I need to make to the letter?"

But before that there is redacted at 5:45, and then you say: "Okay. Thanks. I will make those changes."

Do you remember what those changes were in the letter?

A. No, I don't remember.

Q. Sorry. This is how the thing is.

So then you say: "Okay. Thanks. I will make those changes."

And then it's redacted at 6:10 and redacted from you at 6:28 p.m.

So I'll give these to you. So from 4:40 to 5:00 -- oh, and then that's redacted. Then the next day was redacted, then on the 28th. So this is all June 27th at 5 o'clock at night, 3:45 to 5:30.

Sabrina writes you at 12:14 and says: "Aleta, let's call her and let her know it's being Federal Express'd to her house effective date of today. We will have to show 'term' on her schedule. I don't want her to see this before she knows."

And you write back at 12:40: "Okay. I'm on a call."

Does that mean Sabrina was trying to tell you:



Let's call me, so in case I check my screen I wouldn't see "terminated" on there?

A. Correct.

Q. Okay. And you said: "Okay. I'm on a call," but you don't remember ever calling me or anything?

A. I don't recall.

Q. Okay. But you did send me a FedEx letter, a termination letter, FedEx. I can recall that for you.

MS. FINGER: I'm gonna make this No. 6.

(Exhibit 6 was marked.)

MS. FINGER: And then I'll get your copy, Amit. It's really hard to read and that's on purpose for sure, but that's how chopped off it is, so...

THE REPORTER: Whenever you get a quick -- it's been an hour and half. If we could take a break, that'd be great.

MS. FINGER: Yes. I'm gonna give this to you, Amit.

MR. MISRA: Sure.

MS. FINGER: This is 6.

THE REPORTER: All right. We're off the record at 2:24 p.m. Central.

(Off the record at 2:24 p.m.)

THE REPORTER: We are back on the record at 2:38 p.m. Central.



MS. FINGER: So I'm gonna introduce this as Exhibit 7, please.

(Exhibit 7 was marked.)

MR. MISRA: Did we ever figure out 5?

MS. FINGER: I've got 5. I'm gonna make you copies of this. I've got -- here, you can have, but I'm adding something to it, so if you'll just wait, that would be -- I'll read from it and then I'll --

MR. MISRA: Okay.

MS. FINGER: -- give it to the rest of you. Sorry.

Q. (By Ms. Finger) Okay. So 5 is --

MS. FINGER: Do you have this behind 5?

MR. MISRA: Yes.

MS. FINGER: Aleta, do you have it?

THE WITNESS: I don't have 5 at all.

MS. FINGER: Okay. Here.

MR. MISRA: I mean, we can --

MS. FINGER: Look together?

MR. MISRA: Well, one, we can look together, and two, we can just give a single copy. We can go off the record.

THE REPORTER: All right. We're off the record at 2:39 p.m.

(Off the record at 2:39 p.m.)

THE REPORTER: We are back on the record at 2:40 p.m.

MS. FINGER: So you have 5 and 6 -- you have partial 5 and 6, correct?

MR. MISRA: Correct. But the more important thing is that our court reporter has a copy of the exhibits, so...

MS. FINGER: Sure. Okay. So I'm gonna mark this as 7.

MR. MISRA: Okay. This is 5.

THE WITNESS: Does she want to put a sticker on it?

MR. MISRA: If you can label that as 5, that way...

MS. FINGER: Here Aleta.

THE WITNESS: Thank you.

Q. (By Ms. Finger) Okay. So now we're on seven, and this is the documentation -- so this was on 6/24 at 7:43 in the morning from Brenda Jordan to me, which, I didn't get because of our company email that was difficult to log on with, Outlook Explorer, if you were on the company server.

(As read: "Christine, we received a notice that you have reported an on-the-job injury. Please use the address below for access to most current worker's



compensation guide. If you have any questions, please contact your supervisor" -- and this is the first time I see that is Rick Velez, (281)553-2772.

"Please fax a completed employee status form immediately after initial evaluation and each subsequent visit to the ESC at 847-700-9533."

And an employee status form is just the form that our doctors through the workers' comp third-party administrators would fill out and send to the base so they would have a report on -- and then the next page is just the screenshot that I found on 7/1.

If you'll look at the top corner, I took that off CCS, 1322. And then 4424, Bates numbers, is the OIS report, OIS-390835 [sic] and the workers' comp reference number injury date is June 16th and the created date is 6/22/19 at 1:45 p.m., my employee number, my name, and it says (as read): EE, employee, was exiting mock aircraft and fell injuring the left ankle. Left ankle has had surgery before and it is swelling and hurting. EE did seek treatment," and it just says my supervisor is Rick.

So I don't know how official that is when there's no last name for Rick Velez. Did you -- did Brenda Jordan do this or is this -- because it has your name?



A. Which page?
Q. This --
A. This page?
Q. Yes.
A. No. That would come out of the OIS system.
Q. So they just would put the first name of the supervisor?
A. Yeah. It's autogenerated yeah.
Q. All right. And the next page will -- is 0046 something. I'm sorry. It's cut off, the Bates Numbers. And this is our how to report your injury (as read): "Report your injury to your supervisor or manager as soon as possible and they will record your injury in our internal occupational injury system, which will upload to Sedgwick as a pending claim," and go to the hub, go wherever. "Review your, 'Employee Guide to Workers' Compensation.'" Promptly call Sedgwick.

And as you see here, I was emailing Dominic and also you, Aleta, because he told me. I also emailed T.G. Miller. He was our AFA OJI chair.

It says (as read): "Your role as an injured worker: Immediately report your injury or illness regardless of severity to your supervisor or manager when it occurs. Immediately seek appropriate medical care. Cooperate with your nurse case manager who will



help you obtain answers to medical questions and concerns related to your injury and recovery, and provide your treating physician with the ESF at each medical appointment."

Well, I never even got past that.

"Submit the completed ESF to your supervisor or manager on the same day."

And then it just talks about pharmacy and absence management. But you can see here where when I did, the -- my hand notes on here, that I did speak with Terri Guy at Sedgwick and then they assigned it to Delvin Hill and she -- it said she didn't -- Delvin's emails couldn't get the report from Denver TQ. I asked Dominic how to proceed. I never knew that Rick Velez was my supervisor. Dominic never knew that he wasn't my supervisor because he was on vacation that week.

So when he came down to the crew room on July 1st after I had been terminated on the 27th, Elizabeth Hibberd, our AFA local president called immediately called Crystal and scheduled an appointment for that Monday, July 1st, which was actually Elizabeth first day as AFA new local president.

And when I was being escorted out to go get my FedEx box to ship all my link and property in, Dominic was in his office and he had no clue about this and he

was -- he said, "I've been out for a week. I never -- I didn't know this was going on."

He said, "Let me go talk to Crystal about it with you."

But I knew that was no -- not necessary because of our personal issues that we had, so I just told him this, whatever. Also, during that meeting Crystal was supposed to be there, but she elected not to be there.

Tammy Holt was sent instead, and Elizabeth and I -- and they gave me a piece of paper about writing Bob Krabbe and the higher-ups and how this was just a fluky deal about flight -- sit a day reserve, fly a trip, or perform a contractual schedule change.

And I was like, "I picked up, you know, 80 hours or whatever. I didn't call in sick."

Somehow this narrative of me calling in sick instead of an occupational injury sure seemed to be the cover of how this was expedited and completed. And there's a lot of these, but I'm sorry. That's just because they're all chopped up.

MS. FINGER: This is Exhibit 8.

(Exhibit 8 was marked.)

Q. (By Ms. Finger) So at 5:23 on the same day, Aleta, you initiate my termination letter, first page, 4415. Stansberry to me, to Crystal Heckman, Sabrina



Clark, Den Wheeling, who was the outgoing AFA president, admin, and Curtis Lee. Who is Curtis Lee?

A. I don't know.

Q. Okay. And you write: "Attached is the admin termination letter issued today in accordance with section 15E, 1 and 2. Leave of absence, exceeded max leave three years. A copy of this letter's been placed in your personnel file, P file, and FedEx'd to your home address on file.

(As read): The following items need to be returned. Please contact me to make an appointment to return these items, United Airlines identification badge, $100, parking badge with parking tags, if applicable, $50 ISM/purser duty free key, if applicable, $50, cabin key, 7, and my link. United Airlines may cancel you regarding any outstanding balances you may owe the company upon your release. If you have any questions, please feel free to contact me."

And it's Houston supervisor base administration, Aleta Stansberry.

So within an hour from Bob Krabbe's email, you move forward and write this termination letter?

A. Yes.

Q. Does that seem standard? Did that seem like that was protocol?



MR. MISRA: Objection.

Q. (By Ms. Finger) Is that how you usually would terminate someone that quickly without the contractual protections?

MR. MISRA: Same with -- objection is at -- this is improper hypothetical, but go ahead and answer if you can.

A. If given approval from Bob Krabbe, yes.

Q. (By Ms. Finger) So Bob Krabbe basically has the authority to basically override and oversee any labor decision within the company. If he sees fit, then no investigation necessary? Those words can -- that's the kill shot?

MR. MISRA: I'm gonna object to the question as being kind of argumentative, but if you wanna go ahead and answer that.

A. As far as the admin terminations? Yes. He makes that decision.

Q. (By Ms. Finger) Do you have many of those where he just makes that unilateral decision?

MR. MISRA: Objection. Mischaracterizes prior testimony. Go ahead and answer.

A. Yes, he makes the decision on all admin terminations.

Q. (By Ms. Finger) He makes the decision on all



admin terminations? I'm sorry.

A. As far as Houston? Yes. I don't know about the other places.

Q. He makes all the decisions on Houston-based three-year leave of absence admin terminations?

A. Correct.

Q. Okay. Okay. So you write that at 5:23 on 6/28. Let me go back to that question.

Does anybody else make decisions along with Bob Krabbe on the three-year leave of absence admin termination?

A. No.

Q. No.

Does Dean Whitaker have anything to do with the three-year leave of absence admin terminations?

A. No.

Q. No, okay.

All right. So let's go to the next page and you'll see where Elizabeth writes you at 7:58 and says: (as read): "Hi, Aleta. Christine attended re-qual training and is back, so I'm very concerned about this letter. Please advise."

And the next day at -- on 6:28 at 8:04 -- no, I'm sorry. That night at 8:04 you respond: "Training is not active work."

Page 61

Then there's all of these pages that are all cut and if you go to two pages back at 8:17 a.m. the next morning, Elizabeth writes you and says: "Aleta, that is not true. She was paid for the training. We were told by Tammy Holt, and I believe that Tammy also verified this information. Our understanding was that as long as she had begun the return-to-work process by the three-year mark that she was safe. I believe that she also got this information in wrong."

She later corrects it to me in writing.

"I'm very concerned because we assisted her with the return-to-work process to ensure she was not gonna be administratively terminated."

And then at 8:13 a.m. she says: "Correction, typo in last email. Should have stated, quote/unquote, got in writing versus wrong. Please let me know."

And this just goes on for pages and pages. And then she writes to Tammy Holt. And she says at 10:57 a.m. on the 29th: "Can we discuss this on the phone? I'm shocked and confused," and gives her phone number.

Are we all on the same -- is this working for -- same page?

MR. MISRA: Uh-huh.

Q. (By Ms. Finger) Okay. And then there's one

Page 62

between here. Then on 6/29 at 11:35 a.m., Tammy writes -- let me go back though.

Tammy writes -- in this email thread, she says: "Hi, Elizabeth. I have family in town, but we can talk further on Monday. You may want to reach out to the MEC too, Tammy."

Now if you come back here in the email thread, there, you will see that Bob Krabbe -- and I don't know that we note this on any documentation, that there are seven emails where he is not BCC'd in on, but he is BCC'd in on -- there's six copies that he's not and he is copied on 5308.

Tammy Holt BCC's him and she, I guess, let's him know that Elizabeth is trying to run some interference here and he -- after she says: "Can we discuss this on the phone," he says -- this has been my life; this is what it's like doing this. Where she says: "You may want to reach out to MEC too," that's because -- here on 5311, Bob Krabbe emails Tammy Holt and -- privately -- and says: "You might suggest she reach out to the MEC," but that is missing in 4372, 5390, 4363, 5300, 4360, and 530.

So then that's when Tammy writes back and says: "Hi, Elizabeth. I have family in town but we can talk further on Monday. You may want to reach out to MEC

Page 63

too."

So does that seem like in the thread -- well, I'm just gonna say: Is that normal procedure to BCC the director of labor in a personal thread that seems to be ongoing right here regarding me and not just include him in the email?

MR. MISRA: Objection. Calls for speculation. She's not the author of the email. She can't answer that question.

Q. (By Ms. Finger) Have you seen that happen a lot?

MR. MISRA: Objection. Ambiguous. If you can kind of see what --

Q. (By Ms. Finger) Have you seen -- do you routinely get BCC'd on emails, or do you know of when you're in an email thread, are there BCC's going on that you're aware of? Is that something common at United?

MR. MISRA: Objection. It's calling for kind of opinion testimony. Again, she's here for her personal knowledge; she's not here on behalf of the company.

Q. (By Ms. Finger) Okay. Do you ever BCC someone when you're emailing?

A. Yes, sometimes.

Q. Okay. Would that be Bob Krabbe?

Page 64

A. It depends on what I'm sending an email on. I can't speak specifically to -- I don't CC Bob Krabbe on every email I sent.

Q. No. BCC him.

A. I BCC him on every email that I send. I might send a email to another supervisor regarding something. If it doesn't include labor relations, I wouldn't BCC Bob Krabbe.

Q. But in your communications with Bob Krabbe, do you routinely BCC him when you're emailing him?

A. No. If I'm emailing him directly?

Q. If you're in a thread. If you're in a threesome, twosome thread, foursome, a little conversation going on, do you find that you would BCC Bob Krabbe to alert him that something is going on in the email thread? Is that something that you commonly do?

MR. MISRA: Objection. Improper hypothetical. Go ahead and answer.

A. I mean, it's a general question. I don't BCC him on everything. I've already answered that. If it's pertaining to one individual and he needs to be included, yes, I would BCC him. If it doesn't pertain to him, I wouldn't BCC him.

Q. (By Ms. Finger) What do you mean if it was

pertaining to one individual? If it --
A. Like, if I was talking to him and he was involved in the case? Yes, I would BCC him. If he's not involved, if it's something just normal, like paperwork or something -- you know, I don't know how to answer that question. I mean, I BCC when it's relevant to him.
Q. So you're saying this would be relevant to him that Tammy felt she needed to BCC him because he was already included on the other email thread and he's the one that made the decision that there was no investigation necessary?
MR. MISRA: Objection. It's mischaracterizing a prior testimony, and again, it's an improper hypothetical. Go ahead and answer.
A. I can't speak for Tammy, why she did it.
Q. (By Ms. Finger) Okay. Can you answer why the document would not show it in seven other copies and only one copy showing a BCC?
A. I can't answer for someone else. I don't know why.
Q. Okay. Just didn't know if that's something United does or legal does.
Okay. So we're done with that. Sorry. It's just there's so many of them, they have to be...



Q. (By Ms. Finger) So, Amit, this is something I tried to address with you in that chain about emails and they seem like -- for metadata and for preservation of evidence, this doesn't really look like it's a legitimate -- I mean just -- when I wrote you that letter and I told you that someone stopped a thread and starts a thread, that's just -- this had no header, no nothing. It's just this "to Aleta Stansberry, wrote..." To who? And I've got probably 75 of these, and these are the only ones I brought.
Okay. So I just -- I'm seeing something from Dominic and I can read it and then we can get a copy.
On June 22nd when I'm trying to call him or email him and call him because of my injury and he says:
"Hey, Christine. Were you able to speak with Aleta? The other day you called and I was on the concourse and I told them to make sure and had you speak with Aleta. How are you feeling? I can't believe this happened to you.
I believed, of course, but dang, the timing sucks. I see you already picked up trips. I'm praying that means that you are feeling a little bit better. Let me know what you found out."
This is Saturday, June 22nd, at 12:17. I wrote him back at 12:30: "Hey there. No. Aleta" -- excuse



me -- "Left Aleta a voicemail and haven't heard back. Called three different people at Flightline and no one knew what to do. Finally called T.G. Miller, and he gave me the number to Sedgwick to report. Ironically, I'm on the phone now. What timing you have.
I picked up the trips because I wanted to make sure I had my required hours in, but I needed to adjust for the month just in case I could fly. Was going to adjust tonight at 6 o'clock for July, but my foot and ankle is killing me so I'm kind of like hitting myself at the moment. Hashtag denial.
Finally getting into getting a claim number on this, so at June 22nd, 12:30, I have a claim number through Sedgwick. Now, it's not the authorized one that can switch, but they gave me a claim number to reference with scheduling.
Because I cannot walk, had x-ray done Wednesday at Methodist Hospital. I saw Dr. James Muntz for an appointment. He wanted to get an x-ray on it. I knew I had broken it and he called yesterday and confirmed no damage on the x-ray, just swollen and aggravated it, light pain. I'm in such -- I am so in disbelief."
Now do you know why Dominic would've been telling you to keep calling you?
MR. MISRA: Objection. Calls for



speculation.
MS. FINGER: Well, no, it's procedural. Why would my supervisor -- unless Aleta was the one that did the reporting of the occupational -- why -- why would Dominic direct me to her?
MR. MISRA: Same objection. Go ahead and answer if you can.
A. I don't know why he was directing you to me. I can't speak to why.
Q. (By Ms. Finger) Because you were the admin base secretary and you wrote out my termination letter so I think you probably had something to do with it.
A. Was that a question?
Q. It can be.
Did you have something to do with it?
A. Do with that?
Q. With -- is it not for you to have reported it into the OIS or OSI or whatever along -- as a supervisor or base admin since you handle the occupational? That's not what you do?
A. I don't file the occupational injuries. I just process, like, the -- keep track of it. I'm the tracker, basically.
Q. In 2019 you were just a tracker?
A. Yes. The injury can be reported to Sedgwick,

Page 69

the injury can be reported to the clinic, the injury can be reported to the supervisor, any supervisor.
Q. Okay.
A. I didn't generate every claim.
Q. Well, I understand that, but if this happened in the Denver training center with the lead trainer, Stephanie, and Sabrina has emailed her and is on company property and they are reporting it, how is this not -- oh, that's a hypothetical. I would think that they would ensure that this got to Sedgwick. I've called. I'll show you my call logs. I called Sedgwick about 15 times and couldn't get through. And when I did get through, they were gonna have someone call me, but it is for Sedgwick to call you within 24 hours.
So if the Denver training center has reported this and gotten this here and Brenda Jordan got the report in Houston, how come no one was -- I would think that someone -- supervisor, you -- they would go -- Brenda Jordan sent that email to you. She cc'd you on the email for my injury, you and -- who was it? She didn't send it to Dominic; she sent it to you.
MS. FINGER: Do you have it, Amit?
MR. MISRA: I'm just looking --
MS. FINGER: Right there.
MR. MISRA: Okay. Is this the Exhibit 7,

Page 70

second page?
Q. (By Ms. Finger) Who did she send it to? I don't remember. I'm not looking at it. She cc'd it to you --
A. Uh-huh.
Q. -- and somebody?
A. Jennifer James.
Q. Who is Jennifer James?
A. At the time she was the assistant manager.
Q. She's no longer there?
A. Correct.
Q. And Sabrina Clark?
A. Correct.
Q. Why would Sabrina Clark get it?
A. Sabrina was my manager; she was also Jennifer's manager.
Q. She was your manager and Jennifer's --
A. Jennifer's.
Q. -- manager?
A. Uh-huh.
Q. And Crystal Heckman was the director, right, so she's everybody's manager?
A. Correct.
Q. So if my accident happened on the 16th and I call in with a claim work sick OI on the night of the

Page 71

26th, ten days later, that doesn't seem unique to you --
A. No.
Q. -- per our policies?
A. No.
Q. How often -- how -- what it is usual report time for an injury to go through to Sedgwick?
A. I can't speak for Sedgwick.
Q. No. You can speak for when you submit something how long it takes for you to get a response from them.
MR. MISRA: Objection. Improper hypothetical. If you know, you can answer.
A. Yeah, I don't know. Not everyone's typical, so yeah. It could be anywhere from 24 hours to a week.
Q. (By Ms. Finger) But ten days is a little excessive.
A. I don't know if I've had longer. I might have.
Q. Might have had shorter.
So here on your letter on 4425, when you tell Mr. Krabbe --
A. What letter?
Q. This one.
A. Oh, okay. Thank you.
MR. MISRA: Where is that?
THE WITNESS: That's 5.

Page 72

MS. FINGER: This one. Do you have it, Amit?
Q. (By Ms. Finger) When you say: "Can we admin terminate?"
A. Uh-huh.
Q. Why would you say that? Doesn't that seem like it's a little opportunistic or that you're wanting to terminate me, or would you think that someone in management would say: Gosh, what can we do or is this gonna be a problem for us or do you think that maybe because you don't remember telling me three more days and you would have had me, does this seem retaliatory to you?
MR. MISRA: It's kind of -- objection. Argumentative.
Q. (By Ms. Finger) Well, does it seem like something that a manager, a member of manager would -- instead of saying: We might have an issue here with an employee that called in sick, but now I'm trying to say that we -- I was close to my medical leave. Please let me know ASAP so I can get back to Sedgwick and complete my investigations.
So clearly, you were in communication with Sedgwick, but I wasn't. And that's at 6/27 at 4:22 p.m.
MR. MISRA: Is there a question?

Page 73

Q. (By Ms. Finger) So if I was terminated on 6/27 at midnight, this looks like there was some intent there or from 4:22 to 5:23, you're writing out my termination letter?
MR. MISRA: I'm still not hearing the question.
Q. (By Ms. Finger) The question is: Did you write my termination letter? Are you writing a letter to Bob Krabbe at 4:22 asking if you can admin terminate me? And then at 5:23 he's giving you the authorization and so is that what you did? You terminated a 35-year career within one hour?
MR. MISRA: I'm gonna object as argumentative. Go ahead and answer.
A. Yes. You -- it exceeded the max leave. There were other discussions prior to this in the emails that you showed. And, yes, at that point I was asking if it was an admin term, if they could go ahead with the admin term.
Q. (By Ms. Finger) Is that -- with good leading the way at United Airlines, does that seem like that is the way to take care of your employees?
A. It's contractual --
MR. MISRA: Objection. Argumentative. It's also kind of improper opinion testimony from her.

Page 74

Go ahead and answer.
A. There's a contract and we have to follow the contract and the contract says three years and that's why the admin term was done.
Q. (By Ms. Finger) So there wasn't anything in rush here about the fact that I have another trip coming up that you knew about that next day that Sabrina just cc'd you in on saying that I work comped the first two but have one on the 29th? There wasn't any incentive for you to go ahead and get this termination going out before the next trip, which would have been at 6:33 a.m.?
A. If he had responded a different way and said we had to do further investigation then I would have probably withheld you from service, but that's a what-if.
Q. And withholding me from service, is that the 48-hour HR? Is that what you're talking about?
A. Again, I already answered. I don't know what the 48-hour HR you're talking about. If you're talking about an investigation, I would have withheld you from service because I was still pending from Bob Krabbe.
Q. So 48-hour HR and holding me from service are two separate things, according to you?
A. Correct.

Page 75

Q. Okay. And how do you notify a flight attendant if they're being withheld from service?
A. At that point I would have had to contact the union and contact the employee.
Q. Directly?
A. Correct.
Q. Okay. All right. So have you ever terminated another flight attendant this quickly?
A. Yes.
Q. What would you say is the fastest time that you terminated an employee?
A. On the date of max leave.
Q. I'm sorry?
A. On the date of max leave.
Q. On a date what?
A. On the day of their max leave.
Q. I don't understand. I'm sorry.
On the day of --
A. Their max leave, the three years, on the same day.
Q. Okay. So this was my same day, but this is within an hour. I'm saying are you -- have you terminated an employee faster than an hour by the time you have received not a sick call, but an occupational injury, which I've gone through reasonable accommodation

Page 76

process? Did you check to see if there was any reasonable accommodations that I had gone through? Did you do any kind of background to see if I was -- had a reasonable accommodation prior to going to training, and in the reasonable accommodation, did you do any of that to verify my status before you terminated me?
MR. MISRA: Objection. Compound question. Go ahead and answer.
THE WITNESS: I don't know if she had a RAP.
Q. (By Ms. Finger) You don't know what?
A. I don't know if you had a wrap. I don't -- I don't recall that.
Q. Do you not check that before you terminate someone that's been injured? And you're saying that I have a previous injury. Wouldn't that make you think that you needed to check to see if I had any reasonable accommodations or if I am now -- I'll stop there and let you answer that first.
A. I don't recall looking, but I would look normally.
Q. So you do look now. You would look now into someone to see if they had a reasonable accommodation?
A. Yeah.
MR. MISRA: Objection. Mischaracterizing

testimony. Go ahead and answer.
A. I don't have one normally, so then I would not.
Q. (By Ms. Finger) But this is what you did do back then, correct?
A. Correct.
Q. So you were the one that basically did all of this? This was your job title back then; now it's changed? And what is your title now? I'm sorry.
A. Just supervisor of in-flight services, operations.
Q. So at the time of this letter where you're signing everything as Houston base admin, that was your title?
A. Depended on if I was working operations or if I was working the admin role.
Q. What was your operation title?
A. Would have just been supervisor in-flight service operations.
Q. Operations, okay.
A. Could have said in-flight services or supervisor of operations too.
Q. Okay. So do you -- being with occupational for majority of your tenure at United, you had to be very familiar with reasonable accommodations and what the ADA is and that it is United's responsibility to have an



interactive process with someone that has gone through RAP, correct?
MR. MISRA: Objection. Leading. Argumentative. Go ahead and answer.
A. I'm familiar with ADA. I didn't get the whole question. Sorry.
Q. (By Ms. Finger) Is it not -- should you not be -- is that not the foundation, the basis of something that's very important in your role with having done -- and if you're not doing that now, I'm just saying let's go back to 2019, okay, when you were the occupational or well's (phonetic) family leave.
Was that not something that is fundamental for you to understand -- what the ADA, what the rules are, and what the law is -- for a reasonable accommodation?
MR. MISRA: Objection. Argumentative. Go ahead and answer.
A. Again, I'm familiar with ADA. I'm familiar with the RAP. My response was I don't know if at the time I looked at your RAP.
Q. (By Ms. Finger) Would that be a violation?
A. I can't remember.
Q. Would that be a violation of my disability rights?
MR. MISRA: Objection. Calls for legal



conclusion. Go ahead.
A. I wouldn't have access to RAP information anyway. I would only have it if you had a RAP on file.
Q. (By Ms. Finger) I had a RAP on file.
A. Because that's handled with the Employee Service Center and off the base.
MS. FINGER: We're gonna do Exhibit 8, please.
THE REPORTER: There was already an 8. 9?
MR. MISRA: This is 9.
MS. FINGER: 9, sorry. You got a big table.
(Exhibit 9 was marked.)
Q. (By Ms. Finger) So I'm showing -- are you on the first letter? -- January 15, 2017, excuse me -- February.
A. February 15th?
Q. Uh-huh.
A. Uh-huh.
Q. So this is because the occupational absence management administrative transition. (As read): "Effective 2/15/17, the absence management team would administer occupational absence management for flight attendants. Our records show your next medical documentation is due March 10, 2017. You're required to



submit medical documentation while you're on occupational leave. Please have your treating physician complete the enclosed employee status form, ESF, and faxed to the absence management team at number by the date specified above. A member of the absence management team will call you after receipt of your form to discuss your status and answer any questions you may have."
Which, in our call logs, we're gonna show where that's detailed later.
"If at any point your medical condition becomes long-term or permanent and you would like to participate in the company-offered reasonable accommodation process, please contact the absence management team for details. Unless specifically requested, medical clearance is not required to return to work from an occupational status lasting under 24 months.
Your station will contact you to begin the return-to-work process and assist you with the below listed task. If you are not contacted by the station within 48 hours of clearance, it's your responsibility to ensure due process -- this process. Schedule training, fingerprint clearance, drug testing, report an airport ID badge, and updated parking.
The absence management team will communicate

with you via corporate email, U.S. mail; therefore, please make sure to keep the company up-to-date with your current address."

Okay. So next page is December 31st, 2018. (As read): Dear Cristine, in keeping with our commitment to equal employment opportunity and as reflected in our working together guidelines, United Airlines strives to provide reasonable accommodations, when appropriate, for employees with disabilities or long-term medical restrictions who cannot perform an essential job function."

And I'm gonna note on here that with our new -- when Continental merged with United, it -- we had a light duty where flight attendants could work light duty like I did in recruiting in April/May of 2016. With that implementation of the new JCBA, we, the flight attendant group, lost light duty. I believe we're the group that lost, and we also lost our six-year return-to-work to a three year.

"Per our conversation on December 31st, 2018, we would like to extend to you the opportunity to utilize our Reasonable Accommodation Program, RAP. This voluntary interactive process involves your local management, human resources, a RAP administrator at the employee service center, and when appropriate, a worker



compensation staff representative working together with you to identify reasonable accommodation options. Your situation will be considered on an individual basis."

So is it not something that you would check through if I'm going through? Is there not a way that it flags somebody that's been injured or trying to return to work?

A. No.
Q. No?
A. Not if they're in the process, no.
Q. Okay. In the process? Once I finish testing and pass and the computer was updated, this in the process that you're trying to refer to is the return-to-work with the little handbook glitch of the things, but I have Tammy Holt and everybody else that was saying that as long as you were in the process, you were considered active. So that seems to be a little cover that United has tried to blanket.

So you're saying that once I completed training and did all my testing and got known crew member back and was assigned pairings and could fly trips, that I was still in the process of returning to work?
A. Yeah. You have to fly the first trip assignment. I think you quoted it earlier, the terminology. You have to fly the first trip assignment



or trade it or make some change.
Q. Right.
A. Uh-huh.
Q. You have to fly a trip, sit a day of reserve, or perform a contractual schedule change, i.e., trip trade, PTO, personal -- whatever it is, et cetera. Has the big word, et cetera.

So those trip trades I did to build my line and put those on there, how could I have done trip trades if I wasn't active?
A. You're not --
MR. MISRA: Objection. You're asking an improper hypothetical. Go ahead and answer if you can.
A. Yeah, you didn't fly the first trip assignment after the max leave.
Q. (By Ms. Finger) That's our old verbiage. You don't have to fly the first trip.
A. At the time.
MR. MISRA: Objection. Argumentative. Is there a question?
MS. FINGER: Yes.
Q. (By Ms. Finger) Is it your statement today that you have to fly your first trip, that you have to fly a trip to become active?
A. I don't know.



MR. MISRA: Objection. Asked and answered.
THE WITNESS: Yeah.
MR. MISRA: Go ahead and answer.
A. You had in the packet somewhere the terminology that was used at the time, at the time, which said you have to fly your first trip assignment or do -- I don't remember how it's said, but yes, at the time that was the policy.
Q. Was that Continental's old policy that you had to fly a trip?
MR. MISRA: Objection. I don't --
MS. FINGER: I'm just asking because it's changed so --
MR. MISRA: Just relying on facts not in evidence. Go ahead and answer if you know.
A. I mean, it's changed several times over the course of the last ten years.
Q. (By Ms. Finger) But I'm gonna say on record that it used to be that you had to fly a trip. You had to -- everybody -- do you remember anybody saying, "I'm just gonna go touch metal and then go back out on workers' comp or go do whatever? Did you ever hear that? Like, just fly a short trip and once you're on that plane, then you're golden? Do you remember that?"

Meaning you just have to go to the airplane and fly a trip.
MR. MISRA: Are you asking her if she ever heard in pre-merger a --
MS. FINGER: Yes. We were flight attendants for 25 years and I'm pretty sure that that was --
MR. MISRA: Okay. So do you have any memory of that?
THE WITNESS: I don't remember anybody ever specifically saying it to me.
Q. (By Ms. Finger) Okay. All right. Next page. This is United's Reasonable Accommodation Process for employees.
(As read): "As part of our ongoing committment to providing equal employment opportunity for individuals with disabilities, restrictions, or limitations, United will work with disabled employees to identify and provide reasonable accommodations in order to enable them access to positions and to safely perform the essential functions of their position.
This process is known as the Reasonable Accommodation Process or RAP. RAP is the interactive process where United works with employees who, in order to perform their jobs or participate in the interview



process, may be in need of an accommodation due to a medical condition or restriction.
If an employee is having difficult [sic] performing some aspect of his or her current jobs due to a medical condition or restriction, the employee should think about RAP.
To initiate RAP process, an employee should reach out to his or her supervisor, HR partner, or the Employee Service Center at" -- number -- "there is no need to disclose the nature of the medical condition. The employee need only advise one of the above groups that he or she is having difficulty or anticipates having some difficulty and would like to begin the RAP process.
Once the employee has requested the RAP process, they will be referred to a RAP specialist who will work with them through the entire RAP process. They will explain the RAP process to the employee and send out the initial RAP packet to them which includes a work restriction form" -- which I received on December 31st -- "to indicate the specific restrictions that are related to the medical condition and the duration of the restrictions. This information should be faxed to" blah, blah, blah.
"Once an AFC, which is the Assessment of



Functional Capability, is finalized and signed by the employee, the RAP meeting will be scheduled. The RAP specialist will schedule the meeting and notify local management, the HR partner, and the employee of the date, time, and location of the RAP meeting.
In attendance of the RAP meeting are the RAP specialists who facilitates the meeting along with the employee, supervisor, manager with knowledge of the employee's current position and day-to-day duties.
The local HR partner, and in some instances, a workers' compensation representative, if an occupational injury is involved imposing restrictions. During the RAP meeting, the employee's medical restrictions are reviewed and discussed in an effort to identify any reasonable accommodation that will enable the employee to perform the essential functions of the employee's current position. Please note that an accommodation is not reasonable if it creates an undue hardship" --
When I had my injury, we were offering early outs and they had two early outs and VSLs of six months to a year, so there clearly wasn't a hardship for the airlines.
(As read): "In instances where an accommodation in the employee's current role is not possible, consequently the employee is unable to



continue working in his or her regular position to perform their essential job functions. We assign it to a position within the employee's classification -- if not possible. The HR counsel and instruct the employee during the RAP meeting on how to locate positions outside of the employee's department of classification.
United's RAP process is designed to be an interactive ongoing process between the employee and the company through their longer management supervisor, their HR partner, worker comp staff representative if an occupational case is involved and the RAP specialist.
This means that if an employee's restrictions change in any way at any time in the future following a RAP meeting or a position opens up that was previously unavailable, the employee and company should meet again and reengage in the interactive discussion.
The employee will contact a RAP specialist who will again coordinate, schedule, and facilitate another RAP meeting to continue further discussion. If at any time the employee has questions, they can contact RAP."
Next page is from T.G. Miller who -- I don't have the -- I'd like to add this in here. I don't have the letters from Elizabeth and Tammy that she wrote her in the year prior to my going back about when a flight attendant is considered active, and she told her -- and

I can get that.

But I was talking to T.G. Miller about it on April 10th, and he writes Tammy and he says: "The facts of giving conflicting information, thank you always." She says: "Hi, Gary. If I understand your questions, if a flight attendant has been out close to three years and receives a return-to-work release, they would need to be in the process, i.e. fingerprints, drug test, et cetera. If a CQR class was not available until after the three-year date, that's okay. They just need to be scheduled. Medical and F.A.S.T. manage the entire return-to-work process."

And his question was: "Tammy, if you're out on OJI, do you have to be active or just released to full duty if no training from release date and RQ would only occur after the three-year?"

Next page: "Christine, your return-to-work is effective 5/23/19. Please contact your Bates supervisor to get a refresh link."

And that's when I contacted Dominic, and that's when we had my return-to-work interview because he was my supervisor.

April 19th, I get another occupational return-to-work full duty:

(As read): "Dear Christine, you have been



medically cleared to return to your full duty assignment effective May 23rd, 2019. However, there may be additional requirements you need to comply with prior to your return. If you had not been absence [sic], the same."

I had to do fingerprinting, recurrent training, airport ID in-flight.

"If you are a flight attendant, you will be contacted by the F.A.S.T. and advised of any additional actions you must take to bring your TSA mandates and training requirements up to date. If you're training is lapsed while on your leave of absence, you will be notified, scheduled in the first scheduled training class."

Okay. Then the same day, April 19th, subject: Reasonable Accommodation Program.

(As read): "Accommodation not required. Dear Christine, as discussed in our conversation on April 18th, an accommodation is not required at this time as you are able to perform all the essential functions of your current position as outlined in your job description" -- I had restrictions, but I did not need to be accommodated -- "specifically based on medical documentation received by United's medical department, your treating health provider has listed



your restrictions as clear to work -- clear to return to work full duty. Should the above listed restrictions change, please keep us apprised. If you have questions, please do not hesitate to contact a RAP administrator."

And this is -- the next page is where they just send the blank one that goes with your -- this is an employee status form that your doctor fills out, and this was on April 7 prior to this. This is where I said this is from admin to Karen Parker.

"This flight attendant's three years of EISO ends on 5/26/19. Her ESF from her 4/5/19 appointment notes that she can return to work on 5/23/19, and the comments indicates she needs compression garments and orthotics, the third attachment. For your review, I have attached the previous two ESFs where restrictions were noted.

Also, I checked via one and the claim for her 8/13 -- excuse me -- 8/3/14 date of injury is closed, but she has an open claim for date of injury, which is flagged with the alert icon. Could you please advise that the return-to-work processing can be initiated for her return-to-work effective 5/23/19?"

And I'll read more in the notes there.

"I've also forwarded her documentation to occupational since pages 3 and 4 include the work



restriction form for medical to prepare the AFC prior to RAP schedule."

And then you will see that I had an MRI that was for the ESF. That was on 1/21/19, and I sent the form in on the next page. Spoke with Phyllis (phonetic) and said by Friday, January 18, office visit. He's ordered an MRI and I'm waiting it, and then here we have workers' compensation status form, MRI is scheduled on 1/18-19.

And then I say I'm waiting for the approval that will have it back, so I'm keeping in touch with him. Then on 4/5/2019, April 5th, I send: "Please note fully" -- "please note updated ESF with full duty release per 5/23."

And here's where you see my doctor's form and I have my restrictions are compression garments and orthotics (indicating). Then you see the: "Please see RAP with restriction" form going through reasonable accommodation, and this says orthotics to be worn, flat shoes, and the pants option, lymphedema, wear a compression garment underneath and have to pump at home.

Then on April 7th it says: "Hello Medical" --

MR. MISRA: Christine, are we getting to a question?

MS. FINGER: Yeah. I'm just starting to show that there certainly was history with reasonable accommodation. That's all I'm saying, that this should have been noted with an employee that's going through all of this and coming back to work and has a reasonable accommodation on file with the company. I guess that's my point.

Q. (By Ms. Finger) Okay. I guess we can -- these are emails, emails. Okay. So this would be a good time to do No. 10.

(Exhibit 10 was marked.)

MS. FINGER: And, Amit, if I recall, you had to -- for the court order with Holubeck, Mr. Holubeck, show the supervisor's list on 5626 with the metadata and then you submitted it again on 5747. If you can look at the fourth page or whichever one's bigger. It's easier for me to look on this one; I blew it up. It's not the -- I didn't change anything. I just blew it up to make it -- it was a large Excel spreadsheet. So this says that my supervisor from 10/12/13 to 1/1/2015 was Mark Kilayko.

Q. (By Ms. Finger) Do you know who Mark Kilayko is?

A. Yeah. He was a former supervisor.

Q. Well, he was never a supervisor. He was crew



resource manager. He's the one that wrote this letter on 4977 about the joint collective bargaining agreement. Mark Kilayko, managing director of crew resources and base services. He was never an in-flight supervisor.

A. Okay.

Q. But in here they have him written down as my supervisor 80 times. All these emails that I have checked here is just this one letter, so he's never my supervisor. And from 2013 to 2015, my initial injury was 2014, August the 3rd, and every document I have is with Dominic Cordova. He handled all of my medical. In fact, I think in the back here you'll see he was my supervisor all the way back from 2009 because I took every Bates numbers and looked it in here.

Then you'll see that it shows you as my supervisor from 2/1/2019 to 5/23/2019. Does that sound right? Because I was going to Dominic. I went to Dominic for my return-to-work interview. I went to -- in fact, Dominic sent my retirement plaque in August of 2019 because I was still going to his group.

And if you look at the list back here, everything that I have -- and I did every email on here -- is to Dominic. During my mom's heart surgery, May 18, all the -- it was filed on docket 147 page 58, all of the emails prior to going to training, coming



back from training, reporting my injury, the new one in 2019, and all of these excessive ones from 2009 to 2015.

And the only place that you are listed as my supervisor would be on the back page when Rick Velez is designated per the 5626 in here. This is it. And that's supposed to be 5747. Sorry.

And on the new injury claim form that I just read to you that it said supervisor's name and you said Aleta Stansberry, and on my occupational injury cover sheet, and on my notice of dispute from the union.

So -- and then it shows -- so I went through every Bates number there is, and this is not accurate because these were not my supervisors. So to say that someone else or that I was not going through proper channels or being communicative of -- with who -- and like I said, on July 1st after I left the office; Dominic was crying because he had no idea he wasn't even my supervisor anymore.

MS. FINGER: Okay. This'll be 11.

(Exhibit 11 was marked.)

Q. (By Ms. Finger) So I want to ask you. So here you have the declaration of Bob Krabbe, and I'm gonna read I, if that's okay. On January 25th of 2021 --

MR. MISRA: Can I ask why you want to read the whole declaration?



MS. FINGER: Well, let me just read the part I need to read. Okay?

Q. (By Ms. Finger) Okay. No. 6 (as read): "Finger took a medical leave of absence beginning on May 26, 2016. On April 5th, 2019, Finger submitted medical documentation" -- which we just read -- "stating that she could return to work as a flight attendant effective May 23rd, 2019."

Number 8 (as read): "Finger participated in requalification training from June 3rd, 2019, and was scheduled for her first trip as an active flight attendant from June 26 to 27."

So I'm active, per Mr. Krabbe.

"On June 18th, 2019, Finger reported an injury and thereafter called out sick for her scheduled flights."

Now what's key here is that I reported an injury which he tries to associate with Cato and the other person/flight attendant that went to training and then called in sick.

I didn't call in sick. I didn't fall down and chip my tooth. I didn't have an accident, you know, where I'm sick because I'm traveling back from Guam. I had an injury in the training department which was documented which I begged them not -- so I didn't call

out sick; I had an occupational injury.

10: "Given that Finger had not returned to work and had exceeded the maximum length of leave under section 15(e)(2) of the AFA/CBA, United administratively separated her employment as contractually required to do. Finger filed a grievance CBA challenging her termination, which was denied at the first step of the grievance process," which was denied at the first step of the grievance process, which kind of lends itself to say that the union didn't take it. It was denied challenging that.

"The AFA declined to pursue the grievance to the next level."

So there we go. All right. That's Krabbe's first declaration.

MR. MISRA: But do you have a question for Aleta?

MS. FINGER: I will in just a second.

Q. (By Ms. Finger) Then we have the declaration of Michael Hickey who's the AFA attorney that's representing me.

And he goes on to say: "Mr. Krabbe's declaration and United's motion to dismiss is accurate to the extent that there was a grievance filed under the JCBA challenging Ms. Finger's termination, and that



AFA-CW declined to pursue the grievance to the next level.

It is my understanding that there was not a first step hearing for that grievance and that it was withdrawn by AFA-CWA prior to that first step hearing. In any event, in my opinion, this is all not relevant or material. The grievance that was filed and withdrawn is a grievance that AFA-CWA would file if a flight attendant was terminated for disciplinary reasons for conduct or performance.

Ms. Finger was not subject to a disciplinary termination, so a disciplinary grievance was not proper."

No. 6, what Mr. Krabbe omitted from his declaration is that there is an open contractual dispute as to whether or not her administrative termination was contractually proper.

Ms. Finger was administratively terminated by the company per the terms of section 15(e)(1), which mandates that a medical leave may not exceed three years.

AFA-CWA counsel 42 Houston filed a notice of dispute pursuant to sections 23E of the JCBA taking the position that the administrative termination was not contractually proper.



No. 9, there is a notice of dispute, submission that is currently pending before the DRC pursuant to 23(e)(2) of the JCBA. This dispute is still active and one of the possible outcomes under section 23(e)(2) of the JCBA is to submit the matter to arbitration before a United AFA system board of adjustment."

I declare the following. Then you will have his letter to -- Elizabeth's letter to Michael saying that: "Here's the email you requested that I forward to you regarding Christine Finger. This email was sent to the MEC office originally on July 12, 2019, and confirms that United would not accept our appeal for Christine Finger.

I understand that her attorney is still being told regarding Bob's affidavit that his declaration is accurate to the extent that there was a grievance filed under the JCBA challenging her termination that AFA-CWA declined to pursue the grievance to the next level.

It is my understanding that there was not a first step hearing for that grievance and that it was withdrawn from AFA-CWA prior to that first-step hearing. I don't understand what is this confusion here.

His declaration is most certainly not accurate. We filed a grievance which was not accepted by the company. There was no step one here as the grievance



was not accepted, and AFA certainly would have pursued the disciplinary appeal had UAL not rejected it. This case was only withdrawn because UAL refused to accept it.

I also want to remind you that counsel 42 filed a disciplinary appeal for flight attendant Sherri Bettencourt," case blah [sic], "which was accepted by UAL and proceeded through the grievance process."

Elizabeth told me that was just within months of this, of my grievance.

"I'm also unclear as to why the DRC is still being discussed for this NOD as Kim indicated on Friday's call that her case would be going to arbitration."

MR. MISRA: Again, do you have a question for Aleta?

MS. FINGER: Yeah, I do.

Q. (By Ms. Finger) So here's where Crystal Heckman writes Jarrett and says: "I have received your request for a step-one appeal in regards to the administrative discharge of Christine Finger. Unfortunately, I will have to reject the appeal as this would be a contract grievance. Please be advised I'm unable to hear from Ms. Finger."

Yet she just heard the exact same -- in fact,

it's in our court. It was in our same court for Sherri Bettencourt.

And this is going to Aleta Stansberry. She's cc'd in on all of this. This is where Elizabeth writes Maria Torre and says: "We filed the below attached grievance" --

MR. MISRA: I'm gonna have to object.

Christine, you're just testifying and --

MS. FINGER: Okay.

MR. MISRA: -- reading into the record. I don't --

MS. FINGER: Well, I'm trying to show -- okay. I'm trying to show --

MR. MISRA: We're here to get testi- -- information out of Aleta.

MS. FINGER: Okay.

MR. MISRA: And so if you have questions for Aleta, obviously you're free to ask them, but I don't know why we're gonna spend our time with you --

MS. FINGER: Okay.

MR. MISRA: -- just reading into the record.

MS. FINGER: Okay. Well, it just seems that there's -- when I question, it gets -- okay. So let's move on the second declaration of Robert Krabbe.



Q. (By Ms. Finger) Document 18-1, page 2 of 40. And this was filed on the 2nd day of March. So the first one was January 25th.

So once Michael Hickey corrects it -- and he goes through the same thing. He goes through the same numbers and he gets to six, seven, and eight. I called in sick again. I reported an injury, not an on-the-job occupational, but an injury. And No. 10 -- but on the back he changes No. 11.

"The AFA filed a notice of dispute pursuant to the dispute resolution process laid out in the CBA challenging United's interpretation of section 15E. A true and correct copy of the notice of dispute is attached to the declaration as attachment B.

The union has taken the position that Finger should have been considered active at the time of her administrative termination."

However, his first declaration went to the EEOC stating that the union declined it. Now here, I have Aleta's declaration, and I'll let you read that, if you don't mind.

A. (As read): "My name is Aleta Stansberry. I'm over the age of 18 and am comp- -- competent to give a testimony contained in this declaration. I have personal knowledge of the facts dated herein and they



are true and correct. I make this declaration in support of the Defendant United Airlines' motion to dismiss for lack of subject matter.

I am employed by United Airlines, Incorporated, United, as an in-flight supervisor at Bush International Airport in Houston, IAH, a position I held since 9/1 of 2011 as in-flight supervisor -- or in-flight services supervisor in Houston -- at Houston. I have knowledge of the plaintiff Christine Finger's employment separation and the circumstances that led to her employment separation.

Christine Finger took medical leave of absence beginning May 26, 2016. On April 5th, 2019, she was -- she submitted medical documentation stating that she could return to work as a flight attendant effective May 23rd, 2019. Finger participated in requalification training on June 5th -- or actually 3rd -- 2019 and was scheduled for her first trip as an active flight attendant on June 26th-27th, 2019.

On June 18th, 2019, Finger reported an injury and thereafter called in sick for her first -- for her scheduled flight. Given that Finger had not returned to work and had exceeded the max leave under section 15(e)(2) of the AFA-CVA [sic], United administratively separated her employment as it was



contractually required to do. Although I signed the letter notifying Finger that her employment had been administratively separated, I had no discretion in this matter. The CBA requires separation under the circumstance.

I am unaware of any flight attendant who has exceeded three years of medical leave without returning to active duty since the implementation of the governing CBA who was not also administratively separated.

I declare under penalty of perjury that the foregoing statements are true and correct, executed on the 2nd day of March 2021."

Q. Okay. So I just have a few questions.

So did you write this yourself?

A. I wrote the statement and our legal team put it in that form, correct.

Q. Wrote the statement and the legal team put it -- like, just laid it out --

A. On the page --

Q. Okay.

A. -- like this.

Q. Okay. So the fact that you and Mr. Krabbe have almost the exact wording here -- in his No. 6 and your No. 3: "Finger took a medical leave of absence

beginning on May 26, 2016," and that's exactly what you say.

"On April 5th, Finger submitted medical documentation stating that she could return to work as a flight attendant effective May 23rd."

I'm reading your No. 4.

"On April 5th, 2019, she submitted medical documentation stating that she could return to work as a flight attendant effective May 23rd, 2019."

His No. 8: "Finger participated in requalification training from June" -- he even has the date wrong too -- "5th through the 17th, and was scheduled for her first trip as an active flight attendant from June 26-27, 2019."

His No. 9: "On June 18th, 2019, Finger reported an injury and thereafter called in sick for her scheduled flights."

Yours is: "Finger participated in requalification training from June 5th through the 17th and was scheduled for her first trip as an active flight attendant."

It's just verbatim. So is this just coincidence, or did they tell you what to write?

A. They didn't tell me --

MR. MISRA: Objection. It's going into



attorney-client and communications and she's not getting into it. Let's move on.

Q. (By Ms. Finger) Okay. "Finger reported an injury and thereafter called out sick for her scheduled flights."

That's -- you said that I called out a workers' comp in your report but now you're saying I called out sick. Okay?

MR. MISRA: Was there a question?

MS. FINGER: Yeah. I'm trying to get to it.

Q. (By Ms. Finger) "You're unaware," No. 9. You -- well, first of all, No. 8: "Although you signed the letter notifying Finger, my employment had been administratively separated, I had no discretion in the matter."

Do you feel that you had no discretion in the matter by asking Mr. Krabbe within 45 minutes if we could admin terminate me?

MR. MISRA: Objection. Her testimony here speaks for itself. I don't -- what exactly are you asking?

MS. FINGER: Well, her testimony lines up exactly with Mr. Krabbe's, so I'm not sure what that testimony is because it's verbatim. I'm just asking her



if she has no discretion in the matter.

Q. (By Ms. Finger) What -- what -- what does "discretion" mean to you? What does that term mean, then? If you have no discretion in firing me, what does that mean to you?

A. It's contractual. I mean, that's what I'm talking about when I say I have no discretion. It's contractual, and I have to follow the guidelines as the company said and the union said. So that's where I have no discretion.

Q. Discretion would mean: Did I make that email to Mr. Krabbe and instigate this or did I look for an opportunity or did I try and go, "Wait, what can we do?"

That would be discretionary. When you're not just following the guidelines of this contract, that's not discretion; that means your hands are tied. This was you jumping up and waving and writing my termination letter out in an hour.

MR. MISRA: Objection. Argumentative.

Q. (By Ms. Finger) No. 9: "I am unaware of any flight attendant" -- and please listen to this because you know I know and you know.

"I am unaware of any flight who has exceeded three years of medical leave without returning to active duty since the implementation of the governing CBA who



was not also administratively separated."

That's your testimony under perjury that you are unaware of any flight attendants who have exceeded the three-year maximum leave of absence?

A. Correct.

Q. You're saying correct?

A. Yes.

Q. Okay. All right. In March 2021's declaration, Ms. Stansberry sworn under penalty of perjury: "I am employed by United Airlines as the in-flight service supervisor at Bush Intercontinental Airport in Houston, IAH, a position I've held since 9/1/2011. As the in-flight service supervisor, I have knowledge of the plaintiff Christine Finger's employment separation and the circumstances that led to her employment separation."

But you did not know that I had a reasonable accommodation?

A. Is that the question?

Q. Uh-huh.

A. I did not.

Q. But did you know, I guess I should say.

A. I did not.

Q. So you know the circumstances, but you don't know anything about my particular...

A. That would be the RAP team. I don't handle that.
Q. But you handled out writing out my termination letter?
A. Correct.
MR. MISRA: Objection. Argumentative.
Q. (By Ms. Finger) Okay. "Showing the in-flight service supervisor by Ms. Stansberry during the period from September 2011 through June 28, 2019, across every internal email system record handbook, an administrative documentation produced in discovery, Ms. Stansberry is consistently identified by administrative titles associated with base or clerical functions. The absence of any contemporaneous use of the supervisory title during this multi-year period contrast with the sworn declaration, as in requested in the comparison.
Ms. Stansberry's identified as supervisor of in-flight service appears in plaintiff's termination letter, which was generated after the decision to terminate Plaintiff had already been made and contains also one hyperlink to that title.
By contrast, no contemporaneous email system records, handbooks, internal signatures, or administrative documents prior to June 28th, 2019, reflect Ms. Stansberry holding the title of supervisor



of in-flight service.
This post hoc use of the supervisory title appearing solely in the termination documentation raises a material question as to whether the title was retroactively applied to convey authority to execute or support plaintiff's termination.
Because the title is inconsistent with the contemporaneous documentary record, Plaintiff respectfully requests an in camera view to determine whether Stansberry's sworn declaration accurately reflect her role at the time or whether the title is altered or attributed pursuant to internal instruction to justify or legitimize determination decision" --
MR. MISRA: Do you have a question?
MS. FINGER: Yeah, I do.
Q. (By Ms. Finger) (As read): "It is impossible for a management-level title to exist for nearly a decade without leaving a single paper tray in the termination letter."
So back here, there's not one document in this, anything I have, that has "Aleta Stansberry supervisor in-flight service" except for my termination letter which has a hyperlink. What would a hyperlink mean where the title is?
A. I'm sorry. Ask that again.



Q. When you sign something --
A. Uh-huh.
Q. -- on the computer and a hyperlink pops up, what does -- what does that mean?
A. A hyperlink? You mean --
Q. H-Y-P-E --
A. -- like in my email?
Q. Yes. Like where you signed.
A. I either copy and paste it. I'm not sure what you're asking.
MS. FINGER: Do you want to take a break?
THE REPORTER: That would be great. I was about to say it's been an hour and a half.
All right. We're off the record at 4:12 p.m.
(Off the record at 4:12 p.m.)
THE REPORTER: We are back on the record at 4:33 p.m. Central.
Q. (By Ms. Finger) So I'm not gonna go through all these and do whatever.
You were aware of my termination, that it just was because I called in sick and extended my three-year leave of absence clause?
A. Correct.
Q. Did you have conversations -- once you wrote



this out that night and it shows at 10:23 p.m., your last time, did you -- did you speak about it anymore or was it just like another flight attendant's gone or was it -- is this something that, I don't know, disturbed you?
MR. MISRA: Objection. Compound question. Go ahead and answer.
A. Any release from an employee bothers me, but that's my job.
Q. (By Ms. Finger) Do you remember Dale Kaiser?
A. Yes.
Q. Do you remember what her nickname was at the base?
A. No. She was only there like about a year after I got there, and then she retired.
Q. Oh, okay.
So do you have discussions with Aleta -- excuse me -- with Crystal or -- I'm not talking confidentiality or whatever. Do you have discussions about -- have you spoken about me to Crystal and Sabrina since they're involved in this? Does it come up at all or is it just --
MR. MISRA: Objection. Compound question. Go ahead and answer.
A. Sabrina's no longer there. She's flying. And

the discussions, I've had some with Crystal.
Q. Not -- and Tammy? Do you -- are you friends with Tammy or anybody that's -- I mean --
A. I haven't communicated with Tammy since she retired.
Q. Okay. So you and Crystal speak about it?
A. Just about the schedule for the depositions.
Q. But you don't text each other or I'm not a conversation or...
A. Yeah, we don't text about employees, no.
Q. Do you email?
A. I don't believe we've emailed since then. I don't know. We may have, so I don't know.
Q. Since 2019 or these depositions, meaning --
A. Yeah, just when I have to tell them that I need to schedule to be out of the schedule for a deposition. Yes, I have to notify them.
Q. And do you say it's for Christine or are we anxious about it or do you worry about it or is it...
MR. MISRA: Objection. Compound question.
A. Yeah. I mean, that would be a normal reaction for anyone to be nervous about any kind of deposition. I don't think that's abnormal to be nervous.
Q. (By Ms. Finger) Are you nervous here today?
A. Sure.



Q. Well, I'm not trying to make you that way; I'm just trying to understand what happened to my life, so please understand that. I'm not sure I understand how someone can just say: It's just a job; it's my job, when there were so many other things that could have happened.
Do you feel that way looking back on it now?
MR. MISRA: Objection. Improper hypothetical. Go ahead and answer.
A. I mean, you've shown some things that I didn't know. Sure. I mean, so you're always gonna second-guess yourself. I mean, that's normal. I'm human.
Q. And to take a 35-year career away in an hour? That didn't cause a red flag to you in any way to pump a brake?
MR. MISRA: Objection. Argumentative. Also asked and answered.
Q. (By Ms. Finger) Do you have any remorse?
A. I always have remorse. I already said I feel bad when anybody gets administratively released or released for any reason whether it's legitimate, you know, in your eyes or not.
Q. Was it legitimate in your eyes?
A. Yes.



Q. All right. Do you speak to Mr. Krabbe about me after I got terminated --
A. No.
Q. -- immediately after --
A. No.
Q. Because I wrote him a 15 -- actually, 60 pages on my 60 birthday on July 15th, and everything in here is Aleta Stansberry is designated as my base administrative supervisor, was conveyed to me by base administrative in-flight supervisor, Aleta Stansberry.
He didn't contact you or anything after this email or nothing when all I'm doing -- every email I write: "To whom it may concern, purpose of this letter is to present that I feel I was wrongfully terminated by Stansberry."
All the emails that went out to United and the list we were supposed to send to Bob Krabbe, Dean Whitaker and everything, no one came up to you and said nothing? I mean, it's just, like, administratively separate?
MR. MISRA: Objection. Leading. Objection. Argumentative. You can answer the question.
A. I don't recall having any conversations about it.
Q. (By Ms. Finger) Do you have conversations now



about it since it's ongoing and it's been six years?
MR. MISRA: As long as it doesn't include legal advice, you can say.
A. Yeah, I mean, just legal. I haven't had conversations with anyone, Crystal, any of -- Bob Krabbe. I haven't had any conversations.
Q. (By Ms. Finger) Even about coming to depositions?
A. Other than what I've already said.
Q. Well, I don't mean that. But I mean, there's no sentiment? There's nothing other than: I have a deposition scheduled?
A. No.
Q. Okay. So you're telling me since 2019 when Tammy was still there and Sabrina was still there and all of this was going on that you had no communications that the day I got terminated on 6/27, whatever, that was it? It was just done? You didn't -- like at parties or flight attendant groups or anything that we all know about never came up?
A. There's a grievance process. I was advised that you were filing a grievance initially through the court case. I was advised, but no, we didn't have any discussions about it.
Q. Okay. All right. So let's go to -- you-all

Page 117

have this piece of paper, right, in your...
A. Yes.
Q. Oh, in the back of that other packet you're gonna see -- I'm sorry. Before you go to this, I'm sorry. Esther Guerra.
A. Which packet?
Q. The one we just, 11.
A. 11?
Q. When we stopped for the break. It was after Mr. Krabbe wrote his position statement on -- his first declaration and you're mentioned on here again on page 3: "Ms. Finger reported to the supervisor, Dominic Cordova, that she reinjured her left ankle stepping down from the aircraft on the last day of training, June 17th.
Mr. Cordova instructed her to alert the Houston base occupational injury administrative supervisor, Aleta Stansberry. Following day, Ms. Finger left Ms. Stansberry a voicemail indicating that she had injured herself during training and was unsure if she would be able to complete her first trip scheduled from June 26-27."
Do you remember getting my phone calls, voicemails or -- I know Dominic stated that he spoke with you.

Page 118

A. I don't remember getting the phone calls. I don't remember getting the conversations with Dominic.
Q. Okay. Page 4 where it talks about disability, discrimination, second paragraph: "Is equally meritless. In fact, Ms. Finger's claim is so baseless that she is forced -- that she forced, rely on blatant misstatements in order to bolster it. Contrary to Ms. Finger's assertions, United does not have a hundred percent heal policy; rather, United has a comprehensive accommodation program, RAP, through which United routinely accommodates flight attendants with restrictions to allow them to come back to work.
Although there is no light duty as a flight attendant given the need to ensure that flight attendants can perform all essential functions, particularly the safety sensitive functions even with a reasonable accommodation.
United previously accommodated Ms. Finger by placing her in a temporary desk job as a recruiter when she suffered her first injury. It was Ms. Finger that claimed that she could not perform the duties of that alternate temporary position and chose to take another leave of absence."
So that other leave of absence would be called: I had to go do surgery because Sedgwick or Gallagher

Page 119

Bassett gave me a 6 percent impairment rating and didn't tell me that I had a perineal nerve, crushed nerve in my ankle and I barely could walk. So that took nine months on crutches and I guess it's just I'm tired of seeing all the distortion.
Okay. Look at reasonable accommodation on the next page. You, having worked with the union and having worked with occupational, have you ever seen this letter that Maria Torre put out to the flight attendant group? Do you know who Maria is?
A. No.
Q. You don't know who Maria is?
A. No.
Q. With AFA?
A. No.
Q. Okay.
A. If I saw her face, I might know her. I don't know her --
Q. Well, she -- she and Ken Diaz, he's president and she's -- I would just think you would have known who she was. She's been around for 30 years.
So she states: "This is what was sent out to flight attendants."
A lot of them forwarded this to me and when they would write her and say we've been wrongfully

Page 120

terminated under the three-year leave of absence because, you know, the delays and improper treatment --
It says: "Grievance committee chair, responds to emails" -- in their thing where she says her letter: "The lesser of the period of disability," blah, blah.
(As read): "At the end of the maximum period, the flight attendant will be administratively terminated and removed from the system seniority list. Prior to your leave ending, you needed to return to work, clear medical, and fulfill the flight attendant position without restrictions or accommodations.
There is no provision in our agreement for such. While the company has a reasonable accommodation process, there is none for the flight attendant position."
Does that even cause any alarm to you that this is what the union rep would be saying to flight attendants?
MR. MISRA: I'm gonna object. I mean, she's already testified she doesn't know who Maria Torre is. Obviously Aleta's not here on behalf of the union.
How -- what is she gonna give you as far as the --
MS. FINGER: It's --
MR. MISRA: -- answer to that question?

MS. FINGER: I just think it's the company -- I'll -- I'll read it to you in just a second, that the company and Mr. Krabbe knows there's a problem here and they're not doing anything to correct it.
Q. (By Ms. Finger) (As read): "As you could not clear without restrictions to return to work and you reached your three years, you were administratively terminated pursuant to the contract.
While I understand and sympathize for your specific situation, there is no provision or reason for an extension to the three-year limitation. You were properly administratively separated on" such and such date.
The next page is --
MR. MISRA: Is there a question for Aleta then?
MS. FINGER: No. I'm gonna -- the next page is Elizabeth's response to Ms. Detzner -- talked about flying a trip and calling in sick versus the OJI sick call.
And then we see here this was in the back. I had a -- I don't know if you-all got this page or not where Dominic orders my retirement plaque in August which shows that he was still my supervisor.
Okay. Let's go to this page please,



the...
Q. (By Ms. Finger) So you -- this is my...
MR. MISRA: Which exhibit is that in?
MS. FINGER: The one with the -- I think it was your 5, I think you said.
Q. (By Ms. Finger) Okay. So this is my occupational injury report, correct?
A. No. This (indicating)?
Q. Uh-huh.
A. These were my notes regarding your case.
Q. Okay. So what does it say at the top?
A. Christine Finger.
Q. No, no. I'm sorry.
A. Occupational injury cover.
Q. Cover meaning what?
A. Cover of my (unintelligible).
Q. Okay. So can you read across for me? Just tell me what it says.
A. Christine Finger and then it has your employee number and then it has -- would've had your phone number; COUA, which we were in integration. The date of hire --
Q. Uh-huh.
A. -- 10/13/84. Years of service, 35. Can't read it.



Q. Full-time or --
A. Full-time or part-time? I said full. Supervisor, Aleta. I'm the one processing it. Doesn't mean I'm your supervisor in this case. Date of injury, 6/16/19; time of injury, 3 p.m.; date and time of report, 6/22/19 at 6:45 p.m. Whom called it in? Call line, no name.
Q. Can I stop you for just a second?
A. Uh-huh.
Q. So to whom reported, call line: No name. What does that mean?
A. So you called it in. Either that or somebody called it in for you on that number on the Sedgwick thing. And if it's called in, I don't know -- it always says "no name."
Q. Okay. Because I have their names --
A. Okay.
Q. -- so...
A. Okay.
Q. Okay.
A. Any previous injuries, 2000, I think, 14 is what it says.
Q. To the body part.
A. Oh, previous injury to the body part, 2014. Total prior claims wasn't filled out; investigation



completed, yes; OIS number, 3968235 -- 835. Did the employee receive a raise in the last 12 months? 10/1/18, yes; date of last lost time start, 6/26/19, 06:44, hour first/last time, 6:44. End date called -- I can't read that, 6/28? 6/30? 6/20, 28?
Q. Uh-huh.
A. I don't know. 19? Date employee received -- oh, sorry. Turbulence related --
Q. Well, first it says admin term underneath it.
A. Oh, yes. Admin term, 6/25/19. Turbulence-related, no; IOR, no; paid wages the date of injury, yes; wages continued by employee training day only, yes; description of --
Q. Can I stop you for a second?
A. Uh-huh.
Q. It says: "Paid wages on date of injury," so I was paid. And then it says: "Wages continued by employer," you put "yes."
A. Training pay only.
Q. Okay.
A. Date or description of injury, left ankle; 3/06/14, 3/5/19, 41 --
Q. That's where you're adding the 2014 injury?
A. Yeah. I'm just saying that's the last injury. "Description of accident: EE stated she was exiting

mock aircraft and fall and injured left ankle. Left ankle had surgery before and was -- it was swollen." Can't read that --
Q. And hurting.
A. Hurting, okay.
Q. So I'm gonna ask you: So why would you reference that my left -- why do you-all keep saying that my injury was the ankle that I had surgery on? In every report was Sabrina's left ankle; she's had surgery on it. Why is this something that you-all would be noting down here?
A. Because one of the questions that Sedgwick asks when they call after the injury is: Is there any prior injury to that body part.
Q. Okay.
A. Okay. Medical provider, I didn't have it at the time; witnesses -- what does that say, temporary trainer what?
Q. Pending trainer information.
A. Okay. Okay. So we were waiting on a report, I guess. Was employee working military? No. Any reason --
Q. Reason to doubt validity of the claim.
A. Yes, uh-huh.
Q. Okay. What would be your reason to doubt



validity of the claim?
A. Just the prior injury would be a question, would be a flag. This is a note for me when I'm looking through the investigation, so I would question that.
Recorded on video surveillance, no --
Q. Just a minute, please.
A. Okay.
Q. The training center has cameras everywhere. Why was the -- why was the video not pulled?
A. Well --
MR. MISRA: Objection. Assumes facts not in evidence. Go ahead.
A. Well, as you can see from the above, I said we were pending training information.
Q. (By Ms. Finger) Did you ever hear back from anybody?
A. No.
Q. You never --
A. I didn't.
Q. Who did?
A. I don't know if Sabrina did because she reached out to the training department.
Q. So where is the email from Stephanie Pollock or anybody from the training department?
MR. MISRA: Objection. Your -- just how



she -- it's calling for speculation for her to know --
MS. FINGER: Well, she's filling out my report.
A. This is my report. This is my notes --
Q. (By Ms. Finger) But you're gonna be filling out a report and I'm getting ready to show you and you did fill out my report so we'll just circumvent it right there.
A. Okay.
Q. So you -- is there an accident report from the training center?
A. I don't remember. I don't remember. Record of -- okay. Any abnormality dated, no; Sedgwick adjuster, Briana; Sedgwick claim number, didn't have it; phone number, blank; flight, spoke with 6/28/19; OJI bank, no.
Q. Okay. Wait just a moment, please.
A. Okay.
Q. So I'm gonna go show you this. And I'll label it in just a second, but while you're there, doesn't that show my occupational hours that are in my bank that got restored once you go full-time? Can you read what it says --
A. Uh-huh.
Q. -- please?



A. It says occupational sick hours remaining, 28, as well as occupational sick hours used, 0, yeah.
Q. So that means because you classified it as a sick call, not an occupational, correct?
A. I don't recall classifying it.
Q. I'm sorry. What do you mean classifying it? It's got to be coded in somewhere. Why would you say there's no sick hours -- I mean, no OJI hours remaining?
A. Well, I don't have my whole packet, so I wouldn't know.
Q. Where is the whole packet?
A. It was put in the personnel file.
Q. And why wouldn't I have that whole packet in my...
MR. MISRA: You do have it.
MS. FINGER: Where is it?
MR. MISRA: I mean, I'm not gonna have a discussion with you about documents right now. It's --
MS. FINGER: Okay.
MR. MISRA: It's been produced.
MS. FINGER: Her whole packet on my injury that she was writing?
MR. MISRA: Uh-huh.
MS. FINGER: Okay. All right.
Q. (By Ms. Finger) Go ahead, Aleta. Sorry.

Page 129

A. It's okay. I don't remember where I was at. Okay. Occupational hours remaining, I said 0; sick hours, yes, 2404; pay rate, 64.50; code used WKSP --
Q. No.
A. -- or SK.
Q. So the code you used which just means that you coded it was work sick.
A. On this sheet, yes, uh-huh.
Q. And so this sheet didn't go into anywhere else? This is just --
A. It's not work sick. SK doesn't stand for sick in this case. It's a workers' comp self, not workers' comp sick.
Q. Workers' comp self.
A. Uh-huh.
Q. Okay. So is there a code for it? Because I know I have a --
A. SKO -- OI would be the sick occupation.
Q. Sick occupation?
A. Uh-huh.
Q. Okay. But I'm saying the number. Like, when the schedulers use the number.
A. Yeah, I mean, I didn't necessarily call in the initial absence.
Q. But at this time you could have called this in

Page 130

because you knew I had --
A. No, this was after the fact. It would have been after I got the information from the training center or whoever it came from, yeah. So it wouldn't have been -- it wouldn't have been at that time.
Q. So there's not a way to find out in your packet what time this was filled out?
A. It could have been because typically when I did these packets -- not saying in this case because I don't have the packet in front of me -- I print out your work history and everything else and it records a time and day, so --
Q. Okay.
A. -- when I was pulling in the information, it would normally have included that. Where was I? TW -- I can't read it because it's blurry.
Q. Texas workers?
A. Texas -- okay. Absent, not applicable.
Q. N/A.
A. Return sent, nonapplicable; IR system, yes; work history attached; current points, 2.0; level of discipline, none.
Q. Okay. Level of discipline none?
A. Correct.
Q. So that means at the time you filled this out,

Page 131

there was no discipline?
A. Correct. Comments: Manager requested statement from training center. History of lost time failed to return to work three years, did not fly first trip, exceeded max leave, emailed labor relations, possible -- I'm assuming; it's cut out -- admin term.
Q. Okay. So when you did this, if you -- when did you receive this? You're showing that this was reported on 6/16 --
A. Uh-huh.
Q. -- at 3 p.m.?
A. Yeah. That's when the report --
Q. Right.
A. -- was done. That's not necessarily when I did that.
Q. Right. And then it says that your date -- you're reporting it is 6/22/19 at 6:45 p.m., so...
A. That's when it went into the system; that's not when I was reporting it. That's when it goes into the OIS system.
Q. Okay.
A. Because usually there's a little bit of a lag from when you actually file the report --
Q. So for four days, from 6/22 to 6/26?
A. That's what I reported.

Page 132

Q. Okay.
A. Uh-huh.
Q. All right. So -- so you're saying that work sick OI --
MS. FINGER: Is this No. 12?
THE REPORTER: Was that document that you were just reading from 12?
MR. MISRA: No. That was from 5.
THE REPORTER: Oh, okay. Yeah, we're on 12, yes, ma'am.
(Exhibit 12 was marked.)
Q. (By Ms. Finger) So this is after -- sorry. after I've been terminated here and you'll see the appeal process by Crystal turned down when we just established that she heard it from Sherri Bettencourt.
So on 7/10 after my July 1st meeting, Jarrett sends her the appeal for Christine Finger, and on the second page it says in-flight supervisor, Aleta Stansberry.
Why would you be involved in my discharge appeal?
A. Because I was the one that admin terminated you in the letter.
Q. So you just said because you were the one that admin termed me, correct?

A. Uh-huh. In the letter.
Q. Okay. All right. So here you see Crystal Heckman writing Jarrett back on 7/12 saying: "Good morning, Jarrett." High importance. "I have received your request for a step one appeal in regards to the administrative discharge of Christine Finger. Unfortunately, I'll have to reject the appeal as this would be a contract grievance. Please be advised I am unable to hear the appeal from Ms. Finger."
Okay. That's after she didn't show up for the July 1st meeting where Tammy came in and we found out that Tammy's telling me "I've never seen that clause before" but yet she's BCC'g Bob Krabbe the night I'm getting terminated.
So then on 7/19 Jarrett writes back: "The union withdraws the above-referenced warning appeal because of the unique circumstances to this case. The union withdraws the warning appeal without prejudice."
And then over here, on my notice of dispute, you're not my supervisor anymore; you're my company personnel involved.
So everything's going through you, not Dominic, not Rick Velez. You're on every one of my documents.
A. Is that a question?
Q. Is there a reason why you're all over me like



that? I don't know. Why would --
A. Because I was the one that did the admin term.
Q. Okay. So here's Crystal Heckman, and here you have Elizabeth's letter again showing that Crystal had just listened to Sherri Bettencourt termination and then here you have my NOD, my notice of dispute.
All right. So on these next ones, 13?
A. Yeah.
(Exhibit 13 was marked.)
Q. (By Ms. Finger) This is after the July 1st meeting with Elizabeth and Crystal -- excuse me -- Tammy because Crystal wouldn't come in. This is Denny writing Bob Krabbe on July 1st.
You have to go to the bottom because of the way it's done. At 11:53 Denny -- oh, no. Excuse me. Go to the second page. Sorry.
On July 1st at 10:34 a.m., Denny writes Bob: "Hi, Bob. This weekend Elizabeth let me know about a Houston flight attendant, Christine Finger, who was admin termed due to exceeding the three-year OJI leave parameter. Her case is a little unique in that she completed a re-qual requirement successfully, but on the very last day of the training, she sprained her ankle in the training center.
This was witnessed by the other flight



attendants and training staff. She then unfortunately called out SK for her trip due to needing some time for the ankle to heal. She was terminated for not being, quote/unquote, active after re-qual. Had she known this would have happened, she could have easily dropped her flight to another flight attendant or traded it.
If you have time today to look into it, would you be available for a call from Elizabeth and me? This would be an opportunity to start a relationship with Elizabeth as the new LECP as well. Let me know if there's a time today when we can have that call or if another day works."
So then Bob Krabbe writes back at 11:53 on July 1st: "Denny, I am aware of the case and unfortunately, this is not unique."
I don't know. For some reason, that just fazes me a lot.
"We have had this happen a number of times, and the result is always the same as it has to be."
And this is why I'm referencing Maria's letter that if the union and the company knew that this was targeting and affecting these flight attendants under this three-year leave of absence policy. Seems like it is a great way to get rid of your seniority there because they're usually older and have had an injury or



somewhat disabled.
Anyway, we've clearly laid out the process to return to work in the leave of absence packet. There is a long-standing mutually understood process that the process to return to work has steps that must be completed in order, and until such time as they are completed, the individual has not returned to active status.
Ms. Finger did not completely those steps, so there is no status on which to place her that would not exceed her three years of medical leave. I know this is not the answer you were looking for, but to take any other action would violate the terms of the agreement. I'm happy to discuss further."
So it's your testimony today that you're saying that you're not aware of any other flight attendants that have exceeded that three-year leave of absence?
MR. MISRA: Objection. Asked and answered.
A. Not that I've handled.
Q. (By Ms. Finger) Not that what?
A. I've handled. And I am not aware of anyone else.
Q. Okay. So you're not aware of any flight attendants? Okay. I didn't ask if you handled or

processed them; I'm saying you're not aware that there was any other flight attendant.

Okay. So then, go back to the first page, please, and Denny replies by July 2nd, at 4:50: "Thanks for responding, Bob. I was afraid of that. I do have a question regarding the complete process a flight attendant progresses through in returning to work. At which step of the process is the flight attendant either physically given or specifically made aware of the return to work package which has the info spelling out what it is exactly that makes the flight attendant, quote/unquote, active?

Is ESC, F.A.S.T., or base management responsible for ensuring the flight attendant either has this package or is aware where to find it? Christine maintains she never received it or is made aware a return-to-work package even existed."

Because I was looking at the workers' comp and occupational.

(As read): "My point being, if she was unaware of all the steps to complete in the process, how can she be held accountable for not completing them? She easily could've traded or dropped the trips to comply with the completion process as outlined in the package.

She still wouldn't have flown but at least



would still have her job. She is healed enough to work at this time. I honestly don't think anyone's best interest or being served in this case. I'd appreciate it if you would consider a settlement to reverse the termination."

So after that, if you'll look on the next page, Bob Krabbe forwards this to Crystal Heckman.

And she says at July 8th: "Thank you, Bob."

And he said says at 12:02 p.m.: "Did she talk to you?"

Meaning -- I'm assuming on my July 1st termination meeting that she didn't attend.

And then she writes back at 12:02 and says: "Not one peep. Is this something you or Dean are considering?" That would be Dean Whitaker.

And he says within a minute: "No."

And she says at 12:07 p.m.: "I literally just laughed out loud and spewed my water."

"Good. Then we're on the same page."

Does that seem just hypothetically retaliatory, or does that show kind of management's -- there was something personable there that, a director of the base who's supposed to be professional and can't let their personal feelings get in the way, spew their water out laughing when you're watching a 35-year flight attendant



lose everything in their life?

MR. MISRA: Objection. Argumentative. Speculative. She cannot opine on what Crystal Heckman is thinking.

Q. (By Ms. Finger) Well, what would you think? If you were a juror, what would you think?

MR. MISRA: Objection. I'm gonna answer her not to -- I'm gonna instruct her not to answer that question. It's a bad question.

MS. FINGER: Okay.

Q. (By Ms. Finger) So let's go to -- yeah, this is all about the training center and not calling it in.

MS. FINGER: I lost your stickers.

THE REPORTER: Here's some more for you.

MS. FINGER: Oh, here they are. You mark on these. I'm gonna make it a four, though to conserve. Sorry. It's just everything has a lot of paper. Actually, you know what? Let's go -- oh, it's fine. I can do that one first. Why don't we do this? If you don't mind, can we do this and change the number?

MR. MISRA: We can do this one out order. No problem.

MS. FINGER: Okay. Exhibit 15 on this one, Amit?

MR. MISRA: I mean, if Neph is fine with



it.

THE REPORTER: I mean --

MS. FINGER: Yeah.

THE REPORTER: I have 13. So we're on 14, right?

MS. FINGER: Yeah.

THE REPORTER: So we're marking 14 and 15 now?

MR. MISRA: Yes.

THE REPORTER: Okay, perfect. That's it.

(Exhibits 14 and 15 were marked.)

MS. FINGER: I'll do this -- oh, how about I just do this and we can do that one afterwards?

MR. MISRA: Sure. Whatever works for you, it's not a problem.

MS. FINGER: It is a problem for my brain. Okay. This one's 14.

Q. (By Ms. Finger) So here, as you were saying, Aleta, the code on WKSK, right, means that it was a -- what did you say that was, a worker's comp?

A. It's not. It's worker comp self.

Q. Workers' comp self. Does that mean I reported it myself or what does "self" mean?

A. There's just multiple codes like paid. Some will signify that it's paid and some will signify that

Page 141

it's unpaid. I'd have to have the sheet in front of me to remember because there's so many different codes that we have.
Q. Okay. I've seen that sheet. I thought I had it, but I don't.
A. Yeah.
Q. So you'll see here in June on the 26th, 27th, 28th, 29th, and 30th, there was a WK sick, which they only paid me for one trip and they actually took off three trips, but I guess I was trying to hurry.
The next page is the same thing. These are screenshot from my computer at home because you know when we're taken out of CCS, we usually don't have access so it's the screenshot, 26 through 29.
A. Okay.
Q. Then on 8/19, it's showing term. Everything is term. And here we've got the workers' comp on 8/19. So it shows May came off of workers' comp, came back to work, got the messages. And then on 8/19, you'll see here on the 26th instead of work sick, it has WKLI, so workers' occupational.
A. That means we got documentation.
Q. Yes. So on the 26th, I'm on a WKOI, not on a work sick, so on the 26th, you've got documentation. That's the day I got terminated. You see that?

Page 142

A. I'm sorry. Which page are we on?
MR. MISRA: You've gone way too far.
THE WITNESS: Sorry. It's like...
MR. MISRA: One, two, three four, five. Page 5.
Q. (By Ms. Finger) It's 8/19 on the top left corner, so it'll be August 19 when I screenshot it.
A. This one?
MR. MISRA: Right. So you see the 26th of June.
THE WITNESS: Yeah.
MR. MISRA: Those are the codes.
THE WITNESS: Uh-huh.
Q. (By Ms. Finger) So it was classified as an occupational at that time.
A. Okay.
Q. Okay? And the next page we have all the comment screens and you'll see where it says workers' comp removed absence, occupational leave. Okay. That was in 5/27.
A. Uh-huh.
Q. You come back here to the next page, on 6/28 you see termination right there, but above that on 6/26, you see workers' comp a hundred percent. So that means I had an occupational; I didn't call in sick.

Page 143

The next page is the same. I just took different screenshots, 8/19. And it shows down here it should have the messages of the parents that were removed, pairings mutual with, you know, the whole schedule thing. I don't need to go through that.
And 7/6 it took off everything because it was showing that I was terminated, then if you go to this 4929, the one that looks like this (indicating) -- this was on 6/29; I screenshot it, and you'll see that pairing H1032, on 6/26, was the work SK.
This is just when I had screenshot it, what the scheduler had done. And then also he did H07, I think it's 34, 0734, with purser pay. So that would have been my next trip, and then H0906 on the 29th, so actually, I called in for those three trips.
A. Okay.
Q. And then on this one, you'll see here right at the top, it shows separated. I'm going down here. First of all, it says supervisor's name is Enrique Velez. Okay? Now, I haven't heard from him, never received any contact from him, nothing. This entire time I've been on occupational. I don't see his name on anything except for something like this where it's put in.
And if you look at the first line, it says work

Page 144

history separated on 6/28/2019 at 12:00 a.m., and that's by -- last modified by Susan Bohanon on July 1st, 2019, at 10:37. And then here you say the exact same thing that you said on that OIS covered: "Exceeded max leave, admin termination letter issued effective June 28th, 2019: Failed to fly following release to return, Aleta. Flight attendant is retired effective 6/28/19."
That's a nice way of saying you're fired. And then if you look over here, underneath it it says absent 3, occupational. There's no sick call here. This is an occupational injury for 6/26, which I called in, for a 6:48 show. And then if you look all the way to the side, now Rick Velez is there, but this has been modified on July 12th, 2019, at 7:37 a.m. And it wasn't by you; it was by Dorota Karpierz.
MS. FINGER: You can't see it, but if you look up 5413, Amit, this is where Dorota Karpierz comes in.
Q. (By Ms. Finger) What is her title? Who is she?
A. I don't know who she is.
Q. Well, the lawyers use her a lot. So you've never used her? She's not anything in admin or...
A. I don't know who that is.
Q. Okay. So you see here, per flight attendant, placed WKSK; DOI, date of injury, 16th of June for

pairing H1032 on the 26th of June, pairing H0734 on the 28th of June. Flight attendant called in work sick date of injury for H0906, V. Sientes.

Flight attendant called in work sick, date of injury, 16th of June H0757, V. Sientes.

And then here is yours again. Employee was exiting aircraft. I returned from the leave of absence, came back. There's nothing here that shows any sick calls. It's occupational injury.

And on here, on docket 124-1, page 174-88 when I'm talking about the instructors and everything that happened and the whole thing, Dominic Cordova escalated to you, also able to get the number to Sedgwick and reported, got a claim number, my status changed in any way, blah, blah, blah. And on the page 171: "Contacted scheduling at 6 o'clock on June 25th," which I will show on the call logs.

Preparing H1032 on June 26th, 6 o'clock show. Was trying to get a 12-hour courtesy for scheduling coverage and informed them I had been injured on the last day of training and had contacted everyone. Received no help or answers and told him I have an OJI claim number to mark down with a sick call.

And I put in here: "Strangely enough, his name is Vincent."



Now what are the chances that this V. Sientes just happened to have a V? So I know who I spoke with. I know he worked at -- as an occupational injury and I even -- this was written way before I had this. So there was no sick call, is my point; it was occupational injury, which you can't fire an employee for exercising the right to -- we're on 200. I'm talking about this sole determination from Aleta Stansberry.

And if you'll look on 7/2/2019, this is after all my turns here which show that I'm in training. On 6/26 I have a WKOI and then I'm terminated right after that. This goes through my June and July schedule showing all the trips that I picked up.

MR. MISRA: Are we going to get to a question?

MS. FINGER: Yes, we are. I'm getting there.

Q. (By Ms. Finger) So on this page, here's 5465. It's past all that.

MS. FINGER: It's this one. That's it.

Q. (By Ms. Finger) When I asked you for master schedules and you sent me two; one for June and one for July, this -- and you said, "This is the only master schedules that United has." But you sent this to me on August -- it was printed on August the 7th, 2019.



So all of these trips that I have on here with the little airplanes, all of this had been changed. This is not -- this was two months after I asked for the -- or the court asked for you to provide the master schedules, and this was printed on 8/7/2019 as well. It still has V. Sientes, still has that on there.

Here, on this page it shows Aleta Stansberry, in-flight base administration, at the top and it shows UA account admin. And then on the very next page, Aleta Stansberry puts that I went on a PLOA other/default on 6/28/2019.

A. It's Susan.

Q. Yeah. Susan did it. So what is false, true, false, false, false, false?

A. Where are you seeing that?

Q. The false, true?

A. This column? I don't know. It's some kind of default.

Q. Okay. But here your title is in-flight base administration. So this is your -- this is where you live. You live on the documents. You live on the next page document. You're on the top.

Aleta Stansberry, in-flight base administration. There is not one document that I have, not in the guide books, not here, not in United workers'



comp guide, base administrative supervisor is Aleta Stansberry, Houston. There's nothing that has you as a supervisor of in-flight services except for my termination letter.

MR. MISRA: Objection. You're just testifying. You have a question here?

MS. FINGER: I -- I'm going to ask her on the next page. Sorry.

Q. (By Ms. Finger) On this page which is screenshotted 7/1/2019, I think I had said -- Aleta Stansberry's at the top, and it has on the second line, absent 3 occupational. On 6/24, it shows on 5/23 I returned from a leave of absence. On 6/24, occupational injury report with Brenda Jordan. On 6/26, absent 3 occupational, at 6:18, account admin, and then on 6:28, I'm separated for reporting an occupational. On the next page on July 2nd, it's bigger. It's the same thing only highlighted. There's nothing about sick call on, here, just occupational. Same thing --

MR. MISRA: I'm still asking if we're getting to a question.

MS. FINGER: I'm trying to find it.

Q. (By Ms. Finger) On the next page, you'll see where that occupational from here, occupational 3 on this one, on the work history, it's now been changed to

not 7/1 with Susan Bohanon. Account admin on 6/28 has now been changed to 7/12/2019 with Rick Velez. It says last modified date. So why would his name be inserted there two weeks after I was terminated?
MR. MISRA: Objection. Calls for speculation. Go ahead and answer if you know.
A. I don't know.
Q. (By Ms. Finger) Okay. Then on this page, Finger 2369. Keep going, Aleta. There you go.
A. Okay.
Q. So this page is this blown up, so we can do a comment screen or a not comment screen, so this would be this with the hidden comments (indicating).
And here we go again with Rick Velez being on here now on my occupational modified on 7/12, and we still have my date of injuries and the work history and then Aleta saying: "Employee was exiting mock aircraft swollen and hurting."
A. Can we --
Q. I guess so my question would be: Why was it changed? But you already answered you don't know.
A. That's not me. That's Brenda, so I don't know if that means needs to be corrected that she's saying me.
Q. What?



A. You're saying I wrote this; it's actually Brenda.
Q. No, it is Brenda. I'm saying you're at the top.
A. Oh, okay. Sorry.
Q. Now you see Susan Bohanon and --
A. Okay.
Q. So all of these different screenshots are taken at different times, but if you look down here, Jania Barnes, Brenda Jordan and then -- got to find it. Right here on 7/19/2019 and I blew it up so there could be two where it was separating. It's got your name, Aleta. It doesn't have Susan anymore. So...
A. Is that a question?
Q. Yeah. I don't understand why your name's on there for the action and then it disappears and someone else comes on and then someone else takes account admin, Rick Velez.
Why would this be modified 12 days after my termination, 14 days after my termination?
MR. MISRA: If you know, you can answer it.
A. Okay. So when you're separated, I would initially go in and put the separation in there, and then once the F.A.S.T. team receives it, they would go



in, determine if you were eligible to retire, and they would go in and change the separation what I put to what they ended up putting --
Q. (By Ms. Finger) Well --
A. -- so that's where it gets removed.
Q. The F.A.S.T. time -- the F.A.S.T. team received this notification and closed my case on 7/4. Do you want this piece of paper? (As read): "Thank you for the notification. The employees are -- have closed our cases for Christine Finger."
A. Uh-huh.
Q. Okay. So I think we get the point of these. Okay. Then over here, back to this one where you put PLOA for Susan, puts PLOA.
On the next page, I come in here and this is not like my other master schedule -- which I don't have with me -- but it's completely showing I'm in training, training, training. And then I took a PLOA other, and I have all my screenshots that show the trips that were on there that have been removed.
So it looks convenient that you-all are saying she extended her personal leave of absence; so therefore, we had to terminate her. I can't understand why anything else would work there.
MR. MISRA: Are you asking a question?



Q. (By Ms. Finger) Here's the F.A.S.T. retirement that you did on July 1st. It was suspended.
A. Which page is that --
Q. Please --
A. -- Christine?
Q. In the back.
"Please advise F.A.S.T. that the flight attendant returns any of her duty items. User, Aleta Stansberry, has initiated a F.A.S.T. Supervisor initiated separation request on 6/28 and it was granted on 7/1."
It's almost at the very back, this page (indicating).
A. This one?
Q. Yes.
A. Okay.
Q. So right before that page, you'll see my termination letter, 6/8/19. (As read): "Dear Christine, this letter is in regard to your current inactive status with United Airlines. On 9/26/16, you were sent a business letter indicating changes to the leave of absence policy including but not limited to the maximum length that some leaves per the joint collective bargaining agreement.
The JCBA states in relative parts, section 15E,

1 and 2, leaves of absence required due to illness are nonoccupational injury shall be granted upon written verification of disability from a qualified medical doctor."

I -- I had an occupational here. Why -- is this one of the changes that -- when you asked Mr. Krabbe what changes do you need to make to the letter? Because you can only be fired for what is on your letter of cause. Stroup versus United and the JCBA came up with that.

So you're saying due to illness or nonoccupational injury shall be granted. How did -- how was I terminated under this parameter? Because I had an occupation.

A. That's the policy. I was quoting the policy.

Q. But this isn't it for me. This is not -- illness now, they say nonoccupational or occupational. How can you write due to illness or nonoccupational when we clearly just went through all this and I have an occupational injury?

A. Again, I don't approve or deny occupationals and...

Q. But you signed this letter.

A. Yes, I did.

Q. And you asked Mr. Krabbe what changes to make.



A. To the letter.

Q. Right.

A. Yes.

Q. What changes -- okay. I'll make those changes

A. Yeah.

Q. But yet, now this is not a legally binding termination because I had an occupational.

"Company records reflect you have been on a medical leave of absence 5/26/16 as indicated in the September 29th, 2016, business letter. If you do not return to work prior to the expiration of your medical leave, your employment with United Airlines will be administratively terminated in accordance with section 15E, 1 and 2.

You submitted a release to return to full duty effective 5/23/19 and you attended training from 6/2/19 to 6/17/19. Following your training, you called in sick for your first trip assignment. As a result, you have exceeded the maximum contractual duration for a medical leave."

I didn't call in sick. Where are you showing that I called in sick? But that was in your declaration and in Mr. Krabbe's declaration.

MR. MISRA: What is the question?

Q. (By Ms. Finger) Where do you -- where do you



see me calling in sick? We just went through hundreds of pages of documents.

Where is this? I didn't call in sick. I called in to the -- we have it all over here. OI, OI, occupational, occupational. And I didn't call in for one trip; I called in for three trips, and it's because when she coded this as WKSK and took the money out of my sick bank instead of my occupational bank, that triggered this.

So I'm asking you -- and then I look here and on this next one -- this is what I'm talking about, your hyperlink -- you now have a new title of Aleta Stansberry, supervisor in-flight service, which not on any document that I've had in here and I'll let you know I'm the only patient because I pulled in a lot. Where did you get that title all of a sudden?

A. That is the official title.

Q. As of when? Because --

A. I don't know. The titles have changed over the years and I don't know when. I can't tell you dates.

Q. Okay.

A. Things change, but that's the title.

Q. Okay. Because I can show you emails that you wrote. Where's the one that I just had to the F.A.S.T.? On 7/4, your title is still Houston-based administration



right here.

A. Right. I was both.

Q. You're both?

A. Uh-huh.

Q. Okay. That couldn't be to shield you from being the supervisor and the person that is doing all the documents to determine my termination? Okay.

A. Uh-huh.

Q. Okay. So on the next one, 4974, we see your name come through. So it seems like with a hyperlink, that might have been an instruction from Mr. Krabbe or whoever you get your authorization from to perhaps not put your title as admin base secretary on my termination letter?

A. I was never --

MR. MISRA: Objection. Assumes facts not in evidence. Argumentative.

Q. (By Ms. Finger) Okay. So let's keep going here. The last one is copies of my termination letter, and this one is at 5:23 p.m., sent to everyone. And then these are all the other Bates numbers that have your name all over it. This one was at 8:04 p.m. You're still Houston supervisor base administration, and then the last one at 10:00 -- 10:23, an hour and 40 minutes before I'm terminated, you're still this title.

Here it is on the very back page.
That doesn't seem -- so right now at the base, your title would be supervisor in-flight service?
A. Correct.
Q. Okay. When did that change from 2019?
A. I don't know the specific day. I've always been a supervisor of in-flight services since I've came back to the base, but I've also been admin base supervisor up until 2021.
Q. In everybody's reference, even Judge Hanen's reference about you in his summary judgment to dismiss -- a motion to dismiss your title in Ms. Detzner's EEOC letter, everything refers to you as base and this right here (indicating). Base -- what is this in our workers' comp? Base administrative supervisor and this is you and that's your name and that's it. Doesn't say supervisor.
A. Do you want the color copies?
MS. FINGER: Sorry.
Q. (By Ms. Finger) Okay. So on this one, we're looking at 4444 and 4449, 28 through 3. And this is the OIS report that you filled out, and I'm gonna need some help because I can't even read this with --
MS. FINGER: Amit, do you want to pull it up on your computer to the Bates numbers?



MR. MISRA: 4444?
MS. FINGER: 4444 through 4449, 4428 through 4433, 4434 through 443- -- basically, 4444 through -- easy for me to say. 4444 through 4449.
MR. MISRA: Well, I guess, what questions do you have?
MS. FINGER: Right. It's just hard to read. I just want to go through here because you'll see that this is when she pulls. This goes with that sheet on the email. Here, this goes with this (indicating).
MR. MISRA: Uh-huh.
MS. FINGER: Okay? So when you're reading through it, you can see that it was pulled up at 6:20. She pulls up my old report and looks at it, if that's the first one.
And then on June 27th, there's one at 8:59 that she pulls up. 4431, 4432. And we really have to kind of go through it because the whole time, the answers here, she's doing the investigation on my injury and: "Is the case submitter the same as the supervisor? No. Has it -- is it closed? No." And then all the way back here on 4 -- and it's hard because you just think they're all the same.
Q. (By Ms. Finger) But on 4462 on July 2nd at 12:40 a.m. in the morning, Aleta, you complete my



investigation. And in here where you're saying: Is the case submit the same as the supervisor, you say "no." I can't even read it; it's so small.
And then everywhere before this where it says "investigation completed," you say "no," then finally tonight you say "yes," and then you say submitted by, who's authorizing it, and it's you.
And this means that you completed my report four days after I was already terminated. You had not -- all these say that it was not completed up until that time. And at 12:40 in the morning on July 2nd, you go in and fix this.
A. Where are you looking at? I'm sorry. What page?
Q. 4462. The other ones are June 22nd, June 27th at 8:59, June 27th at 9:15, and then somewhere here, we go in and fix it.
A. Is it further back because I don't see a 62 on my packet.
Q. 4462?
A. I have 61, 4461.
Q. I have it broken down if you wanna go to the bigger columns. This one's June 27th.
MR. MISRA: All right. Let's get your question.



MS. FINGER: Well, if she can't read it, I can't really...
MR. MISRA: She can read it.
MS. FINGER: Yeah, I can read it.
Q. (By Ms. Finger) Okay. Well, I'd like for you to read it across, when you're, like, time loss, everything. Is this a -- you know, was there a witness? Was there any, you know, I mean, it's like you're filling out a report four days after I'm terminated and you're, like, no lost time, you know, to the employee.
And then on here, here's the same thing. You write employee was at the aircraft and fell. You put there was something -- occupational injury case. You put this up here on 5709.
MR. MISRA: Again, are we getting to a question?
MS. FINGER: Yes. I wanna know why my termination happened four days before an investigation into my injury happened.
A. I don't recall. Honestly, I don't recall.
Q. (By Ms. Finger) I'll pull this one out, okay, just to be a smarty pants just because we annihilated me; we ready, aim, fire; then we ready, fire, aim; and then we have to get everything under control.
How do you terminate an employee with a

disability and a known reasonable accommodation? For four days you're going in here doing nothing and you're saying no, it's not complete; no, it's not complete.

Is the supervisor the same as a case submitter? No. That's because we're doing the little cats paw thing where we have to have someone separate. Aleta has to do it; Krabbe has to tell her. We have to put a fake title under her name so it's not all the same. I guess that's the question I'd like to know.

MR. MISRA: I mean, you're testifying. I didn't hear a question.

Q. (By Ms. Finger) I -- well, after six years probably deserve to testify a little bit because for someone to just sit there and look at you and say: No harm, no foul. I don't even -- don't even remember doing this and it's not even a big deal.

And I -- you know, didn't even think that -- it's like Tammy Holt or someone that says if you know you have this kind of devastation to someone's life and that doesn't even make you go: Let me give it 48 minutes before I shoot this out to the F.A.S.T. team and to initiate this. I don't understand it. For the life of me, I don't.

MR. MISRA: Well, we're not here to question Aleta Stansberry on her psychology, so do you



have a question about facts or --

Q. (By Ms. Finger) Yep. I'm asking: How do you -- under the law, how do you -- when someone has a --

MR. MISRA: Well, she's not gonna give you a legal conclusion.

MS. FINGER: No. I mean, under disability and under reasonable accommodation, how do you terminate someone -- okay.

MR. MISRA: Contract. We've been over this a hundred times.

MS. FINGER: The contract doesn't say you can go in and violate someone -- my contract was violated because the steps weren't taken and I didn't have a 48-hour notice and all the --

MR. MISRA: Not entitled to administrative termination because you exceeded your maximum letter of a leave of absence.

MS. FINGER: No, I didn't.

MR. MISRA: And that's what the -- yes, you did. So we can have this if you want, but we're wasting her time here and his time here.

MS. FINGER: Okay.

MR. MISRA: So either we get questions for Aleta --



MS. FINGER: I'd like --

MR. MISRA: -- that are facts --

Q. (By Ms. Finger) Well, even if -- even if it was for calling in sick, how do you terminate me before you complete the investigation? How's that question?

A. I don't recall filling it out later. Honestly, I don't recall filling it out later after you were terminated.

Q. Well, this doesn't lie. You just said it, right? You've not said that July 2nd, 12:40 a.m. is -- you said that it automatically generates and does --

A. I could --

MR. MISRA: Now you're being argumentative. She answered she doesn't recall. Either you move on to the question --

MS. FINGER: Okay.

MR. MISRA: -- or we should just close the deposition.

MS. FINGER: Okay.

Q. (By Ms. Finger) Let's go to the call logs, please.

(Exhibit 16 was marked.)

MS. FINGER: And, Amit, you provided these. These are so hard for me to read.

Q. (By Ms. Finger) These will show the call logs



that we're here -- your, whatever we were talking about, Karen and whatever. It will say: Hello. Occupational OPCMD will wait to see if we can proceed with return-to-work clearance before pursuing RAP as needed, based on what is indicated.

This is just -- but what's strange about these copies that you gave me is there's no -- there's nothing here, whereas usually this'll have the person, the work notes. This is -- here, where I read to you before.

I checked via 1 and the claim for her 8/3/14 date of injury is closed, but she has an open claim for her date of injury, which is flagged with this alert. So there's no -- this whole thing should be who it was, what it was, and we just have this little bitty thread.

Again, spoke with -- requested RAP. 12:31 with D. Wallace. Employee requested RAP, gave overview. Work notes, the work notes, everything's gone, work notes. Work notes, nothing here.

"Employee called and said she had an HCP appointment Friday." Don't know what that is. And then we come here to page 5408 and you'll see what this should be. This whole page should be lined up with the person. It's not at the top. There's nothing here. You can go on to 5409. This is what it should look like. Something has been -- all of that is gone.

And if you see here, 5/26/19: "Employee called to let us know her ESF will be on the weekend, also wanted to know her return-to-work date. Has all the notes, what it is. Kim Preston, advised employee will be texting her. Called to get an extension for next month."
And then on page 5410, you see where I requested RAP. Advised RAP would --
MR. MISRA: Is there a question for Aleta?
MS. FINGER: Yes.
Q. (By Ms. Finger) On -- I don't know if it's for Aleta or what, because with my phone logs, we can show it.
So on 5411 on 5/26 -- I have 5/25 -- there's no phone call. So there's no phone call of me calling to United to call in sick, OI. So they took it off and there's no voice recording.
Aleta, are they supposed to -- you'll see here on 6:44 p.m. at the top I called in to -- called in for my trip. Do they record phone calls, Aleta?
A. Who?
Q. Scheduling. Is it part of our contractual requirement that they preserve the --
MR. MISRA: Aleta's not here to talk about the contract.



MS. FINGER: Well, I mean, just contractual obligations.
MR. MISRA: She -- why would she be here to talk about contractual obligations?
MS. FINGER: Well, I thought she would know because she deals with it, and when you have a grievance, you have to pull those up.
MR. MISRA: Do you know if the scheduling line is recorded?
THE WITNESS: I know some of the scheduling lines are recorded.
Q. (By Ms. Finger) Well, I think it's an important part of my case that when I'm calling in for an occupational injury and then it disappears and everybody else I call disappears and the comment screens disappear while all the flight lines, all the calls I make to Flightline United, trying to get through for 47 phone calls over this.
Can you give me five minutes to look for something? I'm trying to -- and then we'll do it.
THE REPORTER: All right. We're off the record at 6:04 p.m.
(Off the record at 6:04 p.m.)
THE REPORTER: We are back on the record at 6:12 p.m.



Q. (By Ms. Finger) So on August 22nd, 2024, page 4 -- docket 159, I write you the letter about the call logs and the scheduling and the comments, and you said you would go back. I wrote down -- every Bates number is here to find out, just addressing the issues with how this was handled and my termination.
And then you wrote me back that calls made to Houston in-flight other than the records of phone calls from HR cases, which is that (indicating).
"United 53965412: United does not currently have any other records or phone calls or voicemails relevant to your claims."
But you don't have my phone call when I'm calling in and the calls before that. So I don't know how that happens that it disappears on my --
MS. FINGER: And this will be 16, right?
THE WITNESS: 16?
THE REPORTER: The call logs, right?
MS. FINGER: Okay.
THE REPORTER: Call logs, ma'am?
MS. FINGER: No. This is --
THE REPORTER: The call logs were 16, I believe.
MS. FINGER: Oh, you know what? It's still on the back of their thing. I'm sorry. It's not



a new one, Neph. Sorry.
THE REPORTER: Oh.
MS. FINGER: It's in the back right after the contract.
THE REPORTER: Okay. So no 17.
MS. FINGER: No 17 right now, no 17.
Q. (By Ms. Finger) So this one I'm just showing on August 3rd, 2014, I did light duty. Oh, no, that's the injury. On April 23rd, 2016, I did light duty, and it shows my in-flight recruiting and I was a WEAR tester. And then on 2017, August 2017 when I knew I was on crutches and couldn't walk, I applied for recruiter again and was told that I don't qualify.
I also was named the occupational injury chairperson while I was in Denver requalifying for training, which I think might have put a target on my head from the company because I was very vocal -- I know that's hard to imagine -- about the treatment of the injured workers here. And that shows I took my occupational. I had doctor's notes that just showed -- oh, that's something I want to to ask you.
Aleta, so there's not one document in my file about charters, and, you know -- and we've already talked about it. You did my aircraft, the whole catering, everything else, since the Oilers.

Page 169

So can you explain why 25 years of my life there's not -- except for one -- there's not a document about charter flights or issues that I had with in-flight or retaliation or not saying things or maybe witnessing things that were not kosher?
MR. MISRA: Objection. Compound question.
MS. FINGER: Okay.
MR. MISRA: You can go ahead and answer.
THE WITNESS: Oh, yeah.
Q. (By Ms. Finger) Was I very involved in the charter department?
A. Yes.
Q. Okay. And so was I the first charter coordinator? So I helped and I stayed in the charters for at least 25 years, so that's 35 years. Once it started I was prominently flying charters or would you associate me with charter flying?
MR. MISRA: Objection. Compound question. Go ahead and answer.
A. Yeah, I know you were involved in charters for a long time.
Q. (By Ms. Finger) Okay. Is it known that charters can warrant a lot of drama? Is there -- I'll stop. Just, I mean, is it -- are charters more complex as far as crew and designated crew and the mean girl

Page 170

thing and things can get kind of -- a little crazy with the charter department?
A. I don't know what you mean by the "mean girl thing." Is it complicated? Charters are complicated, yes.
Q. Okay. Are charter coordinators and designated crews -- is that a privilege that a lot of people want to do and feel left out when they are not selected?
A. Then or now?
Q. We can go -- if they're separately answers, then let me know, but --
A. Yes. They're separately answers.
Q. Okay.
A. So currently, they apply online just like they would for a language speaker, and then, you know, they have do to -- their record has to be reviewed. Back in the day when you were doing it, I would say -- because that was starting in Continental, correct? You were selected to be part of the charter team. So if you wanna use the word "privileged," I don't know if I would use the word "privileged" but recognized as a premier flight attendant.
Q. And as a coordinator, we could choose our crew. We have designated crew. Now, I understand they have to go through and it has to be a process so it doesn't show

Page 171

that it's, you know, picking. So it has to be more -- politically correct would be a better word. Everybody gets a shot at it; it can't be: I'm taking all of y'all on my trips and it's a club and nobody can get it, is where the problem was.
MR. MISRA: Is that a question?
Q. (By Ms. Finger) Do you remember -- I'm sure not -- but do you -- do you know Alonzo Hutchinson?
A. I recognize the name. Do I know him personally? I don't know. I've been here a long time, so I don't know.
Q. He's a black gay male flight attendant. He's in the charter department now. Does that -- no? Okay.
Do you think that if someone doesn't go along with something that the charter department -- have you heard what happens on the charters stays on the charters?
A. I don't work on charters. I don't really know much about the charters other than, you know, back in the day a long time ago when Continental -- so I don't know.
Q. Okay. It -- okay. Because I have some -- because I have a personal thing with Crystal where I believe this all stems from and I'll just leave it at that, so there's nothing you can comment about that if

Page 172

you don't know the person or anything else.
MS. FINGER: Okay. Last one, I promise. 16?
THE REPORTER: 17.
MS. FINGER: 17. I think I have only one of these. I'll read from it, then maybe you'll be kind enough to...
(Exhibit 17 was marked.)
Q. (By Ms. Finger) Do you feel that the face of United has changed from wanting younger from backstage to marketing to anything? Is there a trend towards younger -- Scott Kirby's saying: This is not a profession; you just come do it one to two years and then get out.
Is it -- do you feel that it's a more -- whereas, where we were growing through it, it was, like: Oh, yeah, fly forever and retire and get the best trips and blah, blah, blah.
Is it now -- do you see more of the turnaround in flight attendants or in the hiring flight attendants? Do you think that they are geared more towards someone that is not making this a career, let's say? Like just more -- I'm gonna go have fun for three or four years and then be done?
A. I don't know. I don't -- that was a long

question. I'm not sure I understand what you mean.

Q. Are you aware of any marketing campaigns or slogans or anything that's been put out to show that more tenured flight attendants are not the new face of United?

A. No, I'm not aware of that.

Q. Okay. All right. So I'm gonna read something here and then we can just -- if you wanna make copies or whatever. I think it's the only one I found at least.

So this is from Oscar's 2015, when he was president and CEO and is still -- I pulled it up on Flying Together.

(As read): "To my fellow employees, all of us at United share a passion for the safety of our customers and our employees. Safety is paramount, and nothing we do is so urgent that we could ever compromise to save your health. I am personally committed to these principles, and I'm confident that all of you share in that same level of commitment.

We all share in the responsibility for running a safe operation and maintaining a safe, helpful workplace. I am personally, and expect you to be, committed to our safety management system" -- parenthesis, SMS -- "and to comply -- and to comply with all industry standards and regulatory requirements



regarding safety and health.

Safety's a critical part of everything we do at United, and be safe and reliable is one of the four cornerstones of our route map -- route map business plan. We have dedicated the necessary resources to ensure our safety management system is implemented and maintained.

United expects all employees to do right thing by supporting our safety programs and abiding by their standards. While acceptable behavior could lead to -- while unacceptable behavior could lead to disciplinary action as an unnecessary outcome that no one wants, I support a non-punitive environment for good faith, reporting of hazards and errors by employees to ensure safety and operational concerns can be addressed by the organization.

The corporate safety division serves as a focal point for our SMS, that the program strength really comes from all of you and from the processes and procedures championed within each division.

United's safety policy can be found in the corporate SMS manual available on Flying Together website. Please join me in supporting the implementation and the continuous improvement of our SMS and our commitment to working safely. It is the right



thing to do for our customers and our fellow employees."

So this also how United treats injured workers. This is the management's guide and this is just five, six pages out of the book.

"All safety concerns as well as injuries must be reported immediately to management. Work injuries are not acceptable. They affect coworkers' lives, they are expensive, and they make us less productive in serving our customers. Working safely is a condition of employment. We review exceptions, the company's safety principles, and training qualifications."

And then you tell -- this is from management to be telling them -- you stated that you are aware of our current policies and would adhere to them during our meeting. I asked if you were following -- insert what the coworker told you, the doctors' recommendations, et cetera. You stated that you are and will continue to do.

"While we trust that you can prevent a future safety occurrence, we must also remind you that failure to do so as a result of not following procedures and recommended practices may result in future corrective action."

MR. MISRA: Christine, you don't have to read. We're entering that as an exhibit, so...



MS. FINGER: Okay. Well, I'm just saying all injuries can be prevented.

Q. (By Ms. Finger) This is a mentality of an airline where you have such physicality and such demands, and if this is telling you that if you report an injury that is -- they're less productive. Work injuries are not acceptable. I'm not sure how an HR department would even be able to put this out.

"All injuries can be prevented. All operating exposures can be safeguarded. In some cases, corrective actions should occur depending on the individual facts and circumstances. Foundation of an action plan will be based on the use of unsafe work practices."

I mean, I am just -- and this is reflective of United once their workers have been -- discuss each occupational injury --

MR. MISRA: Did you have a question for Aleta?

MS. FINGER: I'm asking her. Does she -- does she seem to think that -- I mean, calling in sick because the extended leave was -- 17, the safety guide -- calling in sick was okay, but is that a way -- is this three-year leave of absence implemented to get rid of/target older injured flight attendants to run them out of time? I'm sure you've heard of complaints.

Page 177

This is not -- I mean, this is flagrant amongst flight attendants.
Q. (By Ms. Finger) Let me start. Would you agree that our third party administrators, Gallagher Bassett, Sedgwick now, that there is a huge frustration with flight attendants that have to go through the workers' comp system, that they feel they're not getting the treatment; they're delayed, they run out of time, and then they separate for three years?
MR. MISRA: I'm gonna object to the extent that it's asking for an opinion. She's not --
MS. FINGER: Okay. Well, I don't know how to ask questions on that, then, if you want me to ask a question. I'm just saying if she's --
MR. MISRA: I mean, you can answer, but I'm putting out my objection that you're asking for what --
MS. FINGER: From your experience.
MR. MISRA: -- an opinion, but go ahead and answer.
Q. (By Ms. Finger) From your appearance of being around the base and listening to flight attendants and their experiences.
MR. MISRA: Same objection. Go ahead and answer.

Page 178

MS. FINGER: Okay.
A. I've heard it on both sides: some complaints, some love Sedgwick. So I've heard it both sides, yeah.
Q. (By Ms. Finger) All right. So you don't feel that a three-year leave of absence and difficulties with treating physicians not getting assigned, getting delays, not being correctly diagnosed, that there's a run-you-out-of-time to get you through that three-year maximum?
MR. MISRA: Same objection.
MS. FINGER: That's why I don't ask questions, Amit, because it's just better for me to just -- again, I don't know how else to ask it. I'm asking her opinion. Am I not allowed to --
MR. MISRA: I mean, your -- I'm just saying my objection. I'm not telling her not to answer.
MS. FINGER: Okay. But --
MR. MISRA: So my objection's gonna be on the record.
MS. FINGER: Do you not want me to ask it for her opinion or, I mean, from what she observes?
MR. MISRA: I mean, I'm not gonna get into a discussion --
MS. FINGER: Okay.
MR. MISRA: -- about what is competent

Page 179

evidence, but I mean, my objection's on the record. She's not here to --
MS. FINGER: From her experience. Is that good?
MR. MISRA: Even then, my objection's still gonna be there, so -- but she can go ahead and answer.
But if you wanna -- if you wanna restate the question just because we had this dialogue. So we have a clean record, ask your question.
Q. (By Ms. Finger) So -- and I don't mean to say its like that. You seem somewhat isolated from, I guess, maybe because you're on the concourse or I don't know. It -- I think flight attendants -- I mean, I'm not even there and I hear so much, so I can't -- I don't know how -- it seems very flagrant to me, so I just thought maybe that was something since you deal with family leave.
I know there's a huge frustration with family leave getting approved and the difficulties flight attendants go through. I'm not saying you're in it anymore but that was a huge frustration and I'm just saying I think we switched Gallagher Bassett to go to Sedgwick because of all of the problems with Gallagher Bassett and I can pick a handful of people that are

Page 180

satisfied with their treatments and not just so frustrated.
I don't even think I have a question anymore. It's fine. Just -- so for today, I appreciate your time and I want to, you know, I don't know. Like I said, I don't know how I can have so much -- you mentioned throughout everything, all my documents, Krabbe, anywhere -- and to me, you just seem oblivious that this just didn't even happen and it's the lawsuit or -- or, you know, today coming here or, you know.
Did you -- you don't have anything with my name on it? You don't -- this is just not even a -- did you check your records? Did you have anything? Any emails? Anything at all with anything that has to do with me?
A. Here today?
Q. Not today, personally for you.
A. No. Not -- I mean, on the computer, yes, because I can't delete it because we're in a lawsuit, yeah.
Q. So you do have things that you have access to; you just didn't bring them?
MR. MISRA: Christine, it's already been produced. There's nothing that she has that's already been produced.
THE WITNESS: Correct.

Q. (By Ms. Finger) Well, I will say for one thing, I don't have the injury report.
MR. MISRA: You do. It's there. It's in the P file. It's part of production.
MS. FINGER: It's not. There is: Employee was walking and tripping.
Q. (By Ms. Finger) There is no -- was this reported to OSHA?
A. I don't recall.
Q. Okay. So you do have records; you just didn't bring them? You have records that were...
A. Your P file was sent to legal, your paper file. Your electronic file is available online, and when I say "online" --
Q. Do you --
A. -- in our corporate thing. So, yes, I can access that and see it. Is that what you're asking?
Q. You have my P file? You mean my...
A. Your personnel file, the P files that we had in the back, yes.
Q. Okay. The paper ones?
A. Yeah.
Q. You still have those?
A. No. Legal has them.
Q. Well, that's what I mean.



So you-all have my paper files?
A. I think it's corporate, legal.
MR. MISRA: I mean, it's been produced.
MS. FINGER: Yes.
Q. (By Ms. Finger) So wouldn't there be something about my charters in there?
MR. MISRA: I don't want to spend time on the record --
MS. FINGER: Okay.
MR. MISRA: -- or her deposition. That's a discovery matter, so if you have any more questions for Aleta, please ask them; otherwise --
Q. (By Ms. Finger) Is there anything to do with my charters on -- in my personnel file?
A. I don't have your personnel files, so I don't know.
Q. The whatever file, the --
A. The electronic file? No. That would only be your -- your -- anything since we went electronic, which would be my process, you know?
Q. What year? I don't --
A. Like 2018-2019.
Q. Okay. So --
A. When we went to IR.
Q. So you have access to those?



A. IR, yes.
Q. Okay. But you didn't bring anything with you today from that?
A. No.
Q. Okay. Were you told to search for anything that you had my name on?
A. No. I was told not to --
MR. MISRA: She's not gonna discuss anything that she discussed with her attorney.
Q. (By Ms. Finger) But you were not told to search for any files --
MR. MISRA: She's not gonna discuss anything she discussed with her attorney.
MS. FINGER: Well, I think she already did, but okay.
Q. (By Ms. Finger) Okay. Well, I thank you for your time. And I'm sorry that, you know, it was something that made you nervous and I don't want to bring pain to anybody's life. I really don't. So I appreciate you coming and your time too. I do.
THE REPORTER: Okay. Sounds good.
Before we go off the record, Mr. Misra, I just want to reiterate that you'd like a copy of today's proceedings.
MR. MISRA: Yes, I do.



THE REPORTER: All right. Excellent.
Well, with that, we're off the record at 6:35 p.m.
(Off the record at 6:35 p.m.)

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Christine Finger, *
Plaintiff, Pro Se *
v. * Case No. 4:20-cv-04205
United Airlines, Inc. *
Defendant. *

------------------------------------------------
REPORTER'S CERTIFICATE
ORAL DEPOSITION OF
ALETA STANSBERRY
FRIDAY, JANUARY 30, 2026
------------------------------------------------

I, Nephtali Diaz, a COURT REPORTER in the State of Texas and NOTARY in and for the State of Texas, hereby certify to the following:

That the witness, ALETA STANSBERRY, was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

That pursuant to FRCP Rule 30(f)(1), request to review the transcript was not made by either deponent or party before the deposition was completed.



That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount of time used by each party at the time of the deposition:

Ms. Finger (4 hours, 57 minutes)
Pro se Plaintiff
Mr. Misra (0 hr, 0 min)
Attorney for Defendant



I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action. Hereby certified on this 13th day of February 2026.

____________________
NEPHTALI DIAZ
JANE ROSE REPORTING
74 Fifth Avenue
New York, New York 10011
1-800-825-3341
TEXAS CERT #714



INSTRUCTIONS FOR ERRATA

NOTARY PUBLIC SIGNATURE
Not required unless agreed upon by counsel that notary public signature is required.

Please return a copy of the signed errata within 30 days of receipt, unless otherwise agreed upon by counsel. Once we receive one signed errata, we will distribute an electronic copy to all parties.

RETURN A SIGNED COPY VIA FAX, EMAIL OR MAIL TO:
FAX: 1-800-825-9055
EMAIL: janerose@janerosereporting.com

Jane Rose Reporting
Administrative Offices
PO Box 542
Luck, WI 54853

ACKNOWLEDGMENT OF THE DEPONENT

I, Aleta Stansberry, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_______ ________________________________
(DATE) Aleta Stansberry

Signed and subscribed to before me this
_____ day of _________________, 2026.

____________________________
Notary Public



| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |
| ____ | _____ | ______________ | _____________________ |

A
**abandonment** 5:8
**abiding** 174:9
**ability** 9:2
**able** 29:20 66:15 90:20 117:21 145:13 176:8
**abnormal** 113:23
**abnormality** 127:13
**above-referenced** 133:16
**above-styled** 1:16
**absence** 11:24 13:16 22:24 56:9 58:6 60:5 60:10,15 79:20,22 79:23 80:4,5,14,25 90:4,12 96:4 103:13 104:25 108:4 109:13 111:23 118:23,24 120:1 129:24 135:23 136:3,17 142:19 145:7 148:13 151:22 152:22 153:1 154:9 162:18 176:23 178:5
**absent** 130:18 144:9 148:12,14
**accept** 8:21 99:12 100:3
**acceptable** 174:10 175:7 176:7
**accepted** 99:24 100:1 100:7
**access** 40:2,4,13 53:25 79:2 85:20 141:14 180:20 181:17 182:25
**accident** 70:24 96:22 124:25 127:10
**accommodate** 11:13
**accommodated** 90:23 118:18
**accommodates** 118:11
**accommodation** 10:7 10:10,12 11:7,15 75:25 76:4,5,23 78:15 80:13 81:22 82:2 85:13,23 86:1 87:15,17,24 90:16 90:17,19 92:19 93:3 93:6 108:18 118:10 118:17 119:6 120:13 161:1 162:8
**accommodations** 9:20 10:6 11:8 76:2 76:18 77:24 81:8 85:19 120:11
**account** 147:9 148:15 149:1 150:17
**accountable** 137:22
**accurate** 95:12 97:23 99:16,23
**accurately** 110:10
**Achilles** 9:12
**ACKNOWLEDGMENT** 189:1
**action** 34:12 38:1 39:24 136:13 150:16 174:12 175:23 176:12 187:3,5
**actions** 90:10 176:11
**active** 11:22 29:2,6,10 32:3,3 37:16 44:15 44:15 60:25 82:17 83:10,24 88:25 89:14 96:11,13 99:3 102:16 103:18 104:8 105:13,20 107:24 135:4 136:7 137:12
**ADA** 77:24 78:5,14,18
**add** 88:22
**adding** 52:7 124:23
**additional** 90:3,9
**address** 53:25 58:9 66:2 81:3
**addressed** 49:20 174:15
**addressing** 167:5
**adhere** 175:14
**adjust** 67:7,9
**adjuster** 127:14
**adjustment** 99:6
**admin** 19:13 24:3 34:11 37:25 38:16 41:24 42:3,5,8,12 48:5,11,17 58:2,4 59:17,23 60:1,5,10 60:15 68:10,19 72:3 73:9,18,18 74:4 77:12,15 91:9 106:19 124:9,10 131:6 132:22,25 134:2,20 144:5,22 147:9 148:15 149:1 150:17 156:13 157:8
**administer** 79:23
**administered** 27:5
**administration** 58:20 147:8,20,24 155:25 156:23
**administrative** 18:14 27:8 28:1 47:25 79:21 98:16,24 100:20 102:17 109:10,12,24 115:9 115:10 117:17 133:6 148:1 157:15 162:16 188:19
**administratively** 23:1 46:24 47:14 61:13 97:4 98:18 103:25 104:3,9 106:15 108:1 114:21 115:19 120:7 121:7,12 154:13
**administrator** 8:17 18:16,20 19:9 21:18 81:24 91:4
**administrators** 54:9 177:4
**advice** 116:3
**advise** 60:22 86:11 91:21 152:7
**advised** 90:9 100:23 116:21,23 133:8 165:4,8
**AFA** 14:1 55:20 56:19 56:22 58:1 97:12,20 99:6 100:1 102:10 119:14
**AFA-CVA** 103:24
**AFA-CW** 98:1
**AFA-CWA** 98:5,8,22 99:17,21
**AFA/CBA** 97:4
**AFC** 86:25 92:1
**affect** 175:7
**affidavit** 99:15
**affirm** 4:15
**afraid** 30:21 137:5
**age** 25:5 102:23
**aggravated** 67:21
**aggressive** 13:8,17 14:9
**ago** 15:21 171:20
**agree** 177:3
**agreed** 188:4,9
**agreement** 8:10 94:2 120:12 136:13 152:24
**ahead** 15:9 17:11,21 18:11 21:10 22:14 23:21 40:1 42:15 46:14 48:21 49:22 59:6,16,22 64:19 65:15 68:6 73:14,18 74:1,10 76:8 77:1 78:4,17 79:1 83:13 84:4,16 112:7,24 114:9 126:12 128:25 149:6 169:8,19 177:19,24 179:6
**aim** 160:23,23
**aircraft** 30:10,16 54:18 117:14 125:1 145:7 149:17 160:12 168:24
**airline** 176:4
**airlines** 1:6 4:8,12 58:12,15 73:21 81:8 87:22 103:2,4 108:10 152:20 154:12 185:8
**airplane** 30:20 85:1
**airplanes** 147:2
**airport** 80:24 90:7 103:6 108:11
**alarm** 120:16
**alert** 10:14,25 64:15 91:20 117:16 164:12
**Aleta** 1:11,14 3:4 4:6 4:22 5:6 12:22 13:5 36:4 38:2 40:17 50:18 52:15 53:15 55:19 57:24 58:20 60:20 61:3 66:8,16 66:18,25 67:1 68:3 95:9 97:17 100:16 101:3,15,18 102:22 110:21 112:17 115:8 115:10 117:18 121:15 123:3 128:25 132:18 140:19 144:6 146:8 147:7,9,23 148:1,10 149:9,17 150:12 152:8 155:12 158:25 161:6,25 162:25 165:9,12,18 165:20 168:22 176:18 182:12 185:14,20 189:4,12
**Aleta's** 102:20 120:21 165:24
**allegation** 14:15
**allegations** 16:5
**allow** 11:24 118:12
**allowed** 41:22 178:14
**allowing** 7:12
**Alonzo** 171:8
**altered** 110:12
**alternate** 118:22
**ambiguous** 14:19 18:11 63:12
**Amit** 2:11 4:11 36:6 51:12,18 66:1 69:22 72:2 93:12 139:24 144:17 157:24 163:23 178:12
**amit@misralegal.com** 2:16
**amount** 186:4
**anesthesia** 25:6
**ankle** 7:19 8:5 9:5 30:17,18,18 34:8 37:22 54:18,18 67:10 117:13 119:3 124:21 125:1,2,8,9 134:23 135:3
**annihilated** 160:22
**answer** 14:22 15:9 17:11,21 18:11 21:10 22:14 23:21 34:15 40:1 42:15 48:21 59:7,16,22 63:9 64:19 65:6,15 65:17,20 68:7 71:12 73:14 74:1 76:8,19 77:1 78:4,17 80:7 83:13 84:4,16 112:7 112:24 114:9 115:22 120:25 136:12 139:7 139:8 149:6 150:21 169:8,19 177:15,20 177:25 178:16 179:7
**answered** 48:21 64:21 74:19 84:2 114:18 136:19 149:21 163:14
**answering** 5:23
**answers** 5:15,16 27:16 56:1 145:22 158:19 170:10,12 189:6
**anticipates** 86:12
**anxious** 113:19
**anybody** 31:18,23 60:9 84:21 85:10 113:3 114:21 126:16 126:24
**anybody's** 183:19
**anymore** 95:18 112:2 133:20 150:13 179:22 180:3
**anyone's** 138:2
**anyway** 79:3 136:2
**appeal** 3:19 99:12 100:2,6,20,22 132:14,17,21 133:5 133:7,9,16,18
**appearance** 177:21
**appearances** 3:3 4:10
**appearing** 110:3
**appears** 12:8 41:21 109:18
**applicable** 58:14,14

130:18
**applied** 9:21 110:5 168:12
**apply** 9:23 170:14
**appointment** 56:4,20 58:11 67:19 91:12 164:20
**appreciate** 5:22 138:3 180:4 183:20
**apprised** 91:3
**appropriate** 55:24 81:9,25
**approval** 39:17 59:8 92:11
**approve** 153:21
**approved** 45:8 46:6 179:20
**April** 7:13 9:22 11:19 24:15,17 89:3,23 90:15,19 91:8 92:12 92:22 96:5 103:13 105:3,7 168:9
**April/May** 81:15
**arbitration** 99:5 100:14
**argumentative** 59:15 72:15 73:14,24 78:4 78:16 83:19 107:19 109:6 114:17 115:22 139:2 156:17 163:14
**ASAP** 38:18 72:21
**asked** 11:8 14:19 27:7 28:7 45:21 47:23 48:20 56:13 84:1 114:18 136:18 146:21 147:3,4 153:6,25 175:15
**asking** 12:7 14:14,15 15:19 47:9 73:9,17 83:12 84:13 85:3 106:18,22,25 111:10 148:20 151:25 155:10 162:2 176:19 177:11,16 178:14 181:17
**asks** 125:12
**aspect** 86:4
**assertions** 118:8
**Assessment** 86:25
**assign** 88:2
**assigned** 8:24 13:16 32:4 56:11 82:21 178:6
**assignment** 82:24,25 83:14 84:7 90:1 154:18
**assist** 80:19
**assistance** 29:3 37:17
**assistant** 70:9
**assisted** 61:11
**associate** 96:18 169:17
**associated** 109:13
**Assumes** 126:11 156:16
**assuming** 46:14 48:2 49:22 131:6 138:11
**attached** 1:22 38:10 38:12 58:4 91:15 101:5 102:14 130:21 189:9
**attachment** 91:15 102:14
**attempted** 7:14
**attend** 138:12
**attendance** 87:6
**attendant** 19:21 20:4 20:18 28:17 29:5,8 31:13 34:20 38:21 39:23 41:6,7 42:12 45:16,25 48:25 75:1 75:8 81:17 88:25 89:6 90:8 96:7,12,19 98:9 100:6 103:15 103:19 104:6 105:5 105:9,14,21 107:21 116:19 118:14 119:9 120:7,10,14 134:19 135:6 137:2,7,8,11 137:14 138:25 144:7 144:24 145:2,4 152:8 170:22 171:12
**attendants** 7:10 8:11 34:24 39:13 47:13 47:16 48:5 79:24 81:14 85:6 108:3 118:11,15 119:23 120:18 135:1,22 136:16,25 172:20,20 173:4 176:24 177:2 177:6,22 179:14,21
**attendant's** 39:16,19 39:21 91:10 112:3
**attended** 60:20 154:16
**attorney** 97:20 99:14 183:9,13 186:9
**attorneys** 5:7
**attorney-client** 106:1
**attributed** 110:12
**August** 7:8 8:20 9:20 9:24 10:4 30:1 38:10 94:10,19 121:23 142:7 146:25,25 167:1 168:8,11
**author** 63:8
**authority** 23:10 59:10 110:5
**authorization** 45:14 73:10 156:12
**authorize** 26:4 46:4
**authorized** 11:3 23:4 32:11 45:15 67:14
**authorizing** 159:7
**autogenerated** 55:8
**automatically** 163:11
**available** 40:12 89:9 135:8 174:22 181:13
**Avenue** 2:20 187:19
**awaiting** 11:8
**aware** 47:15 63:17 111:21 135:14 136:16,22,24 137:1 137:9,15,16 173:2,6 175:13
**a.m** 27:4 61:2,14,19 62:1 74:12 134:17 144:1,14 158:25 163:10

**B**

**B** 3:11 102:14
**back** 6:21 8:4 9:23 13:5,6,6 14:4,6 15:23,25 20:25 21:3 21:8,14 22:6,25 24:13,24 25:1,4 26:9 26:17 27:1,11,16 28:14,23 29:24 30:7 31:19 32:12 33:7,10 37:1 38:19 41:1 44:12,14 46:13,21 49:14 50:23 51:24 53:1 60:8,21 61:2 62:2,7,23 66:25 67:1 72:21 77:4,7 78:11 82:20 84:22 88:24 92:11 93:5 94:12,13 94:21 95:1,4 96:23 102:9 110:20 111:17 114:7 117:3 118:12 121:21 126:15 133:3 133:15 135:13 137:3 138:13 141:18 142:22 145:8 151:13 152:6,12 157:1,7 158:22 159:18 166:24 167:4,7,25 168:3 170:16 171:19 181:20
**background** 12:1,11 27:14 76:3
**backstage** 172:10
**bad** 114:21 139:9
**badge** 58:13,13 80:24
**balances** 58:16
**band** 11:11
**bandage** 11:18
**bank** 127:16,21 155:8 155:8
**bar** 7:9 9:5
**barely** 31:1 119:3
**bargaining** 8:9 94:2 152:24
**Barnes** 150:10
**base** 19:8,8,13 21:14 21:18 48:17 49:5 54:9 58:19 68:10,19 77:12 79:6 94:4 109:13 112:13 115:8 115:9 117:17 137:13 138:22 147:8,19,23 148:1 156:13,23 157:2,8,8,13,14,15 177:22
**based** 18:1,2 22:23 90:23 164:5 176:13
**baseless** 118:5
**basically** 7:7 19:7 21:12 59:9,10 68:23 77:6 158:3
**basis** 78:8 82:3
**Bassett** 7:25 8:13 9:6 119:1 177:4 179:23 179:25
**Bassett's** 8:16 10:16
**Bates** 36:24 54:13 55:10 89:18 94:14 95:12 156:21 157:25 167:4
**BCC** 63:3,22 64:4,5,7 64:10,14,20,23,24 65:3,6,9,19
**BCC'd** 62:10,11 63:15
**BCC'g** 133:13
**BCC's** 62:13 63:16
**began** 9:19
**begged** 30:23 96:25
**beginning** 96:4 103:13 105:1
**begun** 61:7
**behalf** 47:21 63:20 120:21
**behavior** 174:10,11
**believe** 16:25 33:4 45:20 49:16 61:5,8 66:18 81:17 113:12 167:23 171:24
**believed** 66:20
**belongs** 12:4
**benefits** 9:1
**best** 138:2 172:17
**Beth** 14:2
**Bettencourt** 100:7 101:2 132:15 134:5
**better** 8:18 26:7 66:22 171:2 178:12
**bid** 29:17,21,21
**Bidaldi** 10:18
**bidding** 30:1
**bids** 29:18
**big** 25:20 79:11 83:7 161:16
**bigger** 93:17 148:17 159:23
**binding** 154:6
**birthday** 115:7
**bit** 7:6 28:15 34:19 35:19 66:22 131:22 161:13
**bitty** 164:14
**black** 171:12
**blah** 86:24,24,24 100:7 120:5,5 145:15,15,15 172:18 172:18,18
**blank** 91:6 127:15
**blanket** 82:18
**blatant** 118:6
**blew** 93:17,19 150:11
**blockage** 25:5
**blown** 149:11
**blurry** 130:16
**board** 99:6
**Bob** 23:12 26:18 27:7 27:21 28:14,23 32:16 34:1,3,25 37:12,19 38:4,21 39:5 40:2,13 41:14 43:12 44:2,11,14 46:21 57:10 58:21 59:8,9 60:9 62:8,19 63:25 64:2,8,9,15 73:8 74:22 95:22 115:17 116:5 133:13 134:13,17,18 135:13 137:5 138:7,8
**Bob's** 99:15
**body** 123:23,24 125:14
**Bohanon** 144:2 149:1 150:6
**bolster** 118:7
**book** 175:4
**books** 147:25
**bothers** 112:8

**bottom** 134:14
**BOULEVARD** 2:13
**box** 56:24 188:20
**brain** 140:16
**brake** 114:16
**break** 5:20 25:8 51:15 111:11 117:9
**Brenda** 53:19 54:24 69:16,19 148:14 149:22 150:2,3,10
**Briana** 127:14
**bring** 12:21 90:10 180:21 181:11 183:2 183:19
**broken** 44:20 67:20 159:22
**brought** 6:16 66:10
**build** 30:2 83:8
**building** 7:17
**built** 31:25 32:1,2 44:18,24
**Bush** 103:5 108:11
**business** 152:21 154:10 174:4
**butchered** 36:12

C

**C** 2:1 4:1
**cabin** 58:15
**call** 3:23 11:21 17:18 27:17 28:7,8 31:14 31:19,20,20,22 32:6 32:14 41:14 43:2,22 44:6 45:16,17 46:1 50:19,24 51:1,4 55:17 57:15 66:13 66:14 69:11,13,14 70:25 75:24 80:6,9 96:21,25 100:13 121:20 123:6,10 125:13 128:4 129:23 135:8,11 142:25 144:10 145:17,23 146:5 148:18 154:21 155:3,5 163:20,25 165:15,15,16 166:15 167:2,13,18,20,22
**called** 17:24 24:20 25:11,11,22 26:3 27:22 34:6 37:20 43:20,22 44:4,19,24 44:25 45:1 48:24 49:7 56:19,20 66:16 67:2,3,20 69:10,11 72:19 96:15,20 102:6 103:21 105:16 106:4,6,7 111:22 118:24 123:6,12,13 123:14 124:4 129:25 135:2 143:15 144:11 145:2,4 154:17,22 155:4,6 164:19 165:1,5,19,19
**calling** 22:25 31:19 41:23 45:6 48:25 51:5 57:16 63:18 67:24 121:19 127:1 139:12 155:1 163:4 165:15 166:13 167:14 176:20,22
**calls** 15:8 23:20 31:8 31:18 34:14 35:2 42:14 45:2 63:7 67:25 78:25 117:23 118:1 145:9 149:5 165:20 166:16,18 167:7,8,11,14
**camera** 110:9
**cameras** 126:8
**campaigns** 173:2
**cancel** 58:16
**cane** 7:23
**Capability** 87:1
**capital** 44:5
**care** 8:2,18 55:25 73:22
**career** 73:12 114:14 172:22
**Carol** 24:21 25:10 32:25
**cart** 7:9 9:5
**case** 1:5 6:1 51:1 55:25 65:3 67:8 88:11 100:3,7,13 116:23 122:10 123:4 129:12 130:9 133:17 134:21 135:14 138:3 151:7 158:20 159:2 160:13 161:4 166:13 185:7
**cases** 151:10 167:9 176:10
**catering** 19:24,25,25 20:13 21:4,12 168:25
**Cato** 96:18
**cats** 161:5
**cause** 1:16 114:15 120:16 153:9
**CBA** 97:6 102:11 104:4,9 107:25
**cc** 43:3 64:2
**CCS** 54:13 141:13
**cc'd** 42:25 44:11 46:17 69:19 70:3 74:8 101:4
**cc'g** 42:21
**cc's** 41:16
**center** 18:23 29:19 69:6,15 79:6 81:25 86:9 126:8 127:11 130:4 131:3 134:24 139:12
**Central** 51:22,25 111:18
**CEO** 173:11
**CERT** 1:24 2:19 187:22
**certainly** 48:4 93:2 99:23 100:1
**Certificate** 3:6 185:12
**certified** 187:5
**certify** 185:19 187:1 189:4
**cetera** 83:6,7 89:9 175:17
**chain** 66:2
**chair** 55:20 120:3
**chairperson** 168:15
**challenging** 97:6,11 97:25 99:17 102:12
**championed** 174:20
**chances** 146:1
**change** 8:10 31:15 44:17 45:13,25 46:4 57:13 83:1,5 88:13 91:3 93:18 139:20 151:2 155:22 157:5 190:1
**changed** 77:8 84:14 84:17 145:14 147:2 148:25 149:2,21 155:19 172:10
**changes** 3:7 50:2,5,6 50:11 102:9 152:21 153:6,7,25 154:4,4 189:8
**channels** 95:15
**charge** 3:12 21:20 48:5
**charter** 169:3,11,13,17 170:2,6,19 171:13 171:15
**charters** 19:23,25 20:1 21:5 168:23 169:14 169:16,20,23,24 170:4 171:16,17,18 171:19 182:6,14
**check** 51:1 76:1,14,17 82:5 180:13
**checked** 91:17 94:8 164:10
**checks** 26:15
**Chefs** 20:15
**Chelsea** 20:16 21:7
**chip** 96:22
**choose** 28:10 170:23
**chopped** 36:16 51:13 57:20
**choppy** 32:18
**chose** 118:22
**Christina** 41:19
**Christine** 1:4 2:4 4:7 5:3 27:22 34:4,5 37:19 43:19 44:3 53:23 60:20 66:15 89:17,25 90:18 92:24 99:10,12 100:21 101:8 103:9 103:12 108:14 113:18 122:12,19 132:17 133:6 134:19 137:15 151:10 152:5 152:19 175:24 180:22 185:5
**CIRCLE** 2:5
**circling** 38:25
**circumstance** 104:5
**circumstances** 103:10 108:15,24 133:17 176:12
**circumvent** 127:7
**Civil** 1:21
**claim** 31:23 32:9,9,10 38:11,17 45:14 46:9 55:15 67:12,13,15 69:4 70:25 91:17,19 95:7 118:5 125:23 126:1 127:14 145:14 145:23 164:10,11
**claimed** 38:9 118:21
**claiming** 8:18
**claims** 8:16 18:16 38:10 39:7 40:5 123:25 167:12
**Claire** 32:25
**clarification** 28:24 37:13
**Clark** 38:4 58:1 70:12 70:14
**class** 24:17 25:13 27:9 28:20,22 42:6 89:9 90:14
**classification** 46:4 47:6 88:3,6
**classified** 8:23 128:3 142:14
**classifying** 128:5,6
**clause** 111:23 133:12
**clean** 179:10
**clear** 28:18 91:1,1 120:9 121:6
**clearance** 41:1 80:15 80:21,23 164:4
**cleared** 11:19 90:1
**clearly** 72:23 87:21 136:2 153:19
**clerical** 109:13
**Cleverly** 26:16,16
**climbing** 7:18
**clinic** 69:1
**clock** 9:16
**close** 72:20 89:6 163:17
**closed** 91:19 151:7,9 158:21 164:11
**closing** 29:19
**club** 171:4
**clue** 17:3 56:25
**coach** 14:20
**code** 129:3,6,16 140:19
**coded** 45:8 128:7 129:7 155:7
**codes** 140:24 141:2 142:12
**coincidence** 105:23
**cold** 7:18
**collapsed** 30:19
**collection** 47:19
**collective** 8:9 94:2 152:23
**color** 157:18
**column** 147:17
**columns** 159:23
**come** 21:8 22:16 23:3 23:6 30:20 40:22 41:16 49:5 55:5 62:7 69:17 112:21 118:12 134:12 142:22 151:15 156:10 164:21 172:13
**comes** 30:20 144:17 150:17 174:19
**coming** 6:1 13:12 15:10 18:4 30:7 31:25 74:6 93:5 94:25 116:7 180:10 183:20
**comment** 15:2,3,4 22:9,18 142:18 149:12,12 166:15 171:25
**comments** 91:13 131:2 149:13 167:3

**commitment** 81:6 173:19 174:25
**committed** 173:17,23
**committee** 120:3
**committment** 85:15
**common** 63:17
**commonly** 64:16
**communicate** 80:25
**communicated** 113:4
**communicating** 42:19
**communication** 72:23
**communications** 64:9 106:1 116:16
**communicative** 95:15
**comp** 34:7,10 37:23 43:23 44:5 45:1,6,7 54:8,14 84:23 88:10 102:23 106:7 129:12 129:13,14 137:18 140:20,21,22 141:17 141:18 142:19,24 148:1 157:15 177:7
**company** 11:24 15:3 20:17 39:9 47:21 53:20,22 58:17 59:11 63:21 69:7 81:2 88:9,15 93:6 98:19 99:25 107:9 120:13 121:2,3 133:20 135:21 154:8 168:17
**company's** 175:10
**company-offered** 80:13
**comparison** 109:16
**comped** 74:8
**compensation** 9:1 54:1 55:17 82:1 87:11 92:8
**competent** 102:23 178:25
**complaint** 12:24 15:15
**complaints** 8:15 176:25 178:2
**complete** 38:17,19 41:22 72:21 80:3 117:21 137:6,21 158:25 161:3,3 163:5
**completed** 34:5 37:19 40:25 41:4 42:4 43:19 44:3 54:4 56:6 57:18 82:19 124:1 134:22 136:6,7 159:5,8,10 185:25
**completely** 136:9 151:17
**completing** 137:22
**completion** 137:24
**complex** 169:24
**complicated** 170:4,4
**complications** 9:12
**comply** 90:3 137:23 173:24,24
**Compound** 17:10,20 21:9 22:13 23:5 76:7 112:6,23 113:20 169:6,18
**comprehensive** 118:9
**compression** 11:11 11:18 91:14 92:16 92:21
**compromise** 173:16
**computer** 29:20 82:12 111:3 141:12 157:25 180:17
**concern** 115:13
**concerned** 28:16 34:19 60:21 61:11
**concerning** 39:11
**concerns** 56:2 174:15 175:5
**concierge** 26:5
**conclusion** 79:1 162:6
**concourse** 19:11 48:15 66:17 179:13
**condition** 80:11 86:2,5 86:10,22 175:9
**conduct** 5:10 98:10
**conducting** 5:6
**confident** 173:18
**confidential** 39:20
**confidentiality** 112:18
**confirmed** 11:6 28:4 67:20
**confirms** 99:11
**conflicting** 89:4
**confused** 16:2 18:1 61:20
**confusing** 24:13
**confusion** 35:19 99:22
**consent** 39:21
**consequently** 87:25
**conserve** 139:16
**consider** 138:4
**considered** 29:6,10 82:3,17 88:25 102:16
**considering** 138:15
**consistently** 109:12
**consultation** 28:17 34:20
**contact** 27:5 54:2 58:11,18 75:3,4 80:14,18 88:17,20 89:18 91:4 115:11 143:21
**contacted** 80:20 89:20 90:9 145:15,21
**contained** 39:18 102:24
**contains** 39:15 109:20
**contemporaneous** 109:14,22 110:8
**Continental** 7:9 19:16 19:17 20:10,13,14 21:7 81:13 170:18 171:20
**Continental's** 84:10
**Continental/United** 19:15
**continual** 13:6
**continue** 8:13 35:8 88:1,19 175:17
**continued** 8:20 124:12 124:17
**continuous** 174:24
**contract** 39:8 44:23 48:3 74:2,3,3 100:22 107:15 121:8 133:8 162:10,12,13 165:25 168:4
**contractual** 44:17 57:13 59:3 73:23 83:5 98:15 107:6,8 154:19 165:22 166:2 166:4
**contractually** 97:5 98:17,25 104:1
**Contrary** 118:7
**contrast** 109:15,22
**control** 28:1 160:24
**convenient** 151:21
**conversation** 15:11 42:23 64:14 81:20 90:18 113:9
**conversations** 111:25 115:23,25 116:5,6 118:2
**convey** 110:5
**conveyed** 115:9
**Cooperate** 55:25
**coordinate** 88:18
**coordinator** 169:14 170:23
**coordinators** 170:6
**copied** 62:12
**copies** 26:12 39:10,14 43:5,11 52:6 62:11 65:18 156:19 157:18 164:7 173:8
**copy** 1:24 36:2,13,18 40:11,13 51:11 52:21 53:6 58:7 65:19 66:12 102:13 111:9 183:23 188:8 188:11,14
**Cordova** 11:6 94:11 117:13,16 145:12
**core** 12:23
**core4** 30:5 31:2
**corner** 54:12 142:7
**cornerstones** 174:4
**corporate** 81:1 174:17 174:22 181:16 182:2
**corporation** 38:1
**correct** 20:20 21:25 22:21,22 23:2 40:19 43:23 44:6,7 45:19 46:8 49:9 51:3 53:4 53:5 60:6 70:11,13 70:23 74:25 75:6 77:4,5 78:2 102:13 103:1 104:12,17 108:5,6 109:5 111:24 121:4 122:7 128:4 130:24 131:2 132:25 157:4 170:18 171:2 180:25 189:6
**corrected** 149:23
**Correction** 61:14
**corrections** 189:8
**corrective** 175:22 176:10
**correctly** 178:7
**corrects** 61:10 102:4
**COUA** 122:21
**could've** 137:23
**counsel** 4:9 5:8,10 6:16 88:4 98:22 100:5 187:1 188:4 188:10
**course** 30:18 34:12 66:20 84:18
**court** 1:1,18 2:23 4:5 5:12 39:22 53:6 93:13 101:1,1 116:23 147:4 185:1 185:17
**courtesy** 145:19
**cover** 35:22 57:18 82:18 95:9 122:14 122:15,16
**coverage** 145:20
**covered** 144:4
**coworker** 175:16
**coworkers** 175:7
**CQ** 27:6,7,11,24 28:2 28:3 30:8
**CQR** 89:9
**crazy** 170:1
**created** 54:15
**creates** 87:18
**crew** 13:2,23 21:3,4,5 22:17 32:4 56:17 82:20 93:25 94:3 169:25,25 170:23,24
**crews** 170:7
**criminal** 12:1
**Cristine** 27:4 81:5
**critical** 174:2
**crushed** 7:9 119:2
**crutches** 9:10,23 24:25 119:4 168:12
**crying** 95:17
**Crystal** 18:5 38:4 39:7 56:20 57:3,7,25 70:21 100:18 112:18 112:20 113:1,6 116:5 132:14 133:2 134:3,4,11,12 138:7 139:3 171:23
**current** 30:8 48:10 53:25 81:3 86:4 87:9 87:17,24 90:21 130:21 152:19 175:14
**currently** 39:11 48:12 48:15 99:2 167:10 170:14
**Curtis** 58:2,2
**customers** 173:15 175:1,9
**cut** 36:16 43:15 44:13 55:10 61:2 131:6
**cutting** 8:11

**D**

**D** 4:1 164:16
**Dale** 112:10
**damage** 8:4 9:10 67:21
**dang** 66:20
**dark** 13:3
**dash** 38:7
**date** 4:3 22:3 24:19 25:13 28:2 34:11 37:25 41:24 42:3,5,8 42:13 50:20 54:15 54:15 75:12,14,15 80:5 87:5 89:10,15 90:11 91:18,19 105:12 121:13 122:21 123:4,5 124:3,4,7,11,16,21

131:16 144:25 145:2 145:4 149:3,16 164:11,12 165:3 189:12
**dated** 102:25 127:13
**dates** 155:20
**day** 7:6 22:7 24:18 29:15 30:3 31:1 32:7 32:14 44:16 48:25 50:15 56:7,22 57:12 57:23 60:23 66:16 74:7 75:16,18,20,21 83:4 90:15 102:2 104:13 116:17 117:14,18 124:12 130:12 134:23 135:12 141:25 145:21 157:6 170:17 171:20 187:6 189:16
**days** 11:25 13:9,14 14:11 15:5,12 24:17 27:6 32:11 33:5 71:1 71:15 72:11 131:24 150:19,20 159:9 160:9,18 161:2 188:9
**day-to-day** 87:9
**DD** 48:16
**dead** 24:18
**deadline** 9:17
**deal** 25:20 47:5,13 57:12 161:16 179:17
**deals** 166:6
**Dean** 60:14 115:17 138:14,15
**Dear** 81:5 89:25 90:17 152:18
**decade** 110:18
**December** 10:9 81:4 81:20 86:21
**decision** 11:8 23:3,7 23:10,11 25:9 28:12 28:19,21 29:13 59:11,18,20,23,25 65:11 109:19 110:13
**decisions** 60:4,9
**declaration** 3:18 19:14 95:22,25 97:15,19 97:23 98:15 99:15 99:23 101:25 102:14 102:18,20,24 103:1 108:8 109:16 110:10 117:11 154:22,23
**declare** 99:7 104:11
**declined** 97:12 98:1 99:18 102:19
**dedicated** 174:5
**default** 147:18
**Defendant** 1:7 2:10 4:8,11 103:2 185:9 186:9
**defendants** 5:11
**delay** 8:19 13:6
**delayed** 28:2 177:8
**delays** 8:2 10:21 120:2 178:7
**delete** 180:18
**Delvin** 56:12
**Delvin's** 56:12
**demands** 176:5
**Den** 58:1
**denial** 8:20 67:11
**denials** 10:21
**denied** 21:21 97:7,8 97:10
**Denny** 14:2 134:12,15 134:17 135:14 137:4
**Denver** 27:6 41:15,20 49:17 56:13 69:6,15 168:15
**deny** 153:21
**department** 7:17 17:16 23:19 24:2 27:8 88:6 90:25 96:24 126:22,24 169:11 170:2 171:13 171:15 176:8
**Depended** 77:14
**depending** 176:11
**depends** 64:1
**deponent** 185:24 189:1
**deposed** 18:8
**deposition** 1:10,14 4:6 5:5,6 6:11,15 113:16 113:22 116:12 163:18 182:10 185:13,21,25 186:2 186:5
**depositions** 113:7,14 116:8
**Derrick** 10:18
**description** 90:22 124:13,21,25
**deserve** 161:13
**designate** 39:10
**designated** 95:5 115:8 169:25 170:6,24
**designed** 88:7
**desk** 19:11 26:6 48:16 118:19
**despite** 8:6,21
**detail** 18:13,13
**detailed** 80:10
**details** 6:6 80:14
**determination** 110:13 146:8
**determine** 110:9 151:1 156:7
**Determined** 9:2
**Detzner** 121:18
**Detzner's** 157:13
**devastation** 161:19
**diagnosed** 178:7
**diagnosis** 8:2 9:6
**diagnostic** 8:22
**dialogue** 179:9
**Diaz** 1:18 2:23 4:4 119:19 185:17 187:17
**different** 6:17 43:8 67:2 74:13 141:2 143:2 150:8,9
**difficult** 53:21 86:3
**difficulties** 178:5 179:20
**difficulty** 86:12,13
**direct** 9:5 68:5
**directed** 23:9
**directing** 68:8
**directly** 27:21 64:11 75:5
**director** 23:15,16,17 63:4 70:21 94:3 138:22
**disabilities** 81:9 85:17
**disability** 78:23 118:3 120:5 153:3 161:1 162:7
**disabled** 85:18 136:1
**disappear** 166:15
**disappears** 150:16 166:14,15 167:15
**disbelief** 67:22
**discharge** 100:21 132:20 133:6
**disciplinary** 98:9,11 98:12 100:2,6 174:11
**discipline** 49:4 130:22 130:23 131:1
**disclose** 86:10
**discovery** 12:9 109:11 182:11
**discretion** 104:3 106:15,17 107:1,3,4 107:7,10,11,16
**discretionary** 107:14
**discrimination** 3:12 118:4
**discuss** 61:19 62:16 80:7 136:14 176:15 183:8,12
**discussed** 10:5 87:14 90:18 100:12 183:9 183:13
**discussion** 88:16,19 128:18 178:23
**discussions** 73:16 112:17,19 113:1 116:24
**dismiss** 97:23 103:3 157:12,12
**disproportionately** 8:10
**dispute** 95:10 98:15 98:23 99:1,3 102:10 102:11,13 133:19 134:6
**distortion** 119:5
**distribute** 188:11
**DISTRICT** 1:1,1 185:1 185:2
**disturbed** 112:4
**disturbing** 14:7 48:4
**division** 1:2 20:14,16 21:12 174:17,20 185:3
**doc** 5:5
**docket** 94:24 145:10 167:2
**doctor** 8:3 24:15 91:7 153:4
**doctors** 11:17 54:8 175:16
**doctor's** 40:4 92:15 168:20
**document** 3:16,17 12:9 16:4,22 21:21 24:7 40:6 41:11 65:18 94:10 102:1 110:20 132:6 147:22 147:24 155:14 168:22 169:2
**documentary** 110:8
**documentation** 10:25 19:2,3,4 40:3 53:18 62:9 79:25 80:1 90:24 91:24 96:6 103:14 105:4,8 109:11 110:3 141:22 141:24
**documented** 96:25
**documents** 3:21,22 6:10,17 12:21 17:12 109:24 128:18 133:23 147:21 155:2 156:7 180:7
**DOI** 144:25
**doing** 12:19 40:23 41:17 62:17 78:10 115:12 121:4 156:6 158:19 161:2,5,16 170:17
**Dominic** 11:6 13:1,23 25:22 26:8,15 27:3 27:16 28:3,16 31:19 32:23 33:9 34:19 40:20 45:12 55:18 56:14,15,24 66:12 67:23 68:5 69:21 89:20 94:11,17,18 94:19,23 95:17 117:12,24 118:2 121:23 133:22 145:12
**Dominic's** 13:11
**door** 15:10 30:10,14 41:21
**Dorota** 144:15,17
**doubt** 125:23,25
**downstairs** 18:4 21:8 26:5 48:9 49:5
**Dr** 10:4,7 11:19 67:18
**drama** 169:23
**DRC** 99:2 100:11
**dropped** 34:9 37:23 44:9 135:5 137:23
**drug** 80:23 89:8
**due** 5:7 9:13 47:14 79:25 80:22 86:1,4 134:20 135:2 153:1 153:11,18
**duly** 1:15 4:23 185:20
**duration** 86:23 154:19
**duress** 5:7
**duties** 87:9 118:21
**duty** 9:15 11:20 19:11 38:6 58:14 81:14,15 81:17 89:15,24 90:1 91:2 92:13 104:8 107:25 118:13 152:8 154:15 168:8,9

**E**

**E** 2:1,1 3:11 4:1,1 5:1
**earlier** 82:24
**early** 46:16 87:19,20
**easier** 93:17
**easily** 135:5 137:22
**easy** 158:4
**EE** 38:4 54:17,20 124:25
**EEOC** 102:18 157:13
**effect** 22:12

**effective** 11:21 50:20 79:22 89:18 90:2 91:22 96:8 103:15 105:5,9 144:5,7 154:16
**effectively** 8:12,25
**effort** 87:14
**eight** 102:6
**EISO** 91:11
**either** 14:17 20:6 25:5 111:9 123:12 137:8 137:14 162:24 163:14 185:24
**elected** 57:8
**electronic** 181:13 182:18,19 188:11
**elevate** 30:25
**eligible** 151:1
**Elizabeth** 13:24 29:6 56:19,21 57:9 60:19 61:3 62:4,14,24 88:23 100:9 101:4 134:11,18 135:8,10
**Elizabeth's** 99:8 121:18 134:4
**email** 3:13,13,14,14 3:15,15 23:24 24:2 26:10,11 27:13,17 28:6 35:18 38:22 41:19 42:21 46:12 53:20 58:21 61:15 62:3,7 63:6,8,16 64:1,3,5,6,16 65:10 66:14 69:19,20 81:1 94:22 99:9,10 107:11 109:10,22 111:7 113:11 115:12 115:12 126:23 158:10 188:14,16
**emailed** 23:25 55:19 69:7 113:12 131:5
**emailing** 31:19 39:5 40:23 55:18 63:23 64:10,11
**emails** 3:20 10:13 11:5 29:7 32:15,15 32:24 35:5 42:25 43:3 56:13 62:10,19 63:15 66:2 73:16 93:9,9 94:7,25 115:16 120:4 155:23 180:13
**EME** 30:3
**employed** 103:4 108:10 187:2
**employee** 18:23 38:4 40:11 54:4,7,16,17 55:16 72:19 75:4,11 75:23 79:5 80:3 81:25 86:3,5,7,9,11 86:15,18 87:2,4,8,15 87:25 88:4,8,15,17 88:20 91:7 93:4 112:8 122:19 124:2 124:7,12 125:21 145:6 146:6 149:17 160:10,12,25 164:16 164:19 165:1,4 181:6
**employees** 8:14,19 10:22 73:22 81:9 85:14,18,24 113:10 151:9 173:13,15 174:8,14 175:1
**employee's** 87:9,13 87:16,24 88:3,6,12
**employer** 124:18
**employment** 18:15 81:6 85:16 97:5 103:10,11,25 104:2 106:14 108:14,15 154:12 175:10
**enable** 85:20 87:15
**enabling** 8:12
**enclosed** 80:3
**ended** 151:3
**ends** 91:11
**engage** 44:17
**Enrique** 143:19
**ensure** 61:12 69:10 80:22 118:14 174:6 174:14
**ensuring** 137:14
**entering** 175:25
**entire** 21:12 86:17 89:11 143:21
**entitled** 7:12 162:16
**environment** 7:19 174:13
**equal** 81:6 85:16
**equally** 118:4
**errata** 188:1,8,10 189:9
**errors** 174:14
**ESC** 54:6 137:13
**escalated** 10:17 145:12
**escorted** 56:23
**ESF** 56:3,6 80:3 91:11 92:4,13 165:2
**ESFs** 91:16
**especially** 18:4
**ESQUIRE** 2:11
**essential** 81:11 85:21 87:16 88:2 90:20 118:15
**established** 132:15
**Esther** 117:5
**et** 83:6,7 89:8 175:17
**evaluation** 7:23 54:5
**evening** 31:8
**event** 98:6
**everybody** 25:19 30:7 30:19 31:4 82:15 84:21 166:14 171:2
**everybody's** 70:22 157:10
**everyone's** 71:13
**everything's** 133:22 164:17
**evidence** 66:4 84:16 126:12 156:17 179:1
**exacerbating** 7:19
**exact** 22:3 100:25 104:24 144:3
**exactly** 105:1 106:21 106:24 137:11
**Examination** 3:1,5
**exceed** 98:20 136:11
**exceeded** 44:21 58:6 73:15 97:3 103:23 104:7 107:23 108:3 131:5 136:17 144:4 154:19 162:17
**exceeding** 134:20
**Excel** 93:19
**Excellent** 184:1
**exceptions** 175:10
**excessive** 7:18 71:16 95:2
**excited** 24:23
**excuse** 10:10 24:17 24:19 66:25 79:15 91:18 112:17 134:11 134:15
**execute** 110:5
**executed** 104:12
**exercising** 146:6
**exhibit** 3:12,12,13,13 3:14,14,15,15,16,17 3:18,19,20,21,22,23 3:24 7:3,4 12:8 16:16,17 26:12,13 35:9 36:2,10 37:1 43:6,9 51:10 52:2,3 57:21,22 69:25 79:7 79:13 93:11 95:20 122:3 132:11 134:9 139:23 163:22 172:8 175:25
**exhibits** 53:7 140:11
**exist** 110:17
**existed** 137:17
**exiting** 54:17 124:25 145:7 149:17
**expect** 44:22 173:22
**expects** 174:8
**expedited** 57:18
**expense** 9:3
**expensive** 175:8
**experience** 177:18 179:3
**experiences** 7:25 177:23
**expiration** 154:11
**explain** 86:18 169:1
**explained** 27:23
**Explorer** 53:21
**exposures** 176:10
**expressed** 10:15
**Express'd** 50:20
**extend** 81:21
**extended** 9:17 11:24 111:22 151:22 176:21
**extension** 121:11 165:5
**extensive** 8:4 9:9
**extent** 97:24 99:16 177:10
**extreme** 5:7
**extremely** 8:1
**eyes** 114:23,24

**F**

**face** 119:17 172:9 173:4
**faced** 8:15 9:12
**facilitate** 88:18
**facilitates** 87:7
**fact** 21:21 22:23 28:19 42:2 74:6 94:12,19 100:25 104:23 118:5 130:2
**facts** 84:15 89:3 102:25 126:11 156:16 162:1 163:2 176:11
**failed** 9:6 38:11,15 131:4 144:6
**failure** 175:20
**faith** 174:13
**fake** 30:13,14 161:7
**fall** 96:21 125:1
**false** 147:13,14,14,14 147:14,16
**familiar** 6:5,22 16:23 16:24 77:24 78:5,18 78:18
**familiarity** 6:9
**familiarize** 12:22
**family** 13:14 19:9 21:21,22 62:4,24 78:12 179:18,19
**far** 6:5 12:6 17:8,12,13 19:3 59:17 60:2 120:22 142:2 169:25
**faster** 75:23
**fastest** 75:10
**fax** 54:4 188:14,15
**faxed** 80:4 86:24
**fazes** 135:16
**February** 10:13 79:16 79:17 187:6
**Federal** 1:21 50:19
**FedEx** 51:7,8 56:24
**FedEx'd** 58:8
**feel** 5:16 17:23 58:18 106:17 114:7,20 115:14 170:8 172:9 172:15 177:7 178:4
**feeling** 66:18,22
**feelings** 138:24
**Felipe** 38:5
**fell** 54:18 160:12
**fellow** 173:13 175:1
**felt** 14:9 65:9
**Fifth** 2:20 187:19
**fight** 44:22
**figure** 31:9 52:4
**file** 10:24 39:19 41:25 42:9 45:4 58:8,8,9 68:21 79:3,4 93:6 98:8 128:12 131:23 168:22 181:4,12,12 181:13,18,19 182:14 182:17,18
**filed** 12:24 94:24 97:6 97:24 98:7,22 99:16 99:24 100:5 101:5 102:2,10
**files** 181:19 182:1,15 183:11
**filing** 116:22
**fill** 25:19,25 54:9 127:7
**filled** 123:25 130:7,25 157:22
**filling** 127:2,5 160:9 163:6,7
**fills** 25:23 91:7
**FINAL** 1:24
**finalized** 87:1
**finally** 8:3 26:10 67:3 67:12 159:5

**financially** 187:4
**find** 16:25 23:18 29:23 36:22 41:10 48:4 64:14 130:6 137:15 148:22 150:10 167:5
**fine** 33:1 139:18,25 180:4
**Finger** 1:4 2:4 3:5 4:7 5:2,3 6:13,14 7:5 12:3,6,10,14,17,20 12:23 14:17,20,23 15:1,14 16:18,21,23 17:6,13,22,23 18:17 21:15 22:15,16 23:6 23:24 24:9,11,12 26:14,23,25 27:22 34:4,5,17 35:6,7,10 35:12,15,21 36:3,6,9 36:11,21,25 37:3,6,8 37:19 39:2 40:5,7,8 42:2,18 43:1,5,10,12 43:19 44:2,3 45:10 47:22,25 48:8,23 51:9,11,17,20 52:1,5 52:10,12,13,15,17 52:19 53:3,8,15,17 57:21,23 59:2,9,19 59:25 61:25 63:10 63:14,22 64:25 65:17 66:1 68:2,10 69:22,24 70:2 71:15 72:1,3,16 73:1,7,20 74:5 76:11 77:3 78:7 78:21 79:4,7,11,14 83:16,21,22 84:13 84:19 85:5,12 93:1,8 93:12,22 95:19,21 96:1,3,4,5,9,14 97:2 97:6,18,19 98:11,18 99:10,13 100:17,18 100:21,24 101:9,12 101:16,20,23 102:1 102:15 103:12,16,20 103:22 104:2,25 105:3,10,15,18 106:3,3,10,12,14,23 107:2,20 109:7 110:15,16 111:11,19 112:10 113:24 114:19 115:25 116:7 117:12,18 118:18,20 120:24 121:1,5,17 122:2,4,6,12,19 126:15 127:2,5 128:16,19,21,24,25 132:5,12,17 133:6,9 134:10,19 136:9,21 139:5,10,11,13,15 139:23 140:3,6,12 140:16,18 142:6,14 144:16,19 146:16,18 146:20,21 148:7,9 148:22,23 149:8,9 151:4,10 152:1 154:25 156:18 157:19,20,24 158:2 158:7,12,24 160:1,4 160:5,17,21 161:12 162:2,7,12,19,23 163:1,3,16,19,20,23 163:25 165:10,11 166:1,5,12 167:1,16 167:19,21,24 168:3 168:6,7 169:7,10,22 171:7 172:2,5,9 176:1,3,19 177:3,12 177:18,21 178:1,4 178:11,17,20,24 179:3,11 181:1,5,7 182:4,5,9,13 183:10 183:14,16 185:5 186:6
**fingerprint** 80:23
**fingerprinting** 11:25 29:9 90:6
**fingerprints** 89:8
**Finger's** 41:20 97:25 103:9 108:14 118:5 118:8
**finish** 5:23 82:11
**fire** 146:6 160:23,23
**fired** 144:8 153:8
**firing** 107:4
**firm** 32:20
**first** 4:23 19:16,24 22:25 26:15,24 37:10 38:12 40:2 45:22 54:2 55:6 56:22 57:24 74:8 76:19 79:15 82:23 82:25 83:14,17,23 84:7 90:13 96:11 97:7,8,15 98:4,5 99:20 102:3,18 103:18,21 105:13,20 106:13 117:10,21 118:20 124:9 131:4 137:3 139:19 143:19 143:25 154:18 158:15 169:13
**first-step** 99:21
**first/last** 124:4
**Fischer** 32:20
**fit** 59:11
**five** 13:5 46:20 142:4 166:19 175:3
**five-minute** 46:21
**fix** 159:12,17
**flag** 114:15 126:3
**flagged** 10:14 91:20 164:12
**flagrant** 177:1 179:16
**flags** 82:6
**flat** 11:11 92:19
**flight** 7:10 8:11 19:21 20:4,18 28:16 29:5,7 31:13 34:20,23 38:21 39:12,16,19 39:21,23 41:6,7 42:12 45:15,25 47:13,16 48:5,25 57:12 75:1,8 79:23 81:14,16 85:5 88:24 89:6 90:8 91:10 96:7 96:11 98:8 100:6 103:15,18,22 104:6 105:5,9,13,21 107:21,23 108:3 112:3 116:19 118:11 118:13,14 119:9,23 120:7,10,14,17 127:15 134:19,25 135:6,6,22 136:16 136:24 137:2,6,8,11 137:14 138:25 144:7 144:24 145:2,4 152:7 166:16 170:22 171:12 172:20,20 173:4 176:24 177:1 177:6,22 179:14,20
**Flightline** 67:2 166:17
**flights** 96:16 105:17 106:5 169:3
**flown** 34:6 37:20 43:20 44:4 137:25
**fluky** 57:11
**fly** 44:16 57:12 67:8 82:21,23,25 83:4,14 83:17,23,23 84:7,11 84:20,24 85:1 131:4 144:6 172:17
**flying** 11:13 19:23 33:16 112:25 121:19 169:16,17 173:12 174:22
**focal** 174:17
**follow** 10:23 74:2 107:8
**followed** 43:14
**following** 58:10 88:13 99:7 107:15 117:18 144:6 154:17 175:15 175:21 185:19 186:3
**follows** 4:23
**foot** 67:9
**forced** 8:21 118:6,6
**foregoing** 104:12 189:5
**forever** 172:17
**form** 3:12 25:19,24,25 34:14 54:4,7,7 80:3 80:6 86:20 91:7 92:1 92:5,8,15,18 95:7 104:17 189:8
**formally** 11:7
**former** 93:24
**formerly** 10:5
**Fortner** 14:2
**forward** 5:13 6:16 58:22 99:9
**forwarded** 91:24 119:24
**forwarding** 39:6
**forwards** 138:7
**fought** 7:22
**foul** 161:15
**found** 10:24 54:11 66:23 133:11 173:9 174:21
**foundation** 78:8 176:12
**four** 30:5 131:24 139:16 142:4 159:9 160:9,18 161:2 172:23 174:3
**foursome** 64:13
**fourth** 93:16
**FRCP** 185:23
**free** 58:14,18 101:18
**Friday** 1:12 92:6 164:20 185:15
**Friday's** 100:13
**friends** 113:2
**front** 130:10 141:1
**frustrated** 180:2
**frustrating** 8:1
**frustration** 177:5 179:19,22
**fulfill** 120:10
**full** 11:20 38:5 89:14 89:24 90:1 91:2 92:13 123:2 154:15
**fully** 92:13
**full-time** 123:1,2 127:22
**fun** 172:23
**function** 81:11
**Functional** 87:1
**functions** 85:21 87:16 88:2 90:21 109:13 118:15,16
**fundamental** 78:13
**further** 7:22 9:1 62:5 62:25 74:14 88:19 136:14 159:18 187:1 187:3
**future** 5:10 88:13 175:19,22
**F.A.S.T** 18:23 24:20 24:21 26:1 29:22 32:25 89:11 90:9 137:13 150:25 151:6 151:6 152:1,7,9 155:24 161:21

**G**

**G** 4:1
**Gallagher** 7:25 8:13 8:16 9:6 10:16 118:25 177:4 179:23 179:24
**garment** 92:21
**garments** 91:14 92:16
**Gary** 89:5
**gay** 171:12
**geared** 172:21
**general** 64:20
**generate** 69:4
**generated** 109:19
**generates** 163:11
**getting** 29:16 47:7 67:12,12 92:24 106:1 117:23 118:1 118:2 127:6 133:14 146:16 148:21 160:15 177:7 178:6 178:6 179:20
**girl** 169:25 170:3
**give** 12:10 16:15,18 25:8 26:6,18 29:12 32:10 37:8,10 43:16 46:9 50:14 51:17 52:10,21 102:23 120:22 161:20 162:5 166:19
**given** 37:2 45:14 48:1 59:8 97:2 103:22 118:14 137:9 185:22 186:1 189:6
**gives** 61:20
**giving** 47:18 73:10 89:4
**glitch** 82:14
**go** 6:21 7:2 12:18 15:9 17:11,21 18:11 20:7

21:10 22:14 23:21 25:18 27:24 29:12 29:13 30:15,24 31:7 35:7 40:1 42:5,15 44:15 45:12,19 46:3 46:14 48:21 49:22 52:22 55:15,15 56:23 57:3 59:6,16 59:22 60:8,18 61:2 62:2 64:19 65:15 68:6 69:18 71:6 73:14,18 74:1,10 76:8 77:1 78:4,11,16 79:1 83:13 84:4,16 84:22,22,23 85:1 97:14 107:13 111:19 112:7,24 114:9 116:25 117:4 118:25 121:25 126:12 127:19,22 128:25 129:9 134:14,15 137:3 139:11,18 143:5,7 149:6,9,14 150:24,25 151:2 158:8,18 159:12,17 159:22 161:20 162:13 163:20 164:24 167:4 169:8 169:19 170:10,25 171:14 172:23 177:6 177:19,24 179:6,21 179:23 183:22
**God** 4:17
**goes** 26:8 28:25 29:1 30:19 37:14,15 49:3 61:17 91:6 97:22 102:5,5 131:19 146:12 158:9,10
**going** 13:2,6,6 14:4 24:24 29:22,24 38:3 40:22 48:24 49:21 57:2 63:16 64:14,15 67:8 74:10 76:4 82:5 88:24 92:18 93:4 94:17,20,25 95:14 100:13 101:3 105:25 116:16 133:22 143:18 146:14 148:7 149:9 156:18 161:2
**golden** 84:25
**gonna** 5:21 12:3,12 14:8,18 18:10 24:12 24:24 29:22 30:6,21 30:24 31:10 39:25 43:10,16 51:9,17 52:1,5 53:8 59:14 61:13 63:3 69:13 72:10 73:13 79:7 80:9 81:12 84:19,22 95:22 101:7,19 111:19 114:11 117:4 120:19,22 121:17 125:6 127:5,19 128:17 139:7,8,16 157:22 162:5 172:23 173:7 177:10 178:18 178:22 179:6 183:8 183:12
**good** 24:24 30:17,24 73:20 93:9 133:3 138:19 174:13 179:4 183:21
**Google** 5:5
**gosh** 30:22 72:9
**gotta** 31:5
**gotten** 29:6 37:4 47:16 69:16
**governing** 104:9 107:25
**grace** 25:18
**granted** 152:10 153:2 153:12
**great** 25:21 33:1 51:16 111:12 135:24
**grievance** 97:6,8,9,12 97:24 98:1,4,7,8,12 99:16,18,20,24,25 100:8,10,23 101:6 116:21,22 120:3 133:8 166:7
**group** 2:12 13:10,11 13:12 81:17,18 94:20 119:10
**groups** 86:11 116:19
**growing** 172:16
**Guam** 96:23
**Guerra** 117:5
**guess** 5:13 6:9 7:1 30:13 31:12 62:13 93:6,8 108:22 119:4 125:21 141:10 149:20 158:5 161:8 179:13
**guide** 54:1 55:16 147:25 148:1 175:3 176:22
**guided** 23:9
**guidelines** 81:7 107:8 107:15
**Guy** 56:11

**H**

**H** 3:11
**half** 8:12 51:15 111:13
**hand** 4:14 56:10
**handbook** 3:24 82:14 109:10
**handbooks** 109:23
**handful** 179:25
**handle** 13:13 18:22 68:19 109:1
**handled** 18:23 21:22 79:5 94:11 109:3 136:20,22,25 167:6
**handling** 8:16 19:25
**hands** 27:18 107:16
**handwritten** 36:1
**Hanen's** 157:10
**happen** 15:13 63:10 135:18 180:9
**happened** 10:22 15:21 16:1 43:3 66:19 69:5 70:24 114:2,6 135:5 145:12 146:2 160:18 160:19
**happens** 167:15 171:16
**happy** 24:9 25:1 136:14
**hard** 16:25 24:25 26:12 32:17 43:16 44:12 51:12 158:7 158:22 163:24 168:18
**hardship** 87:18,21
**harm** 161:15
**Hashtag** 67:11
**hazards** 174:14
**HCP** 164:19
**head** 13:4 168:17
**header** 66:7
**heads-up** 28:15 34:21
**heal** 118:9 135:3
**healed** 138:1
**health** 90:25 173:17 174:1
**hear** 12:12 15:2 27:21 84:23 100:23 126:15 133:9 161:11 179:15
**heard** 16:9 18:2 48:6 49:2 67:1 85:4 100:25 132:15 143:20 171:16 176:25 178:2,3
**hearing** 73:5 98:4,5 99:20,21
**heart** 24:22 25:10 28:9 94:23
**Heckman** 39:8 57:25 70:21 100:18 133:3 134:3 138:7 139:3
**HEIGHTS** 2:13
**held** 103:6 108:12 137:22
**Hello** 92:22 164:2
**help** 4:16 56:1 145:22 157:23
**helped** 169:14
**helpful** 173:21
**hereto** 1:22
**hesitate** 91:4
**Hey** 13:4 45:18 66:15 66:25
**hi** 15:11 60:20 62:4,24 89:5 134:18
**Hibbard** 13:24
**Hibberd** 56:19
**Hickey** 97:20 102:4
**hidden** 149:13
**High** 2:5 133:4
**higher-ups** 57:11
**highlighted** 148:18
**Hill** 56:12
**hip** 7:19 8:4
**HIPPA** 39:8
**hire** 122:22
**hiring** 172:20
**history** 3:12 6:5 93:2 130:11,21 131:3 144:1 148:25 149:16
**hit** 13:19
**hitting** 67:10
**hoc** 110:2
**hold** 26:21 27:19 29:11 31:22 32:23 36:19 49:12
**holding** 74:23 109:25
**Holt** 11:5 14:6 16:6 22:8 29:7 57:9 61:5 61:18 62:13,19 82:15 161:18
**Holubeck** 93:13,14
**home** 30:8 31:7 58:8 92:21 141:12
**honestly** 138:2 160:20 163:6
**hope** 26:7 41:17
**hopefully** 41:18
**hospital** 24:22 67:18
**hotel** 30:24
**hour** 51:15 58:21 73:12 75:22,23 107:18 111:13 114:14 124:4 156:24
**hours** 17:19 32:1,13 37:23 44:9 57:15 67:7 69:14 71:14 80:21 127:21 128:1 128:2,8,8 129:2,3 186:6
**house** 50:20
**Houston** 1:2 2:14 41:9 58:19 60:2 69:17 77:12 98:22 103:6,8 103:8 108:11 117:16 134:19 148:2 156:23 167:8 185:3
**Houston-based** 60:4 155:25
**How's** 163:5
**hr** 46:15,25 47:7,10,12 47:16 48:6,18,22 49:23 74:18,20,23 86:8 87:4,10 88:4,10 167:9 176:7 186:8
**hub** 41:9 55:15
**huge** 177:5 179:19,22
**human** 81:24 114:13
**hundred** 118:8 142:24 162:11
**hundreds** 155:1
**hurry** 141:10
**hurt** 34:24
**hurting** 54:19 125:4,5 149:18
**Hutchinson** 171:8
**hyperlink** 109:21 110:23,23 111:3,5 155:12 156:10
**hypothetical** 24:7 40:1 59:6 64:19 65:15 69:9 71:12 83:13 114:9
**hypothetically** 138:20
**H-Y-P-E** 111:6
**H07** 143:12
**H0734** 145:1
**H0757** 145:5
**H0906** 143:14 145:3
**H1032** 143:10 145:1 145:18

**I**

**IAH** 103:6 108:12
**ice** 30:24
**icon** 91:20
**ID** 80:24 90:7
**idea** 16:11,13 95:17
**identification** 58:12
**identified** 9:4 109:12 109:17
**identify** 82:2 85:19 87:14
**illness** 55:22 153:1,11 153:17,18

**imagine** 18:4 168:18
**immediately** 9:4 23:25 25:11 31:7 38:24 54:5 55:22,24 56:20 115:4 175:6
**impact** 9:6
**impacted** 8:11
**impairment** 8:25 119:1
**implementation** 81:16 104:8 107:25 174:24
**implemented** 174:6 176:23
**importance** 133:4
**important** 34:3 53:6 78:9 166:12
**imposing** 87:12
**impossible** 110:16
**improper** 24:6 39:25 59:6 64:18 65:15 71:11 73:25 83:13 114:8 120:2
**improvement** 174:24
**inactive** 29:1 37:15 152:20
**incentive** 74:9
**incident** 14:16 16:25
**incidents** 6:6,22 39:12
**include** 63:5 64:7 91:25 116:2
**included** 35:5 64:23 65:10 130:15
**includes** 86:19 186:3
**including** 9:12 152:22
**inconsistent** 110:7
**Incorporated** 103:5
**INDEX** 3:1
**indicate** 86:21
**indicated** 100:12 154:9 164:5
**indicates** 91:13
**indicating** 6:18 33:22 92:17 117:19 122:8 143:8 149:13 152:13 152:21 157:14 158:10 167:9
**individual** 64:22 65:1 82:3 136:7 176:11
**individually** 45:23
**individuals** 85:17
**industry** 173:25
**influence** 5:15
**info** 137:10
**information** 38:13 39:16,18,23 40:6,9 61:6,9 79:2 86:23 89:4 101:15 125:19 126:14 130:3,14 186:1
**informed** 145:20
**inhibit** 5:16
**initial** 54:5 86:19 94:9 129:24
**initially** 43:13 45:5,9 116:22 150:24
**initiate** 10:11 57:24 86:7 161:22
**initiated** 10:7 41:8 91:22 152:9,10
**initiating** 32:16
**injured** 8:11,14,18 10:16,21 11:4 17:16 22:5 24:2,5 31:15 38:24 42:12 55:21 76:15 82:6 117:20 125:1 145:20 168:19 175:2 176:24
**injuries** 7:20 8:23 9:14 9:18 39:11 47:7 68:21 123:21 149:16 175:5,6 176:2,7,9
**injuring** 54:18
**injury** 7:8 10:14 15:22 16:1 17:18,25 18:15 18:22 19:1 23:18,22 31:9 32:12 35:1 38:9 38:17 39:11 41:16 43:23 45:5,16 46:1 53:24 54:15 55:11 55:12,13,14,22 56:2 57:17 66:14 68:25 69:1,1,20 71:6 75:25 76:16 87:12,19 91:18,19 94:9 95:1,7 95:9 96:14,18,24 97:1 102:7,8 103:21 105:16 106:4 117:17 118:20 122:7,14 123:4,5,24 124:12 124:16,21,23,24 125:8,13,14 126:2 128:21 135:25 144:11,25 145:3,5,9 146:3,6 148:14 153:2,12,20 158:19 160:13,19 164:11,12 166:14 168:9,14 176:6,16 181:2
**insert** 175:15
**inserted** 149:3
**instance** 1:15
**instances** 87:10,23
**instigate** 107:12
**instruct** 88:4 139:8
**instructed** 117:16
**instruction** 110:12 156:11
**INSTRUCTIONS** 188:1
**instructor** 20:7
**instructors** 30:11,20 145:11
**insulted** 17:2
**integrated** 22:2
**integration** 122:21
**intensive** 9:11
**intent** 73:2
**interactive** 78:1 81:23 85:23 88:8,16
**Intercontinental** 108:11
**interest** 138:3
**interested** 187:4
**interests** 5:12
**interference** 62:15
**internal** 55:14 109:10 109:23 110:12
**International** 103:6
**interpretation** 102:12
**intervals** 46:21
**interview** 13:1 40:24 85:25 89:21 94:18
**intro** 12:2
**introduce** 52:1
**investigation** 14:8 16:7 22:10 46:22 48:24 49:3,11,24 59:12 65:12 74:14 74:21 123:25 126:4 158:19 159:1,5 160:18 163:5
**investigations** 38:19 49:6 72:22
**investigator** 10:23
**invited** 10:11
**involved** 18:6 26:18 27:7 49:6 65:3,4 87:12 88:11 112:21 132:20 133:21 169:10,20
**involves** 81:23
**involving** 39:12
**in-flight** 9:23 17:2 19:12,13 20:24,25 21:11,13,17 29:5 39:12 40:12 77:9,17 77:20 90:7 94:4 103:5,7,8 108:10,13 109:7,18 110:1,22 115:10 132:18 147:8 147:19,23 148:3 155:13 157:3,7 167:8 168:10 169:4
**in-flight's** 28:19
**IOR** 124:11
**IR** 40:11 130:20 182:24 183:1
**Ironically** 67:4
**ISM/purser** 58:14
**isolated** 179:12
**issue** 30:21 72:18
**issued** 10:23 58:5 144:5
**issues** 7:22 10:15 57:6 167:5 169:3
**items** 58:10,12 152:8
**it'll** 142:7
**i.e** 83:5 89:8

**J**

**James** 67:18 70:7,8
**Jane** 1:25 2:18 4:5 187:18 188:18
**janerose@janerose...** 188:16
**Jania** 150:9
**January** 1:12,17 4:4 79:15 92:6 95:23 102:3 185:15
**Jarrett** 100:19 132:16 133:3,4,15
**JCBA** 81:16 97:25 98:23 99:3,5,17 152:25 153:9
**Jennifer** 70:7,8
**Jennifer's** 70:15,17,18
**jetway** 30:13,14
**job** 19:5,6 28:11 77:7 81:11 88:2 90:22 112:9 114:4,4 118:19 138:1
**jobs** 85:25 86:4
**join** 174:23
**joint** 8:9 94:2 152:23
**Jordan** 53:19 54:24 69:16,19 148:14 150:10
**Josh** 26:5 27:13
**Judge** 157:10
**judgment** 157:11
**July** 13:25,25 27:9,10 28:21 32:2 56:18,21 67:9 95:16 99:11 115:7 132:16 133:11 134:10,13,17 135:14 137:4 138:8,11 144:2,14 146:12,23 148:17 152:2 158:24 159:11 163:10
**jump** 32:5
**jumping** 107:17
**jumps** 49:12
**June** 25:13 27:24 29:14,14 32:1 34:2 37:18 50:17 54:15 66:13,24 67:13 96:10,12,14 103:17 103:19,20 105:11,14 105:15,19 109:9,24 117:14,22 141:7 142:10 144:5,25 145:1,2,5,16,18 146:12,22 158:16 159:15,15,16,23
**juror** 139:6
**justify** 110:13

**K**

**Kaiser** 112:10
**Karen** 10:15 11:9 91:9 164:2
**Kari** 31:3,10
**Karpierz** 144:15,17
**keep** 67:24 68:22 81:2 91:3 125:7 149:9 156:18
**keeping** 81:5 92:11
**Ken** 119:19
**kept** 39:20
**key** 58:14,15 96:17
**kicking** 13:8
**kidding** 30:22
**Kilayko** 93:21,22 94:3
**kill** 59:13
**killing** 67:10
**Kim** 31:16 100:12 165:4
**kind** 6:21 7:2 10:19 12:1 15:20 26:12 59:15 63:13,19 67:10 72:14 73:25 76:3 97:9 113:22 138:21 147:17 158:18 161:19 170:1 172:6
**Kirby's** 172:12
**kitchen** 19:24 20:7,19 21:2,7
**knew** 22:20 56:14,15 57:5 67:3,19 74:7 130:1 135:21 168:11
**know** 5:21,24,25 6:3,4 6:8,8,20 10:10 11:3 13:7,9,15,20,21,21 13:22,23 14:10,12 14:13 16:8 17:14,23

18:8,13,14,15 20:9 23:14,22,23 24:4 25:12,15 26:7,25 27:14 30:15 31:10 31:10 32:4 33:4,18 34:15,16,21 35:4,14 37:6 38:18 41:18 47:2,3,8,10 49:7 50:19 54:22 57:2,14 58:3 60:2 61:16 62:8 62:14 63:15 65:5,5 65:20,22 66:23 67:23 68:8 71:12,13 71:17 72:21 74:19 76:9,11,12 78:19 83:25 84:16 93:22 96:22 101:19 107:22 107:22,22 108:17,22 108:24,25 112:4 113:13,13 114:11,23 116:20 117:24 119:10,12,17,18 120:2,20 121:22 123:14 124:7 126:21 127:1 128:10 129:17 134:1,18 135:10,16 136:11 139:18 141:12 143:4 144:20 144:23 146:2,3 147:17 149:6,7,21 149:22 150:21 155:14,19,20 157:6 160:7,8,10,17 161:9 161:17,18 164:20 165:2,3,11 166:6,8 166:10 167:14,24 168:17,23 169:20 170:3,11,15,20 171:1,8,9,10,11,18 171:19,21 172:1,25 177:12 178:13 179:14,16,19 180:5 180:5,6,10,10 182:16,20 183:17
**knowing** 17:13 18:5 29:5
**knowledge** 63:20 87:8 102:25 103:9 108:13
**known** 14:5 32:4 82:20 85:22 119:20 135:4 161:1 169:22
**knows** 14:15 23:22 47:23,24 50:22 121:3
**kosher** 169:5
**Krabbe** 17:17 23:12 26:18 27:7,19,21 28:14 32:16 34:25 38:21 39:7 40:2 46:21 57:11 59:8,9 60:10 62:8,19 63:25 64:2,8,9,15 71:20 73:9 74:22 95:22 96:13 98:14 101:25 104:23 106:18 107:12 115:1,17 116:6 117:10 121:3 133:13 134:13 135:13 138:7 153:7 153:25 156:11 161:7 180:7
**Krabbe's** 58:21 97:15 97:22 106:24 154:23

**L**

**label** 53:13 127:19
**labor** 23:15,16 59:10 63:4 64:7 131:5
**lack** 103:3
**ladies** 31:3
**lag** 131:22
**laid** 102:11 104:19 136:2
**Lake** 31:3
**language** 170:15
**lapsed** 90:12
**large** 93:19
**lasting** 80:17
**laughed** 138:18
**laughing** 138:25
**law** 32:18,20 78:15 162:3
**lawsuit** 15:15 16:10 17:9 18:6 180:9,18
**lawyers** 144:21
**lead** 33:6 69:6 174:10 174:11
**leading** 73:20 78:3 115:21
**learn** 9:11
**learned** 24:25
**leave** 7:12 8:8 9:16 11:24 13:15 19:5,9 21:21,22 22:24 25:22 29:13 31:14 31:20 38:15,16,23 44:19,21 45:11 46:24 49:18 58:6,7 60:5,10,15 72:20 73:15 75:12,14,16 75:19 78:12 80:2 83:15 90:12 96:4 97:3 98:20 103:12 103:23 104:7,25 107:24 108:4 111:23 118:23,24 120:1,9 131:5 134:20 135:23 136:3,11,17 142:19 144:4 145:7 148:13 151:22 152:22 154:9 154:12,20 162:18 171:24 176:21,23 178:5 179:18,20
**leaves** 13:14 47:15 152:23 153:1
**leaving** 34:1 110:18
**LEC** 39:10
**LECP** 135:10
**led** 103:10 108:15
**Lee** 58:2,2
**left** 7:19 8:4,5 9:5 20:10 22:17 30:18 34:8 37:22 54:18,18 67:1 95:16 117:13 117:18 124:21 125:1 125:1,7,9 142:6 170:8
**leg** 13:8
**legal** 2:12 39:22 65:23 78:25 104:16,18 116:3,4 162:6 181:12,24 182:2
**legally** 154:6
**legitimate** 66:5 114:22 114:24
**legitimize** 110:13
**lends** 97:9
**length** 44:21 97:3 152:23
**lesser** 120:5
**letter** 10:20 13:18 22:21 49:18 50:2,7 51:7,8 57:24 58:5,22 60:22 66:6 68:11 71:19,21 73:4,8,8 77:11 79:15 94:1,8 99:8,8 104:2 106:14 107:18 109:4,19 110:19,22 115:13 119:9 120:4 132:23 133:1 134:4 135:20 144:5 148:4 152:18 152:19,21 153:8,9 153:23 154:1,10 156:14,19 157:13 162:17 167:2
**letters** 19:2 88:23
**letter's** 58:7
**letting** 24:4
**let's** 35:7 50:19 51:1 60:18 62:13 78:11 101:25 106:2 116:25 121:25 139:11,18 156:18 159:24 163:20 172:22
**level** 97:13 98:2 99:18 130:21,23 173:19
**lie** 163:9
**life** 46:12 62:17 114:2 139:1 161:19,22 169:1 183:19
**light** 9:15 67:22 81:14 81:14,17 118:13 168:8,9
**light-duty** 7:14
**limitation** 121:11
**limitations** 9:19 85:18
**limited** 152:22
**line** 30:2 32:1,2 44:19 44:24 83:8 123:7,10 143:25 148:11 166:9 190:1
**lined** 164:22
**lines** 106:23 166:11 166:16
**link** 56:24 58:15 89:19
**list** 16:16 93:14 94:21 115:17 120:8
**listed** 80:20 90:25 91:2 95:3
**listen** 107:21
**listened** 134:5
**listening** 177:22
**literally** 138:17
**little** 7:6 14:25 22:11 29:11 35:19 64:13 66:22 71:15 72:7 82:14,17 131:22 134:21 147:2 161:5 161:13 164:14 170:1
**live** 6:3 147:21,21,21
**lives** 175:7
**local** 56:19,22 81:23 87:3,10
**locate** 88:5
**location** 87:5
**lock** 32:8
**log** 53:21
**logs** 3:23 69:11 80:9 145:17 163:20,25 165:12 167:3,18,20 167:22
**long** 20:21 21:6 29:7 48:8 61:7 71:9 82:16 116:2 169:21 171:10 171:20 172:25
**longer** 48:17 70:10 71:17 88:9 112:25
**long-standing** 136:4
**long-term** 8:11 80:12 81:10
**look** 26:14 33:19,20 40:8 44:14 48:3 52:19,20 54:12 66:4 76:20,22,22 93:16 93:17 94:21 107:12 119:6 135:7 138:6 143:25 144:9,12,17 146:9 150:9 155:10 161:14 164:24 166:19
**looked** 13:7 78:20 94:14
**looking** 6:10 41:19 42:11 69:23 70:3 76:20 114:7 126:3 136:12 137:18 157:21 159:13
**looks** 44:18,18 73:2 143:8 151:21 158:14
**lose** 28:11 139:1
**loss** 160:6
**lost** 43:24 81:17,18,18 124:3 131:3 139:13 160:10
**lot** 5:22 10:15 12:12 25:4,6 35:23 57:19 63:11 119:24 135:17 139:17 144:21 155:15 169:23 170:7
**loud** 138:18
**love** 178:3
**lowered** 30:13
**Luck** 188:21
**lunch** 30:14
**lymphedema** 11:12 92:20

**M**

**M** 5:1
**machine** 1:20
**Maeve** 49:17
**mail** 81:1 188:14
**maintained** 20:18 174:7
**maintaining** 173:21
**maintains** 137:16
**majority** 77:23
**making** 28:10 31:8 172:22
**male** 171:12
**manage** 89:11
**management** 40:12 45:19 56:9 72:9 79:21,22,23 80:4,6

80:14,25 81:24 87:4 88:9 137:13 173:23 174:6 175:6,12
**management's** 138:21 175:3
**management-level** 110:17
**manager** 41:15 55:12 55:23,25 56:7 70:9 70:15,16,17,19,22 72:17,17 87:8 94:1 131:2
**managing** 23:17 94:3
**mandates** 90:10 98:20
**manual** 174:22
**map** 174:4,4
**March** 9:8 11:5 79:25 102:2 104:13 108:8
**Maria** 30:10 31:4 101:5 119:9,10,12 120:20
**Maria's** 135:20
**mark** 35:21 44:20 46:15 53:9 61:8 93:21,22 94:3 139:15 145:23
**marked** 7:4 16:17 26:13 35:9,22 36:10 43:9 51:10 52:3 57:22 79:13 93:11 95:20 132:11 134:9 140:11 163:22 172:8
**marketing** 172:11 173:2
**marking** 140:7
**master** 146:21,23 147:4 151:16
**material** 98:7 110:4
**math** 21:2
**Matt** 38:4
**matter** 4:6 99:5 103:3 104:4 106:16,18 107:1 182:11
**max** 19:5 33:6 38:16 58:6 73:15 75:12,14 75:16,19 83:15 103:23 131:5 144:4
**maximum** 24:14 44:21 97:3 108:4 120:6 152:23 154:19 162:17 178:9
**ma'am** 4:20 35:8 43:7 132:10 167:20
**mean** 6:3,18 21:1,1 42:24 47:20 48:14 50:25 52:18 64:20 64:25 65:6 66:5 84:17 107:3,3,5,6,11 110:23 111:4,5 113:3,21 114:10,11 114:12 115:19 116:4 116:10,10 120:19 123:4,11 128:6,8,17 129:23 139:25 140:2 140:22,23 160:8 161:10 162:7 166:1 169:24,25 170:3,3 173:1 176:14,20 177:1,15 178:15,21 178:22 179:1,11,14 180:17 181:18,25 182:3
**meaning** 85:1 113:14 122:15 138:11
**means** 66:22 88:12 107:16 128:3 129:6 130:25 140:19 141:22 142:24 149:23 159:8
**MEC** 62:5,18,21,25 99:11
**medical** 3:12 7:12,22 8:2,8 9:3,16 11:20 38:15 39:7,16,19 40:3,6,9,9 55:24 56:1,4 72:20 79:24 80:1,11,15 81:10 86:2,5,10,22 87:13 89:11 90:24,24 92:1 92:23 94:11 96:4,6 98:20 103:12,14 104:7,25 105:3,7 107:24 120:10 125:16 136:11 153:3 154:9,11,19
**medically** 90:1
**medication** 5:14
**meet** 38:15 88:15
**meeting** 46:16 57:7 87:2,3,5,6,7,13 88:5 88:14,19 132:16 133:11 134:11 138:12 175:15
**member** 32:4 72:17 80:5 82:20
**memory** 6:9 85:9
**mentality** 176:3
**mentioned** 16:10 117:11 180:6
**mere** 8:23
**merged** 19:17 81:13
**merger** 7:11
**meritless** 118:5
**merits** 15:24
**messages** 141:19 143:3
**met** 6:16 10:4 19:24
**metadata** 66:3 93:15
**metal** 84:22
**method** 1:20
**Methodist** 67:18
**Michael** 97:20 99:8 102:4
**microsurgeon** 9:7
**midnight** 73:2
**military** 125:21
**Miller** 29:6 55:20 67:3 88:21 89:2
**million** 49:2
**min** 186:8
**mind** 102:21 139:20
**minute** 126:6 138:16
**minutes** 39:4 41:14 42:20 46:20 106:18 156:25 161:21 166:19 186:6
**Mischaracterizes** 59:21
**mischaracterizing** 65:14 76:25
**misclassified** 17:17
**Misra** 2:11,12 4:11,11 6:12 12:5,12,15,18 14:14,18,24 15:8 16:21 17:4,10,20 18:10 21:9 22:13 23:5,20 24:6,10 26:21 32:21,21 34:14 35:2,11,18 36:1,8,23 37:1,5 39:1,25 42:1,14,22 43:25 45:2 47:20,23 48:20 51:19 52:4,9 52:14,18,20 53:5,10 53:13 59:1,5,14,21 61:24 63:7,12,18 64:18 65:13 67:25 68:6 69:23,25 71:11 71:24 72:14,25 73:5 73:13,24 76:7,25 78:3,16,25 79:10 83:12,19 84:1,4,12 84:15 85:3,8 92:24 95:24 97:16 100:15 101:7,10,14,17,21 105:25 106:9,20 107:19 109:6 110:14 112:6,23 113:20 114:8,17 115:21 116:2 120:19,25 121:15 122:3 126:11 126:25 128:15,17,20 128:23 132:8 136:18 139:2,7,21,25 140:9 140:14 142:2,4,9,12 146:14 148:5,20 149:5 150:21 151:25 154:24 156:16 158:1 158:5,11 159:24 160:3,15 161:10,24 162:5,10,16,20,24 163:2,13,17 165:9 165:24 166:3,8 169:6,8,18 171:6 175:24 176:17 177:10,15,19,24 178:10,15,18,22,25 179:5 180:22 181:3 182:3,7,10 183:8,12 183:22,25 186:8
**missing** 62:21
**misstatements** 118:7
**MMI** 8:21
**mobility** 7:22
**mock** 30:10 54:17 125:1 149:17
**modified** 144:2,14 149:3,15 150:19
**module** 30:12
**mom** 24:22 25:10,12 25:15 26:7 27:14 28:10 29:13
**moment** 26:19 32:23 67:11 127:17
**mom's** 25:3 26:16 27:25 28:9 94:23
**Monday** 56:21 62:5,25
**money** 155:7
**monitor** 18:21,25
**month** 21:18 25:18,18 29:1 37:15 41:20 67:8 165:6
**months** 9:11 24:25 80:17 87:20 100:9 119:3 124:2 147:3
**morning** 53:19 61:3 133:4 158:25 159:11
**motion** 97:23 103:2 157:12
**move** 14:24 20:24 27:7 58:22 101:25 106:2 163:15
**moved** 27:25
**moving** 5:13
**MRI** 8:3,5 92:3,7,8
**multiple** 45:21 47:9 140:24
**multi-year** 109:15
**Muntz** 67:18
**mutual** 143:4
**mutually** 136:4
**M-A-E-V-E** 49:17

**N**

**N** 2:1 4:1 5:1,1
**name** 4:4 5:3 10:18 18:4 26:7 34:4 40:17 49:8 54:16,23,25 55:6 95:8 102:22 123:7,10,15 143:19 143:22 145:24 149:3 150:12 156:10,22 157:16 161:8 171:9 180:11 183:6
**named** 17:3,8 168:14
**names** 15:16 16:4 31:3 123:16
**name's** 150:15
**narrative** 15:9 57:16
**nature** 86:10
**nearly** 6:17,18 110:17
**necessarily** 129:23 131:14
**necessary** 57:5 59:12 65:12 174:5
**need** 6:21 11:15 12:15 42:7 44:16 49:18 50:2 58:10 86:1,10 86:11 89:7,10 90:3 90:23 96:2 113:15 118:14 143:5 153:7 157:22
**needed** 19:4 46:22 49:11,25 65:9 67:7 76:17 120:9 164:4
**needing** 135:2
**needs** 25:15 64:22 91:13 149:23
**neither** 187:1
**Neph** 2:23 4:4 139:25 168:1
**Nephtali** 1:18 185:17 187:17
**nerve** 9:10 119:2,2
**nervous** 113:22,23,24 183:18
**never** 8:21 15:18 18:4 22:9 48:6,18 56:5,14 56:15 57:1 93:25 94:4,8 116:20 126:18 133:12 137:16 143:20 144:22 156:15
**new** 2:21,21 7:23 8:3,9 9:4 14:1 17:17 38:11

38:17 56:22 81:13 81:16 95:1,7 135:10 155:12 168:1 173:4 187:20,20
**nice** 46:12 144:8
**Nick** 26:3
**nickname** 112:12
**night** 32:6,7 50:17 60:24 70:25 112:1 133:13
**nightmare** 37:7
**nine** 9:10 24:25 119:3
**NOD** 100:12 134:6
**nonapplicable** 130:20
**nonoccupational** 153:2,12,17,18
**nonpaid** 18:24
**non-punitive** 174:13
**normal** 63:3 65:4 113:21 114:12
**normally** 38:20 39:3 76:21 77:2 130:15
**NORTH** 2:5
**notary** 1:19 185:18 188:3,5 189:19
**note** 62:9 81:12 87:17 92:13,13 126:3
**noted** 91:16 93:4 189:9
**notes** 11:17 56:10 91:12,23 122:10 127:4 164:9,17,17 164:18,18 165:4 168:20
**notice** 46:15,25 47:8 47:11,16 48:6,19 49:1,4,8 53:23 95:10 98:22 99:1 102:10 102:13 133:19 134:6 162:15
**notices** 47:18
**notification** 151:7,9
**notified** 39:23 90:13
**notify** 75:1 87:3 113:17
**notifying** 104:2 106:14
**noting** 125:11
**number** 31:23 32:9,10 39:6 45:14 46:9 54:15,16 61:21 67:4 67:12,13,15 80:4 86:9 95:12 96:9 122:20,21 123:13 124:1 127:14,15 129:21,22 135:18 139:20 145:13,14,23 167:4
**numbered** 1:16
**numbers** 54:13 55:10 94:14 102:6 156:21 157:25
**numerous** 8:15
**nurse** 55:25
**N/A** 130:19

**O**

**O** 4:1 5:1
**OAKS** 2:5
**object** 14:18 18:10 39:25 59:14 73:13 101:7 120:19 177:10
**objecting** 12:7
**objection** 12:5 15:8 17:10,20 21:9 22:13 23:5,20 24:6 34:14 35:2 42:14 45:2 48:20 59:1,5,21 63:7 63:12,18 64:18 65:13 67:25 68:6 71:11 72:14 73:24 76:7,25 78:3,16,25 83:12,19 84:1,12 105:25 106:20 107:19 109:6 112:6 112:23 113:20 114:8 114:17 115:21,22 126:11,25 136:18 139:2,7 148:5 149:5 156:16 169:6,18 177:16,24 178:10,16
**objections** 5:10 12:13
**objection's** 178:18 179:1,5
**obligations** 166:2,4
**oblivious** 180:8
**observes** 178:21
**obtain** 56:1
**obviously** 6:1,3 42:24 101:18 120:21
**occupation** 45:16 129:18,19 153:14
**occupational** 17:18,25 18:15,21 19:1,9 31:5 31:12,13,14 39:11 45:5,18 46:1,5 47:7 55:14 57:17 68:4,19 68:21 75:24 77:22 78:12 79:20,23 80:2 80:16 87:11 88:11 89:23 91:25 95:9 97:1 102:8 117:17 119:8 122:7,14 127:21 128:1,2,4 129:2 137:19 141:21 142:15,19,25 143:22 144:10,11 145:9 146:3,5 148:12,13 148:15,16,19,24,24 149:15 153:5,17,20 154:7 155:5,5,8 160:13 164:2 166:14 168:14,20 176:16
**occupationals** 153:21
**occur** 89:16 176:11
**occurrence** 175:20
**occurs** 55:24
**offering** 12:6 87:19
**office** 7:16 13:3 22:7 26:10 40:4 41:18 56:25 92:6 95:16 99:11
**officer** 186:2
**Offices** 188:19
**official** 54:22 155:17
**off-handed** 22:11
**of/target** 176:24
**oh** 10:9 26:22 30:21 37:2 49:17 50:15 69:9 71:23 112:16 117:3 123:24 124:8 124:10 132:9 134:15 139:15,18 140:12 150:5 167:24 168:2 168:8,21 169:9 172:17
**OI** 45:11,17 70:25 129:18 132:4 155:4 155:4 165:16
**Oilers** 168:25
**OIS** 39:11 40:2 54:13 55:5 68:18 124:1 131:20 144:4 157:22
**OIS-390835** 54:14
**OJI** 8:16 17:17 30:22 55:20 89:14 121:19 127:15 128:8 134:20 145:22
**OJIs** 13:13
**okay** 5:3,18 7:1 12:14 12:20 14:23 15:7,14 16:3,15 17:22 18:19 19:19,22 20:9,21 22:1,5,15,20 23:3,18 24:12 25:21 27:2 33:24 35:6,15,19 36:6 37:5 40:15 44:8 45:21,24 46:3,9,10 47:10 48:18 49:10 49:21 50:4,10,23 51:4,4,7 52:9,12,17 53:8,10,17 58:4 60:7 60:7,17 61:25 63:22 63:25 65:17,22,24 66:11 69:3,25 71:23 75:1,7,21 77:19,22 78:11 81:4 82:11 85:8,12 89:10 90:15 93:8,9 94:5 95:19,23 96:2,3 101:9,13,16 101:20,23,24 104:14 104:21,23 106:3,8 108:8 109:7 112:16 113:6 116:14,25 118:3 119:6,16 121:25 122:6,11,17 123:16,17,19,20 124:20 125:5,15,16 125:20,20,25 126:7 127:9,13,17,18 128:19,24 129:1,2 129:16,21 130:13,18 130:23 131:7,21 132:1,9 133:2,10 134:3 136:24,25 137:3 139:10,23 140:10,17 141:4,15 142:16,17,19 143:16 143:20 144:24 147:19 149:8,10 150:5,7,23 151:12 151:13 152:16 154:4 155:21,23 156:5,7,9 156:18 157:5,20 158:12 160:5,21 162:9,23 163:16,19 167:19 168:5 169:7 169:13,22 170:6,13 171:13,22,22 172:2 173:7 176:1,22 177:12 178:1,17,24 181:10,21 182:9,23 183:2,5,15,16,21
**old** 83:16 84:10 158:14
**older** 135:25 176:24
**omitted** 98:14
**once** 13:14 29:2 33:6 37:16 40:25 41:6,7 45:13 46:6 82:11,19 84:24 86:15,25 102:4 111:25 127:22 150:25 169:15 176:15 188:10
**ones** 66:10 95:2 134:7 159:15 181:21
**one's** 93:16 140:17 159:23
**ongoing** 9:19 11:10 63:5 85:15 88:8 116:1
**online** 20:6 170:14 181:13,14
**on-the-job** 7:8 53:24 102:7
**OPCMD** 164:3
**open** 14:8 42:1 91:19 98:15 164:11
**opening** 16:6
**opens** 88:14
**operating** 176:9
**operation** 77:16 173:21
**operational** 19:10 174:15
**operations** 21:17 48:12,13 77:10,14 77:18,19,21
**opine** 139:3
**opinion** 17:14 63:19 73:25 98:6 177:11 177:19 178:14,21
**opportunistic** 72:7
**opportunity** 81:6,21 85:16 107:13 135:9
**opposed** 12:7
**option** 92:20
**options** 82:2
**oral** 1:10,14 4:6 185:13
**order** 5:12 39:22 85:19 85:24 93:13 118:7 136:6 139:21
**ordered** 8:3 92:7
**orders** 121:23
**organization** 174:16
**original** 15:15
**originally** 12:24 99:11
**orthotics** 11:11 91:14 92:17,19
**Oscar's** 173:10
**OSHA** 181:8
**OSI** 68:18
**other/default** 147:10
**outcome** 174:12 187:5
**outcomes** 99:4
**outgoing** 58:1
**outlined** 90:21 137:24
**Outlook** 53:21
**outs** 87:20,20
**outside** 88:6
**outstanding** 58:16
**override** 59:10
**oversee** 59:10
**overview** 164:16
**owe** 58:17

**o'clock** 32:7 50:17 67:9 145:16,18

**P**

**P** 2:1,1 4:1 58:8 181:4 181:12,18,19
**package** 137:10,15,17 137:24
**packet** 84:5 86:19 117:3,6 128:9,11,13 128:21 130:6,10 136:3 159:19
**packets** 130:9
**packet's** 36:8
**page** 3:1 26:24 27:20 29:12 33:19,21 34:2 35:23 36:19 54:10 55:1,3,9 57:24 60:18 61:23 70:1 81:4 85:12 88:21 89:17 91:5 92:5 93:16 94:24 95:4 102:1 104:20 117:11 118:3 119:7 121:14,18,22 121:25 132:18 134:16 137:3 138:6 138:19 141:11 142:1 142:5,17,22 143:1 145:10,15 146:18 147:7,9,22 148:8,9 148:17,23 149:8,11 151:15 152:3,12,17 157:1 159:14 164:21 164:22 165:7 167:1 190:1
**pages** 36:15 43:24 44:13 61:1,2,17,17 91:25 115:6 155:2 175:4 189:5
**paid** 61:4 124:11,16 124:17 140:24,25 141:9
**pain** 8:6 67:22 183:19
**pairing** 143:10 145:1,1
**pairings** 32:5,5 82:21 143:4
**pants** 92:20 160:22
**paper** 18:18 57:10 110:18 117:1 139:17 151:8 181:12,21 182:1
**paperwork** 18:22 29:23,25 65:5
**paragraph** 118:4
**parameter** 134:21 153:13
**paramount** 173:15
**parenthesis** 34:8 37:22 173:24
**parents** 143:3
**Parker** 10:15 91:9
**parking** 58:13,13 80:24
**part** 9:15 14:12 16:9 16:19 20:13,14 29:4 85:15 96:2 123:23 123:24 125:14 165:22 166:13 170:19 174:2 181:4
**partial** 53:4
**participate** 80:12 85:25
**participated** 96:9 103:16 105:10,18
**particular** 108:25
**particularly** 118:16
**parties** 116:19 186:3 187:2 188:11
**partner** 6:24 86:8 87:4 87:10 88:10
**parts** 152:25
**party** 177:4 185:25 186:4
**part-time** 123:2
**pass** 16:19 29:14 82:12
**passed** 28:2 29:15
**passion** 173:14
**paste** 32:19 111:9
**patience** 5:22
**patient** 155:15
**patterns** 8:19
**paw** 161:5
**pay** 124:19 129:3 143:13
**peep** 138:14
**penalty** 104:11 108:9
**pending** 55:15 74:22 99:2 125:19 126:14
**people** 19:3 30:15 67:2 170:7 179:25
**percent** 8:24 118:9 119:1 142:24
**perfect** 140:10
**perform** 57:13 81:10 83:5 85:20,25 87:16 88:2 90:20 118:15 118:21
**performance** 98:10
**performed** 9:7
**performing** 86:4
**perineal** 9:4 119:2
**period** 33:5 109:8,15 120:5,6
**perjury** 104:11 108:2,9
**permanent** 80:12
**persistent** 28:5
**person** 13:14 17:8 156:6 164:8,23 172:1
**personable** 38:23 138:22
**personal** 57:6 63:4,20 83:6 102:25 138:24 151:22 171:23
**personally** 171:10 173:17,22 180:16
**personnel** 58:8 128:12 133:21 181:19 182:14,15
**person/flight** 96:19
**pertain** 64:23
**pertaining** 64:22 65:1
**pharmacy** 56:8
**Phillips** 32:20
**phone** 10:2 31:8,18,21 32:8 43:1 61:20,20 62:16 67:5 117:23 118:1 122:20 127:15 165:12,15,15,20 166:17 167:8,11,13
**phonetic** 33:11 78:12 92:6
**Phyllis** 92:5
**physical** 9:11
**physicality** 176:4
**physically** 137:9
**physician** 7:23 10:5 56:3 80:2
**physicians** 178:6
**pick** 179:25
**picked** 32:2 34:9 37:22 44:8 57:14 66:21 67:6 146:13
**picking** 171:1
**piece** 57:10 117:1 151:8
**pilot** 7:17
**place** 95:3 136:10
**placed** 58:7 144:25
**places** 60:3
**placing** 118:19
**plaintiff** 1:4,15 2:3 4:7 5:4 8:20 103:9 108:14 109:20 110:8 185:6 186:7
**plaintiff's** 9:16 109:18 110:6
**plan** 174:5 176:12
**plane** 84:25
**planes** 30:7
**plaque** 94:19 121:23
**Plavix** 25:7
**please** 4:9,14 5:23 25:23,25 32:23 38:18 52:2 53:24 54:1,4 58:11,18 60:22 61:16 72:20 79:8 80:2,14 81:2 87:17 89:18 91:3,4 91:20 92:12,13,17 100:23 107:21 114:3 121:25 126:6 127:17 127:25 133:8 137:4 152:4,7 163:21 174:23 182:12 188:8
**PLOA** 147:10 151:14 151:14,18
**PO** 188:20
**point** 33:3 73:17 75:3 80:11 93:7 137:20 146:5 151:12 174:18
**points** 130:21
**policies** 71:3 175:14
**policy** 7:12 8:8,10 46:25 84:9,10 118:9 135:23 152:22 153:15,15 174:21
**politically** 171:2
**Pollock** 41:15 43:14 126:23
**pop** 41:13
**popped** 13:4
**pops** 111:3
**portion** 32:22
**position** 7:15 10:1 18:19 19:20 21:15 85:21 87:9,17 88:1,3 88:14 90:21 98:24 102:15 103:6 108:12 117:10 118:22 120:10,15
**positions** 85:20 88:5
**possible** 41:23 55:13 87:25 88:4 99:4 131:6
**post** 110:2
**postpone** 26:1
**postponed** 28:4
**practices** 175:22 176:13
**praying** 66:21
**prejudice** 133:18
**premier** 170:21
**prepare** 6:14 92:1
**prepared** 6:10
**Preparing** 145:18
**prescribed** 7:23
**present** 115:14
**presented** 28:25 37:14
**preservation** 66:3
**preserve** 165:23
**president** 14:1 39:10 56:19,22 58:1 119:19 173:11
**Preston** 165:4
**pretextual** 42:10
**pretty** 17:1 85:6
**prevent** 175:19
**prevented** 176:2,9
**previous** 38:9 76:16 91:16 123:21,24
**previously** 88:14 118:18
**pre-merger** 85:4
**principles** 173:18 175:11
**print** 130:10
**printed** 146:25 147:5
**prior** 5:8 7:11 8:22 11:12 32:24 34:1 40:22 59:22 65:14 73:16 76:4 88:24 90:3 91:8 92:1 94:25 98:5 99:21 109:24 120:8 123:25 125:13 126:2 154:11
**private** 9:3 10:23
**privately** 62:20
**privilege** 170:7
**privileged** 170:20,21
**pro** 1:4 2:4 4:7 185:6 186:7
**proactively** 9:19
**probably** 33:5 49:17 66:9 68:12 74:15 161:13
**problem** 25:17 26:6 27:13 29:4 32:25 35:16 72:10 121:3 139:22 140:15,16 171:5
**problems** 179:24
**procedural** 48:3 68:2
**procedure** 1:21 63:3
**procedures** 174:20 175:21
**proceed** 56:14 164:3
**proceeded** 100:8
**proceeding** 5:9 187:3
**proceedings** 183:24
**process** 10:12 14:24 29:2,8 37:16 38:6 41:3,5,8 45:4 61:7 61:12 68:22 76:1

78:1 80:13,19,22,22 81:23 82:10,11,13 82:16,22 85:13,22 85:23,24 86:1,7,14 86:16,17,18 88:7,8 89:8,12 97:8,9 100:8 102:11 116:21 120:14 132:14 136:2 136:4,5 137:6,8,21 137:24 170:25 182:20
**processed** 45:7 137:1
**processes** 174:19
**processing** 11:25 91:21 123:3
**produced** 1:14 12:9 27:1 109:11 128:20 180:23,24 182:3
**production** 181:4
**productive** 175:8 176:6
**profession** 172:13
**professional** 138:23
**program** 81:22 90:16 118:10 174:18
**programs** 174:9
**progresses** 137:7
**prolonged** 7:21
**prominently** 169:16
**promise** 172:2
**Promptly** 55:17
**proper** 8:1 95:14 98:13,17,25
**properly** 121:12
**property** 56:24 69:8
**propounded** 189:7
**protect** 5:11
**protections** 59:4
**protocol** 34:24 39:3 58:25
**provide** 8:18 56:3 81:8 85:19 147:4
**provided** 8:1 39:14 163:23
**provider** 90:25 125:16
**providing** 39:15 85:16
**provision** 120:12 121:10
**provisions** 1:21
**psychology** 161:25
**PTO** 83:6
**public** 188:3,5 189:19
**pull** 25:6 41:7 157:24 160:21 166:7
**pulled** 126:9 155:15 158:13 173:11
**pulling** 130:14
**pulls** 158:9,14,17
**pump** 11:12,12 92:21 114:15
**purpose** 44:13 51:12 115:13
**purser** 143:13
**pursuant** 1:20 98:23 99:2 102:10 110:12 121:8 185:23 186:1
**pursue** 97:12 98:1 99:18
**pursued** 100:1
**pursuing** 164:4
**push** 27:11
**pushed** 26:17
**put** 12:3 15:21 20:23 29:20 33:7 41:25 42:7,8 53:11 55:6 83:9 104:16,18 119:9 124:18 128:12 143:23 145:24 150:24 151:2,13 156:13 160:12,14 161:7 168:16 173:3 176:8
**puts** 147:10 151:14
**putting** 151:3 177:16
**p.m** 1:17,17 4:3 23:25 34:2 37:12 43:13,14 49:13 50:13 51:22 51:23,25 52:24,25 53:2 54:16 72:24 111:15,16,18 112:1 123:5,6 131:11,17 138:9,17 156:20,22 165:19 166:22,23,25 184:3,4

**Q**

**qualifications** 175:11
**qualified** 9:25 10:1 153:3
**qualify** 168:13
**question** 5:19,23 6:12 12:7 14:19,21 16:2 17:10,20 18:11 21:9 22:13,14 23:5 26:20 39:1 42:1 44:1 46:15 48:7 59:15 60:8 63:9 64:20 65:6 68:13 72:25 73:6,7 76:7 78:6 83:20 89:13 92:25 97:16 100:15 101:24 106:9 108:19 110:4,14 112:6,23 113:20 115:22 120:25 121:15 126:2 126:4 133:24 137:6 139:9,9 146:15 148:6,21 149:20 150:14 151:25 154:24 159:25 160:16 161:9,11,25 162:1 163:5,15 165:9 169:6,18 171:6 173:1 176:17 177:14 179:9,10 180:3
**questions** 45:21 47:9 54:1 56:1 58:18 80:7 88:20 89:5 91:3 101:17 104:14 125:12 158:5 162:24 177:13 178:12 182:11 189:7
**quick** 24:13 51:14
**quicker** 14:25
**quickly** 59:3 75:8
**quoted** 82:24
**quote/unquote** 14:20 22:25 61:15 135:4 137:12
**quoting** 153:15
**Q-U-A-L** 38:7

**R**

**R** 2:1 4:1
**raise** 4:14 124:2
**raised** 30:14
**raises** 110:3
**ramifications** 28:25 37:14
**ran** 8:14 19:10
**RAP** 24:16 76:10 78:2 78:19,20 79:2,3,4 81:22,24 85:23,23 86:6,7,13,15,16,17 86:18,19 87:2,2,5,6 87:6,13 88:5,7,11,14 88:17,19,20 91:4 92:2,18 109:1 118:10 164:4,15,16 165:8,8
**rate** 129:3
**rating** 8:25 119:1
**rave** 10:3
**Raygo** 26:5 27:13
**reach** 34:22,25 38:21 62:5,18,21,25 86:8
**reached** 121:7 126:21
**reaction** 113:21
**read** 7:6,6 8:7 11:1 13:22 15:14,18 16:22 27:4 32:17 34:5 36:13,17,21 37:10 39:9 43:10,16 44:8 46:14 51:12 52:8 53:23 54:17 55:11,21 58:10 60:20 66:12 79:21 81:5 85:15 87:23 89:25 90:17 91:23 95:8,23,24 96:1,2,3 96:6,9 102:20,22 110:16 120:6 121:2 121:5 122:17,24 124:5 125:3 127:22 130:16 137:20 151:8 152:18 157:23 158:8 159:3 160:1,3,4,6 163:24 164:9 172:6 173:7,13 175:25 189:5
**reading** 17:4,5 101:10 101:21 105:6 132:7 158:12
**ready** 29:17 127:6 160:23,23
**real** 24:13
**realize** 25:3
**realized** 25:10
**realizing** 26:9
**really** 45:22 51:12 66:4 158:17 160:2 171:18 174:18 183:19
**reason** 18:7 114:22 121:10 125:22,23,25 133:25 135:16 190:1
**reasonable** 10:5,10 11:7,15 75:25 76:2,4 76:5,17,23 77:24 78:15 80:13 81:8,22 82:2 85:13,19,22 87:15,18 90:16 92:18 93:2,5 108:17 118:17 119:6 120:13 161:1 162:8
**reasons** 98:9
**reassigned** 41:1,9,10
**recall** 22:3 33:10 43:4 46:19 51:6,8 76:13 76:20 93:12 115:23 128:5 160:20,20 163:6,7,14 181:9
**receipt** 80:6 188:9
**receive** 41:25 42:9 124:2 131:8 188:10
**received** 38:11 53:23 75:24 86:20 90:24 100:19 124:7 133:4 137:16 143:21 145:22 151:6
**receives** 89:7 150:25
**receiving** 8:21 39:4
**recognize** 171:9
**recognized** 170:21
**recognizing** 9:18
**recollect** 15:22
**recollection** 12:25 17:6
**recommendations** 175:16
**recommended** 175:22
**record** 1:22 4:3 7:2 12:6,16 36:17,21 40:12 43:11,17 51:22,23,24 52:22 52:24,25 53:1 55:13 84:19 101:10,22 109:10 110:8 111:14 111:16,17 127:12 165:20 166:22,23,24 170:16 178:19 179:1 179:10 182:8 183:22 184:2,4 185:22 186:3
**recorded** 126:5 166:9 166:11
**recording** 165:17
**records** 79:24 109:23 130:11 154:8 167:8 167:11 180:13 181:10,11
**recount** 6:7
**recover** 7:13
**recovery** 8:12 9:13 56:2
**recruiter** 9:23 118:19 168:12
**recruiting** 7:15 9:15 9:22 81:15 168:10
**recurrent** 90:6
**red** 114:15
**redacted** 32:22 35:24 36:16 43:15 50:3,12 50:12,15,16
**redo** 25:7
**reduced** 8:8
**reengage** 88:16
**refer** 36:23 82:13
**reference** 14:13 54:14 67:15 125:7 157:10 157:11
**referencing** 135:20
**referred** 9:7 86:16
**refers** 157:13
**reflect** 109:25 110:11

154:8
**reflected** 81:7
**reflective** 176:14
**refresh** 89:19
**refreshed** 6:2
**refused** 100:3
**regain** 9:2
**regard** 152:19
**regarding** 8:15 15:3 58:16 63:5 64:6 99:10,15 122:10 137:6 174:1
**regardless** 55:23
**regards** 100:20 133:5
**register** 31:21
**regular** 88:1
**regulations** 23:16
**regulatory** 173:25
**reinjured** 34:7 37:21 117:13
**reinjury** 38:9
**reiterate** 183:23
**reject** 100:22 133:7
**rejected** 100:2
**related** 39:19 56:2 86:22 124:8 187:2
**relations** 64:7 131:5
**relationship** 135:9
**relative** 152:25
**release** 11:20 39:22 58:17 89:7,15 92:14 112:8 144:6 154:15
**released** 24:15 38:5 39:17,20 89:14 114:21,22
**relevant** 65:6,8 98:6 167:12
**reliable** 174:3
**relocation** 7:16
**rely** 118:6
**relying** 84:15
**remaining** 128:1,8 129:2
**remember** 12:23 15:1 15:10,10,11,12 19:22 21:3,4,20,22 42:19,22 43:1 46:18 50:6,8 51:5 70:3 72:11 78:22 84:8,21 84:25 85:10 112:10 112:12 117:23 118:1 118:2 127:12,12 129:1 141:2 161:15 171:7
**remembers** 14:16
**remind** 100:5 175:20
**remorse** 114:19,20
**removed** 120:8 142:19 143:4 151:5,20
**rep** 120:17
**repeat** 5:20 44:1
**replies** 137:4
**report** 30:23 31:9,10 31:11 39:12,14,15 40:3 41:23 42:11 45:5 54:10,14 55:11 55:12,22 56:13 67:4 69:17 71:5 80:23 106:7 122:7 123:6 125:9,20 127:3,4,6,7 127:10 131:12,23 148:14 157:22 158:14 159:8 160:9 176:5 181:2
**reported** 1:20 41:21 45:6 53:24 68:17,25 69:1,2,15 96:14,17 102:7 103:20 105:16 106:3 117:12 123:10 131:8,25 140:22 145:14 175:6 181:8
**reporter** 1:18 2:23 4:2 4:5,13,20 35:8,14,16 43:7 51:14,21,24 52:23 53:1,6 79:9 111:12,17 132:6,9 139:14 140:2,4,7,10 166:21,24 167:18,20 167:22 168:2,5 172:4 183:21 184:1 185:17
**Reporter's** 3:6 185:12
**reporting** 1:25 2:18 4:5 68:4 69:8 95:1 131:17,19 148:16 174:14 187:18 188:18
**reports** 31:11 39:10 41:25 42:8
**representative** 82:1 87:11 88:10
**representing** 4:5 97:21
**requalification** 96:10 103:16 105:11,19
**requalify** 11:22
**requalifying** 168:15
**request** 10:7 39:9 100:19 133:5 152:10 185:23
**requested** 11:7 39:15 80:15 86:15 99:9 109:16 131:2 164:15 164:16 165:8
**requests** 110:9
**required** 7:18 34:9 37:22 39:21 44:8 67:7 79:25 80:16 90:17,19 97:5 104:1 153:1 188:4,5
**requirement** 39:22 134:22 165:23
**requirements** 90:3,11 173:25
**requires** 104:4
**reserve** 10:9 44:16 57:12 83:4
**reset** 9:16
**resolution** 102:11
**resolved** 24:16
**resource** 94:1
**resources** 81:24 94:3 174:5
**respectfully** 110:9
**respond** 60:24
**responded** 74:13
**responding** 137:5
**responds** 120:3
**response** 71:9 78:19 121:18
**responsibility** 19:2 77:25 80:21 173:20
**responsible** 137:14
**rest** 32:22 52:10
**restate** 179:8
**restored** 127:22
**restriction** 11:14 86:2 86:5,20 92:1,18
**restrictions** 11:10,16 81:10 85:17 86:21 86:23 87:12,13 88:12 90:22 91:1,2 91:16 92:16 118:12 120:11 121:6
**restroom** 13:2 14:3
**result** 9:5 135:19 154:18 175:21,22
**retaliated** 17:15,24
**retaliation** 169:4
**retaliatory** 14:10 16:5 72:12 138:20
**retire** 151:1 172:17
**retired** 112:15 113:5 144:7
**retirement** 94:19 121:23 152:1
**retroactively** 110:5
**return** 7:13 11:1,20 33:6 38:5,11 58:12 80:16 82:7 90:1,4 91:1,12 96:7 103:15 105:4,8 120:9 121:6 130:20 131:4 136:3 136:5 137:10 144:6 154:11,15 188:8,14
**returned** 7:14 24:14 24:18 58:11 97:2 103:23 136:7 145:7 148:13
**returning** 10:6 82:22 104:8 107:24 137:7
**returns** 152:8
**return-to-work** 9:17 13:1 29:8 38:6 40:24 40:25 41:3,5,8 61:7 61:12 80:19 81:19 82:14 89:7,12,17,21 89:24 91:21,22 94:18 137:17 164:4 165:3
**return-to-works** 47:6
**revealed** 8:4 10:13
**revealing** 9:9
**reverse** 138:4
**review** 39:9 55:16 91:15 175:10 185:24
**reviewed** 28:18,19 87:14 170:16
**reviews** 10:3
**re-qual** 38:7 41:20,22 60:20 134:22 135:4
**Rick** 33:11,12 54:3,21 54:23 56:14 95:4 133:23 144:13 149:2 149:14 150:18
**rid** 135:24 176:24
**right** 4:2,13,14,20 5:9 12:17,20 13:25 23:14 25:8 30:17 40:17 45:10,13 46:7 48:9 49:10 51:21 52:23 55:9 60:18 63:5 69:24 70:21 75:7 83:2 85:12 94:17 97:14 108:8 111:14 115:1 116:25 117:1 127:7 128:18 128:24 131:13,16 132:3 133:2 134:7 140:5,19 142:9,23 143:17 146:7,11 150:10 152:17 154:2 156:1,2 157:2,14 158:7 159:24 163:10 166:21 167:16,18 168:3,6 173:7 174:8 174:25 178:4 184:1
**rights** 78:24
**Robert** 101:25
**Rogers** 14:2
**role** 48:9,10 55:21 77:15 78:9 87:24 110:11
**roles** 19:7,12
**room** 13:2,23 21:3,4,5 22:17 56:17
**Rose** 1:25 2:18 4:5 187:18 188:18
**route** 174:4,4
**routinely** 63:15 64:10 118:11
**RQ** 89:15
**rule** 46:23 49:11 185:23
**rules** 1:21 78:14
**run** 22:24 62:14 176:24 177:8
**running** 10:22 13:15 47:14 173:20
**run-you-out-of-time** 178:8
**rush** 74:6
**R-E** 38:7

**S**

**S** 2:1 3:11 4:1
**Sabrina** 17:17 18:5 24:1 26:15 27:3,16 27:17 28:15 29:3 32:16 33:25 34:3,25 35:4 36:18 37:8,12 38:4 39:5,7 41:13,14 42:16,23 43:13 44:2 44:14,25 46:13 48:2 49:14 50:18,25 57:25 69:7 70:12,14 70:15 74:7 112:20 116:15 126:21
**Sabrina's** 112:25 125:9
**safe** 61:8 173:21,21 174:3
**safeguarded** 176:10
**safely** 85:20 174:25 175:9
**safety** 3:24 118:16 173:14,15,23 174:1 174:6,9,15,17,21 175:5,10,20 176:21
**Safety's** 174:2
**sat** 19:11
**satisfied** 180:1
**Saturday** 66:24
**save** 173:17
**saw** 13:2 21:5 67:18

119:17
**saying** 13:22 15:1,11 15:17 27:25 29:7 65:8 72:18 74:8 75:22 76:15 78:11 82:16,19 84:21 85:11 93:3 99:8 106:7 108:6 120:17 124:24 125:7 129:21 130:9 132:3 133:3 136:15 137:1 140:18 144:8 149:17,23 150:1,3 151:21 153:11 159:1 161:3 169:4 172:12 176:1 177:14 178:16 179:21,23
**says** 11:23 24:2 26:16 27:4,18,21 28:15 29:23 30:1 32:3,25 34:3 37:12 40:17 41:17 43:19 44:3,14 44:24 46:13,22 48:2 49:14,24 50:18 54:17,20 55:21 60:19 61:3,14,18 62:3,15,16,18,20,23 66:14 74:3 89:3,5 92:19,22 93:20 100:19 101:5 120:3 120:4 122:18 123:15 123:22 124:9,16,17 127:23 128:1 131:16 132:18 138:8,9,13 138:16,17 142:18 143:19,25 144:9 149:2 159:4 161:18
**schedule** 25:8 44:17 50:21 57:13 80:22 83:5 87:3 88:18 92:2 113:7,16,16 143:5 146:12 151:16
**scheduled** 29:9 34:11 37:24 38:7 44:10 56:20 87:2 89:11 90:13,13 92:8 96:11 96:15 103:18,22 105:13,17,20 106:4 116:12 117:21
**scheduler** 143:12
**schedulers** 129:22
**schedules** 146:22,24 147:5
**scheduling** 5:12 31:17 42:6 67:16 145:16 145:19 165:22 166:8 166:11 167:3
**Scott** 172:12
**screen** 51:1 149:12,12
**screens** 142:18 166:15
**screenshot** 54:11 141:12,14 142:7 143:9,11
**screenshots** 143:2 150:8 151:19
**screenshotted** 148:10
**se** 1:4 2:4 4:7 185:6 186:7
**search** 183:5,10
**seats** 32:5
**second** 16:1 33:21 70:1 97:18 101:25 118:4 121:2 123:8 124:14 127:20 132:18 134:16 148:11
**second-guess** 114:12
**secretary** 68:11 156:13
**section** 39:18 58:6 97:4 98:19 99:4 102:12 103:24 152:25 154:13
**sections** 38:14 98:23
**Sedgwick** 7:25 8:17 31:22 32:9 38:19 45:8,8,13 46:7 55:15 55:17 56:11 67:4,14 68:25 69:10,11,14 71:6,7 72:21,24 118:25 123:13 125:12 127:13,14 145:13 177:5 178:3 179:24
**see** 6:21 27:20 33:20 33:25 41:12 49:16 50:22 51:2 54:3 55:18 56:9 60:19 62:8 63:13 66:21 76:1,3,17,23 92:3,15 92:17,17 94:12,15 117:4 121:21 126:13 132:13 133:2 141:7 141:19,25 142:9,18 142:23,24 143:9,17 143:22 144:16,24 148:23 150:6 152:17 155:1 156:9 158:8 158:13 159:18 164:3 164:21 165:1,7,18 172:19 181:17
**seeing** 32:15 66:11 119:4 147:15
**seek** 54:20 55:24
**seeking** 9:19
**seen** 16:3 17:7 48:18 63:10,14 119:8 133:12 141:4
**sees** 59:11
**selected** 170:8,19
**self** 129:12,14 140:21 140:22,23
**self-accommodate** 11:14
**send** 19:2 28:5 46:15 49:23 51:7 54:9 64:5 64:6 69:21 70:2 86:19 91:6 92:12 115:17
**sending** 64:1
**sends** 132:17
**seniority** 120:8 135:24
**sensitive** 118:16
**sent** 57:9 64:3 69:19 69:21 92:4 94:19 99:10 119:22 130:20 146:22,24 152:21 156:20 181:12
**sentiment** 116:11
**separate** 46:24 74:24 115:20 161:6 177:9
**separated** 23:1 44:15 44:22 47:14 97:5 103:25 104:3,10 106:15 108:1 121:12 143:18 144:1 148:16 150:23
**separately** 170:10,12
**separating** 150:12
**separation** 49:18 103:10,11 104:4 108:14,16 150:24 151:2 152:10
**September** 8:7 19:18 109:9 154:10
**served** 138:3
**server** 53:22
**serves** 174:17
**service** 18:23 19:12 19:13 46:15 49:23 74:15,17,22,23 75:2 77:18 79:6 81:25 86:9 108:10,13 109:8,18 110:1,22 122:24 155:13 157:3
**services** 77:9,20 94:4 103:8 148:3 157:7
**serving** 175:9
**set** 46:16
**setbacks** 9:13
**settlement** 138:4
**seven** 6:2 15:21 16:25 53:17 62:10 65:18 102:6
**seven-year-old** 6:1
**severity** 9:14,18 55:23
**SFC** 48:16
**share** 173:14,18,20
**sharing** 28:16 34:19
**sheet** 35:22 36:1 95:10 129:8,9 141:1 141:4 158:9 189:9
**Sherri** 100:6 101:1 132:15 134:5
**shield** 156:5
**ship** 56:24
**shocked** 61:20
**shoe** 31:2
**shoes** 11:11,17 92:20
**shoot** 161:21
**short** 84:24
**shortening** 9:13
**shorter** 71:18
**shorthand** 1:20
**shot** 59:13 171:3
**show** 24:7,11 32:7 50:21 65:18 69:11 79:24 80:9 93:2,14 101:12,13 127:6,19 127:21 133:10 138:21 144:12 145:16,18 146:10 151:19 155:23 163:25 165:12 170:25 173:3
**showed** 73:17 168:20
**showing** 43:25 65:19 79:14 109:7 131:8 134:4 141:16 143:7 146:13 151:17 154:21 168:7
**shown** 114:10
**shows** 23:24 94:15 95:11 112:1 121:24 141:18 143:2,18 145:8 147:7,8 148:12 168:10,19
**shut** 29:11
**shutting** 8:25
**sic** 54:14 86:3 90:4 100:7 103:24
**sick** 17:18 22:25 31:14 31:14 32:14 43:22 44:6,19,24,25 45:9 45:10,11,17 46:1 57:15,16 70:25 72:19 75:24 96:15 96:20,21,23 97:1 102:7 103:21 105:16 106:4,8 111:22 121:19,20 128:1,2,4 128:8 129:2,7,11,11 129:13,18,19 132:4 141:8,20,24 142:25 144:10 145:2,4,8,23 146:5 148:18 154:17 154:21,22 155:1,3,8 163:4 165:16 176:20 176:22
**side** 144:13
**sides** 178:2,3
**Sientes** 145:3,5 146:1 147:6
**sign** 111:1
**signature** 188:3,5
**signatures** 109:23
**signed** 87:1 104:1 106:13 111:8 153:23 188:8,10,14 189:15
**significant** 9:10
**signify** 140:25,25
**signing** 77:12
**simpler** 24:10
**simulator** 7:17
**single** 52:21 110:18
**sir** 35:13
**sit** 44:16 57:12 83:4 161:14
**sitting** 7:21
**situation** 28:18 82:3 121:10
**six** 17:1 18:3 62:11 87:20 102:6 116:1 161:12 175:4
**six-year** 7:12 8:8 81:18
**SK** 129:5,11 135:2 143:10
**SKO** 129:18
**Sky** 20:15
**slated** 27:10
**slogans** 173:3
**small** 159:3
**smarty** 160:22
**SMS** 173:24 174:18,22 174:24
**sole** 146:8
**solely** 5:11 110:3
**somebody** 70:6 82:6 123:12
**someone's** 34:18 47:7 49:3 161:19
**somewhat** 136:1 179:12

**some-odd** 36:15
**soon** 55:13
**sorry** 5:4 16:19 25:12 25:15 26:22 35:12 35:12,15 37:5,7 43:24 44:1 50:9 52:11 55:10 57:19 60:1,24 65:24 75:13 75:17 77:8 78:6 79:11 95:6 110:25 117:4,5 122:13 124:8 128:6,25 132:12 134:16 139:17 142:1,3 148:8 150:5 157:19 159:13 167:25 168:1 183:17
**sought** 7:22 9:3
**sound** 94:16
**Sounds** 183:21
**SOUTHERN** 1:1 185:2
**speak** 35:4 56:10 64:2 65:16 66:15,17 68:9 71:7,8 112:2 113:6 115:1
**speaker** 170:15
**speaks** 106:21
**specialist** 31:4 86:16 87:3 88:11,17
**specialists** 87:7
**specific** 86:21 121:10 157:6
**specifically** 15:16 16:4,12 17:8 64:2 80:15 85:11 90:23 137:9
**specified** 80:5
**speculation** 23:21 34:15 35:3 42:15 45:3 63:8 68:1 127:1 149:6
**Speculative** 139:3
**spelling** 137:10
**spend** 101:19 182:7
**spew** 138:24
**spewed** 138:18
**spoke** 28:3 92:5 117:24 127:15 146:2 164:15
**spoken** 112:20
**sprained** 134:23
**sprains** 8:24
**spreadsheet** 40:14,15 40:16 93:20
**staff** 82:1 88:10 135:1
**stair** 7:18
**stalled** 11:1
**stalling** 8:13
**stand** 129:11
**standard** 58:24
**standards** 173:25 174:10
**Stansberry** 1:11,14 3:4 4:6,13,22 5:6 14:22 40:18 57:25 58:20 66:8 95:9 101:3 102:22 108:9 109:8,11,25 110:21 115:8,10,15 117:18 117:19 132:19 146:8 147:7,10,23 148:2 152:9 155:13 161:25 185:14,20 189:4,12
**Stansberry's** 109:17 110:10 148:11
**start** 19:15,16,17 31:8 32:15,24 39:5 124:3 135:9 177:3
**started** 5:25 7:2 169:16
**starting** 27:6 38:8,8 93:1 170:18
**starts** 29:2 37:16 66:7
**state** 1:18,19 4:9 185:17,18
**stated** 1:22 61:15 117:24 124:25 175:13,17
**statement** 83:22 104:16,18 117:10 131:3
**statements** 104:12
**states** 1:1 119:22 152:25 185:1
**stating** 34:7 37:21 96:6 102:19 103:14 105:4,8
**station** 80:18,20
**status** 11:22 18:24 20:19 45:25 54:4,7 76:6 80:3,7,16 91:7 92:8 136:8,10 145:14 152:20
**statutory** 8:21
**stay** 28:22 29:1 30:5 37:15
**stayed** 169:14
**stays** 171:16
**stems** 171:24
**stenographic** 1:18 4:4
**step** 49:4 97:7,8 98:4 98:5 99:20,25 133:5 137:8
**Stephanie** 41:15,17 43:14 69:7 126:23
**stepped** 30:9,10,17
**stepping** 117:13
**steps** 136:5,9 137:21 162:14
**step-one** 100:20
**sticker** 53:12
**stickers** 139:13
**stimulator** 30:4
**stint** 9:21
**stop** 76:18 123:8 124:14 169:24
**stopped** 66:6 117:9
**story** 13:21
**storyline** 6:22
**straight** 30:19 44:23
**strains** 8:24
**strange** 164:6
**Strangely** 145:24
**strength** 174:18
**strictly** 22:23
**strives** 81:8
**Stroup** 153:9
**struggling** 7:21
**subject** 90:15 98:11 103:3
**submission** 99:1
**submit** 56:6 71:8 80:1 99:5 159:2
**submitted** 32:21 93:15 96:5 103:14 105:3,7 154:15 159:6
**submitter** 158:20 161:4
**subpoenaed** 18:7
**subscribed** 189:15
**subsequent** 54:5
**substance** 189:8
**successfully** 134:22
**succinct** 14:21
**sucks** 66:21
**sudden** 155:16
**suffered** 118:20
**suggest** 62:20
**summary** 157:11
**Sunday** 29:18
**sup** 31:15
**supervisor** 11:6 19:10 19:12,13 21:17,19 25:19 26:4 31:11,15 32:11 33:2,3,8,17 40:20 41:1,2,10 45:12 46:3 48:11,12 48:13,17 54:2,20 55:7,12,23 56:6,15 56:16 58:19 64:6 68:3,18 69:2,2,18 77:9,17,21 86:8 87:8 88:9 89:18,22 93:20 93:24,25 94:4,7,9,13 94:16 95:4,18 103:5 103:7,8 108:11,13 109:8,17,25 110:21 115:9,10 117:12,17 121:24 123:3,4 132:18 133:20 148:1 148:3 152:9 155:13 156:6,23 157:3,7,8 157:15,17 158:20 159:2 161:4
**supervisors** 95:13
**supervisory** 109:14 110:2
**supervisor's** 40:17 93:14 95:8 143:19
**support** 103:2 110:6 174:13
**supporting** 174:9,23
**supposed** 30:15 32:12 57:8 95:6 115:17 138:23 165:18
**sure** 5:21 6:2 11:2 23:17 40:9 48:1 51:13,19 53:8 57:17 66:17 67:7 81:2 85:6 106:24 111:9 113:25 114:3,11 140:14 171:7 173:1 176:7 176:25
**surgeon** 9:4 25:3
**surgery** 9:8,9 15:24 24:22 25:10 26:17 27:15,25 28:9 30:18 54:19 94:23 118:25 125:2,8,9
**surveillance** 126:5
**Susan** 26:16 144:2 147:12,13 149:1 150:6,13 151:14
**suspended** 152:2
**sustained** 7:7
**swear** 4:10,15
**swelling** 54:19
**switch** 67:15
**switched** 8:17 179:23
**swollen** 67:21 125:2 149:18
**sworn** 1:15 4:19,23 108:9 109:15 110:10 185:20
**sympathize** 121:9
**system** 10:14 31:12 55:5,14 99:6 109:10 109:22 120:8 130:20 131:18,20 173:23 174:6 177:7

**T**

**T** 3:11 5:1
**table** 79:12
**tags** 58:13
**take** 33:10 35:22 51:15 73:22 90:10 97:10 111:11 114:14 118:22 136:12
**taken** 1:16 14:6 102:15 141:13 150:8 162:14 186:2 187:3
**takes** 71:9 150:17
**talk** 26:2 31:23 57:3 62:4,24 138:9 165:24 166:4
**talked** 26:10 27:18 121:18 168:24
**talking** 16:13,14 40:22 42:19 65:2 74:18,20 74:20 89:2 107:7 112:18 145:11 146:7 155:11 164:1
**talks** 56:8 118:3
**Tammy** 11:5,8 14:6 16:6 18:5 22:8,10,16 29:7 57:9 61:5,5,18 62:1,3,6,13,19,23 65:9,16 82:15 88:23 89:3,13 113:2,3,4 116:15 133:11 134:11 161:18
**Tammy's** 133:12
**target** 168:16
**targeted** 34:18
**targeting** 135:22
**task** 80:20
**taught** 41:19
**team** 10:11 24:20,21 26:1 29:22 32:25 79:22 80:4,6,14,25 104:16,18 109:1 150:25 151:6 161:21 170:19
**tell** 4:15 12:21 28:8 35:24 41:19 50:25 71:19 105:23,24 113:15 119:2 122:18 155:20 161:7 175:12
**telling** 22:8 24:1 31:20 32:24 34:21 47:24 67:24 72:11 116:14 133:12 175:13 176:5 178:16
**tells** 27:17

**template** 49:18
**temporary** 118:19,22 125:17
**ten** 71:1,15 84:18
**tendon** 9:13
**tenure** 77:23
**tenured** 173:4
**term** 28:2 34:11 37:25 41:24 42:3,5,8,13 50:21 73:18,19 74:4 107:3 124:9,10 131:6 134:2 141:16 141:17
**termed** 132:25 134:20
**terminate** 24:3 38:16 59:3 72:4,8 73:9 76:14 106:19 109:20 151:23 160:25 162:8 163:4
**terminated** 17:15 22:21 27:5 51:2 56:18 61:13 73:1,11 75:7,11,23 76:6 98:9 98:18 115:2,14 116:17 120:1,7 121:8 132:13,22 133:14 135:3 141:25 143:7 146:11 149:4 153:13 154:13 156:25 159:9 160:9 163:8
**termination** 13:18 17:1 18:14 32:16 51:8 57:24 58:5,22 60:11 68:11 73:3,8 74:10 97:7,25 98:12 98:16,24 99:17 102:17 107:17 109:3 109:18 110:3,6,19 110:22 111:21 134:5 138:5,12 142:23 144:5 148:4 150:20 150:20 152:18 154:7 156:7,13,19 160:18 162:17 167:6
**terminations** 59:17,24 60:1,5,15
**terminology** 82:25 84:5
**terms** 98:19 136:13
**Terri** 56:11
**test** 89:8
**tester** 168:10
**testi** 101:14
**testified** 4:23 120:20
**testify** 47:20 161:13
**testifying** 101:8 148:6 161:10
**testimony** 12:6,8 59:22 63:19 65:14 73:25 77:1 102:24 106:20,23,25 108:2 136:15 185:22 186:2
**testing** 29:16 80:23 82:11,20
**Texas** 1:1,19,19,24 2:19 130:17,18 185:2,18,18 187:22
**text** 113:8,10
**texting** 165:5
**thank** 35:13 45:24 53:16 71:23 89:4 138:8 151:8 183:16
**thanks** 28:15,24 29:2 37:13,16 50:4,10 137:4
**that'd** 51:16
**therapy** 9:11
**thing** 24:16 30:9 40:7 50:9 53:6 102:5 120:4 123:14 141:11 143:5 144:3 145:12 148:17,19 160:11 161:6 164:13 167:25 170:1,4 171:23 174:8 175:1 181:1 181:16
**things** 40:9 49:21 74:24 82:15 114:5 114:10 155:22 169:4 169:5 170:1 180:20
**think** 9:24 10:18 21:2 32:1 33:11 35:10 37:2 68:12 69:9,17 72:8,10 76:16 82:24 86:6 94:12 113:23 119:20 121:1 122:4 122:5 123:21 138:2 139:5,6 143:12 148:10 151:12 158:22 161:17 166:12 168:16 171:14 172:5,21 173:9 176:20 179:14 179:23 180:3 182:2 183:14
**thinking** 139:4
**third** 91:14 177:4
**third-party** 8:17 54:8
**this'll** 37:9 95:19 164:8
**thought** 24:23 141:4 166:5 179:17
**thread** 3:13,13,14,14 3:15,15 34:4,18 35:23 37:9,10 38:22 43:18 46:17 62:3,7 63:2,4,16 64:12,13 64:16 65:10 66:6,7 164:14
**threatening** 14:10 16:8
**three** 8:9 13:9 15:5,12 15:24 27:6,22 28:20 30:6 31:21 58:7 67:2 72:11 74:3 75:19 81:19 89:6 91:10 98:20 104:7 107:24 121:7 131:4 136:11 141:10 142:4 143:15 155:6 172:23 177:9
**threesome** 64:13
**three-year** 9:16 13:15 22:24 24:14 38:15 44:20 60:5,10,15 61:8 89:10,16 108:4 111:22 120:1 121:11 134:20 135:23 136:17 176:23 178:5 178:8
**tied** 107:16
**time** 4:3 7:9,13 8:12 8:14 10:22 11:15 19:8,10 20:10 21:12 21:13,23 24:15 25:2 38:18 40:21 45:12 47:5 49:16 54:2 70:9 71:6 75:10,23 77:11 78:20 83:18 84:6,6,8 87:5 88:13,20 90:20 93:9 101:19 102:16 110:11 112:2 123:5 123:5 124:3,4 125:17 129:25 130:5 130:7,11,25 131:3 135:2,7,11 136:6 138:2 142:15 143:22 151:6 158:18 159:11 160:6,10 162:22,22 169:21 171:10,20 176:25 177:8 180:4 182:7 183:17,20 186:2,4,4
**times** 27:23 49:2 69:12 84:17 94:7 135:18 150:9 162:11
**timing** 66:20 67:5
**tired** 119:4
**title** 19:6 23:13,14 77:7,8,13,16 109:14 109:21,25 110:2,4,7 110:11,17,24 144:19 147:19 155:12,16,17 155:22,25 156:13,25 157:3,12 161:8
**titles** 109:12 155:19
**TK** 41:20
**today** 5:4,9,15 6:11,15 50:20 58:5 83:22 113:24 135:7,11 136:15 180:4,10,15 180:16 183:3
**today's** 183:23
**told** 9:24 11:14 23:4 23:25 25:2,3 27:12 27:25 28:3 31:10,17 45:1 55:19 57:6 61:5 66:6,17 88:25 99:15 100:9 145:22 168:13 175:16 183:5,7,10
**tonight** 67:9 159:6
**tooth** 96:22
**top** 40:13 48:5 54:12 122:11 142:6 143:18 147:8,22 148:11 150:4 164:23 165:19
**Torre** 101:5 119:9 120:20
**Total** 123:25
**totally** 13:19
**touch** 32:13 84:22 92:11
**town** 62:4,24
**TQ** 41:20 56:13
**track** 19:1 68:22
**tracker** 68:23,24
**trade** 83:1,6
**traded** 135:6 137:23
**trades** 83:8,9
**trainer** 41:16,21 69:6 125:18,19
**training** 7:17 17:16 23:19 24:2,24 26:1,3 28:10 29:12,14,14 29:19,24 30:3 32:1 32:24 34:1,6,8 37:19 37:21 38:8,23 40:23 41:4,21 42:4,5 43:20 44:4 60:21,24 61:4 69:6,15 76:4 80:23 82:19 89:15 90:6,11 90:11,13 94:25 95:1 96:10,19,24 103:17 105:11,19 117:14,20 124:12,19 126:8,14 126:22,24 127:11 130:3 131:3 134:23 134:24 135:1 139:12 145:21 146:10 151:17,18,18 154:16 154:17 168:16 175:11
**transcript** 185:21,24
**transcription** 189:6
**transferred** 27:23
**transition** 79:21
**traveling** 96:23
**tray** 110:18
**treating** 7:23 10:4 56:3 80:2 90:25 178:6
**treatment** 8:22 9:3 10:16 54:20 120:2 168:18 177:8
**treatments** 8:13 180:1
**treats** 175:2
**trend** 172:11
**tried** 66:2 82:18
**tries** 96:18
**triggered** 155:9
**trip** 22:25 34:6,11 37:20,24 43:20 44:4 44:10,16 57:12 74:6 74:11 82:23,25 83:4 83:5,8,9,14,17,23,24 84:7,11,20,24 85:2 96:11 103:18 105:13 105:20 117:21 121:19 131:5 135:2 141:9 143:14 154:18 155:6 165:20
**tripping** 181:6
**trips** 32:3 38:12 66:21 67:6 82:21 137:23 141:10 143:15 146:13 147:1 151:19 155:6 171:4 172:17
**true** 61:4 102:13 103:1 104:12 147:13,16 185:21
**trust** 175:19
**truth** 4:15,16,16
**try** 14:21 25:5 27:4 34:22 40:1 107:13
**trying** 5:4 6:21 12:10 12:22 15:20,22 21:2 21:6 27:11 31:9 38:17 50:25 62:14 66:13 72:19 82:6,13 101:12,13 106:10 114:1,2 141:10 145:19 148:22 166:17,20
**TSA** 90:10
**tumor** 9:4
**Turbulence** 124:8

**turbulence-related** 7:8 124:11
**turn** 19:4
**turnaround** 172:19
**turned** 19:1,3 132:14
**turns** 146:10
**TW** 130:15
**two** 17:19 19:7,7,11 40:5 42:18 43:17 49:21 52:21 61:2 74:8,24 87:20 91:16 142:4 146:22 147:3 149:4 150:11 172:13
**twosome** 64:13
**TX** 2:6,14
**typical** 71:13
**typically** 18:25 130:8
**typo** 61:15
**T.G** 29:6 55:20 67:3 88:21 89:2

**U**

**UA** 147:9
**UAL** 100:2,3,8
**uh-huh** 6:25 61:24 70:5,20 72:5 79:18 79:19 83:3 108:20 111:2 122:9,23 123:9 124:6,15 125:24 127:24 128:23 129:8,15,20 131:10 132:2 133:1 142:13,21 151:11 156:4,8 158:11
**umber** 32:9
**unable** 87:25 100:23 133:9
**unacceptable** 174:11
**unavailable** 88:15
**unaware** 104:6 106:12 107:20,23 108:3 137:20
**unclear** 100:11
**underneath** 92:21 124:9 144:9
**understand** 5:19,24 69:5 75:17 78:14 89:5 99:14,22 114:2 114:3,3 121:9 150:15 151:23 161:22 170:24 173:1
**understanding** 31:16 61:6 98:3 99:19
**understood** 136:4
**undue** 87:18
**unfortunately** 100:21 133:7 135:1,15
**unilateral** 59:20
**unilaterally** 8:8
**unintelligible** 122:16
**union** 16:7 22:8 75:4 95:10 97:10 102:15 102:19 107:9 119:7 120:17,21 133:16,18 135:21
**unique** 71:1 133:17 134:21 135:15
**United** 1:1,6 4:7,12 8:7 8:16 10:6,8 17:7 18:3 31:8 58:12,15 63:17 65:23 73:21 77:23 81:7,13 82:18 85:18,24 97:4 99:6 99:12 103:2,4,5,24 108:10 115:16 118:8 118:9,10,18 146:24 147:25 152:20 153:9 154:12 165:16 166:17 167:10,10 172:10 173:5,14 174:3,8 175:2 176:15 185:1,8
**United's** 7:11 10:9 47:18 77:25 85:13 88:7 90:24 97:23 102:12 174:21
**unnecessary** 174:12
**unpaid** 141:1
**unsafe** 176:13
**unsure** 117:20
**update** 29:20
**updated** 80:24 82:12 92:13
**upload** 55:14
**up-to-date** 81:2
**urgent** 173:16
**use** 53:24 109:14 110:2 129:22 144:21 170:20,21 176:13
**User** 152:8
**usual** 71:5
**usually** 59:2 131:22 135:25 141:13 164:8
**utilize** 81:22
**U.S** 81:1

**V**

**v** 1:5 4:7 145:3,5 146:1 146:2 147:6 185:7
**vacation** 26:3 56:16
**validity** 125:23 126:1
**Varner** 10:4,7 11:19
**Velazquez** 33:11
**Velez** 33:12 54:3,23 56:14 95:4 133:23 143:20 144:13 149:2 149:14 150:18
**verbatim** 105:22 106:25
**verbiage** 83:16
**verification** 153:3
**verified** 61:6
**verify** 76:6
**versus** 6:9 61:16 121:19 153:9
**video** 126:5,9
**view** 110:9
**Vincent** 145:25
**violate** 136:13 162:13
**violated** 162:14
**violation** 38:14 39:8 46:23 49:12 78:21 78:23
**visit** 54:6 92:6
**vocal** 168:17
**voice** 165:17
**voicemail** 25:22 67:1 117:19
**voicemails** 31:21 117:24 167:11
**voluntary** 81:23
**volunteered** 30:12
**VSLs** 87:20

**W**

**wages** 124:11,12,16 124:17
**wagons** 38:25
**wait** 52:7 107:13 127:17 164:3
**waiting** 11:21 13:24 26:8 30:11 92:7,10 125:20
**waive** 5:9
**walk** 9:12 25:1 67:17 119:3 168:12
**walked** 14:3,6 31:2
**walking** 7:18 181:6
**Wallace** 164:16
**wanna** 19:16 59:16 159:22 160:17 170:20 173:8 179:8 179:8
**want** 5:20 6:6 7:5 14:20 16:21 24:7 28:11 45:15 50:21 53:11 62:5,18,25 95:21,24 100:5 111:11 151:8 157:18 157:24 158:8 162:21 168:21 170:7 177:13 178:20 180:5 182:7 183:18,23
**wanted** 11:2 67:6,19 165:3
**wanting** 72:7 172:10
**wants** 174:12
**warning** 133:16,18
**warrant** 169:23
**wasn't** 9:24 10:1 35:5 48:22 56:15 72:24 74:5,9 83:10 87:21 95:17 123:25 144:14
**wasting** 162:22
**watching** 138:25
**water** 138:18,24
**waving** 107:17
**way** 10:17 14:19 24:4 26:25 36:14,15 53:14 73:21,22 74:13 82:5 88:13 94:13 114:1,7,15 130:6 134:14 135:24 138:24 142:2 144:8 144:12 145:15 146:4 158:21 176:22
**wear** 11:10,17 92:20 168:10
**website** 174:23
**Wednesday** 67:17
**week** 26:8 46:16 56:16 57:1 71:14
**weekend** 134:18 165:2
**weeks** 149:4
**well's** 78:12
**well-known** 17:1
**went** 13:21,23 21:13 25:11 30:8 44:15 94:17,18 95:11 96:19 102:18 115:16 131:18 147:10 153:19 155:1 182:19 182:24
**weren't** 42:18 162:14
**we'll** 16:16 46:16 127:7 166:20
**we're** 7:11 31:10 48:24 51:21 52:23 53:17 65:24 79:7 80:9 81:17 101:14,19 111:14 132:9 138:19 140:4,7 141:13 146:7 148:20 157:20 161:5,24 162:21 164:1 166:21 175:25 180:18 184:2
**we've** 25:4 113:12 119:25 136:2 141:17 162:10 168:23
**what-if** 74:16
**Wheeling** 14:2 58:1
**whichever** 93:16
**whistleblowing** 10:19
**Whitaker** 60:14 115:18 138:15
**WI** 188:21
**withdraw** 5:7
**withdrawn** 98:5,7 99:21 100:3
**withdraws** 133:16,18
**withheld** 74:15,21 75:2
**withhold** 46:14 49:22
**withholding** 74:17
**witness** 1:15 3:7 4:10 4:18,19 17:5 26:22 35:17 36:5,7,19 42:24 48:7 52:16 53:11,16 71:25 76:9 84:3 85:10 142:3,11 142:13 160:7 166:10 167:17 169:9 180:25 185:20,22
**witnessed** 48:23 134:25
**witnesses** 18:6 41:24 125:17
**witnessing** 169:5
**WK** 141:8
**WKCP** 34:7 37:20 41:23 43:21 44:9
**WKLI** 141:20
**WKOI** 141:23 146:11
**WKSK** 140:19 144:25 155:7
**WKSP** 129:3
**WOODLANDS** 2:6
**word** 83:7 170:20,21 171:2
**wording** 104:24
**words** 59:12
**work** 7:13,14,24 9:2 10:6 11:2,20 15:25 21:14 24:14,18 33:7 34:7 45:10 48:15,15 48:16 60:25 70:25 74:8 80:16 81:14 82:7,22 85:18 86:17 86:20 91:1,2,12,25 93:5 96:7 97:3 103:15,23 105:4,8 118:12 120:9 121:6 129:7,11 130:10,21 131:4 132:3 136:3,5

137:7,10 138:1 141:19,20,24 143:10 143:25 145:2,4 148:25 149:16 151:24 154:11 164:8 164:17,17,17,18 171:18 175:6 176:6 176:13
**worked** 10:2 20:19 21:11 24:24 119:7,8 146:3
**worker** 55:22 81:25 88:10 140:21
**workers** 9:1 10:17,21 34:10 37:23 43:23 44:5 45:1,6,7 54:8 54:14 55:16 84:23 87:11 92:8 106:6 129:12,12,14 130:17 137:18 140:22 141:17,18,21 142:18 142:24 147:25 157:15 168:19 175:2 176:15 177:6
**worker's** 53:25 140:20
**working** 19:23 20:21 61:22 77:14,15 81:7 82:1 88:1 125:21 174:25 175:9
**workplace** 173:22
**works** 85:24 135:12 140:14
**worn** 92:19
**worry** 113:19
**wouldn't** 8:5 51:1 64:7 64:24 76:16 79:2 128:10,13 130:4,5 134:12 137:25 182:5
**would've** 13:9 67:23 122:20
**Wow** 14:4
**wrap** 76:12
**write** 31:5 38:2,3 50:23 58:4,22 60:7 73:7 104:15 105:23 115:13 119:25 153:18 160:12 167:2
**writes** 27:3,17,21 28:14,23 33:25 34:3 37:18 41:15 44:2,11 44:14 46:13,21 49:14 50:18 60:19 61:3,18 62:2,3,23 89:3 100:19 101:4 133:15 134:17 135:13 138:13
**writing** 13:18 26:15
57:10 61:10,16 73:3 73:8 107:17 109:3 128:22 133:3 134:12
**written** 34:13 39:21 94:6 146:4 153:2
**wrong** 35:21 61:9,16 105:12
**wrongfully** 115:14 119:25
**wrote** 15:15 22:21 31:7 42:17 43:12,13 66:5,8,24 68:11 88:23 94:1 104:16 104:18 111:25 115:6 117:10 150:1 155:24 167:4,7
**W-K-C-P** 44:5

**X**

**X** 3:11 5:1
**x-ray** 67:17,19,21

**Y**

**Yay** 24:23
**yeah** 6:13 21:1 23:16 23:23 24:9,11 26:23 33:13 36:3,14 42:16 42:24 55:8,8 71:13 71:14 76:24 82:23 83:14 84:3 93:1,24 100:17 106:10 110:15 113:10,15,21 116:4 124:24 128:2 129:23 130:4 131:12 132:9 134:8 139:11 140:3,6 141:6 142:11 147:13 150:15 154:5 160:4 169:9,20 172:17 178:3 180:19 181:22
**year** 20:2 81:19 87:21 88:24 112:14 182:21
**years** 6:2,22 8:9 13:5 14:5 15:21,24 17:1,1 17:9 18:3 20:22 21:2 22:20 28:11,20 30:6 58:7 74:3 75:19 84:18 85:6 89:6 91:10 98:21 104:7 107:24 116:1 119:21 121:7 122:24 131:4 136:11 155:20 161:12 169:1,15,15 172:13,24 177:9
**Yep** 162:2
**yesterday** 67:20
**York** 2:21,21 187:20
187:20
**younger** 172:10,12
**you-all** 116:25 121:22 125:7,10 151:21 182:1
**y'all** 171:3

**$**

**$100** 58:13
**$50** 58:14,15

**#**

**#714** 1:24 2:19 187:22

**0**

**0** 128:2 129:2 186:8,8
**0046** 55:9
**06:44** 124:4
**0734** 143:13

**1**

**1** 3:12 7:3,4 12:8 58:6 153:1 154:14 164:10
**1B** 38:15
**1Ladyfinger@gmail....** 2:8
**1st** 13:25 56:18,21 95:16 132:16 133:11 134:10,13,17 135:14 138:11 144:2 152:2
**1-800-825-3341** 1:25 2:22 187:21
**1-800-825-9055** 188:15
**1/1/2015** 93:21
**1/18-19** 92:9
**1/21/19** 92:4
**1:45** 54:16
**10** 3:17 32:11 79:25 93:10,11 97:2 102:8
**10th** 89:3
**10/1/18** 124:3
**10/12/13** 93:21
**10/13/84** 122:24
**10:00** 156:24
**10:01** 27:4
**10:23** 112:1 156:24
**10:34** 134:17
**10:37** 144:3
**10:57** 61:19
**10011** 2:21 187:20
**11** 3:18 95:19,20 102:9 117:7,8
**11:35** 62:1
**11:52** 27:20
**11:53** 134:15 135:13
**12** 3:19 99:11 124:2
132:5,7,10,11 150:19
**12th** 144:14
**12-hour** 145:19
**12:00** 144:1
**12:02** 138:9,13
**12:07** 138:17
**12:14** 50:18
**12:17** 66:24
**12:24** 28:14
**12:30** 66:25 67:13
**12:31** 164:15
**12:40** 50:23 158:25 159:11 163:10
**12:54** 1:17 4:3
**12:57** 28:23 34:2 37:12
**124-1** 145:10
**13** 3:20 134:7,9 140:4
**13th** 187:5
**132** 3:19
**1322** 54:13
**134** 3:20
**14** 3:21 123:21 140:4,7 140:11,17 150:20
**140** 3:21,22
**147** 94:24
**15** 3:22 20:22 21:2 69:11 79:15 115:6 139:23 140:7,11
**15E** 38:14 58:6 102:12 152:25 154:14
**15th** 11:19 79:17 115:7
**15(e)(1)** 98:19
**15(e)(2)** 97:4 103:24
**159** 167:2
**16** 3:12,23 163:22 167:16,17,22 172:3
**16th** 29:15,21,25 31:6 54:15 70:24 144:25 145:5
**163** 3:23
**17** 3:24 168:5,6,6 172:4,5,8 176:21
**17th** 25:14 29:14 31:7 105:12,20 117:15
**171** 145:15
**172** 3:24
**174-88** 145:10
**18** 92:6 94:24 102:23
**18th** 90:19 96:14 103:20 105:15
**18-1** 102:1
**185** 3:6
**187** 3:7
**19** 32:1 124:7 142:7
**19th** 89:23 90:15
**1984** 20:3

**2**

**2** 3:3,12 16:16,17 58:6 102:1 153:1 154:14
**2L** 30:10
**2nd** 25:13 27:6,24 29:14 102:2 104:13 137:4 148:17 158:24 159:11 163:10
**2.0** 130:21
**2/1/2019** 94:16
**2/15/17** 79:22
**2:24** 51:22,23
**2:38** 51:25
**2:39** 52:24,25
**2:40** 53:2
**20-plus** 14:5
**200** 146:7
**2000** 123:21
**2009** 94:13 95:2
**2011** 21:14 103:7 109:9
**2013** 94:9
**2014** 7:9 15:22 38:10 94:10 123:24 124:23 168:8
**2015** 94:9 95:2 173:10
**2016** 7:13 8:7,20 9:22 15:23 22:4 81:15 96:5 103:13 105:1 154:10 168:9
**2017** 9:8,24 79:15,25 168:11,11
**2018** 9:20 10:4,9 81:5 81:21
**2018-2019** 182:22
**2019** 6:1 9:18 10:13 11:5 15:25 22:4,5 45:20 68:24 78:11 90:2 94:20 95:2 96:5 96:8,10,14 99:11 103:13,16,17,19,20 105:7,9,14,15 109:9 109:24 113:14 116:14 144:2,6,14 146:25 157:5
**2021** 95:23 104:13 157:9
**2021's** 108:8
**2024** 167:1
**2026** 1:12,17 4:4 185:15 187:6 189:16
**21st** 10:9
**22nd** 10:4 66:13,24 67:13 159:15 167:1
**23E** 98:23

**23rd** 11:21 24:17 90:2 96:8 103:16 105:5,9 168:9
**23(e)(2)** 99:3,4
**2369** 149:9
**24** 32:13 69:14 71:14 80:17
**2404** 129:3
**25** 85:6 169:1,15
**25th** 95:23 102:3 145:16
**26** 3:13 9:17 10:13 96:5,12 103:13 105:1 141:14
**26th** 24:19 31:25 32:6 32:14 71:1 141:7,20 141:23,24 142:9 145:1,18
**26th-27th** 103:19
**26-27** 105:14 117:22
**27** 96:12
**27th** 32:15 34:2 37:18 50:17 56:18 141:7 158:16 159:15,16,23
**28** 14:11 109:9 124:5 128:1 157:21
**28th** 27:3 37:18 50:16 109:24 141:8 144:5 145:2
**281)553-2772** 54:3
**29** 141:14
**29th** 24:15,18 61:19 74:9 141:8 143:14 154:10

**3**

**3** 3:13 26:12,13 35:17 37:1 91:25 104:25 117:12 123:5 131:11 144:10 148:12,14,24 157:21
**3rd** 7:8 9:8 94:10 96:10 103:17 168:8
**3/06/14** 124:22
**3/5/19** 124:22
**3:44** 23:25 37:19 38:3 43:13
**3:44:49** 34:3
**3:45** 43:19 44:3,12 50:17
**30** 1:12,17 4:4 11:24 24:16 33:5 119:21 185:15 188:9
**30th** 141:8
**30(f)(1)** 185:23
**31st** 81:4,20 86:21
**34** 143:13
**35** 28:11 122:24 169:15
**35-year** 73:11 114:14 138:25
**350** 36:15
**36** 3:13
**3968235** 124:1

**4**

**4** 3:13 35:9,18,20,20 36:2,7,8,10 91:25 105:6 118:3 158:22 167:2 186:6
**4th** 8:20
**4/5/19** 91:11
**4/5/2019** 92:12
**4:12** 111:14,16
**4:20-cv-04205** 1:5 185:7
**4:22** 38:2 43:13 72:24 73:3,9
**4:30** 44:13 46:13
**4:33** 111:18
**4:35** 49:22
**4:40** 46:20 49:13,24 50:14
**4:43** 49:14
**4:45** 41:14 43:14,18 46:13
**4:50** 49:17 137:4
**40** 102:1 156:24
**41** 124:22
**42** 98:22 100:5
**43** 3:14
**4360** 62:22
**4363** 62:22
**4372** 62:21
**4415** 57:25
**4421** 33:20
**4424** 54:13
**4425** 36:25 71:19
**4428** 158:2
**443** 158:3
**4431** 158:17
**4432** 158:17
**4433** 158:3
**4434** 158:3
**4444** 157:21 158:1,2,3 158:4
**4449** 157:21 158:2,4
**4453** 39:9
**4461** 159:21
**4462** 158:24 159:15,20
**449(c)** 39:18
**45** 39:4 41:13 42:20 106:18
**47** 2:5 31:18 166:17
**48** 80:21 161:20
**48-hour** 46:15,25 47:10,16,18 48:6,18 49:1,4,7,23 74:18,20 74:23 162:15
**4929** 143:8
**4974** 156:9
**4977** 94:2

**5**

**5** 3:5,14 43:6,9 50:17 52:4,5,12,13,16 53:3 53:4,10,13 71:25 122:5 132:8 142:5
**5th** 24:16 27:10 92:12 96:5 103:13,17 105:3,7,12,19
**5/23** 24:17 92:14 148:12
**5/23/19** 38:6 89:18 91:13,22 154:16
**5/23/2019** 94:16
**5/25** 165:14
**5/25/19** 34:12 37:25 38:5
**5/26** 165:14
**5/26/16** 154:9
**5/26/19** 91:11 165:1
**5/27** 142:20
**5/28** 33:20 34:1
**5:00** 50:15
**5:02** 50:1
**5:23** 57:23 60:7 73:3 73:10 156:20
**5:30** 50:17
**5:45** 50:3
**51** 3:14
**52** 3:15
**530** 62:22
**5300** 62:22
**5308** 62:12
**5311** 62:19
**5390** 62:22
**53965412** 167:10
**5408** 164:21
**5409** 164:24
**5410** 165:7
**5411** 165:14
**5413** 144:17
**542** 188:20
**5465** 146:18
**54853** 188:21
**5626** 93:14 95:5
**57** 3:15 186:6
**5709** 160:14
**5747** 93:15 95:6
**58** 94:24

**6**

**6** 3:14 8:24 32:7 38:8 51:9,10,20 53:3,4 67:9 96:3 98:14 104:24 119:1 145:16 145:18
**6/16** 131:9
**6/16/19** 123:5
**6/17/19** 154:17
**6/2/19** 154:16
**6/2/2019** 38:8
**6/20** 124:5
**6/22** 131:24
**6/22/19** 54:16 123:6 131:17
**6/24** 53:18 148:12,13
**6/25/19** 124:10
**6/26** 34:10 37:23 44:9 131:24 142:23 143:10 144:11 146:11 148:14
**6/26/19** 38:12 124:3
**6/27** 72:24 73:1 116:17
**6/28** 34:10,10 37:24 44:10 60:8 124:5 142:22 149:1 152:10
**6/28/19** 127:15 144:7
**6/28/2019** 144:1 147:11
**6/29** 34:11 37:24 44:10 62:1 143:9
**6/30** 124:5
**6/8/19** 152:18
**6:04** 166:22,23
**6:10** 50:12
**6:12** 166:25
**6:18** 148:15
**6:20** 158:13
**6:28** 50:13 60:23 148:15
**6:33** 74:12
**6:35** 1:17 184:3,4
**6:44** 124:4 165:19
**6:45** 123:6 131:17
**6:48** 144:12
**6:55** 32:7
**60** 33:5 115:6,7
**61** 159:21
**62** 159:18
**639** 2:13
**64.50** 129:3

**7**

**7** 3:12,15 52:2,3 53:9 58:15 69:25 91:8
**7th** 92:22 146:25
**7/1** 54:11 149:1 152:11
**7/1/2019** 148:10
**7/10** 132:16
**7/12** 133:3 149:15
**7/12/2019** 149:2
**7/19** 133:15
**7/19/2019** 150:11
**7/2/2019** 146:9
**7/4** 151:7 155:25
**7/6** 143:6
**7:37** 144:14
**7:43** 53:19
**7:58** 60:19
**74** 2:20 187:19
**75** 66:9
**77007** 2:14
**77380** 2:6
**79** 3:16

**8**

**8** 3:15 57:21,22 79:7,9 96:9 105:10 106:13
**8th** 138:8
**8/13** 91:18
**8/19** 141:16,17,19 142:6 143:2
**8/3/14** 91:18 164:10
**8/7/2019** 147:5
**8:04** 60:23,24 156:22
**8:13** 61:14
**8:17** 61:2
**8:59** 158:16 159:16
**80** 57:14 94:7
**832)656-6999** 2:7
**832)723-4776** 2:15
**835** 124:1
**84** 19:18,18 20:4
**847-700-9533** 54:6
**86** 20:5,6,7
**88** 25:6

**9**

**9** 3:16 79:9,10,11,13 99:1 105:15 106:12 107:20
**9/1** 103:7
**9/1/2011** 108:12
**9/26/16** 152:20
**9:15** 159:16
**90** 13:14 33:5
**90s** 20:8,9
**93** 3:17
**95** 3:18